# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

---

## MICHAEL S. WORTHINGTON,

### Petitioner,

---

### v.

## DONALD L. ROPER,

### Respondent.

### Case No.   4:05CV01102 (CAS)

---

## PETITION FOR A WRIT OF HABEAS CORPUS

**KENT E. GIPSON #34524**
**Attorney At Law**
**305 E. 63rd Street**
**Kansas City, MO  64113**
**816/363-2795 • fax 816/363-2799**

**GINO F. BATTISTI  #2586**
**Foley & Mansfield, P.L.L.P.**
**1001 Highlands Plaza DriveWest**
**Suite 400**
**St. Louis, Missouri   63110**
**314/645-7788 • fax 314/645-9945**

**Counsel for Petitioner**

# TABLE OF CONTENTS

PAGE

**LIST OF EXHIBITS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

**I. Introduction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**II. Procedural History** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**III. Petition For A Writ of Habeas Corpus** . . . . . . . . . . . . . . . . . . . . . . 14

## Claim No. 1

Worthington was denied his Sixth and Fourteenth Amendment rights to effective assistance of counsel because his attorneys failed to conduct an adequate investigation and present available evidence regarding Worthington's background and social and medical history, which would have provided petitioner a viable guilt phase defense of diminished capacity and provided compelling mitigating evidence at the sentencing phase of trial. Had this evidence been discovered and presented, petitioner would not have pleaded guilty and there is a reasonable probability that the outcome would have been different in both the guilt and penalty phases of trial.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

A. Failure to adequately investigate social history and provide it to experts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

B. Failure to provide social history to Dr. Evans . . . . . . . . . . . . . . . . 28

C. Failure to request funds to perform a proper investigation . . . . . . . 31

D. Failure to present testimony from Worthington's parents . . . . . . . 35

E. Legal Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

## Claim No. 2

Worthington was denied his Sixth, Eighth and Fourteenth Amendment rights to the effective assistance of counsel because his attorneys failed to investigate and present available evidence to rebut the state's aggravating evidence and failed to raise meritorious objections to the admission of other bad acts evidence, which adversely impacted the result of the penalty phase. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

A.    Failure to object to nondisclosure of penalty phase witness Peroti and failure to investigate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

B.    Failure to investigate and object to lack of notice of non-statutory aggravators involving jail misconduct and prior bad acts . . . . . . . . 53

C.    Failure to rebut evidence Worthington set Butch Mackey on fire . . 61

## Claim No. 3

Petitioner's death sentence was imposed in violation of his rights secured by the Eighth and Fourteenth Amendments because it was imposed based upon the perjured penalty phase testimony of Charlotte Peroti and because the state failed to disclose material exculpatory evidence in its possession that would have destroyed her credibility. . . . . . . . . . . . . . . 65

## Claim No. 4

Petitioner was denied a fair and impartial sentencing judge and a fair sentencing trial in violation of his Sixth, Eighth and Fourteenth Amendment rights due to the improper injection of political influences into the sentencing decision involving the fact that both the prosecutor and sentencing judge were in heated contests for re-election at the time petitioner's case was heard, and the prosecutor made improper media contacts to exert political pressure upon Judge Nichols to impose death and received political contributions from the victim's family, and because the victim's family and friends waged a secret letter writing campaign to

the sentencing judge that was never disclosed to defense counsel. Trial counsel was also ineffective in failing to move to disqualify Judge Nichols. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

A.     Prosecutor Braun's and the victim's family's public statements . . . 71

B.     Secret Letter Writing Campaign . . . . . . . . . . . . . . . . . . . . . . . . . 75

C.     Judge Nichol's representation of Anthony Hansen . . . . . . . . . . . 76

## Claim No. 5

Petitioner was denied his right to counsel and right to be protected against self-incrimination guaranteed by the Fifth, Sixth and Fourteenth Amendments by the prosecution's use during the penalty phase of the testimony of Dr. Max Givon who testified regarding petitioner's dangerousness and anti-social personality disorder, despite the fact that the court-ordered mental evaluation Dr. Givon conducted was limited to issues of sanity and competence to proceed. Trial counsel was also ineffective in failing to raise Fifth and Sixth Amendment objections to Givon's testimony and in stipulating to the admission of Givon's written report. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

## Claim No. 6

Worthington was denied his Sixth, Eighth and Fourteenth Amendment rights to a fair trial and to confront his accusers by the prosecution's failure to give adequate notice of the identities of its penalty phase witnesses and the substance of their testimony regarding petitioner's prior bad acts and jail misconduct. . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

## Claim No. 7

Worthington was denied his Sixth, Eighth and Fourteenth Amendment rights by the prosecution's use of excessive and inflammatory victim impact evidence that injected passion, prejudice and arbitrariness into the proceeding, thus rendering the penalty phase fundamentally unfair. Trial

counsel was ineffective for failing to object and limit the scope of this
evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

# LIST OF EXHIBITS

1.     Dr. Evans' PCR Report

2.     Dr. Pincus Report

3.     Dr. Legan 1989 Psychological Evaluation

4.     Dr. Cowan Report

5.     Affidavit of Patricia Washburn

6.     Affidavit of Richard Worthington

7.     Affidavit of Bessie Smith

8.     Dr. Smith Report

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

MICHAEL S. WORTHINGTON,  )
           )
    Petitioner,     )
           )     Case No.  4:05CV01102 (CAS)
     v.       )
           )
DONALD L. ROPER,       )
           )
    Respondent.    )

## PETITION FOR WRIT OF HABEAS CORPUS
## BY A PRISONER IN STATE CUSTODY
## <u>UNDER A SENTENCE OF DEATH</u>

COMES NOW petitioner, Michael S. Worthington, by and through his counsel,

Kent E. Gipson and Gino F. Battisti, and pursuant to 28 U.S.C. § 2254, submits the

following Petition for Writ of Habeas Corpus by a petitioner in State Custody Under

a Sentence of Death.

Petitioner, Michael S. Worthington (hereinafter "petitioner" or "Worthington"),

is confined at Potosi Correctional Center, Missouri Division of Adult Institutions,

Route 2, Box 2222, Mineral Point, Washington County, Missouri 63660, by

Superintendent Donald L. Roper, and is being denied his liberty pursuant to an unconstitutional conviction and sentence of death.

The allegations contained in this Petition are in accordance with the model form for use and application for habeas corpus under § 2254.

## I. INTRODUCTION

On the evening of October 1, 1995, Petitioner Michael Shane Worthington was arrested in connection with the killing of Melinda Griffin in her Lake St. Louis apartment. Ms. Griffin's body was discovered earlier in the day in her bedroom, the victim of a strangulation. She had also been raped. Worthington, who was found in possession of several personal items belonging to Ms. Griffin, consistently maintained to the authorities, including the state-appointed psychiatrist, that he could not remember the details surrounding the killing since he was extremely high from the ingestion of multiple drugs and a large quantity of alcohol. Following his arrest and continuing through his plea of guilty without a plea bargain, the penalty phase of trial and sentencing, Worthington's fate was ultimately decided in a politically-charged atmosphere during the 1998 election cycle where both the sentencing judge Grace Nichols and prosecutor Tim Braun were engaged in hotly contested re-election campaigns that both of them ultimately lost.

The events surrounding Worthington's waiver of a trial by jury, his plea to first degree murder without a plea bargain and death sentence were tainted by local pressure politics. In short, the judicial system caved in to pervasive public outcries and behind-the-scenes lobbying by the prosecutor and the victim's affluent and well-connected family to give petitioner the death penalty. For example, when Judge Cundiff, the original trial judge assigned to the case, indicated to the parties that he could be receptive to imposing a sentence of life without parole in exchange for Worthington pleading guilty to first degree murder and accepting responsibility, Worthington decided to plead guilty. The Judge then received a letter from either Prosecutor Braun or a representative from the Angelbecks (Ms. Griffin's parents). As a result, an unprecedented off-the-record meeting between the Judge, the prosecuting attorney, defense counsel and the Angelbecks was arranged. Following an "intense" meeting, where the victim's parents accused Judge Cundiff of showing favoritism toward Worthington, Judge Cundiff immediately recused himself from the case. (D.A.L.F.

8).[1]  Following Judge Cundiff's recusal, Judge Grace Nichols, a jurist who was facing a tough re-election campaign, was assigned the case.  (D.A.L.F. 152).

Judge Nichols, as well as Tim Braun, the prosecuting attorney, were both running for re-election in 1998 when petitioner's trial was imminent.  Following Worthington's plea of guilty to first degree murder, Judge Nichols was bombarded with letters from the family and friends of Ms. Griffin, imploring the Judge to sentence Worthington to death.  ( P.C.R. Exh. 56).  Judge Nichols read these letters but never made their existence known to defense counsel.  (1st Supp. P.C.R. L.F. 494-96).  Meanwhile, the prosecuting attorneys' office had been making public statements, reported in the local papers, contending that the community was overwhelmingly in favor of the death penalty, and that Judge Nichols' decision in Worthington's case should reflect the sentiment of the community.  (P.C.R. Exh. 13 at 3384).  Braun's comments to the press were obviously a "not-so-veiled" threat to the sentencing judge

---

[1]  The state court record from this case, will be referenced as follows: Direct Appeal Legal File ("D.A.L.F."), Guilty Plea Transcript ("Plea Tr."), Penalty Phase Trial Transcript  ("Tr."), Rule 24.035 Postconviction Evidentiary Hearing Transcript ("P.C.R. Tr."), Rule 24.035 Postconviction Legal File ("P.C.R.  L.F.") , the Post Conviction Exhibits ("P.C.R. Exh.") and Sentencing Transcript ("S.Tr.").

that her re-election prospects would be jeopardized if she did not sentence petitioner to death.

Even though the case had been pending for three years, Mr. Braun had not actively participated in Worthington's prosecution until his 1998 re-election campaign began. Braun often stated to defense counsel and other attorneys that he was being hurt politically by the lack of publicity because of Worthington's decision to plead guilty instead of going to trial. (See D.A.L.F. 399). Judge Nichols read the public statements made to the press by the prosecutors and went so far as to state on the record that the statements "offended" her. (Hrg. D.Q. Braun 20). Following the penalty hearing but prior to sentencing, defense counsel moved to disqualify Braun based upon his politically-motivated actions in trying the case before the press. (D.A.L.F. 396-402). However, this motion was denied.

During petitioner's guilty plea, after intense coaching by counsel, Worthington "recalled" the details of the crime and pleaded guilty to first degree murder and the other charged offenses on August 28, 1998. (Plea Tr. 2-32). Worthington then waived his right to a jury during the penalty phase. (Tr. 2-6). The penalty phase, held in September 1998, was a farce. Defense counsel called only two mitigation witnesses. Carol Tegard, Worthington's aunt, briefly testified in general terms, that petitioner had a disadvantaged upbringing. (Tr. 675-696). Dr. Lee Evans, a pharmacist, testified that

Worthington's intoxication at the time of the offense affected his ability to control his behavior. (Tr. 738-776). The Court never heard available testimony from family and expert witnesses who could have explained in great detail Worthington's mental, social and psychological history. Despite knowing that Worthington suffered from a disadvantaged, abusive childhood and long-term, severe alcohol and substance abuse, defense counsel failed to investigate or present readily available evidence concerning how petitioner's background and afflictions affected his behavior and lessened his moral culpability.

Defense counsel also inexplicably stipulated to nearly every piece of aggravating evidence offered by the State against Worthington, most of which was objectionable as untrue, unreliable, irrelevant and/or inadmissible hearsay. For example, counsel stipulated to Worthington's juvenile court records, police records from other jurisdictions and records of fifty-five alleged "incidents" from the St. Charles County Jail, where Worthington was incarcerated for nearly three years awaiting trial. (P.C.R. Exh 12, 13 at 3038-3348). Jailers from the St. Charles County Jail also testified that Worthington was combative and violent. (Tr. 138-147, 188).

Despite petitioner's well-documented, life-long history of psychiatric disorders, and a history of excessive drug and alcohol abuse, Worthington's attorneys made little or no effort to explore a diminished capacity defense. Although funds were available

for an independent neuropsychological examination, Worthington was examined by court order under Chapter 552 R.S.Mo. by Dr. Max Givon, a notoriously pro-prosecution mental health expert, who worked for the State of Missouri. Dr. Givon prepared a detailed report in January 1997 and found Worthington competent to stand trial and further found that he did not suffer from any mental diseases or disorders.

The prosecution also called Dr. Givon to testify at the penalty phase. When one of Worthington's attorneys attempted to object , he learned for the first time that co-counsel Joseph Green had already stipulated to the admission of Dr. Givon's twenty-five page report. (Tr. 295). Dr. Givon proceeded to testify *against* Worthington in the penalty phase, telling the sentencing court that Mr. Worthington did not suffer from any mental disease or defects. (*Id.* 313). Dr. Givon also diagnosed Worthington as "antisocial" and accused him of "malingering" during his court-ordered competency and insanity examination. (*Id.* 315-317). Dr. Givon also testified that his conclusions were bolstered by his belief that Worthington had intentionally set his childhood friend, Butch Mackey, on fire with gasoline when they were both eleven years old. (*Id.* 310).

The prosecution also endorsed as a penalty-phase witness, a woman named Charlotte Kirn. Braun, however, knew that she also went by the name of Charlotte "Peroti", because Braun had previously prosecuted her on a felony charge for passing

a bad check and two additional charges under that name. (P.C.R. L.F. 886-887, 914). Peroti was on probation for these charges when she testified. Peroti testified during the penalty phase that the week before Ms. Griffin was killed, Worthington had broken into her home and attempted to sexually assault her–the same *modus operandi* employed in the Griffin killing. (*Id.* 100-102). Braun never disclosed the substance of Peroti's testimony, Peroti's criminal record, and plea bargain to defense counsel, which compromised petitioner's opportunity to impeach Peroti's credibility in violation of *Napue v. Illinois*, 360 U.S. 264 (1959). The prosecution also improperly bolstered Peroti's credibility when she testified falsely she worked as an undercover narcotics agent. (Tr. 744).

Numerous family members and friends of Ms. Griffin testified as victim impact witnesses who read lengthy prepared statements to the Judge. These witnesses asked the Judge to impose death. (See Tr. 509-29, 532-54, 556-68, 614-618). The day after both Nichols and Braun lost their re-election bids, Judge Nichols sentenced Worthington to death on November 4, 1998, finding two statutory aggravating factors beyond a reasonable doubt: 1) that Worthington committed the murder while engaged in the perpetration of forcible rape and burglary; and 2) that Worthington committed the murder for the purpose of monetary gain. The court also considered and weighed the non-statutory aggravating evidence of petitioner's history of prior criminal behavior

and his misbehavior in jail in reaching its sentencing decision. (Sent. Tr. 28-29; P.C.R. Exh. 15 at 3893).

A post-conviction hearing under Missouri Supreme Court Rule 24.035 was held in 2002 and 2003 before Judge Nancy Schneider, who had defeated Judge Nichols in the 1998 general election. At the hearing, it was demonstrated that trial counsel failed to conduct an adequate investigation to develop readily available mitigating evidence for the penalty phase. Counsel failed to investigate the extent of Worthington's mental disorders and his drug and alcohol addiction. Counsel was unaware that from an early age, petitioner was sexually abused by a babysitter and a neighbor, despite the fact that petitioner's history of abuse and neglect was noted in a 1989 psychiatric report, obtained by postconviction counsel, that was part of a court file from petitioner's 1989 Illinois burglary conviction. (See Pet. Exh. 3). Counsel's failure to review documents from this prior conviction and pursue additional investigation clearly constituted ineffective assistance of counsel under *Rompilla v. Beard*, 125 S.Ct. 2456, 2464 (2005). Counsel was also ineffective under *Rompilla* in failing to investigate and rebut the aggravating evidence by showing that much of it was fabricated, untrue, or exaggerated. (*Id.* at 2465). Counsel's abysmal performance in failing to investigate petitioner's background to uncover compelling mitigating evidence is the centerpiece of this petition.

9

Behaviors relied upon by Dr. Givon to support his diagnosis of anti-social behavior were in fact symptoms of frontal lobe damage, bipolar disorder, attention deficit hyperactivity disorder (ADHD) and Tourette's Syndrome. (P.C.R. Tr. 552-645). During state post-conviction proceedings, powerful expert medical testimony was presented supporting a diminished capacity defense in the guilt-phase. This testimony would have also provided Worthington's defense team compelling mitigating evidence to present in the penalty phase. This expert testimony indicated that, at the time of the crime, petitioner was taking Prozac for depression. However, petitioner's treating physician failed to recognize that giving anti-depressants to individuals with bipolar disorder is likely to trigger manic episodes. (See Pet. Exh. 1, 2, 8). This medical testimony at the 24.035 hearing also demonstrated that many of Worthington's alleged incidents of misbehavior while incarcerated in the County Jail occurred because he did not receive proper medication for his mental disorders.

The sentencing court also never heard testimony from Worthington's parents and others that would have detailed petitioner's history of severe physical and sexual abuse Worthington suffered as a child; how he was abandoned by his parents; how his father introduced him to heroin and cocaine in early childhood; how both of Worthington's parents and his grandparents suffered from mental illness and severe drug and alcohol addiction; and how Worthington's own mother in fact committed

10

many of the crimes attributed to petitioner in records from Peoria, Illinois' authorities that were presented by the state through stipulation as non-statutory aggravating evidence. (P.C.R. Tr. 456, 491, 494, 500-05, 514, 542, 544, 546). The parents of Butch and Richy Mackey also testified at the state postconviction hearing that their son, Richy, not Butch, was in fact burned in a gasoline accident when he was a child, and that Mr. Worthington was not involved in this incident. (P.C.R. Tr. 22-25, 34-35, 52, 56-59). Had this evidence been heard, the petitioner probably would not have been sentenced to death. *See e.g., Harries v. Bell*, 417 F.3d 631, 639-640 (6th Cir. 2005).

The constitutional violations set forth below prevented Worthington from making an intelligent decision to plead guilty and virtually assured him of receiving the death penalty. Mr. Worthington's continued incarceration and sentence of death violate the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. His specific constitutional claims are set forth below.

## II. <u>PROCEDURAL HISTORY</u>

Petitioner was charged by way of information in the Circuit Court of St. Charles County, Missouri, with crimes of Murder in the Second Degree, a class "A" felony, Mo. Ann. Stat. § 565.020.1., forcible rape and burglary involving Melinda Griffin. (D.A.L.F. 1). An amended information was subsequently filed on January 9, 1996,

amending the charge of murder in the second degree to murder in the first degree. (D.A.L.F. 26-28).

Joel Eisenstein entered his appearance as petitioner's counsel . (D.A.L.F. 1) On August 3, 1996, Judge Lohmar ordered an examination pursuant to §552.020 R.S.Mo. (1994) to determine petitioner's mental competency and sanity. (D.A.L.F. 51-53) Dr. Max Givon conducted the §552.020 examination and filed his written report with the Court on January 29, 1997. (P.C.R. L.F. 2582-2607).

On March 18, 1997, Mr. Eisenstein, filed a Notice of Change of Counsel (D.A.L.F. 69) and R. Todd Ryan entered as counsel for petitioner. On August 21, 1997, attorneys N. Scott Rosenblum, Bradford Kessler, and Joseph Green filed their Entry of Appearance as petitioner's counsel. (D.A.L.F. 138).

On January 13, 1998, petitioner filed a Notice of Guilty Plea. On January 15, 1998, the Honorable Ellsworth Cundiff, who had succeeded Judge Lohmar, recused himself from the case. (D.A.L.F. 8). Judge Grace M. Nichols was then assigned the case. (D.A.L.F. 152).

On August 28, 1998, petitioner entered a guilty plea before Judge Nichols in Division Two of the St. Charles County Circuit Court to the offenses of murder in the first degree, burglary in the first degree and forcible rape, without a plea bargain. (Plea

Tr. 2-32).  On September 17, 1998, petitioner waived his right to a jury for the penalty phase of trial.    (Tr. 2-6).

The  penalty phase commenced on September 14, 1998 before Judge Nichols. The penalty phase evidence closed on September 17, 1998.  On  November 4, 1998, the trial court sentenced petitioner to death, and consecutive sentences of thirty years and life imprisonment for the other charges.  (S.Tr. 28-29).

Petitioner then pursued a direct appeal before the Missouri Supreme Court.  On December 7, 1999, the Missouri Supreme Court affirmed petitioner's convictions and sentence.  *State v. Worthington,* 8 S.W.3d 83 (Mo. banc 1999).  That court denied rehearing on January 11, 2000.  The United States Supreme Court denied petitioner's petition for a writ of certiorari on December 1, 2000.  *Worthington  v. Missouri*, 529 U.S. 1116 (2000).

On April 7, 2000, petitioner timely filed, pursuant to Missouri Supreme Court Rule 24.035(j), his  *pro se* Motion to Vacate, Set Aside, or Correct Judgment or Sentence in the Circuit Court of St. Charles County.  (P.C.R. L.F. 8-47).  On April 14, 2000, the Court appointed the Office of the Public Defender who assigned Robert Lundt, Assistant Appellate Public Defender, and Loyce Hamilton, to represent petitioner on his Rule 24.035 Motion.  (*Id.* 48-51).  They filed a timely Amended Motion on behalf of petitioner on July 12, 2000.  (*Id.* 368-534).

After holding an evidentiary hearing from January 28 through February 1, 2002 and May 19, 2003, the Circuit Court denied petitioner's Rule 24.035 Motion on December 5, 2003. (P.C.R. L.F. 1062-83).

Thereafter, petitioner appealed the denial of his Rule 24.035 Motion to the Missouri Supreme Court. On May 31, 2005, the Missouri Supreme Court issued an opinion affirming the denial of petitioner's motion for postconviction relief. *Worthington v. State*, 166 S.W.3d 566 (Mo. banc 2005). That court denied rehearing on August 2, 2006. Petitioner is currently incarcerated under sentence of death at Potosi Correctional Center, Route 2, Box 2222, Mineral Point, MO 63660.

### III. **PETITION FOR A WRIT OF HABEAS CORPUS**

Petitioner's conviction and sentence of death were obtained in violation of his rights secured and guaranteed under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution in the following respects:

### CLAIM NO. 1

**WORTHINGTON WAS DENIED HIS SIXTH AND FOURTEENTH AMENDMENT RIGHTS TO EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE HIS ATTORNEYS FAILED TO CONDUCT AN ADEQUATE INVESTIGATION AND PRESENT AVAILABLE EVIDENCE REGARDING WORTHINGTON'S BACKGROUND AND SOCIAL AND MEDICAL HISTORY, WHICH WOULD HAVE PROVIDED PETITIONER A VIABLE GUILT PHASE DEFENSE OF DIMINISHED CAPACITY AND PROVIDED COMPELLING MITIGATING EVIDENCE AT THE SENTENCING PHASE OF TRIAL. HAD THIS EVIDENCE BEEN DISCOVERED AND PRESENTED, PETITIONER WOULD NOT HAVE PLEADED GUILTY AND THERE IS A REASONABLE PROBABILITY THAT THE OUTCOME WOULD HAVE BEEN DIFFERENT IN BOTH THE GUILT AND PENALTY PHASES OF TRIAL.**

Petitioner's counsel was constitutionally ineffective because he failed to investigate and present evidence regarding: (1) the significant traumatic events, neglect and abuse in Mr. Worthington's childhood; (2) the fact that Worthington suffers from numerous organic brain disorders including bipolar disorder and frontal lobe cerebral brain dysfunction and Tourette's syndrome; and, (3) evidence to rebut the aggravating evidence regarding petitioner's criminal history.

In preparing for the penalty phase of petitioner's trial, trial counsel Joseph Green, by his own admission, conducted a very limited investigation for mitigating evidence. The state court record strongly suggests that Green's meager investigation was a result of the fact that his co-counsel Scott Rosenblum did not provide him with adequate funds to investigate the case. A friend of Worthington paid Mr. Rosenblum a total retainer fee of $50,000. *Worthington v. State,* 166 S.W.3d at 575. Rosenblum, in turn, contracted with Mr. Green to conduct the penalty phase for a fee of $10,000. (*Id.*)

During the penalty phase, Mr. Green presented only two witnesses to provide mitigating evidence. Petitioner's first witness, his aunt, Carol Tegard, briefly testified about petitioner's turbulent family history. Ms. Tegard testified that her sister and petitioner's mother, Patricia Washburn, was a heavy drug and alcohol user who had engaged in prostitution. Ms. Tegard also testified that petitioner's father, Richard Worthington, was also a substance abuser and criminal who taught him how to commit burglaries when he was a child and that many of the crimes of which he was accused were actually committed by his father. (Tr. 675-696).

Mr. Green also called Dr. Lee Evans, a PhD in pharmacology, who testified about petitioner's substance abuse and concluded that his ingestion of drugs and alcohol rendered him incapable of making rational decisions about his behavior. (Tr.

738-776).   As a result of Mr. Green's inadequate investigation, petitioner was sentenced to death by a judge who knew virtually nothing about petitioner's life history, his abusive childhood, and his serious mental deficiencies.

In reviewing this issue, this court must be guided by the familiar test of *Strickland v. Washington*, 366 U.S. 668, 694 (1984).  Under the two-part *Strickland* test, the court must consider whether counsel's performance was objectively unreasonable and whether the defendant was prejudiced thereby.  *Id.*  In assessing counsel's performance pertaining to the penalty phase of capital trials, the Supreme Court has recognized that counsel's performance must be assessed in the context of the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases.  *Wiggins v. Smith*, 539 U.S. 510, 524 (2003).  As the Sixth Circuit has indicated:

> The Wiggins case now stands for the proposition that the ABA Standards for counsel in death penalty cases provide the guiding rules and standards to be used in defining the "prevailing professional norms" in effective assistance cases.  This principle adds clarity, detail and content to the more generalized and indefinite twenty year old language of Strickland.

*Hamblin v. Mitchell*, 354 F.3d 482, 486 (6th Cir. 2004).  Viewing Mr. Green's performance at the penalty phase of petitioner's capital trial under the ABA Guidelines,

it is not a close question that Mr. Green's performance was objectively deficient.  As

the ABA Guidelines state in pertinent part:

> Counsel's duty to investigate and present mitigating evidence is now well established.  The duty to investigate exists regardless of the expressed desire of a client.  Nor may counsel sit idly by, thinking that investigation would be futile.  Counsel cannot responsibly advise a client about the merits different courses of action, the client cannot make informed decisions and counsel cannot be sure of the client's competency to make such decisions unless he has first conducted a thorough investigation with respect to both phases of the case. . . .

> Counsel needs to explore: [1] medical history, (including hospitalizations, mental and physical illness or injury, alcohol and drug use, prenatal and birth trauma, malnutrition, developmental delays and neurological damage).

> [2] Family and social history, (including physical, sexual or emotional abuse, family history of mental illness, cognitive impairments, substance abuse or domestic violence; poverty, familial instability, neighborhood environment and peer influence; other traumatic events such as exposure to criminal violence, the loss of a loved one or a natural disaster; experiences of racism or other social or ethnic bias cultural or religious influences. . . . ).

> [3] Educational history (including achievement, performance, behavior and activities), special educational needs (including cognitive and limitations and learning disabilities and the opportunity or lack thereof and activities. . . .

ABA Guidelines for Appointment and Performance of Defense Counsel in Death Penalty Cases, ¶ 10.7 (2003) pp. 80-83 (quotation marks and footnotes omitted).

The following facts establish, beyond any doubt, that Mr. Green's investigation and presentation of petitioner's defense involving both the guilt and penalty phases of trial was objectively deficient. Petitioner was also prejudiced at both the guilt and penalty phases of the proceeding. The testimony at the state post-conviction hearing reflects that had counsel conducted an adequate investigation, petitioner would have had a viable guilt phase defense of diminished capacity. Petitioner testified that, if this evidence had come to light, he would have taken the case to trial, rather than pleading guilty without any plea bargain agreement. (2nd Supp. P.C.R. L.F.222). In addition, the compelling mitigating evidence that could have been presented to Judge Nichols would have significantly altered the balance of aggravating and mitigating evidence, creating a reasonable probability that the outcome of the sentencing phase would have been different. *See Antwine v. Delo*, 54 F.3d 1357, 1365 (8th Cir. 1995); *Wiggins v. Smith,* 539 U.S. at 538.

## A. Failure to Adequately Investigate Social History and Provide it to Experts.

Prior to the guilty plea, counsel hired Dr. Kevin Miller, who performed a psychiatric evaluation of Worthington. (P.C.R. Exh. 10 at 2608-16). The only

materials relied upon by Dr. Miller were Dr. Givon's report, the police-generated materials (discussed below), and partial records of Worthington's Methodist Medical Center psychiatric hospitalization. (*Id.* 2608). Dr. Miller's diagnoses were: 1) ADHD; 2) cocaine and alcohol abuse; 3) post-traumatic stress disorder (PTSD); 4) major depression, recurrent. Dr. Miller's report stated that further evaluation was needed to rule out bipolar disorder, dissociative disorder, malingering and anti-social personality disorder. (*Id.* 2613).

Mr. Green candidly admitted during his post-conviction testimony, that he failed to provide Dr. Miller and Dr. Evans with any meaningful records regarding petitioner's social and medical history to permit them to fully and accurately assess Worthington's mental disorders. (1st Supp. P.C.R. L.F. 432-33). Counsel admitted they did not conduct a thorough social history that would have included going to Peoria and interviewing Worthington's relatives and family members. (1st Supp. P.C.R. L.F. 433-34; 457-58). Counsel also did not hire a paralegal or mitigation specialist to prepare a social history. (*Id.* 434-37; 459). Based on the reports of Dr. Givon and their own expert, Dr. Miller, counsel advised Worthington to plead guilty. (*Id.* 466, 511-12).

Rule 24.035 counsel conducted a thorough investigation and uncovered and produced literally thousands of pages of records that were provided to petitioner's

postconviction mental health experts. These records included mental health records from Worthington's parents and immediate family members; police records concerning Worthington's mother and father; affidavits from parents and family members; Worthington's school medical and psychological records, and many others. (See, e.g., P.C.R. Exh's I-XVIII, 1-1265; 1266-1974; 1975-2003; 2025-89; 3988-4172; 2090-2153; 4463-66; 2154-64; 4444-62). These documents were provided to and reviewed by petitioner's state postconviction experts.

At the Rule 24.035 hearing, these experts offered the following testimony. Dr. Jonathon Henry Pincus, a Georgetown neurologist, examined Worthington and found his brain's frontal lobes, which are responsible for judgment, were not functioning properly. (P.C.R. Tr. 67, 85, 93, 95, 98). At the time of the offense, Worthington had not only suffered frontal lobe impairment, but also from Tourette's Syndrome, ADHD, obsessive compulsive disorder, and bipolar disorder. (*Id.* 110, 114-15, 117-18, 131-35, 144-45, 171, 177-78). On the night of the offense, Dr. Pincus concluded that Worthington was not able to deliberate or cooly reflect upon his actions, and he was unable to appreciate the criminality of his conduct and conform his conduct to the requirements of the law. (*Id.* 121-22, 145-46, 194). Dr. Pincus also stated that when Worthington was incarcerated in the St. Charles County jail, he was not properly medicated for his mental illnesses and that many of the conduct violations attributed

to Worthington resulted from the fact he was not properly medicated. (P.C.R. Tr. 122-25, 127-28). Dr. Pincus' written report detailing his full findings is attached to this petition as Exhibit 2.

During Dr. Pincus' physical examination of petitioner, he noticed many scars on petitioner's back which appeared to be from beatings and cigarette burns. (*Id*.) There are also several other scars whose origins he could not identify. Dr. Pincus, after reviewing the extensive records he obtained from postconviction counsel, also noted that, at the time of the crime, petitioner had been prescribed and had been taking the anti-depressant drug Prozac. This medication had been prescribed by his treating physician Dr. Ryall. Regarding the impact of this medication on the crime, Dr. Pincus noted:

> [Dr. Ryall] may have correctly diagnosed depression but missed the Tourette's and more importantly the mania. Treatment with Prozac precipitated an episode of mania, and I believe that [petitioner] was very much under its influence when he participated in the robbery of the victim's apartment.

(*Id.*)

Dr. Dennis George Cowan is a neuropsychologist who tested and evaluated Worthington in connection with the 24.035 action and determined that he suffered from severe frontal lobe dysfunction. (P.C.R. Tr. 205-11, 240, 287-88, 294-96, 325). Dr. Cowan's findings, also echoed Dr. Pincus' findings of cerebral brain dysfunction,

ADHD, Tourette's Syndrome and bipolar disorder. (P.C.R. L.F. 4636). Like Dr. Pincus, Dr. Cowan ruled out anti-social personality disorder, relying on the fact that Worthington had not been diagnosed with a conduct disorder prior to age 15. (*Id.* 274-78, 311, 313). Dr. Cowan testified that the symptoms and behavioral disorders noted by Dr. Givon, the state's expert, such as impulsivity, irritability, irresponsibility and reckless disregard for the safety of himself and others are consistent with frontal lobe dysfunction and Tourette's. (*Id.* 272-74, 310-13). Dr. Cowan also recognized that Dr. Givon's findings were offered without an adequate investigation of petitioner's social history because Givon never spoke to any of Worthington's family members. (*Id.* 302-03). Dr. Cowan's written report is attached to this petition as Exhibit 4.

Dr. Cowan's report indicates that petitioner's poor performance in school could be attributed to his mental disorders, particularly ADHD. (*Id.*) Dr. Cowan also noted that petitioner began abusing drugs at the age of 9 when he began drinking alcohol and sniffing glue. (*Id.*) He began using harder drugs, including cocaine, at the age of 11 or 12. Dr. Cowan's report also indicates that petitioner had significant and multiple head injuries during childhood, including incidents when he was twice hit with a baseball bat and an incident where he and his mother were involved in a car accident when petitioner's head was thrown into the windshield. (*Id.*)

Dr. Cowan also indicated that "individuals diagnosed with Tourette's syndrome are more likely to have significant problems with emotional lability, impulsivity and aggression towards others when not medicated appropriately. Indeed, such a pattern is evidenced in this individual's records. Of interest and significance is the fact that when he is appropriately medicated, this patient does not manifest any such difficulties." (*Id.* 30).

Based upon the battery of neuropsychological tests administered to petitioner by Dr. Cowan, Dr. Cowan concluded that Worthington's neuropsychological dysfunction impaired his level of abstract reasoning abilities, judgment, decision making abilities and higher level executive functioning. His neurological deficiencies also affected his ability to learn, his short-term memory, and motor control. (*Id.* 37). In Dr. Cowan's opinion, petitioner's neurological damage was caused by multiple head injuries, substance abuse, and congenital abnormalities. (*Id.*)

Dr. Robert Smith is a clinical psychologist. (*Id.* 458). Dr. Smith's postconviction testimony focused primarily on the events surrounding Worthington's upbringing and the effects of his family's behavior on him. Worthington's mother had a history of bipolar disorder, homelessness, drug addiction, and prostitution. (*Id.* 491). His father introduced him to drugs and alcohol at the age of 9 or 10 and taught him at an early age how to burglarize homes and businesses. (*Id.* 494, 544, 546). His

father would beat him if Worthington stole the wrong things. (*Id*. 456).Mr. Worthington was, at an early age, physically and sexually abused by a babysitter and neighbor in horrific ways. (*Id.* 500-05, 514, 542).

Dr. Smith also concluded Worthington suffers from ADHD, bipolar disorder, cerebral brain dysfunction, PTSD and substance dependence. (P.C.R. Tr. 552, 645). Worthington's jail records indicate his captors did not understand or properly medicate him for his disorders. (P.C.R. Tr. 553-55). Dr. Smith's report is attached to this petition as Exhibit 8.

Dr. Smith's written report indicates that he reviewed voluminous records regarding Mr. Worthington's background and social history, conducted a ten hour interview of petitioner, and also conducted extensive interviews of petitioner's family and acquaintances. (*Id.* 3-4). Based upon the information he received, Dr. Smith prepared a forty-one page report regarding petitioner's social, medical and family history. (Exh. 8).

Dr. Smith noted that Worthington's family has a long history of mental illness. His father Richard Worthington has been hospitalized numerous times for mental illness. Petitioner's mother, Patricia Washburn, has been diagnosed with bipolar disorder since her adolescence and has repeatedly been treated with psychotropic medications. Worthington's mother also attempted suicide more than 15 times and

has required multiple hospitalizations and electroshock therapy. (*Id.* 7). Both of petitioner's maternal grandparents also have a history of depression, mental illness and suicide attempts. Dr. Smith noted that this history of family mental illness is significant because medical literature indicates that many psychiatric disorders are genetically influenced. Mr. Worthington was first evaluated by a mental health professional at the age of 13 or 14. However, his mother never did follow through with recommendations for medication and treatment. Shortly before Ms. Griffin was killed, Worthington received treatment from Dr. Ryall, who prescribed him Prozac. Dr. Smith agreed with Dr. Pincus' conclusion that Dr. Ryall did not recognize Mr. Worthington's diagnoses of ADHD, Tourette's Syndrome and bipolar disorder. In this regard, Dr. Smith noted:

> If [Dr. Ryall] had acquired further data, she would have known the risk of prescribing an anti-depressant for Mr. Worthington given that he had a bipolar disorder. The literature consistently indicates that clients with bipolar disorder should not be described an anti-depressant alone because it is likely to trigger a manic episode.

(*Id.* 10).

Regarding petitioner's history of substance abuse, Dr. Smith noted that Mr. Worthington was introduced to illicit drugs by his father at the age of 9 or 10, when he first started sniffing glue and smoking marijuana. Mr. Worthington also began consuming alcohol around this same time period. By the age of 12, his father began

injecting him with heroin and giving him LSD.  A short time later, petitioner began using cocaine with his father.  (*Id.* 12)

Dr. Smith's report also provided extensive information regarding petitioner's upbringing and social history.  Dr. Smith noted that it became clear to him that petitioner suffered from ongoing emotional and physical abuse throughout his life. Petitioner was emotionally and physically abused by his grandfather, who was mentally ill.  His mother and father would also repeatedly strike him, "call him names, spit in his face and slap and punch him.  Each of these abusive episodes was confirmed by family members who either committed the abuse or witnessed it."  (*Id.* 25). Petitioner's mother was very promiscuous and was eventually known by friends and neighbors as a prostitute.  She brought men home that she had picked up in bars virtually every night.  Mr. Worthington slept in a room that was connected to his mother's without a door and "he would lie in bed and cover himself with a sheet trying to block out the sounds and sights of his mother with various men."  (*Id.*)

When Mr. Worthington was a toddler, he was placed with a babysitter named Bessie Smith, an African-American woman who ran a daycare center in petitioner's neighborhood.  Ms. Smith had a grandson named Michael Williams who was approximately 14 years of age when Mr. Worthington first began staying at Ms. Smith's home.  Michael Williams fondled petitioner's genitals and encouraged Mr.

Worthington to engage in the same conduct with him.  The shame from these incidents caused Mr. Worthington to run away from Ms. Smith's home.  When he would return, Ms. Smith would whip him with a switch.  This pattern of conduct continued for several years.  This physical and sexual abuse was confirmed by petitioner's mother, paternal aunt and others.  (*Id.* 26).

When petitioner was approximately 10 years old, his mother secured the services of another individual named David Morris to babysit him.  Mr. Morris was approximately 18 years of age and Mr. Worthington's mother was dating his older brother.  Dr. Smith's report describes the following instances of abuse petitioner suffered at the hands of David Morris:

> David would force Mr. Worthington to take off his clothes and sit in a chair while he would throw lit matches at him.  On other occasions, David would fondle Mr. Worthington's testicles and strike them with a spoon.  In addition, he would stick various items (i.e., pencil, spoon, etc.) up Mr. Worthington's rectum.  On a number of occasions, David would tie Mr. Worthington's hands and feet with pieces of cloth, fill the bathtub with water, and place him in the water until it was high enough that he could not breathe.

(*Id.*)

Morris would also place petitioner in a sleeping bag or in a closet or push Mr. Worthington into the crawl space above the ceiling.  These spaces of the house were infested with rats, mice, roaches and other vermin.  Petitioner's mother did not believe

him when he told her of these abusive incidents.  It was not until Mr. Worthington's paternal uncle, Vincent Worthington, came by the house and witnessed David Morris torturing petitioner that the abuse stopped.  (*Id*. 26-27).

Dr. Smith's report also states that many of the incidents of jail misconduct that occurred in St. Charles County were the result of petitioner not being properly medicated for his mental diseases.  This conclusion is also bolstered by the fact that petitioner was involved in similar instances of alleged misconduct during prior Illinois incarcerations when he was also not properly medicated.  (*Id.* 20-21).  Dr. Smith also indicated that petitioner's Tourette's Syndrome, which causes those afflicted with this disease to engage in inappropriate grunts and noises, had also been misinterpreted as belligerent comments or threats by his jailers.  (*Id.*)

Echoing the conclusions of Dr. Cowan and Dr. Pincus, Dr. Smith concluded that his numerous psychiatric disorders had an adverse and cumulative effect on Mr. Worthington's ability to function and to conform his conduct to the requirements of the law, which was exacerbated by his use of alcohol and cocaine prior to the crime.  As Dr. Smith concluded:

> Based upon these mental diseases and their combined symptoms, it is the examiner's belief that Mr. Worthington was under the influence of extreme mental and emotional disturbance and that his ability to appreciate the wrongfulness of his actions and to conform his behavior to the law was substantially impaired.  Furthermore, due to his mental

disease or defect, Mr. Worthington evidenced a diminished mental capacity in that he was unable to deliberate at the time of the offense.

(*Id.* 41).

### B. Failure to Provide Social History to Dr. Evans.

At the penalty phase, the prosecution called Michael McKee, a correctional officer who worked at the St. Charles County jail, where Worthington spent three years awaiting trial. McKee testified that jail records indicate Worthington was involved in fifty-five separate "incidents" during his incarceration. (Tr. 151-52, 164). All of these incident reports were admitted into evidence by stipulation by Worthington's counsel.

The prosecution led McKee through a few of the more serious alleged incidents, including how Worthington: a) possessed homemade alcohol and threatened a guard when it was discovered (Tr. 138-39); b) was found in possession of a razor blade in his cell (Tr. 140-42); c) assaulted a jail officer, and when restrained, threatened to kill other officers (Tr. 142-44); d) instigated fistfights and challenged an officer to a fight (Tr. 144-47); and e) wedged a broom handle in a sliding security door to prevent entry (Tr. 149-50). McKee was also permitted to offer his opinion, without objection, that Worthington had a reputation for being "violent and combative." (Tr. 188).

The prosecution also called Robert Smith, another officer from St. Charles County jail. Smith testified to an incident where Worthington grabbed a broom handle, ran over tables and chased another inmate, threatening to kill him with it. (Tr. 202-04). Judge Nichols utilized this evidence in finding the nonstatutory aggravating circumstance of "the defendant's violent behavior in pre-trial confinement." (P.C.R. Exh. 15 at 3893).

Dr. Roswald "Lee" Evans was a pharmacologist whose expertise includes the psychiatric effects of substance abuse. (Tr. 725-30). Dr. Evans testified for petitioner at trial that Worthington displayed classic polysubstance abuse symptoms. (Tr. 772). It was his opinion that Worthington was intoxicated at the time of the offense and was not capable of making rational decisions about his behavior. (Tr. 733, 738-76).

At the postconviction hearing, Dr. Evans testified that trial counsel Joseph Green spent "a very small amount of time" discussing Worthington's case with him and "nothing in terms of preparing [him] to provide testimony." (P.C.R. Tr. 654-55). Mr. Green, in advance of his trial testimony, provided him with 1) Dr. Givon's report; 2) Worthington's Methodist Medical Center record; 3) police records; 4) DNA reports; and 5) cocaine plasma concentration report. (*Id.* 657-58). Dr. Evans understood his role at the penalty phase to be limited to discussing the impact of substance abuse on Worthington. (P.C.R. Tr. 658-59).

However, Dr. Evans later testified at the 24.035 hearing that, to fully utilize his expertise, he needed to coordinate his findings with a psychologist's or psychiatrist's evaluation because he was not qualified to provide a psychiatric diagnosis. (*Id.* 661-662). Dr. Evans was provided and reviewed the social history compiled by state PCR counsel prior to the Rule 24.035 hearing. (*Id.* 670-88). From reviewing this material, and then focusing on the St. Charles County jail records, Dr. Evans testified that Worthington's Tourette's and bipolar disorders were not being treated while he was in jail, and the resulting 55 "incidents" were explainable for that reason. (*Id.* 679, 681-82). In this regard, Worthington was not consistently given the drugs he needed to treat his mental illness, and when he did get the appropriate medications, he did not get the right dosages. (*Id.* 680-81). In addition, while Worthington was in jail, he was given a medication which made his bipolar disorder even worse. (*Id.* 680-81). Dr. Evans' written report, prepared in advance of his 24.035 testimony, is attached to this petition as Exhibit 1.

Dr. Evans' written report reveals, in no uncertain terms that he could have provided much more compelling testimony at the penalty phase if he had been properly prepared to testify by Mr. Green. (*Id.*) Dr. Evans stated that, after reviewing petitioner's social history, that Worthington's use of drugs was not voluntary because he was forced as a child to use drugs with his family to gain parental acceptance. (*Id.*

2). Based upon his review of the psychiatric reports prepared in conjunction with the 24.035 action, Dr. Evans stated that petitioner's cocaine use exacerbated his bipolar disorder could have made the psychotic and manic symptoms of that illness more pronounced. As a result of his brain damage, Dr. Evans stated that petitioner would experience a more profound toxic effect from his use of drugs and alcohol. Dr. Evans concluded that, at the time the offense was committed, petitioner's use of drugs and alcohol, coupled with his psychiatric illnesses, "significantly impaired his ability to appreciate the criminality of his conduct and conform his conduct to the requirements of the law." (*Id.* 4).

The failure of counsel in a capital case to conduct a thorough investigation that would mitigate punishment and rebut aggravating evidence constitutes ineffective assistance of counsel. *Williams v. Taylor*, 529 U.S. 362, 371 (2000); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003); *Rompilla v. Beard*, 545 U.S. 374 (2005). Reasonably competent counsel under similar circumstances would have conducted a thorough social history and provided that information to Dr. Evans--the only expert called by defense counsel at trial. Worthington was clearly prejudiced by counsel's failures. Had counsel performed competently, there is a reasonable probability that the result would have been different and Worthington would not have been sentenced to death. *Strickland,* 466 U.S. at 694.

## C. Failure to Request Funds to Perform a Proper Investigation.

In July 1997, Worthington's original counsel filed a motion with Judge Cundiff requesting funding from the Court to pay for experts, testing, and psychological evaluations based upon Worthington's indigence. (D.A.L.F. 73-74). The motion indicated attorneys' fees had been paid by a non-relative, but the non-relative could not afford to pay these additional costs. (*Id.* 73-74). The motion was denied (*Id.* 76-77) and in August 1997, N. Scott Rosenblum and Joseph Green entered as counsel for Worthington. (D.A.L.F. 80, 115-16).

A man named Wayne King hired Rosenblum for $50,000, and Rosenblum subcontracted with Green for $10,000. Green's role was to concentrate on DNA testing and mitigation investigation, but he subsequently took on a larger role in the case without renegotiating additional compensation. (1st Supp. P.C.R. L.F. 436, 446, 527, 572-73). From Green's prior capital case experience, he knew having a social history was important before deciding on how to proceed with the guilt and penalty phases. (*Id.* 432-33). Rosenblum left Green entirely responsible for investigating Worthington's social history. (*Id.* 661-62).

The record establishes that Green did not do a complete social history of petitioner that should have included, at a bare minimum, traveling to Peoria and

interviewing Worthington's family and acquaintances. (*Id.* 433-34). Green admitted, based on his training, that a complete social history should have been done by either a paralegal or a mitigation specialist. (*Id.* 434-35). Green testified he did not have investigative assistance because he did not control spending and therefore could not contract with anyone. (*Id.* 435-37).

The social history eventually developed by Rule 24.035 counsel through the deposition testimony of Worthington' mother and her affidavit was the type that Green would have given to an expert in psychology or psychiatry to determine whether Worthington suffered from any mental illnesses. (*Id.* 456-57). Green did not consider filing a motion under *Ake v. Oklahoma*, 470 U.S. 68 (1985), because the earlier request for funding was denied. (1st Supp. P.C.R. L.F. 459).

The Missouri Supreme Court addressed this issue by stating " ... there was no showing that the lack of funds played an improper part" in counsel's decision not to seek out an expert to provide a diminished capacity defense. *Worthington v. State*, 166 S.W. 3d at 575. The Court reasoned:

> [I]t is not ineffective to consider cost in deciding what type of investigation to do and how to do it, so long as the resulting investigation is adequate. . . . Rather, counsel made a strategic choice to advise Mr. Worthington to plead guilty and concentrate on his penalty phase defense. . . . In sum, it was not unreasonable for defense counsel to conclude that the risk of a death sentence was greater if Mr.

Worthington went to trial than if he pled guilty and the penalty phase was tried to the judge.

*Id.*

The Missouri Supreme Court's decision completely misses the mark. The issue is not whether the lack of funds "played an improper part" in counsel's decision to have Worthington plead guilty in lieu of putting on a diminished capacity defense, but whether it was unreasonable for counsel to make this critical decision in the dark, when funds should have been provided to comport with due process. There is also no authority permitting a retained or appointed capital trial attorney to limit or abandon their constitutional duty to investigate because the attorney's retainer fee was inadequate. In fact, the pertinent Supreme Court decisions and the ABA guidelines do not create a "financial hardship on the lawyer" exception to the *Strickland* performance test. It has been long held that the due process clause requires that a defendant has a fair opportunity to present a defense. *Ake v. Oklahoma*, 470 U.S. at 76. That opportunity "derives from the belief that justice cannot be equal where, simply as a result of his poverty, a defendant is denied the opportunity to participate meaningfully in a judicial proceeding in which his liberty is at stake." (*Id.* at 76).

In *Starr v. Lockhart*, 23 F.3d 1280, 1288 (8th Cir. 1994), the Eighth Circuit held that *Ake* requires "that an indigent defendant be supplied with the basic tools necessary

for an effective defense." Those basic tools include experts. (*Id*. at 1288). Here, counsel was obligated to act as reasonably competent counsel and to have requested money for services that absolutely needed to be done. Even if he did not receive court ordered funding, he was required, under the ABA guidelines, to perform a constitutionally adequate investigation. *Wiggins,* 539 U.S. at 524. Worthington was prejudiced because there is a reasonable probability that had counsel requested the funds, he would have received them and, thereafter, performed his duty to conduct a thorough social history investigation, he would not have pleaded guilty and probably would not have received a death sentence. *Strickland,* 466 U.S. at 694.

### D. Failure to Present Testimony From Worthington's Parents.

Prior to the penalty phase, counsel Joseph Green contacted Worthington's mother, Patricia Washburn by phone, for ten to fifteen minutes, on a couple of occasions. Mr. Green testified he could not have possibly obtained an adequate social history from this limited investigation. (1st Supp. P.C.R. L.F. 455). Counsel testified he could not afford to go to Peoria to meet with Ms. Washburn. (*Id.* 457-58). Counsel was aware of Washburn's shameful past as a parent. Despite the fact Washburn was in the courthouse, counsel determined not to call Washburn solely because she would have testified she thought she was "a good mother." (*Id.* 559-61).

35

Washburn was told to leave the courthouse because counsel feared the prosecution would subpoena her. (*Id.* 337-39; 407).

The only family member called at trial was Washburn's sister, Carol Tegard. Her brief testimony included the following: Washburn was sixteen at the time of her pregnancy, (Tr. 675); both of Worthington's parents were heavy drug and alcohol users, (*Id.* 675-76; 680-81; 694); Washburn was a prostitute and made many suicide attempts, (*Id.* 680-82); and in 1994, Worthington was homeless and living out his mother's car, until she sold it for drugs. (*Id.* 693-94).

During the penalty phase, defense counsel stipulated to numerous police reports, which contained highly damaging evidence against Worthington. For example, witnesses such as Jerry McKee, a detective from the Peoria Police Department, testified that Worthington victimized his own grandparents on four occasions, including stealing their car, burglarizing their home and shooting at his grandfather. (*Id.* 230-31).

During the Rule 24.035 proceedings, counsel obtained the deposition of Patricia Washburn, while she was incarcerated in the Peoria County Jail. (1st Supp. P.C.R. L.F. 285-86). Counsel also obtained a detailed affidavit from her. (P.C.R. L.F. 2101-19). Her affidavit is attached to this petition as Exhibit 5.

Ms. Washburn divorced her husband, Richard, because he beat her constantly. (1st Supp. P.C.R. L.F. 318). Richard once badly beat up and bloodied Washburn's father while Worthington was in another room crying. (*Id.* 310-12). Richard committed burglaries and sold drugs. He stole the family's food stamps and food and used them to buy drugs. (*Id.* 317-18). Washburn did drugs while pregnant with Worthington, including tuinal, seconal, acid, glue, cocaine, alcohol and crystal meth. (*Id.* 314). Richard made his son do drugs when he was nine years old. (*Id.* 318-19).

Washburn admitted that it was she who actually burglarized her parents' home, stealing money, a microwave, and a car to get money for drugs, and then blamed her own son. (*Id.* 320-22). She was "addicted to sex." She had many sexual relationships with local police officers, and she often called the police to say her son committed a crime to get their attention or get a date. (Pet. Exh. 5). Washburn became depressed and suicidal when her one night stands did not grow into "true love." Worthington witnessed many of his mother's suicide attempts. (*Id.*) She and Worthington would use crack cocaine together and commit thefts in order to support their drug addictions. (*Id.*)

Washburn did not believe her father's accusation that Worthington shot at him and stole his wallet and car. (*Id.*) This accusation occurred one month before her father died. Her father was a severe alcoholic and at the time had been suffering from

delusions for many years. (P.C.R. Exh. 9 at 2114-15). In addition, at the time of the accusation, her father suffered from post-traumatic stress disorder, grand mal seizures and brain cancer. (*Id.* 2114).

Ms. Washburn's affidavit corroborates that petitioner was abused by his babysitter, David Morris. (Pet. Exh. 5). She stated that she did not believe petitioner when he reported to her that David Morris had been abusing him. (*Id.*) Ms. Washburn
also corroborated the fact that petitioner would often run away from Bessie Smith's house when she was babysitting for him. These incidents were also confirmed by Ms. Smith's affidavit, which is attached to this petition as Exhibit 7.

Ms. Washburn also stated that when petitioner was 4 or 5, he lost the only stable father figure he ever had, his uncle Gary. (Exh. 5). Gary was the only male role model in petitioner's early life who was not an alcoholic or a drug addict. Gary drowned while water skiing at a family vacation and petitioner and the rest of the family were on the shore when Gary's body was recovered. Mr. Worthington was completely traumatized by his uncle's death and he never received any treatment or counseling for the emotional distress that it caused him. (P.C.R. Exh. 9 at 2109). Ms. Washburn also corroborated the fact that Worthington was forced to witness her having sex with numerous men through his entire childhood and that she was

physically and emotionally abusive toward him. (Pet. Exh. 5). Ms. Washburn also corroborated the fact that petitioner received a serious head injury in an auto wreck they were involved in when he was a young child. (*Id.*)

Prior to the penalty phase, Worthington's father, Richard, was never contacted by Worthington's attorneys. At that time, he was in prison, but he was able and willing to speak to counsel and to testify. (P.C.R. Exh. 10 at 2090-91). Richard Worthington's affidavit is attached to this petition as Exhibit 6. From an early age, Richard was on his own living on the street or in abandoned houses. He needed to be a good thief in order to survive. (P.C.R. Exh. 10 at 2093). From age twelve through sixteen, he was a ward of the court, living at the Illinois Soldier and Sailor's Children's Home, where he ran away over forty times. (*Id.* 2094).

For at least a decade before his son was born, Richard was high or stoned most of the time. (*Id.*) When he learned his wife was pregnant, he was in the drug unit of the Zeller Mental Health Center. When he got out, he began using LSD, mescaline, angel dust, heroine, cocaine, and marijuana. He was sniffing glue, drinking beer and whiskey every day. (*Id.* 2095). Richard does not remember anything about his son's early childhood because he was never around. He does not know anything about Worthington's childhood illnesses. (*Id.*) Richard confirmed that his wife would routinely call the police and blame her son for things she had stolen. (*Id.* 2096).

Richard taught his son about sniffing glue and shot him up with heroin when Worthington was nine years old. They shared cocaine and pot. Richard turned his son onto crack when his son was in his twenties. He taught his own son to be a criminal, a drug addict, a thief, and a burglar. (*Id.*) In sum, he was "a worthless parent." (*Id.*)

Judge Nichols never heard this compelling testimony directly from Worthington's parents, documenting numerous incidents of the violent, assaultive, and abusive behavior that occurred during petitioner's childhood; the sexual abuse; and the pervasive presence of drugs. Such testimony not only would have provided powerful mitigating evidence, but would have also rebutted the prosecution's aggravating evidence that Worthington had shot at his grandfather, had burglarized his grandparents home on numerous occasions, and had been blamed for numerous other crimes that were either committed or fabricated by his mother.

The Missouri Supreme Court held that counsel was not ineffective in not calling Patricia Washburn to testify because counsel believed her testimony "would undermine the defense's mitigation theory that Mr. Worthington had a horrible childhood ... ." *Worthington v. State*, 166 S.W. 3d at 578. The court held:

> It was not unreasonable for counsel to make the strategic choice that it was better to use records of Mr.

> Worthington's history of abuse from Illinois that to call his
> mother at the trial.

*Id.* In finding the failure to call Richard Worthington was not ineffective, the court noted that he was "difficult to locate" and "he had not had contact with his son since 1977 and they did not have much of a relationship." *Id.* Because the trial judge heard evidence from Worthington's aunt to the effect that Worthington was abused and neglected but still imposed death, "offering additional evidence of such abuse by calling Mr. Worthington's parents was not necessary nor was its absence prejudicial." *Id.*

### E. Legal Analysis.

In *Williams v. Taylor*, 529 U.S. 362 (2000), trial counsel presented mitigating evidence through the defendant's mother, his friends and a psychiatrist, but failed to conduct an investigation that would have uncovered extensive evidence of Willliams' abusive and deprived childhood. The jury also never heard Williams was borderline mentally retarded and that his impairments were likely organic in nature. (*Id.* at 370, 395-98). Under these circumstances, the Supreme Court found Williams was denied effective assistance of counsel under *Strickland* because counsel failed to conduct a reasonable investigation that would have uncovered mitigating evidence. (*Id.* at 396). The record shows the same deficiencies in counsel's investigation in this case.

The failure to interview witnesses or discover mitigating evidence relates to trial preparation and not strategy. *Kenley v. Armontrout*, 937 F. 2d 1298, 1304 (8th Cir. 1991). Failure to pursue a crucial line of investigation in a capital murder case where counsel knows the line of investigation is necessary is professionally unreasonable. *Chambers v. Armontrout*, 907 F.2d 825, 826 (8th Cir. 1990); *Mauldin v. Wainwright*, 723 F.2d 799, 800 (11th Cir. 1984); *Loyd v. Whitley*, 977 F.2d 149, 157 (5th Cir. 1992) (counsel failed to develop psychiatric evidence of mental disease of defect even though they were on notice of potential problems).

More recently, in *Wiggins v. Smith*, 539 U.S. 510 (2003), the Court found counsel's failure to conduct a thorough investigation that would have uncovered evidence of physical and sexual abuse resulted in only a "partial" mitigation case being heard. *Id.* at 524. Counsel's failures in *Wiggins* resulted from "inattention, not reasoned strategic judgment." (*Id*. at 512). Citing the ABA Guidelines, the court in *Wiggins* held that a thorough penalty phase investigation "should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." (*Id.* at 524).

Most recently, the Supreme Court found counsel ineffective in *Rompilla v. Beard*, 125 S.Ct. 2456 (2005) because trial counsel in a Pennsylvania capital case failed to adequately investigate a prior conviction that the state had disclosed they

would use as an aggravating factor at the penalty phase of trial. Had Rompilla's counsel reviewed court files from this prior conviction the file would have revealed leads to allow defense counsel to discover compelling mitigating evidence. (*Id.* at 2468-2469).

The facts of this case are strikingly similar to Rompilla's case in many respects. First, evidence of petitioner's troubled and abusive childhood, most notably his history of sexual abuse, is contained in a psychological evaluation that was obtained from the file of petitioner's 1989 Illinois burglary conviction. (See Pet. Exh. 3). As in *Rompilla*, a review of this file of petitioner's prior conviction would have given counsel information to pursue, discover, and present the mitigating evidence that was ultimately presented during state postconviction proceedings. Second, the substance of the mitigating evidence uncovered in *Rompilla* is very similar to the evidence uncovered here. As the Supreme Court in *Rompilla* noted:

> Rompilla's parents were both severe alcoholics who drank constantly. His mother drank during her pregnancy with Rompilla, and he and his brothers eventually developed serious drinking problems. His father, had a vicious temper, frequently beating Rompilla's mother, leaving her bruised and black-eyed and bragged about his cheating on her. His parents fought violently and on at least one occasion, his mother stabbed his father. He was abused by his father who beat him when he was young with his hands, fist, leather straps, belts and sticks.... There were no expressions of parental love, affection, or approval.

Finally, the *Rompilla* decision also provides language that trial counsel was ineffective in failing to present testimony from petitioner's mother and father that would have neutralized the aggravating evidence regarding petitioner's prior criminal activity in Illinois. *Rompilla* also indicates that petitioner's counsel was ineffective in failing to utilize mental health experts to neutralize the jail misconduct aggravating evidence. As the court noted in *Rompilla*, a reasonably competent lawyer in a death penalty case is required to review files regarding prior convictions and criminal conduct because "we may reasonably assume that the jury could give more relative weight to a prior violent felony aggravator where defense counsel missed an opportunity to argue that the circumstances of the prior conviction were less damning than the prosecution's characterization of the conviction would suggest." (*Id*. at 2465).

Trial counsel barely "scratched the surface" in investigating Worthington's background and thus gave the sentencing judge only a brief and cursory glimpse into petitioner's history and upbringing. (*Id.* at 2469) ("[the evidence presented in state postconviction proceedings] adds up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury..."). The Missouri Supreme Court's suggestion that the mitigating evidence would have been cumulative to the vague and general testimony from his aunt that petitioner had a disadvantaged

upbringing cannot survive scrutiny under 2254(d).  Counsel has a particular duty to investigate and present concrete facts to support whatever theory of mitigation is pursued.  *Wiggins,* 539 U.S. at 526.  The Eleventh Circuit has noted that mitigating evidence is persuasive only if supported by specific facts:

> The jury was called upon to determine whether a man whom they did not know would live or die; they were not presented with the *particularized circumstances* of his past and his actions on the day of the crime that would have allowed them fairly to balance the seriousness of his transgressions with the conditions of his life.

*Collier v. Turpin,* 177 F.3d 1184, 1204 (11th Cir. 1999) (emphasis added).

Green's performance in investigating and presenting mitigating evidence was abysmal.  Green's performance and investigative efforts were more limited than the efforts of trial counsel in *Williams*, *Wiggins* and *Rompilla*.  This evidence of petitioner's family history, horrible upbringing, history of physical and sexual abuse and mental illness would have provided powerful mitigating evidence.  The expert testimony regarding petitioner's psychiatric conditions also would have lessened petitioner's culpability by showing that the crime occurred while petitioner was likely in the throes of a manic episode due to receiving improper medication for his undiagnosed bipolar disorder.  This evidence would have supported the statutory mitigating circumstance of extreme mental or emotional disturbance.  See §

565.032.3(2) R.S.Mo. (2000). This additional statutory mitigating factor would have significantly altered the sentencing calculus. *Antwine v. Delo,* 54 F.3d at 1365.

Petitioner suffered guilt phase prejudice because he would not have pleaded guilty if counsel's investigation had not been deficient. *Hill v. Lockhart*, 474 U.S. 52 (1985). Had this evidence of diminished capacity been presented to a jury, there is a reasonable probability that petitioner would have been convicted of the lesser crime of second degree murder. *Jacobs v. Horn,* 395 F.3d 92, 109-110 (3rd Cir. 2005). Penalty phase prejudice is established because, had this evidence been presented to the sentencer to rebut the aggravating evidence and mitigate petitioner's moral culpability, there is a reasonable likelihood that petitioner would have received a life sentence. *Strickland*, 466 U.S. at 697. The Missouri Supreme Court's decision is both "contrary to" and involves an "unreasonable" application of *Strickland*, *Williams*, *Wiggins*, and *Rompilla*. See 28 U.S.C. § 2254(d). Habeas relief is warranted.

## CLAIM NO. 2

**WORTHINGTON WAS DENIED HIS SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS TO THE EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE HIS ATTORNEYS FAILED TO INVESTIGATE AND PRESENT AVAILABLE EVIDENCE TO REBUT THE STATE'S AGGRAVATING EVIDENCE AND FAILED TO RAISE MERITORIOUS OBJECTIONS TO THE ADMISSION OF OTHER BAD**

ACTS EVIDENCE, WHICH ADVERSELY IMPACTED THE RESULT OF THE PENALTY PHASE.

Petitioner's counsel failed to adequately investigate the aggravating evidence utilized by the state to convince the trial court to sentence Worthington to death. Counsel also failed to object to any of this evidence and, in fact, stipulated to the admission of most of the state's most damning evidence despite the fact that much of it was unreliable and inadmissible. The evidence at issue included: 1) a witness identified as Charlotte Kirn, also known as Charlotte Peroti, who testified that one week before the murder, Worthington broke into her apartment and attempted to rape her; 2) evidence from Dr. Givon that Worthington, as a youth, intentionally set his friend on fire; 3) numerous police and probation reports detailing prior criminal activity, and 4) evidence of misconduct during petitioner's pre-trial incarceration.

### A. Failure to Object to Nondisclosure of Penalty Phase Witness Peroti and Failure to Investigate.

In January 1996, the prosecution filed an information and endorsed a witness named "Charlotte Kirn" of Troy, Missouri, without providing a specific address. (D.A.L.F. 30, 35). In February 1996, counsel for Worthington filed a patterned motion for discovery under Missouri Supreme Court Rule 25.03, which included a request for disclosure of the prosecution's witnesses, any statements made by them, related memoranda, and their prior convictions. (*Id.* 4, 37-38).

47

The prosecution filed an amended information in October 1996 which contained the same endorsement. (*Id.* 284). Later in April, and again in July and August 1998, the prosecution filed additional witness endorsements, but none contained the name Charlotte Kirn. (D.A.L.F. 13, 15, 284, 290-92, 356-57). In February of 1998, counsel filed a specific request for all conviction reports of the prosecution's penalty phase witnesses. (*Id.* 206-07).

At the penalty phase, Charlotte Peroti provided the following damaging testimony against Worthington. Peroti stated prior to the killing, she lived in the same apartment complex as Worthington and Ms. Griffin. (Tr. 96-98). She stated that approximately ten days before Ms. Griffin was killed, Worthington broke into her apartment late at night by removing the screen to the kitchen window and became "forceful," trying to have sex with her. (Tr. 100-02). Worthington allegedly told Peroti that he was let in by Peroti's son, Anthony Hansen. (Tr. 100, 102). Peroti said her boyfriend, who was sleeping , came down the stairs and Worthington was chased out. (Tr. 100, 103). She stated Worthington took her car, but returned it, and that he stole some of her jewelry. (Tr. 102-03). Finally, she stated she contacted the police concerning this incident, but was told not to pursue charges for attempted sexual assault because she was, in fact, "an undercover narcotics agents" working with local authorities trying to set up Worthington on drug charges. (Tr. 103-05, 113).

Rather than challenging the veracity of Peroti's allegations concerning the alleged break-in of her apartment and the attempted sexual assault, counsel's cross-examination focused on eliciting details of Peroti's contention that she was an undercover drug agent. (Tr. 103-18). The following is the entire cross-examination of Peroti concerning the alleged attempted sexual assault and her failure to report it:

> Q. Okay. So you didn't report this incident as a sexual assault. You called another officer you had been working with on some other case?
>
> A. Right.
>
> Q. Okay. And did that officer come over right away to your apartment?
>
> A. We spoke and decided what I should do and then the next day is when I realized he had taken my car and how he got in, then I reported to Lake St. Louis Police, then I called the MEG unit in St. Louis County, who I was working with and I let then know what had happened. They asked me to hold off on pressing charges against Michael Worthington. (Tr. 104).
>
> ***
>
> Q. Now, after this incident in September, did you still have the officer telling you, well, let's not file any charges right now, instead of getting him for an attempted rape or sexual assault charge, we would rather try to get him on a drug charge. Is that the way the plan went down?
>
> A. They wanted to try to get him for the drugs then go for the sexual assault and stealing my car.

(Tr. 113).

When Charlotte Kirn was called to the stand, counsel did not know she was actually Charlotte Peroti. (1st Supp. P.C.R. L.F. 484). Before Peroti was called, counsel was never supplied the name "Peroti," nor her last known address nor the substance of her expected testimony. (*Id.* 483). In addition, prosecutor Tim Braun never disclosed to the defense that in August 1996 he had charged Charlotte Kirn, a/k/a Peroti, a/k/a Gibson, a/k/a Deroy, a/k/a Myers, a/k/a Hansen, with the felony of passing a bad check over $150.00. (P.C.R. L.F. 886-887). In November 1997, Peroti pleaded guilty to the misdemeanor passing a bad check and received a suspended imposition of sentence, two years of supervised probation and monthly restitution. Two other cases brought against Peroti by Braun were dismissed. (*Id.* 915).

When Worthington watched as Peroti testified, he told his attorneys that she was mentally unstable, that she was fabricating all her testimony, and that she was the mother of Anthony Hansen, the person that Worthington previously informed the court was present with him during the killing. (1st Supp. P.C.R. L.F. 485). Counsel also admitted there was no reason why they should not have objected because the prosecution failed to comply with its discovery obligations and with *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to turn over the information on Peroti's convictions. (*Id.* 484-485). Further, counsel admitted he had no reason for failing

50

to object to Peroti's testimony based on *State v. Debler*, 856 S.W. 2d 641, 656-58 (Mo.banc 1993), which required the prosecution to provide pre-trial notice of any unconvicted misconduct it intends to present as a non-statutory aggravating factor. Counsel also admitted that he should and could have requested additional time to investigate Peroti's background. (*Id.*)

The Missouri Supreme Court began its analysis of the Peroti/ineffectiveness issue by noting that Worthington argued on his direct appeal that the state failed to give notice under *Debler* of Peroti's testimony. However, this claim was relegated to plain error review because counsel did not object. *Worthington v. State*, 166 S.W. 3d at 580. The Missouri Supreme Court then turned to the issue as to whether the ruling in the direct appeal precluded it from granting relief on ineffectiveness grounds on appeal of the post-conviction proceeding. (*Id.* at 581). The Court denied relief by concluding:

> Even if counsel did not know until she got on the stand that Charlotte Peroti and Charlotte Kirn were the same person, Mr. Worthington had mentioned Ms. Peroti numerous times in his statement to the police after his arrest and counsel knew all about the events to which she testified and cross-examined her effectively about them. . . . There is no reasonable probability that the minor additional impeachment value of showing she had a prior bad check conviction and that she may have exaggerated her role as a police informant affected the outcome of the case.

*Id.*

The Missouri Supreme Court's decision involves an unreasonable interpretation of the relevant facts and the applicable law.  See 28 U.S.C. § 2254(d).  Most notably, the state court's factual finding that Worthington mentioned Peroti numerous times to the police and that counsel knew in advance about all the events to which she testified and effectively cross-examined her is erroneous because there is no mention of "Charlotte Peroti" in the statements Worthington made to the police.[2]  (P.C.R. Exh. 14 at 3571-3788).  In addition, the state court record explicitly contradicts any factual finding that counsel knew in advance the substance of Peroti's

testimony and effectively cross-examined her.  As noted earlier, counsel's cross-examination was limited and did no damage to Peroti's credibility.  If counsel had investigated Peroti, counsel could have destroyed Peroti's credibility with, among

---

[2]  In Worthington's taped recorded statement, there are a few references to "Charlotte (last name unknown)" and others who had lived at the apartment complex.  (P.C.R. Exh. 14 at 3598, 3608, 3610, 3634, 3665, 3687).  However, there is nothing in petitioner's statement that would put petitioner or his counsel on notice that Charlotte Perotti had accused petitioner of burglary and attempted rape one week before Ms. Griffin was killed.  (*Id.* 3571-3788).

other things, her prior criminal record and her fabrication of her role as a drug informant. As a result, the Missouri decision rested upon an unreasonable determination of fact under 2254(d)(2). *See Simmons v. Luebbers*, 299 F.3d 929, 937-938 (8th Cir. 2002).

The Missouri Supreme Court decision is also flawed because it fails to take into account that counsel specifically testified in the post-conviction proceeding that he learned for the first time that Peroti was allegedly a police informant when she took the stand. (1st Supp. P.C.R. L.F. at 489). This decision also overlooked the fact that counsel testified that his advice to Worthington, as to whether he should plead guilty, would have been impacted if counsel had been notified in advance of the content of Peroti's testimony. (*Id.* 566-67).

Counsel also unequivocally stated he had no tactical reason in failing to object to Peroti's testimony under *Debler*. Reasonably competent counsel under similar circumstances would have objected to the prosecution's failure to properly endorse Peroti and disclose the substance of her testimony under *Debler* and *Brady*. Had these objections been made, trial court would have had no choice but to exclude her testimony. Worthington was clearly prejudiced because Peroti's testimony provided damning non-statutory aggravating evidence that Worthington had been involved in a similar attempted rape and burglary in the same location just days before Ms. Griffin

was killed.  This evidence was utilized by the sentencing court to establish the non-

statutory aggravator of petitioner's criminal history.  (P.C.R. Exh. 15 at 3893).  There

is a reasonable probability that, if this damaging and unreliable testimony had been

excluded, Worthington would not have been sentenced to death.  *Strickland,* 466 U.S.

at 694.

### B. Failure to Investigate and Object to Lack of Notice of Non-Statutory Aggravators Involving Jail Misconduct and Prior Bad Acts.

During the penalty phase, the prosecution was given a free pass by defense

counsel to introduce an avalanche of evidence–most of it inadmissible and unreliable

hearsay to establish the non-statutory aggravating factor of "violent behavior in pre-

trial confinement." (P.C.R. Exh. 15 at 3893). Regarding Officer Michael McKee, who

testified against Worthington, the prosecution filed a witness endorsement in July 1997

that only indicated: "The Major Case Squad report involving the above referenced

witness has previously been disclosed to defendant's attorney through discovery."

(D.A.L.F. 78).

Counsel stipulated to nearly two hundred fifty (250) pages of records from the

St. Charles County Jail.    (P.C.R. L.F. 3083-3348).  Counsel felt there was no legal

basis for objecting to these records and had not bothered to investigate the accuracy

of their contents.  (D.A.L.F. 365-68; Tr. 6-7; 1st Supp. P.C.R. L.F. 469-70). Without

objection, Officer McKee testified that jail records indicate Worthington was involved in fifty-five (55) separate "incidents" during his incarceration. (Tr. 151-52, 164).

The prosecution led McKee through a few of the more serious alleged incidents, including how Worthington: a) possessed homemade alcohol and threatened a guard when it was discovered (Tr. 138-39); b) was found in possession of a razor blade in his cell (Tr. 140-42); c) assaulted a jail officer, and when restrained, threatened to kill other officers (Tr. 142-44); d) instigated fistfights and challenged an officer to a fight (Tr. 144-47); and e) wedged a broom handle in a sliding security door to prevent entry(Tr. 149-50). McKee was even permitted to give his "opinion" that Worthington had a reputation for being "violent and combative." (Tr. 188).

The prosecution also called Robert Smith, another officer from St. Charles County jail. Smith testified to an incident where Worthington grabbed a broom handle, ran over tables and chased another inmate, threatening to kill him with it. (Tr. 202-04). Defense counsel also stipulated to a transcript from the assault charge brought against Worthington by this inmate. Only Smith's name, along with other names, was listed in a July 1998 penalty phase endorsement of witnesses. (D.A.L.F. 290-92, 365-68; Tr. 6-7).

In addition, the prosecution called officer Jerry McKean, from the Peoria Illinois Police Department, to testify in the penalty phase. Once again, counsel stipulated to

the admission into evidence of numerous police reports and police records totaling one hundred twenty-six pages. (Tr. 6-7, 221-22; P.C.R. Exh. 17 at 4211-4337). McKean testified to specific instances of alleged crimes committed by Worthington contained in the records. (Tr. 223-33). Those alleged incidents included: a) Worthington committed three burglaries where he stole items from guests at Jumer's Hotel, where he worked (Tr. 224-28); b) Worthington's mother gave a knife to police, telling them it was because of her son's "violent tendencies" and that the knife was used to assault her father (Tr. 239-40, 247); c) Worthington reportedly shot at his grandfather (Tr. 240); and d) Worthington admitted to police that he used someone's bank card to get ATM money (Tr. 240-41). McKean testified Worthington was listed in thirty-seven (37) police reports. (Tr. 228-29). Several reports showed Worthington's maternal grandparents being the victims of burglaries, thefts, and assaults committed by Worthington. (Tr. 229-30).

Only the name "Christine Frey" appeared in the same filing endorsing McKean and Smith. (D.A.L.F. 291). In April 1998, the prosecution disclosed Christine Frey's Interview Worksheet for the penalty phase. (*Id.* 283). Ms. Frey was disclosed without identifying the non-statutory aggravators for which she would be providing testimony.

Christine Frey, an Illinois probation officer, testified concerning a pre-sentence investigation she prepared on Worthington stemming from his 1995 guilty plea for burglary and theft in Peoria. (Tr. 248-54). Her report was admitted by stipulation. (Tr. 6-7, 253-5; D.A.L.F. 365-68). Worthington did not appear for sentencing in that case because he was already in custody for the killing of Ms. Griffin. (*Id.* 253). Frey testified concerning prior Worthington's placement in juvenile facilities for burglaries and thefts. (*Id.* 253-55). While in juvenile custody, Worthington formed an escape plan and was regarded as a "major security risk." (*Id.* 255). The escape risk information came from a letter of a juvenile detention administrator, which was inadmissible hearsay. Frey also testified from a report completed by a grade school psychologist when Worthington was seven years old. Worthington allegedly told the psychologist that "when his adrenaline gets going, he could kill someone." (Tr. 257). Relying on hearsay from this report, Frey testified Worthington had thoughts of killing others by stabbing them in the chest, including his teachers, stepfather and other children. (*Id.* 257).

Dr. Max Givon also testified for the state in the penalty phase. Dr. Givon prepared a written report that was admitted into evidence by stipulation. (P.C.R. Exh. 10 at 2582-2607). Givon testified that Worthington told him that he had set his friend on fire by throwing gasoline on him. (Tr. 310). Givon also testified that

Worthington's disciplinary infractions while in juvenile custody, were consistent with Givon's finding of anti-social behavior disorder. (Tr. 312-313).

In his closing statement, the prosecutor stressed that the death penalty was appropriate based upon the aforementioned evidence. (Tr. 17-24). Braun then argued: "he can't live peacefully in prison. He doesn't deserve a life sentence. The death penalty is needed to stop him." (Closing Arg. Tr. 19).

The Missouri Supreme Court's decision denying relief on this claim stated: "It was not unreasonable for counsel to conclude that it was better not to object and instead to use the positive aspects of the information to support the claim that Mr. Worthington should not receive death. Counsel cannot be ineffective for making reasonable choices of trial strategy. .." *Worthington v. State*, 166 S.W. 3d at 582.

But it was the height of "unreasonableness" for counsel to stipulate to an avalanche of damaging evidence, most of which was inadmissible hearsay. *See e.g., State v. Revelle,* 957 S.W.2d 428, 431-432 (Mo. App. S.D. 1998).[3] It was not a

_____

[3] It cannot be seriously disputed that most of the documents detailing the incidents outlined above could have been excluded by objection on hearsay grounds, including the jail records, the Peoria police and probation reports and Dr. Givon's report. *See e.g., State v. Landers,* 596 S.W.2d 487 (Mo. App. E.D. 1980).

reasonable choice of trial strategy to simply open the floodgates to the admission of any and all evidence the state wished to present. In addition, the Missouri Supreme Court did not identify what aspects of this evidence were "positive" or favorable to Worthington's case. This is understandable because the record reflects that this evidence categorically portrays Worthington as a dangerous sociopath who was beyond redemption and rehabilitation. As a result, the Missouri decision involved an unreasonable determination of fact under 2254(d)(2).

Apart from the fact that most of this evidence could have been excluded had counsel objected, much of this non-statutory aggravating evidence could have been effectively neutralized and rebutted if trial counsel had conducted a reasonable investigation of these issues. With regard to the prior crimes in Peoria, as more fully set forth under Claim 1, *infra.*, had Mr. Green bothered to extensively interview petitioner's parents and other members of his family, he could have demonstrated to the sentencing court that many of the crimes attributed to petitioner in Peoria, including the alleged assault and burglaries committed against his grandfather and grandmother, were actually fabricated by or committed by his mother. (See Exh's 5, 6).

A reasonable investigation by trial counsel would have also effectively neutralized the prosecution's evidence that petitioner was assaultive and dangerous during his pre-trial incarceration. Had counsel bothered to closely examine the St.

Charles County jail records admitted into evidence through the testimony of Officer McKee, he would have had substantial ammunition to argue that the vast majority of petitioner's fifty-five (55) disciplinary infractions involved very trivial incidents. (See P.C.R. Exh. 12, 13 at 3083-3348).

Eighteen of these incidents are characterized as "informational" or "shake down," involving minor incidents, such as when visitors were refused in their efforts to visit Worthington due to their late arrival or when the guards found paper on the light and walls of his cell during shake downs. (*Id.* 3143, 3190). Twelve of these incidents involved medical issues, such as when Worthington injured his toe on his bunk bed. (*Id.* 3103). Seven incidents involved situations where Worthington was actually the victim of assault or involved purely verbal abuse. In one of these incidents, another inmate was found on top of Worthington, hitting him with his fists and petitioner was merely defending himself. (*Id.* 3108). In another incident, Worthington told guards that they should not be using pepper spray on two inmates involved in a fight. (*Id.* 3119-3121).

Five other incident reports involve Worthington's "refusal to rack", which means that he did not immediately go to his cell when ordered to do so by a guard. (*Id.* 3329). Five other incident reports involved conduct violations involving Worthington's failure to wear his prison wristband. (*Id.* 2999).

In nearly three years of confinement, petitioner was apparently involved in only two altercations where he was actually the aggressor. (*Id.* 3264-67; 3336-3337). The first incident in March of 1997 involved Worthington grabbing the arm of the guard who was searching his cell. Worthington was immediately shackled. Although he was yelling and screaming at the guards, there were no injuries reported. (Tr. 142-143). The only truly serious incident occurred on October 30, 1997, where Worthington chased an inmate named Minter with a broom handle and struck him several times on the back. (*Id.* 150).

The foregoing facts indicate that, if Mr. Green had adequately reviewed and investigated the jail records and effectively rebutted them, the trial court would have not had any reasonable factual basis to find a non-statutory aggravating circumstance that petitioner was a violent and aggressive inmate. (P.C.R. Exh. 15 at 3893). In nearly three years of pre-trial incarceration, petitioner was only involved in one serious incident involving assaultive conduct. The above-noted chronology clearly establishes that Mr. Green's failure to investigate and rebut the jail misconduct and the Peoria crime evidence was objectively unreasonable. Petitioner was prejudiced because, had this evidence been effectively rebutted, the trial judge would have had no basis to find and weigh the non-statutory aggravating factors of prior criminal conduct and assaultive behavior while incarcerated. Without this damaging evidence being factored

61

into the sentencing equation, there is a reasonable likelihood that Judge Nichols would have elected to impose a sentence of life without parole. *Strickland,* 466 U.S. at 697.


### C. Failure to Rebut Evidence Worthington Set Butch Mackey on Fire.

Worthington underwent a pretrial mental examination. An evaluation was done by state employee Dr. Max Givon pursuant to Chapter 552 R.S.Mo. (1994). Dr. Givon prepared a written report that was admitted by stipulation. (P.C.R. Exh. 10 at 2582-2607). During the penalty phase, he was also called as a witness by the prosecution. Counsel Rosenblum objected to Dr. Givon testifying because Givon was hired under Chapter 552 to determine whether Worthington was competent to stand trial. (Tr. 294-295). When Rosenblum learned that co-counsel Green had already stipulated to Givon's report, he had no choice but to withdraw the objection. (*Id.* 295).

Dr. Givon diagnosed Worthington with cocaine dependence, alcohol abuse and anti-social personality disorder. In his opinion, Worthington exhibited signs of malingering during his evaluation. (Tr. 313-14). When asked about what evidence he found to support his diagnosis of anti-social personality disorder, Givon testified:

> He had admitted setting his own home on fire twice as well
> as a garbage truck and he also said he was always doing

> something destructive *and made the remarkable statement*
> *that we burned our friend, Butch Mackey, over ninety*
> *percent of his body. I was eleven then. We were throwing*
> *gas on each other.*

(Tr. 310).

Attorney Joseph Green recalled a pre-trial conference with Worthington where petitioner called Green's attention to the inaccuracies in Givon's report, and was told that Worthington told Givon that he was not involved in Butch Mackey being burned. (1st Supp. D.A. L.F. 452-54). Green did not consider talking to the people involved with the Mackey burning and he did not go to Peoria to investigate this incident because he was not given sufficient funds by Rosenblum. (*Id.* 457-58).

When the penalty phase was being tried, Elex and Beverly Mackey were still living in Peoria. (P.C.R. Tr. 19, 53). Mr. and Mrs. Mackey are the stepparents of Butch and Richy Mackey. (*Id.* 22, 48). No one from petitioner's defense team contacted them in advance of the penalty phase. (*Id.* 22, 49). The Mackeys testified that Richy Mackey, not Butch Mackey, was severely burned in an incident that did not even involve Worthington. (*Id.* 22-25, 52). Richy Mackey was accidentally burned when his brother Butch and another friend, "Kevin," cut up a garden hose into small pieces, and one of them blew gasoline through the hose while the other lit the other end like a torch. Richy, not knowing what was going on, walked past the two into a

fireball.  (*Id.* 30-31, 56).  The Mackeys both stated that Worthington had nothing to do with the incident.  (*Id.* 34-35, 56-59).

The Missouri Supreme Court held that counsel's failure to investigate this incident did not constitute ineffective assistance of counsel because "[c]orrecting the record as to who caused the burns was relative only to the extent that the incident affected Dr. Givon's diagnosis of anti-social personality disorder ..." because Dr. Givon "did not state that the burning incident was necessary to his conclusion." *Worthington v. State*, 166 S.W. 3d at 576.  The Court concluded ineffectiveness had not been shown because "[n]othing suggests that, had the facts as to that incident been further explored, Dr. Givon's diagnosis would have changed."  (*Id.* at 577).

The failure to conduct a thorough investigation that would mitigate punishment and rebut aggravating evidence constitutes ineffective assistance of counsel.  *Williams v. Taylor*, 529 U.S. 362, 371, *Wiggins v. Smith*, 539 U.S. at 537.  In *Rompilla v. Beard*, 125 S.Ct. 2456 (2005), the Supreme Court was faced with a claim of ineffective assistance where trial counsel knew that the prosecution would seek death by proving that Rompilla had a significant history of violent felonies, yet counsel failed to obtain the readily accessible documents that would be used by the prosecutor in order to rebut the evidence.  (*Id.* at 2465-66).  The Supreme Court held counsel was ineffective under the *Strickland* standard in failing to review the file that contained this

damaging evidence, and which also contained "a range of mitigation leads that no other source had opened up." (*Id.* at 2465).

Had counsel investigated this burning incident, Dr. Givon's credibility would have been destroyed. The Missouri Supreme Court's decision ignored the fact that this non-existent crime was utilized to support Judge Nichols' decision to impose death based upon the non-statutory aggravating factor of Worthington's prior criminal history. (P.C.R. L.F. 3893). The Missouri Supreme Court's opinion totally ignored the impact of this evidence and focused solely on whether this evidence would have affected Dr. Givon's diagnosis.

The penalty phase was held in September 1998. Dr. Givon's report was completed in January 1997. Counsel had this report for over a year and a half and were apprised by Worthington of the report's inaccuracies. Reasonably competent counsel under similar circumstances would have gone to Peoria, met with the Mackeys, and called them to rebut this false and damaging evidence. *See Johnson v. Mississippi*, 486 U.S. 578, 590 (1988). A reasonably competent counsel would not have stipulated to Givon's report and would have raised hearsay and self-incrimination objections to Givon's report and penalty phase testimony. (See Claim 5, *infra*). Worthington was clearly prejudiced because the sentencer heard and relied upon false,

unreliable evidence, and then utilized this evidence in reaching its decision to impose the death penalty. *See Johnson v. Mississippi*, 486 U.S. at 590.

The prejudice to Worthington from counsels's failure to investigate and object to all of the other bad act evidence is apparent. The judge considered and then weighed unreliable and inadmissible evidence that never should have been heard. The prosecutor emphasized this testimony in argument and urged the court to impose death on this basis. Competent counsel would have objected to the witnesses and the records and kept much of this evidence from being heard. Had counsel investigated this aggravating evidence, he could have neutralized much of the damage by showing the extent of petitioner's jail misconduct was grossly exaggerated, that many of the Peoria crimes attributed to him were fabricated by his mother, and that he was not involved in the burning of Butch or Richy Mackey. The Missouri Supreme Court's decision, therefore, is also both "contrary to" and involves an "unreasonable application" of *Strickland* and *Rompilla*. *See* 28 U.S.C. §2254(d)(1). Penalty phase relief is warranted.

## CLAIM NO. 3

**PETITIONER'S DEATH SENTENCE WAS IMPOSED IN VIOLATION OF HIS RIGHTS SECURED BY THE EIGHTH AND FOURTEENTH AMENDMENTS BECAUSE IT WAS IMPOSED BASED UPON THE PERJURED PENALTY PHASE TESTIMONY OF CHARLOTTE PEROTI AND BECAUSE THE STATE FAILED TO DISCLOSE MATERIAL**

**EXCULPATORY EVIDENCE IN ITS POSSESSION THAT WOULD HAVE DESTROYED HER CREDIBILITY.**

As noted earlier, prosecutor Braun never disclosed to the defense that in August 1996 he, personally, had charged Charlotte Kirn, a/k/a Peroti, a/k/a Gibson, a/k/a Deroy, a/k/a Myers, a/k/a Hansen, with the felony of passing a bad check over $150.00. (P.C.R. L.F. 886, 914). In November 1997, Peroti pled guilty to misdemeanor passing a bad check and received a two-year suspended imposition of sentence, supervised probation and monthly restitution. Two other cases brought against her by Braun were dismissed. (*Id.* 915). The government also failed to disclose that Peroti was not an undercover drug agent for the police.

The failure to disclose this evidence that would have destroyed Peroti's credibility violates due process under *Brady v. Maryland,* 373 U.S. 83 (1963), and its progeny. Under *Brady*, the prosecution is under a duty to disclose favorable evidence that is material to either guilt or punishment. (*Id.* at 87). For purposes of due process, no distinction between exculpatory and impeachment evidence exists. *United States v. Bagley*, 473 U.S. 667, 676-78 (1985). Nondisclosure of *Brady* material violates due process "irrespective of the good faith or bad faith of the prosecution". *Brady,* 373 U.S. at 87. *See also United States v. Agurs*, 427 U.S. 97, 110 (1976). This issue was raised by Worthington in the postconviction motion and in his appeal to the Missouri

Supreme Court. Neither the Rule 24.035 court nor the Missouri Supreme Court directly addressed this constitutional issue. Therefore, this Court may review this issue *de novo*. *Taylor v. Bowersox,* 329 F.3d 963, 968 (8th Cir. 2003); *Robinson v. Crist,* 278 F.3d 862, 865 (8th Cir. 2002).

Peroti provided extremely damaging testimony against Worthington. She contended that approximately ten days before Ms. Griffin was killed, Worthington broke into her apartment late at night by removing the screen to the kitchen window and became "forceful," by trying to have sex with Peroti. (Tr. 100-02). This accusation, if true, would have mirrored the crime against Ms. Griffin and strongly supported the non-statutory aggravating factor, found by the judge, of Worthington's "criminal history." (P.C.R. Exh. 15 at 3893). The proximity in time of this alleged sexual assault to the killing of Ms. Griffin was no less damaging.

On cross-examination, Peroti detailed how she had been working with local law enforcement authorities, including the St. Louis County MEG unit, to set up Worthington on drug charges. (Tr. 104-117). The prosecution also used her testimony that she was an undercover agent to bolster her credibility during the questioning of Worthington's expert, Dr. Evans:

> Q.     Okay. I want to assume that in evidence is a statement from
>        a Charlotte Peroti, somebody who knows Michael Shane

> Worthington, *but who was working as an undercover agent for the law enforcement. . . .*

(Tr. 744) (emphasis added).

During closing argument, the prosecution urged death by focusing on Worthington's alleged assault of Peroti:

> [A]nd you also know from the facts that *a week before,in this very same apartment complex, he broke into another woman's apartment,* not through he front door, came through the kitchen window, and what, looking for a car. But he wanted more than that. He wanted sex, and that's what he came for here.

(Clos. Arg. Tr. 7) (emphasis added).

\*\*\*

> He went to a place he knew there was life. He broke in. He violently and savagely raped and strangled her, *and it isn't surprising that a week before he had done the same thing.*

(Clos. Ar. Tr. 14) (emphasis added).

Apart from her criminal past, Charlotte Peroti was never an undercover drug agent. She apparently invented this testimony on the stand to enhance her credibility. The pre-sentence investigation report states the following:

> When a member of the St. Charles MEG unit was asked if [Peroti] was working with them, or if they were working a case on [Peroti] or Worthington, he replied they were not.

(P.C.R. L.F. 3554).

69

Because of this falsehood, the veracity of Peroti's entire testimony is called into serious question. Not only was counsel denied the chance to impeach Peroti on the bad check conviction and her subsequent deal with the prosecutor, the evidence suggests that Worthington was sentenced to death, in large part, on the basis of Peroti's perjured testimony. *Agurs,* 427 U.S. at 112; *United States v. Foster,* 874 F.2d 491, 494-495 (8th Cir. 1988); *United States v. Boyd,* 833 F.Supp. 1277, 1328-1337 (N.D. Ill. 1993).

There is a reasonable probability that if Peroti's testimony had been discredited, Worthington would not have been sentenced to death. *See e.g., Strickler v. Greene,* 527 U.S. 263, 280 (1999). Had counsel known of the content of Peroti's bad check casefile, he would have used the file to attack her credibility based on the deal she made with prosecutor Braun and her use of multiple names. (1st Supp. P.C.R. L.F. 492). Petitioner was also prejudiced because, if the substance of Peroti's testimony had been disclosed, counsel's decision to advise petitioner to plead guilty would have been adversely impacted. (*Id.* 565-67).

The Eighth Amendment clearly prohibits the use of prior convictions or crimes in aggravation of punishment in a capital case if they are unreliable or "materially inaccurate." *Johnson v. Mississippi*, 486 U.S. 578, 590 (1988). In light of the

foregoing facts, Peroti's testimony was unworthy of belief and inherently unreliable.

Habeas relief is warranted.

## CLAIM NO. 4

**PETITIONER WAS DENIED A FAIR AND IMPARTIAL SENTENCING JUDGE AND A FAIR SENTENCING TRIAL IN VIOLATION OF HIS SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS DUE TO THE IMPROPER INJECTION OF POLITICAL INFLUENCES INTO THE SENTENCING DECISION INVOLVING THE FACT THAT BOTH THE PROSECUTOR AND SENTENCING JUDGE WERE IN HEATED CONTESTS FOR RE-ELECTION AT THE TIME PETITIONER'S CASE WAS HEARD, AND THE PROSECUTOR MADE IMPROPER MEDIA CONTACTS TO EXERT POLITICAL PRESSURE UPON JUDGE NICHOLS TO IMPOSE DEATH AND RECEIVED POLITICAL CONTRIBUTIONS FROM THE VICTIM'S FAMILY, AND BECAUSE THE VICTIM'S FAMILY AND FRIENDS WAGED A SECRET LETTER WRITING CAMPAIGN TO THE SENTENCING JUDGE THAT WAS NEVER DISCLOSED TO DEFENSE COUNSEL. TRIAL COUNSEL WAS ALSO INEFFECTIVE IN FAILING TO MOVE TO DISQUALIFY JUDGE NICHOLS.**

As noted earlier, the fairness of petitioner's penalty phase trial and the impartiality of the judge were tainted by the fact that the critical stages of this case were conducted in the eye of a political maelstrom surrounding the hotly contested St. Charles County elections of 1998. Both the prosecutor and sentencing court were engaged in competitive re-election bids at the time Mr. Worthington's fate was being decided. In addition, co-counsel Joseph Green had unsuccessfully attempted to unseat Braun and be elected St. Charles County prosecutor, but was defeated in the

August 1998 Democratic primary. The record also establishes that the affluent and well-connected parents of the victim made significant campaign contributions to Mr. Braun's re-election campaign just before petitioner was sentenced to death. Mr. Braun also engaged in a relentless media campaign in favor of a death sentence in the case. Both the tone and tenor of Braun's statements to the press were calculated to convey to Judge Nichols that her re-election prospects would be jeopardized if she did not sentence Worthington to death as the majority of the electorate demanded. Finally, friends and family of the victim engaged in a secret letter writing campaign to Judge Nichols urging her to impose a death sentence. None of these letters were disclosed to defense counsel to give them an opportunity to rebut or neutralize the damage done by these *ex parte* contacts with the sentencing judge, which violated the Constitution under *Gardner v. Florida*, 430 U.S. 349 (1977).

### A. Prosecutor Braun's and the Victim's Family's Public Statements.

On August 2, 1998, the St. Louis Post Dispatch ("Post") profiled the candidates for the upcoming November elections in St. Charles County. Prosecutor Tim Braun's "priorities" included "imposition of the death penalty for aggravated deliberate killers." (P.C.R. Exh. 13 at 3419). On August 28, 1998, Worthington pleaded guilty. The next day, the Post carried the first of many calls by Carol Angelbeck, Ms. Griffin's mother,

for Worthington's death.  Mrs. Angelbeck  said that "... justice is the death penalty."
(*Id.* 3401-03).

Petitioner's penalty phase trial took place between September 14, 1998 and September 17, 1998.  An article published in the Post on September 14, 1998,  quoted Mrs. Angelbeck as follows:  "Justice in this case will be the death penalty."  She said Worthington was "just trying to save his own skin ... He figures he has a better chance by throwing [sic] his mercy on the court."  (*Id.* 3395).  On October 5, 1998, the Post published: "Defendants May Be Pleading Guilty As Ploy To Avoid Getting Death Sentences From Juries." (*Id.* 3383-84).   Assistant prosecutor Groenweghe told the Post that Worthington and others thought they had a better chance of avoiding death in front of a judge.  (*Id.* 3383).  Mrs. Angelbeck stated that Worthington's guilty plea was his way of trying to get out of the death penalty.  (*Id.*)  Braun told the Post that Kansas City guilty pleas stopped when a judge imposed death. Braun added:  "You shouldn't be putting executions up for election, but the judiciary should share the values of the community and reflect them ... and the community is overwhelmingly in favor of the death penalty."  (*Id.* 3384)

On October 13, 1998, defense counsel moved to disqualify Braun based on these statements to the press.  (D.A.L.F. 396-402).  Counsel argued Braun's actions "demonstrated such a personal interest so as to indicate that he is not only unfair to

defendant, but also he has impugned the integrity of the Court and has served to undermine the public confidence in these proceedings." (*Id.* 396). Even though Worthington's case had been pending for three years, Braun had not actively participated in the case until the election year and only after Worthington pleaded guilty in August 1998. The motion detailed how Braun had told defense counsel and other lawyers that he was being hurt by the lack of favorable death penalty publicity since Worthington entered a guilty plea instead of going to trial. (*Id.* 399).

On October 15, 1998, Judge Nichols heard the motion to disqualify. She stated she was "somewhat offended by the statements that were made in that article." (Hrg. DQ. Braun 20). Closing arguments were made that same day. The October 16, 1998, Post reported how Braun invoked five minutes of silence for the court to imagine how long it took Ms. Griffin to die. (P.C.R. Exh. 13 at 3379-80; Clos. Arg. Tr. 14-15). On October 19, 1998, the Post ran an article called "Defense Ploy of Citing Victim Draws Criticism." Mrs. Angelbeck was quoted saying her daughter always believed in "an eye for an eye." (P.C.R. Exh. 13 at 3376).

On October 21, 1998, the Post published an article about the race between Nichols and Schneider. Schneider was quoted as saying: "The death penalty and life in prison is an issue all citizens are concerned about ... The judge can take the place of the jury, so it is important public officials share their values and beliefs." (*Id.* 3405).

74

Schneider added: "It's very important for a judge to reflect the values of the community." (*Id.*)  The article noted that Nichols was on Worthington's case and would be responsible for deciding life or death. (*Id.*)

On October 27, 1998, the Post published: "Braun, Banas Clash in Race for Prosecutor Issue of Experience, What Should Count Dominates Contest." (*Id.* 3430-31).  Braun was quoted as saying he has "personally sent two people to death row, which is more than any other prosecutor has in St. Charles County." (*Id.* 3430).  Braun noted that his opponent Jack Banas had never put anyone on death row.  (*Id.*)  The October 28, 1998, Post published a Letter From Readers that read:

> Could it be that Judge Grace Nichols is dragging her feet on sentencing Michael Worthington – the admitted rapist and killer of Mindy Griffin–until after the November 3 elections? Then she can slap him on the wrist and say what a bad boy he is without the risk of voter disapproval at the ballot box. Is the delay politically motivated?
>
> I would say to the voters of St. Charles County that you should consider voting Judge Nichols out of office if she hasn't decided by Nov. 3 on what to do about Worthington.  Give Judge Nancy Schneider, Nichols' opponent in the election, a chance to honor the memory of Mindy Griffin.
>
> Worthington is not fit to live.  He should be put to death.

(*Id.*)  On October 30, 1998, the Post published another letter from Mrs. Angelbeck calling for death.  (*Id.* 3371-72).  Nichols and Braun were both defeated on November

3, 1998. Worthington's formal sentencing was set the next day–November 4, 1998.

Braun's campaign contributions records from the Missouri Ethics Commission established that in June 1997 Ms. Griffin's parents gave him four baseball tickets worth $76.00. (P.C.R. Exh. 18 at 4754). On October 18, 1998, Mrs. Angelbeck gave $500.00 to Braun. (*Id.* 4757) That same day, Ms. Griffin's stepfather Jack Angelbeck made his own $500.00 contribution to Braun. (*Id*. 4758). Ten days later, Ms. Griffin's stepfather gave Braun another $500.00. (*Id*.4759-60).

## B.     Secret Letter Writing Campaign.

A total of twenty-four (24) letters were sent to Judge Nichols by the victim's family and friends prior to the sentencing on November 4, 1998. (See P.C.R. L.F. 926-973). Trial counsel never knew of the letters because they were kept under seal. (1st Supp. P.C.R. L.F. 494-96). These letters contained the following representative excerpts:

a) "many Lake St. Louis residents" want death;

b) "Worthington is not worthy to take up space in a jail cell and therefore I, the jury, cast my vote for the Death Sentence" (by hanging);

c) All they that strangle, shall perish by strangulation";

d) "that Villainous, Murderer, Rapist, animal has taken my shining star";

e) Worthington is a "dangerous monster" and she "shuddered to think of how many years this animal walked the streets among good, decent people." "Why should we, as taxpayers, be forced to support this degenerate?"

In light of this politically charged atmosphere surrounding the 1998 election, trial counsel was understandably concerned that political considerations would affect Judge Nichols' sentencing decision. (*Id.* 442). This reality motivated counsel to file the motion to disqualify Braun. (*Id.* 444). Attorney Green had no excuse in failing to also move to disqualify Judge Nichols. (*Id*. 493). Even though sentencing took place the day after the election, when the judge and prosecutor both lost, counsel felt that improper political considerations were not removed because Nichols continued to serve as a senior judge. (*Id.* 555-57). In light of the foregoing facts, a reasonably competent attorney would have moved to disqualify Nichols. *Strickland*, 466 U.S. at 687. In light of the fact that political considerations created an appearance of impropriety, prejudice is presumed.

## C.    Judge Nichol's Representation of Anthony Hansen.

At the conclusion of the testimony of Charlotte Peroti, who testified that she was an undercover drug agent who was the victim of a burglary and an attempted sexual assault by Worthington ten days before Ms. Griffin was killed, Judge Nichols stated on the record:

Just informing counsel that during this witness's testimony, it became clear to me that about ten or twelve years ago I was appointed by the juvenile court in St. Charles county as a guardian ad litem for Anthony Hansen, who is the witness's son and in a proceeding having to do - I believe he was about six years old at the time, having to do with a burn that took place in a tub, hot water, tub incident and I didn't recognize Ms. Peroti, but she was his mother and I just want to make counsel aware of that so that there – so you have all the information in front of you.

MR. GREEN:      Thank you, judge

MR. BUEHLER:   Is there any objection by defense counsel

for her to hear these proceedings based upon that representation?

MR. GREEN:      No, there is not.

MR. BUEHLER:   Okay.  State has none either, judge.

(Tr. 120).

Coupled with the aforementioned political factors, a reasonably competent attorney would have moved to disqualify Judge Nichols to ensure that his client was sentenced by an impartial decisionmaker.   In addressing this issue, the Missouri Supreme Court stated as follows:

Trial counsel was not required to consult with his client before waiving the conflict.  Defense counsel has wide discretion in determining what strategy to use in defending his or her client.

***

78

> Waiving the disqualification of a judge is not one of the[]
> fundamental decisions that must be personally made by the
> accused. *See State v. Baller*, 949 S.W. 2d 269, 274
> (Mo.App. E.D. 1997).
>
> ***
>
> The record further reveals that Judge Nichols took
> reasonable measures to limit any perceived public pressure
> to impose the death penalty by delaying sentencing until the
> day after the election, an election that she lost. Mr.
> Worthington asks this Court to speculate that she might
> have imposed the death penalty because she wanted
> favorable publicity in the event she decided to seek public
> office at some point in the future, but such speculation has
> no foundation in the record

*Worthington v. State*, 166 S.W. 2d at 579, 580.

"A fair trial in a fair tribunal is a basic requirement of due process. . . . Every procedure which would offer a possible temptation to the average man as a judge . . . not to hold the balance nice, clear and true between the State and the accused denies the latter due process of law." *In Re Murchison*, 349 U.S. 133, 136 (1955), quoting *Tumey v. Ohio*, 273 U.S. 510, 532 (1927). A reasonably competent attorney, based upon the foregoing facts, would have moved to disqualify Judge Nichols. *Strickland,* 466 U.S. at 687. The fact that the court received letters in secret, never making them known to defense counsel, was also constitutionally prohibited under *Gardner v. Florida*, 430 U.S. 349 (1977). In *Gardner*, the trial judge imposed death, but did not disclose portions of a PSI report to counsel. (*Id.* at 353-54). The Court reversed

Gardner's death sentence because there was no opportunity for counsel to challenge or rebut the undisclosed material. (*Id.* at 356, 360).

It is undeniable that the aforementioned facts created an appearance of impropriety calling Judge Nichols' impartiality into question. Her decision to seal the family's letters urging death underscores this point. This action clearly violated *Gardner*. Worthington's sentence was irreparably tainted by "the politics of death." These political considerations compromised the integrity of the proceedings and, unless this court intervenes, petitioner will forfeit his life as a result of an impermissibly arbitrary and capricious sentencing process.

What makes this situation more than suspicious and casts doubt upon the integrity of the entire St. Charles County judicial system are unanswered questions of how and why Judge Cundiff removed himself from the case in the first place in a proceeding conducted off the record. However, the answer can be inferred from the circumstances. Judge Cundiff was not concerned about appearing pre-disposed to a life sentence in exchange for a guilty plea. He was forced off the case by the victim's politically-connected and prosperous family and possibly other local political pressures. There is simply no other explanation for his actions. Once Judge Cundiff indicated he was possibly receptive to a life sentence, he mysteriously and inexplicably recused himself from the case.

A competent attorney would have, at the very least, consulted with petitioner before deciding not to move to disqualify Judge Nichols because of the Anthony Hansen situation. *See Geders v. United States*, 425 U.S. 80 (1976). In *Strickland*, the Court recognized that "[f]rom counsel's function as assistant to the defendant derive the overarching duty to advocate the defendant's cause and the more particular duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution." *Strickland*, 466 U.S. at 688.

Counsel failed to inform Worthington of this important development–that Nichols had actually represented Charlotte Peroti's son. Reasonably competent counsel would have conferred with their client and disclosed this conflict. Worthington was prejudiced because he would not have agreed to continue his guilty plea in front of Nichols and would have asked to withdraw his plea. (2nd Supp. P.C.R. L.F. 219-20).

However, under prevailing caselaw, because the presence of a biased decisionmaker undermines the integrity of the criminal justice system, this is a structural error in which prejudice is to be presumed. *See Porter v. Singletary,* 49 F.3d 1483, 1489 (11ᵗʰ Cir. 1995) (evidence that "the judge had a fixed predisposition to sentence this particular defendant to death if he were convicted" warrants relief);

*Tumey v. Ohio,* 273 U.S. 510 (1927) (automatic reversal when tried by judge with financial interest in the outcome). Where trial counsel's deficient performance results in a structural error, *Strickland* prejudice is also presumed. *See McGurk v. Stenberg,* 163 F.3d 470, 473 (8th Cir. 1998); *Miller v. Dormire*, 310 F.3d 600, 603-604 (8th Cir. 2002).

Since the Missouri Supreme Court did not address the *Gardner v. Florida* aspect of this claim on petitioner's postconviction appeal, the Court is not constrained by the standard of review provisions of § 2254(d) and is free to grant habeas relief after reviewing the claim *de novo*. In addition, the Missouri Supreme Court's decision addressing the judicial bias aspect of this claim is contrary to and involves an unreasonable application of well-settled Supreme Court precedent. Habeas relief is warranted.

## CLAIM NO. 5

**PETITIONER WAS DENIED HIS RIGHT TO COUNSEL AND RIGHT TO BE PROTECTED AGAINST SELF-INCRIMINATION GUARANTEED BY THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS BY THE PROSECUTION'S USE DURING THE PENALTY PHASE OF THE TESTIMONY OF DR. MAX GIVON WHO TESTIFIED REGARDING PETITIONER'S DANGEROUSNESS AND ANTI-SOCIAL PERSONALITY DISORDER, DESPITE THE FACT THAT THE COURT-ORDERED MENTAL EVALUATION DR. GIVON CONDUCTED WAS LIMITED TO ISSUES OF SANITY AND COMPETENCE TO PROCEED. TRIAL COUNSEL WAS ALSO INEFFECTIVE IN FAILING TO RAISE FIFTH AND SIXTH AMENDMENT OBJECTIONS TO GIVON'S TESTIMONY**

**AND IN STIPULATING TO THE ADMISSION OF GIVON'S WRITTEN REPORT.**

On August 3, 1996, Judge Lohmar ordered an examination pursuant to §552.020 RSMo. (1994) to determine if Worthington was competent to stand trial, if he suffered from a mental disease or defect, and whether he was able to assist his attorneys. (D.A.L.F. 90-93). Dr. Max Givon, a supposedly neutral state-employed psychologist, conducted this court-ordered exam and filed his written report with the Court on January 29, 1997. (P.C.R. Exh. 10 at 2582-2607).

The prosecution later called this state-appointed psychologist to testify at the penalty phase. When one of Worthington's attorneys attempted to object, he learned for the first time that co-counsel had already stipulated to Dr. Givon's twenty-five (25) page report. Dr. Givon proceeded to testify against Worthington, diagnosing him as "antisocial" and accusing him of malingering during the examination. (Tr. 315-317). It is undisputed that Givon did not explain to Worthington prior to the examination that he had the right to have counsel present, the right to remain silent and that the state could use any statements he made against him in the penalty phase.

Dr. Givon's testimony was also utilized by the prosecution to establish the non-statutory aggravating factor of Worthington's "violent" past. (P.C.R. Exh. 15 at 3893). In this regard, Givon testified that Worthington made the "remarkable" claim

that he had intentionally set on fire his childhood friend, Butch Mackey, by throwing

gasoline on him. (Tr. 310). Givon also testified that petitioner's twenty-two (22)

referrals for discipline while in juvenile custody, were consistent with Givon's finding

of anti-social conduct disorder. (*Id.* 312). Givon stated:

> He had admitted setting his own home on fire twice as well
> as a garbage truck and he also said he was always doing
> something destructive *and made the remarkable statement*
> *that we burned our friend, Butch Mackey, over ninety*
> *percent of his body. I was eleven then. We were throwing*
> *gas on each other.*

(*Id.* 310) (emphasis added).

Counsel Scott Rosenblum objected to Dr. Givon testifying on relevance

grounds because Givon was ordered under Chapter 552 to determine whether

Worthington was competent to stand trial. (Tr. 295). When Rosenblum learned that

co-counsel Green had already stipulated to the report, counsel had no choice but to

withdraw the objection. (*Id.*) Dr. Givon testified his diagnoses of Worthington were:

malingering, cocaine dependence, alcohol abuse and anti-social personality disorder.

(Tr. 313).

The Missouri Supreme Court reviewed this issue in the direct appeal. *State v.*

*Worthington*, 8 S.W.3d at 91. The court relied on the fact that Worthington had

already pleaded guilty, and stated that "[a]lthough Dr. Givon's diagnosis may have

been internally inconsistent and his examination perhaps not as thorough as the other doctors who had previously seen Worthington, it was not plain error for the court to allow it as evidence during the penalty phase." (*Id*.) (citation omitted).

The Court further held that the admission of Worthington's statements to Dr. Givon did not violate his right to remain silent and right to counsel under *Estelle v. Smith*, 451 U.S. 454 (1981):

> *Estelle* stands for the proposition that a "criminal defendant who neither initiates a psychiatric examination nor attempts to introduce any psychiatric evidence may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding." (cites omitted).
>
> \*\*\*
>
> Thus, since Worthington initiated the examination, he was not compelled to testify against himself, nor was his right to counsel violated.

*State v. Worthington* , 8 S.W.3d at 91-92.

In *Estelle*, the Court observed that the state-appointed psychiatrist's diagnosis was based not only on his observations of the defendant, but that he "drew his conclusions largely from respondent's account of the crime during their interview and . . . [his] prognosis as to future dangerousness rested on statements respondent made. . . ." *Estelle*, 451 U.S. at 464. In *Estelle*:

The state trial judge, *sua sponte*, ordered a psychiatric evaluation of respondent for the limited, neutral purpose of determining his competency to stand trial, but the results of that inquiry were used by the by the State for a much broader objective that was plainly adverse to respondent.

\*\*\*

That respondent was questioned by a psychiatrist designated by the trial court to conduct a neutral competency examination, rather than by a police officer, government informant, or prosecuting attorney is immaterial. When Dr. Grigson went beyond simply reporting to the court on the issue of competence and testified for the prosecution at the penalty phase on the crucial issue of respondent's future dangerousness, his role changed and became essentially like that of an agent of the State recounting unwarned statements made in a postarrest custodial setting.

*Id.* at 465, 467.

There is no principled basis to distinguish the facts surrounding Dr. Givon's testimony and the testimony of Dr. Grigson in *Estelle*. In both situations, the doctors were ordered by the trial court to conduct pre-trial and neutral competency examinations. Both doctors later became agents of the state when they testified in support of the death penalty at the penalty phase of trial. The only arguable distinction is the fact that petitioner originally asked for the court-ordered examination here and the trial court *sua sponte* ordered the competency evaluation in *Estelle*. However, this is a distinction without a difference. In both situations, a court-ordered examination

by a neutral psychologist was ordered for the benefit of the court and both of the parties for the limited purpose of determining sanity and competence to stand trial during the guilt phase. Dr. Givon's transformation into an agent of the state where he provided incriminating testimony relating to petitioner's dangerousness and anti-social personality disorder violated petitioner's right to counsel and his Fifth Amendment right against self-incrimination for the same reasons found in *Estelle*.

This side-by-side comparison of *Estelle* with this case indicates that the Missouri Supreme Court's decision is both contrary to and involves an unreasonable application of *Estelle*. *See* 28 U.S.C. § 2254(d). It is also evident that trial counsel was ineffective and that petitioner was prejudiced thereby when counsel failed to object to Givon's testimony under *Estelle* and stipulated to the admission of his written report. (*See* Claim 2). For all of these reasons, habeas relief is warranted.

## CLAIM NO. 6

**WORTHINGTON WAS DENIED HIS SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS TO A FAIR TRIAL AND TO CONFRONT HIS ACCUSERS BY THE PROSECUTION'S FAILURE TO GIVE ADEQUATE NOTICE OF THE IDENTITIES OF ITS PENALTY PHASE WITNESSES AND THE SUBSTANCE OF THEIR TESTIMONY REGARDING PETITIONER'S PRIOR BAD ACTS AND JAIL MISCONDUCT.**

As noted in Claim No. 2, in January 1996, the prosecution filed an information and endorsed a witness named "Charlotte Kirn" of Troy, Missouri, without providing

a specific address or disclosing the substance of her testimony. (D.A.L.F. at 35). In February 1996, Worthington's counsel filed a patterned motion for discovery under Missouri Supreme Court Rule 25.03, which included a request for disclosure of the prosecution's witnesses, any statements made by them, related memoranda, and their prior convictions. (D.A.L.F. 4, 37-38).

When Charlotte Peroti testified at the penalty phase that Worthington burglarized her apartment and attempted to rape her ten days before the death of Ms. Griffin, her testimony came as a complete surprise to the defense. As a result, apart from issues relating to counsel's ineffectiveness in failing to object, the prosecutor's failure to disclose this witness' identity and the substance of her testimony violated petitioner's due process right to fair notice of the evidence to be used against him and his Sixth Amendment right to confront and cross-examine his accusers. *See Lankford v. Idaho*, 500 U.S. 110 (1991).

Similar constitutional violations involving fair notice and confrontation occurred as a result of the state's failure to adequately disclose the identities and substance of the testimony to be offered by Corrections Officers Michael McKee and Robert Smith, who testified regarding petitioner's conduct violations while awaiting trial in the St. Charles County jail. (D.A.L.F. 78). A similar transgression occurred when the prosecution failed to make adequate disclosures of penalty phase witnesses from

88

Peoria who testified regarding petitioner's prior criminal conduct. (D.A.L.F. 290-291).

Both Officer Jerry McKean and Probation Officer Frey later testified about numerous uncharged crimes allegedly committed by petitioner in the Peoria, Illinois area. Without a doubt, the testimonies of Peroti, the jail guards, and the Peoria law enforcement officials were extremely prejudicial to petitioner. Because of the lack of fair notice, coupled with counsel's incompetence as set forth under Claim 2, counsel was unable to effectively rebut this evidence or cross-examine these witnesses. In fact, Mr. Green inexplicably stipulated to most of this damaging evidence.

The state was under an absolute duty under state law pursuant to Mo.S.Ct. Rule 25.03 to disclose the names and last addresses of its penalty phase witnesses and to provide the defense with actual notice of the unconvicted misconduct it intended to present to prove non-statutory aggravators. *See State v. Debler*, 856 S.W.2d at 656-68; *State v. Thompson*, 985 S.W.2d 779, 791-92 (Mo.banc 1999). *Debler* "does not merely recapitulate the basic criminal discovery requirements contained in Rule 25.03." *State v. Thompson*, 985 S.W.2d at 792. Rather, "[u]pon request, the state must disclose evidence of unconvicted bad acts, even if that evidence has not been reduced to a writing or other record discoverable under Rule 25.03." (*Id.*)

Counsel was not provided with adequate notice of the testimony of the specific acts that would be presented as non-statutory aggravators through each of these

89

witnesses.  The trial judge obviously relied greatly upon this testimony in finding the non-statutory aggravating factors involving Worthington's violent pre-trial confinement behavior and criminal history.  (P.C.R.Exh. 15 at 3893; D.A.L.F. 420-21).

The Missouri Supreme Court addressed this issue on direct appeal.  *State v. Worthington*, 8 S.W. 3d at 90-91.  Because the issue was not preserved for review due to trial counsel's incompetence, the court declined to grant relief under its plain error rule.  As the court stated:

> From the *Debler* line of cases, the failure of the state to provide notice of this evidence is error.  However, the question remains whether the lack of notice and the admission of this evidence was plain error constituting manifest injustice.  (cite omitted).  Under the totality of circumstances surrounding this evidence,the prejudice that would arise from such evidence as explained in *Debler* does not exist in this case. (footnote omitted). . . . Absent objection, there is no basis under a plain error analysis for concluding that the admission of the evidence was prejudicial to Worthington.

*Id*.

The Missouri Supreme Court's reasoning involved an unreasonable application of settled law and ignored material facts that established beyond any doubt that this lack of fair notice prejudiced petitioner.  *See* 28 U.S.C. § 2254(d).  The prejudice is most apparent with regard to Charlotte Peroti, who was not effectively cross-examined on the fact that she had been given probation on bad check charges by Mr. Braun and

had fabricated testimony that she worked as an undercover drug informant. Based upon information that would have and should have been discovered if proper disclosures had been made and if petitioner had competent counsel, Peroti would have been totally discredited and the trier of fact could have reasonably concluded that her story was unworthy of belief. Similarly, much of the jail misconduct and prior criminal activity evidence was exaggerated or non-existent. If proper disclosures had been made and if counsel had properly investigated this aggravating evidence as the Constitution requires, much of this aggravating evidence would have been discredited in the eyes of sentencing judge. The Missouri Supreme Court's conclusion that petitioner was not prejudiced is contrary to *Lankford* and *Gardner v. Florida* and is not supported by the state court record. Thus, this Court is not constrained by the standard of review provisions of 2254(d) and is duty bound to grant habeas relief on this issue.

## CLAIM NO. 7

**WORTHINGTON WAS DENIED HIS SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS BY THE PROSECUTION'S USE OF EXCESSIVE AND INFLAMMATORY VICTIM IMPACT EVIDENCE THAT INJECTED PASSION, PREJUDICE AND ARBITRARINESS INTO THE PROCEEDING, THUS RENDERING THE PENALTY PHASE FUNDAMENTALLY UNFAIR. TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT AND LIMIT THE SCOPE OF THIS EVIDENCE.**

During the penalty phase, eleven victim impact witnesses testified, each reading a prepared statement, with most witnesses urging the court to impose death. (*See* Tr. 509-24; 524-29; 532-34; 535-37; 538-46; 546-48; 549-52; 552-54; 556-59; 560-63; 564-68; 614-18).

Ms. Griffin's stepfather John Angelbeck urged the court to look at the crime scene photographs, to consider how long it took for Ms. Griffin to die, to consider the terror she felt, and stated that Worthington "must be willing to pay the price of his crime." (*Id.* 528). Lisa Banga, a friend of Ms. Griffin's urged the court to "give Mindy the justice she deserves." Mona Gordon, Lisa Banga's mother, admonished the court that Ms. Griffin died a terrible death and "[w]hen Michael broke into her home, he had a choice. Now this Court has a choice." (*Id.* 545-548).

Ms. Griffin's mother Carol Angelbeck testified that she changed clothes before coming to court to put on the suit her daughter planned to wear to her first job because she thought "it would be very nice if I brought Mindy to court with me today and I did want to wear it." (*Id.* 564). She was permitted to read a prepared statement by family friends Annabelle and Barry Farrell, who could not be in court. Angelbeck went through a multitude of photographs of Ms. Griffin, starting with her at age five months through to a picture of her grave on what would have been her twenty-fifth birthday. (*Id.* 572-88; Exh. 42A-42TT). Ms. Griffin's academic accomplishments were

recounted in meticulous detail. (Tr. 589-606; Exh's 44, 45, 46, 48-50, 51-A-C, 52-53, 54A-C, 56-65). Mother's Day gifts and cards were presented. (Tr. 612-13; Exh's 68, 69).

Mrs. Angelbeck also testified her first husband was an abusive drunk whom she left because she did not want her daughter growing up around him. (Tr. 607-10). Her first husband died in an alcohol-related accident when her daughter was 13. Ms. Griffin loved her father, but he frequently disappointed her. (Tr. 608-10). Mindy Griffin was awarded her college degree posthumously with a moment of silence observed at her graduation ceremony. (*Id.* 604-06). After graduation, Mrs. Angelbeck went to the cemetery, as she always does on her daughter's birthday. (Tr. 606).

Next, Mrs. Angelbeck read her prepared statement. (*Id.* 614-18). She stated that when Worthington killed her daughter, he sentenced her and her husband to life without parole. (*Id.* 615). "Our daughter, Mindy, had so much to give to our world and society as opposed to only taking from society as Michael Worthington has and will continue to do with drugs and alcohol." (*Id.* 615). She asked the judge "to be brave enough" to impose the death penalty. (*Id.* 616). "I am pleading with this Court to send the message that our community will not allow this rapist and the murderers to do this to our children without severe penalties." (Tr. 617). She concluded her statement speaking as though she were her daughter, asking for "justice," and detailing

what Worthington did to her, speaking of the pain her parents feel and the pain she feels for never being able to marry and have children. (Tr. 618).

At the formal sentencing hearing on November 4, 1998, Mrs. Angelbeck again argued for death, stating that 75% of the court's time was spent hearing defense "excuses." (Sent. Tr. 16-17). She argued "the time has passed for this man," and he is "deviant to a point not reachable nor helpable." (Sent. Tr. 18). She said: "Simply put, even the most humane concerned and adamant animal rights person would not need a thunderbolt to know a rabid or a vicious dog should be human[e]ly slain for the good of the whole, and further to cease his own suffering. Good and bad, right and wrong is not that complicated. A gross crime deserves a gross penalty." (Sent. Tr. 21).

The decision to impose the death penalty must be, and appear to be, based on reason rather than caprice or emotion. *Gardner v. Florida*, 430 U.S. 349, 358 (1977). In *Payne v. Tennessee*, 501 U.S. 808, 827 (1991), the Supreme Court held that if a state chose to admit victim impact evidence during the penalty phase, the Eighth amendment did not *per se* bar such evidence, but that such evidence could rise to the level of being so unduly prejudicial as to violate due process. (*Id.* at 825-827). The issue before the Missouri Supreme Court was whether the victim impact testimony so infected the proceeding as to make it fundamentally unfair.

Because counsel failed to object to this testimony and the exhibits offered in the penalty phase, the Missouri Supreme Court reviewed this issue on direct appeal for plain error. *State v. Worthington*, 8 S.W.3d at 87. Relying on *Payne v. Tennessee,* the Court "disagree[d] with Worthington that the evidence violated his constitutional rights by being unduly prejudicial." (8 S.W.3d at 90).

> This Court has rejected the notion that the state is only allowed to present a "brief glimpse" of the victim's life. *State v. Knese*, 985 S.W.2d 759. No manifest injustice occurred in allowing the judge, who was sentencing Worthington, to hear this victim impact evidence.

(*Id.*)

On appeal of the postconviction proceeding, the Missouri Supreme Court addressed the issue of whether counsel was ineffective for failing to object to the victim impact evidence. *Worthington v. State*, 166 S.W.3d at 582. The Court stated:

> Assuming, without deciding, that an excessive amount of victim impact evidence was offered, this Court cannot say there is a reasonable probability that the result of the proceeding would have been different if a lesser amount of victim impact evidence had been admitted.
>
> ***
>
> Any prejudicial effect was greatly limited by the fact that the case was tried to the court, rather than a jury, because judges are "presumed not to consider improper evidence when sentencing a defendant."

(*Id.*) (citation omitted).

Here, it could not be more manifest that Worthington's death sentence was based upon caprice and emotion, rather than on reason. The victim impact evidence violated Worthington's due process rights. The quantity and scope of the evidence clearly exceeded the limits noted in *Payne*. The court heard an avalanche of evidence from no less than eleven live witnesses regarding Ms. Griffin's life and worth. The constant repetition from so many individuals violated due process because the volume and contents of this evidence injected passion, prejudice and arbitrariness into the sentencing process.

The victim impact evidence presented was improperly excessive because it also compared the value of Worthington's life to Ms. Griffin's life. Witness Pitman emphasized this point: "[Ms. Griffin] was a compassionate and gentle person, unlike the person who took her life." (Tr. 554). Mrs. Angelbeck told the judge: "[o]ur daughter Mindy had so much to give our world and society as opposed from only taking from society as Michael Worthington has and will continue to do with drugs and alcohol." (Tr. 615). At sentencing, the improper evidence continued from Mrs. Angelbeck who stated her reason for testifying about her daughter's accomplishments was her need to show her life "held some worth" while wondering what they would have done if she had only been average. (Sent. Tr. 20). Melinda Griffin's "worth" was contrasted with Worthington's "worth" as a drug abuser with a criminal history.

Angelbeck's call for the judge to "imagine that Mindy is your daughter, wife, sister, mother or friend (Sent. Tr. 26) involved the same category of improper personalization condemned in *State v. Storey*, 901 S.W. 2d 886, 901 (Mo. banc 1995). Furthermore, the calls by these witnesses to disregard mitigating evidence violated well-settled Eighth Amendment principles. *See e.g., Lockett v. Ohio*, 438 U.S. 586 (1978). Mr. Angelbeck urged: "We can't hide behind our childhood." (Tr. 528). Ms. Selecky told the judge whatever brought Worthington to commit the offense was "irrelevant." (Tr. 562). Angelbeck said that at least 75% of the court's time was spent hearing Worthington's "excuses." (Sent. Tr. 16). Finally, these witnesses' explicit and repeated calls for death to be imposed crossed the line under *Payne*'s due process framework.

The Missouri Supreme Court's decisions addressing the nature and prejudice arising from this evidence, therefore, is both "contrary to" and involves an "unreasonable application" of *Gardner* and *Payne*. *See* 28 U.S.C. §2254(d)(1). In addition, competent counsel would have objected to this evidence rather than stipulate to it. Under *Strickland*, the omissions of counsel were well outside the range of a reasonably competent attorney performance under prevailing standards. There is a "reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Habeas relief is warranted.

## CONCLUSION

WHEREFORE, petitioner, Michael Shane Worthington, prays:

1. That a writ of habeas corpus be directed to respondent;

2. That the State of Missouri be required to appear and answer the allegations in this petition;

3. That Mr. Worthington be afforded reasonable discovery and an evidentiary hearing on the allegations of this petition;

4. That after a full and fair hearing, Mr. Worthington be discharged from his unconstitutional convictions and sentence of death;

5. That petitioner be allowed such other and further relief as may seem just, equitable and proper under the circumstances.

Respectfully submitted,

/s/ Kent E. Gipson
KENT E. GIPSON #34524
Attorney At Law
305 E. 63rd Street
Kansas City, MO  64113
816/363-2795 • fax 816/363-2799
and
GINO F. BATTISTI  #2586
Foley & Mansfield, P.L.L.P.
1001 Highlands Plaza DriveWest
Suite 400
St. Louis, Missouri   63110
314/645-7788 • fax 314/645-9945

Counsel for Petitioner

## CERTIFICATE OF SERVICE

I hereby certify that on August 1, 2006, the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system upon the following:

Jeremiah "Jay" Nixon
Office of the Attorney General
P.O. Box 899
Jefferson City, MO 65102

*Counsel for Respondent*


/s/ Kent E. Gipson
Kent E. Gipson, #34524

*Counsel for Petitioner*