# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL S. WORTHINGTON, | ) | |
| | ) | |
| Petitioner, | ) | Case No. 4:05-CV-1102 (CAS) |
| | ) | |
| vs. | ) | **CAPITAL CASE** |
| | ) | |
| DON ROPER, | ) | |
| | ) | |
| Respondent. | ) | |

## Respondent's Response to Order to Show Cause Why a Writ of Habeas Corpus Should Not Be Granted

## I.    PROCEDURAL & HISTORICAL BACKGROUND

Petitioner Michael S. Worthington pleaded guilty to murder in the first degree, burglary in the first degree, and forcible rape in the Circuit Court of St. Charles County, Missouri; he was sentenced as a prior and persistent offender to, respectively, death, thirty years imprisonment, and life imprisonment.  Exhibit A, at 150-51, 393, 423-24.  The Missouri Supreme Court affirmed his convictions and sentences on direct appeal, State v. Worthington, 8 S.W.3d 83 (Mo. 1999) (en banc), describing his crimes as follows:

> On September 29, 1995 . . . Worthington, and a friend from work, Jill Morehead, were at his condominium in Lake St. Louis, watching television. At about 4:00 p.m., they left to pick up their paychecks from their employer, a local supermarket.  They returned to the condo and had dinner and drinks. They then went to a nightclub where each had three drinks.  After about two hours, Worthington and Morehead drove to Jennings where Worthington told Morehead he had to pick up money owed to him by a friend.  Worthington testified he actually went to pick up drugs.  Morehead stayed in her vehicle, while Worthington was in the house for about 15 minutes.  They drove back

1

to his condo where he left Morehead. Morehead left the condo when Worthington did not return after about 45 minutes.

Later that night, Worthington saw that the kitchen window was open in the condominium of his neighbor, Melinda Griffin. Worthington had seen Ms. Griffin around the condominium complex. He got a razor blade and gloves, and when he returned to her condo, he saw that a bathroom light had been turned on. Worthington cut through the screen. He confronted Ms. Griffin in the bedroom. He covered her mouth to stop her screams and strangled her until she became unconscious. Worthington began to rape her and she regained consciousness. Worthington raped Ms. Griffin with such force that he bruised the inside of her vagina, tore both labia minora, and made a large, deep tear between her vagina and anus. Ms. Griffin fought Worthington, and he beat her and strangled her to death. The wounds on her neck showed that Worthington used a rope or cord in addition to his hands to strangle her. He stole her jewelry, credit cards, mobile phone, keys, and her car.

The next morning, September 30, 1995, a police officer pulled Worthington over. Worthington was driving Ms. Griffin's car. The officer noticed a woman's items in the car such as make-up and shoes, but the car had not been reported stolen.

The next day, October 1, a neighbor discovered Ms. Griffin's body. When police arrived, they found the screen in the kitchen window had been cut to gain entry. They found Ms. Griffin's body lying bruised, bloody, and naked at the foot of the bed, with a lace stocking draped across it. All the bedroom drawers had been pulled open. DNA testing later established that semen found on Ms. Griffin's body came from Worthington.

Police officers found Worthington that evening, but when he saw the police, he pulled out a knife, held it to his throat, and threatened to commit suicide. Police officers convinced him to put the knife down and brought him into custody. Worthington was wearing a fanny pack containing jewelry and keys belonging to Ms. Griffin.

At the police station, Worthington relayed his story of four days of drinking and getting high. After being presented with the evidence against him, Worthington confessed to the killing but could not remember the details since, he said, he was prone to blackouts when using alcohol and cocaine. At the time the offenses occurred, Worthington said he was extremely high on Prozac, cocaine, marijuana, and alcohol. Worthington also said that two friends, Darick and Anthony, helped him with the burglary. However, this story was inconsistent with the physical evidence and with subsequent statements made by Worthington. Worthington pleaded guilty to the crimes

charged.  The judge [Judge Nichols] imposed the death penalty for the murder conviction, as well as the prison terms for the other offenses.

Id. at 86-87.

After his convictions were affirmed, Worthington filed a motion for postconviction relief under Missouri Supreme Court Rule 24.35 with the Circuit Court.  Exhibit L, vol. I, at 8-47; Exhibit O.  The Circuit Court denied relief after an evidentiary hearing, and Worthington appealed.  Exhibit L, vol. VIII, at 1062-83, 1086-87.  The Missouri Supreme Court affirmed the denial of postconviction relief.  Worthington v. State, 166 S.W.3d 566 (Mo. 2005) (en banc).

Worthington has a filed a petition for a writ of habeas corpus against his immediate custodian, Don Roper, the superintendent of the Potosi Correctional Center.  Doc. 16.  He raises seven claims for relief.  Doc. 16, at 3-6.

## II.    STANDARD OF REVIEW

All claims adjudicated on the merits by the Missouri courts are reviewed under the deferential standard set forth in 28 U.S.C. § 2254(d).  28 U.S.C. § 2254(d) bars habeas relief unless the state court's adjudication of a claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;  or (2) resulted in a decision that was based on an unreasonable determination of the facts."  28 U.S.C. § 2254(d).  A state court decision is "contrary to" clearly established law if it "applies a rule different from the governing law set forth in [the Supreme Court's] cases, or if it decides a case differently than [the Supreme

Court] has done on a set of materially indistinguishable facts." Bell v. Cone, 535 U.S. 685, 694 (2002). A decision involves an "unreasonable application" of clearly established law if "the state court correctly identifies the governing legal principle from [the Supreme Court's] decisions but unreasonably applies it to the particular case." Id.; see Williams v. Taylor, 529 U.S. 362, 405 (2000). It is the reasonableness of the decision, not the quality of the reasoning given for the decision, that matters. Long v. Humphrey, 184 F.3d 758, 760-61 (8th Cir. 1999) (focusing on the reasonableness of the "outcome"); Brown v. Luebbers, 371 F.3d 458, 471 (8th Cir. 2004) (Colloton, J., concurring); Neal v. Puckett, 239 F.3d 683, 695-96 (5th Cir. 2001); Hennon v. Cooper, 109 F.3d 330, 334-5 (7th Cir. 1997).

## III.   ANALYSIS OF CLAIMS

### CLAIM 1

#### A.   Summary of Claim

Worthington raises numerous claims that his trial counsel provided ineffective assistance of counsel, in violation of the Sixth and Fourteenth Amendments. Doc. 16, at 22-55.

1.   Worthington contends that defense counsel failed to do an adequate investigation into and presentation of his social and family history. Doc. 16, at 15. A competent attorney, according to Worthington, would have personally traveled to Peoria, Illinois, to interview his family, in particular his mother, or hired a paralegal or mitigation specialist to prepare a social history – or perhaps both. Doc. 16, at 20. Worthington argues

that counsel's inadequate investigation harmed him in two ways. One, if an adequate social history, such as the one prepared by postconviction counsel, had been given to mental health experts Drs. Jonathan Henry Pincus, Dennis George Cowan, and Robert Smith, they would have provided him with a viable diminished capacity defense, and he wouldn't have pleaded guilty. Doc. 16, at 19-30. Two, an adequate social history would have provided the sentencing judge, Judge Nichols, with a stronger mitigation case and rebutted much of the State's aggravating evidence. The additional mitigating evidence includes the foregoing mental health experts' testimony that Worthington had frontal lobe impairment, Tourette's Syndrome, attention-deficit, hyperactivity disorder ("ADHD"), obsessive-compulsive disorder, and bipolar disorder; that mental illness runs in his family and likely has a genetic component; and that Worthington, when he raped and killed the victim, was in a manic phase, precipitated by improper medication with Prozac. Doc. 16, at 21-30.

2.      Dr. Roswald Evans is a pharmacologist who, at the penalty hearing, testified that Worthington was intoxicated and incapable of making rational decisions about his behavior, when he killed and raped the victim. Exhibit D, vol. IV, at 733, 738-76. During the penalty phase, Michael McKee testified that Worthington was involved in fifty-five incidents while awaiting trial in the St. Charles County jail: among other things, Worthington possessed homemade alcohol in his cell and threatened a guard when it was discovered; had a razor blade in his cell; assaulted a guard, and when restrained, threatened to kill other guards; started fistfights and challenged an officer to a fight; and wedged a

broom handline in a sliding security door to prevent guards from gaining entry. Exhibit D, v. I, at 1138-50. Another guard, Robert Smith, testified that, in Smith's presence, Worthington chased after an inmate with a broom handle and threatened to kill him. Exhibit D, v. II, at 202-04. After reviewing the documents produced by postconviction counsel, Dr. Evans opined that the fifty-five incidents were the result of Worthington's improperly-treated bipolar illness and that Worthington's alcohol and drug use, coupled with his undiagnosed illnesses (e.g., bipolar disorder), significantly impaired his ability to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law. Doc. 16, at 40. Worthington argues that there is a reasonable probability that if Judge Nichols had heard Dr. Evans (new) opinion she wouldn't have imposed the death penalty. Doc. 16, at 40.

3.     As a causal explanation for the inadequate investigation into his social and family history, Worthington posits defense counsel Green's inability to access the funds in the control of defense counsel Rosenblum. Doc. 16, at 41-44. Consequently, Worthington insists that Green should have sought funding under Ake v. Oklahoma, 470 U.S. 68 (1985). Doc. 16, at 44. Had counsel done so, Worthington concludes that there is a reasonable probability that he would have received the money he needed to do an adequate social history. Doc. 16, at 35.

4.     Worthington contends that defense counsel should have had his mother testify at the penalty phase, instead of telling her to leave to avoid being subpoenaed by the State. Doc. 16, at 44-45. He also contends that defense counsel should have interviewed his father,

Richard Worthington, and gone to gone to Peoria, Illinois, and personally interviewed his mother, instead of (just) interviewing his mother by phone "on a couple of occasions" for "ten to fifteen minutes." Doc. 16, at 44. A large amount of strong mitigation evidence thus went undiscovered, according to Worthington: Worthington's mother and father would have told defense counsel that his mother had committed many of the crimes attributed to Worthington (e.g., the burglarizing of his grandparents' home and the stealing of their car); that Worthington's mother believed her father was under an alcoholic delusion when he accused Worthington with trying to shoot him; that a babysitter had sexually abused Worthington; that Worthington's mother was a prostitute; that she physically and emotionally abused Worthington – e.g., by having sex with her "johns"; that Richard Worthington got Worthington addicted to hard-core drugs, taught him how to sniff glue, and shot him up with heroin when he was nine; that Richard Worthington taught his son how to steal and commit burglaries; that in his youth Worthington suffered a serious head injury in an auto wreck; and Worthington was traumatized by the loss of his only father-figure, his uncle. Doc. 16, at 44-50. Had Judge Nichols heard the foregoing "directly from Worthington's parents," Worthington concludes, there is a reasonable probability that she wouldn't have imposed the death penalty. Doc. 16, at 49.

5.     Worthington contends that the Missouri Supreme Court's decision rejecting claim 1 is both contrary to and involves an unreasonable application of <u>Strickland v.</u>

Washington, 466 U.S. 668 (1984), <u>Williams v. Taylor</u>, 529 U.S. 362 (2000), <u>Wiggins v. Smith</u>, 539 U.S. 510 (2003), and <u>Rompilla v. Beard</u>, 545 U.S. 374 (2005).  Doc. 16, at 41-46.

B.    <u>Analysis of Claim</u>

The Missouri Supreme Court reasonably applied <u>Hill v. Lockhart</u>, 474 U.S. 52 (1985) and <u>Strickland v. Washington</u>, 466 U.S. 668 (1984) and their progeny in rejecting claim 1. <u>See</u> 28 U.S.C. § 2254(d)(1).

To prove ineffective assistance of counsel, the defendant must prove that defense counsel's performance was objectively unreasonable and prejudicial – namely, that there was a "reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." <u>Strickland v. Washington</u>, 466 U.S. 668, 684, 695 (1984).  "Although hindsight may make a decision appear unwise or unsound, when scrutinizing counsel's performance, a court 'must be highly deferential.  It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.'" <u>Underdahl v. Carlson</u>, 381 F.3d 740, 742-43 (8th Cir. 2004) (quoting <u>Strickland</u>, 466 U.S. at 689).  There is a strong presumption that counsel's conduct fell within the "wide range" of reasonable professional assistance.  <u>Strickland</u>, 466 U.S. at 689.

Regarding counsel's duty to investigate, the U.S. Supreme Court has declared that

strategic choices made after thorough investigation of law and facts relevant
to plausible options are virtually unchallengeable; and strategic choices made

8

> after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

Strickland, 466 U.S. at 690-91. It must be remembered that "the duty to investigate does not force defense lawyers to scour the globe on the off-chance that something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." Rompilla v. Beard, 125 S.Ct. 2456, 2463 (2005).

In the context of a guilty plea, prejudice means a reasonable probability that the defendant would not have pleaded guilt, but rather insisted on going to trial. Hill v. Lockhart, 474 U.S. 52, 59 (1985). In the context of capital sentencing, prejudice means "a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695.

1.    Social & Family History

Defense counsel did a thorough (and doubtless a competent) investigation into Worthington's social and family history – or so a reasonable jurist could conclude. In preparation for trial, defense counsel unearthed a voluminous amount of documents recounting Worthington's social, psychological, educational, and family history. As the postconviction court found:

> [M]uch of [Worthington's] history, including educational, medical, psychological and substance [abuse] records, of [his] life, was well documented as evidenced by the thousands of pages of reports prepared on [Worthington] throughout his life. These records consisted of a psychological report prepared by [Worthington's] school psychologist, Valerie Kessler, when [Worthington] was fourteen years [old]; [his] Limestone, Illinois Community High School Records; Lincoln Land Community College Records; records from the Peoria County juvenile [c]ourt regarding [him]; [his] birth records from the St. Francois Medical Center, Peoria, Illinois; records of the Illinois Department of Corrections[,] Juvenile Division; admission and discharge narratives from a substance abuse treatment program at White Oaks Knolls; several reports from Methodist Medical Center, Peoria, Illinois; a psychological evaluation by Leone Legan, M.A., and Donald Legan, Ed.D., on August 3, 1989; records from the Human Service Center/White Oaks Companies of Illinois, which contained a psychosocial assessment of [Worthington] dated September 6, 1994.
>
> Those records clearly supported [Worthington's] mitigating claims that he had been abused and neglected and that he had a long-term drug problem. Moreover, [Worthington's] trial counsel could not have presented this evidence without investigating [Worthington's] psychological and social history.

Exhibit L, v. VIII, at 1067; see Exhibit D, at 631-33; Exhibit M, vol. VI, at 727-32. Defense counsel also interviewed Worthington's mother on at least two occasions, in an attempt to verify the family history Worthington relayed to counsel, Exhibit M, at 454, and Worthington's aunt, Carol Tegard. In a deposition, defense counsel conceded that the documents in question provided an "extensive history of [Worthington's] life." Exhibit M, vol. VI, at 732.

In his opening statement at the penalty phase, defense counsel Green revealed the extent of the information his investigation turned up:

> Judge, what all this evidence shows, what we anticipate to show, not only through the testimony of Dr. Evans but also we will call Carol Tegard, who is

the aunt that the Court has a heard a little bit something about. She will come in here from Peoria, Illinois and she will testify as best as she can as to Michael's childhood history and how he was abandoned, how he was neglected and how he was abused.

*    *    *

What all of this will show the Court is that Michael Shane Worthington was born to a seventeen year old mother who was a crack addict and an[d] eventually turned to prostitution. That his natural father was Richard Worthington and that he was a drug addict an[d] a known criminal in the Peoria area, that they tried to live together as husband and wife for a couple of years and in fact, even moved down to New Orleans to live together. That Michael's natural mother, Patricia Washburn, her family would no longer associate with the Worthingtons because of Richard Worthington. Patricia Washburn couldn't take living the abusive lifestyle with Mr. Worthington with her six month old son down in New Orleans and moved back to Peoria, Illinois. After she moved back to Peoria, Illinois, Mr. Worthington followed her there. They were estranged from each other for a number of years and she tried to, in her mind, make the best life she could for Michael by working a number of different jobs and even turning to prostitution. This kept her out of the house and had Michael being shuffled from one home to another, from neighbors to grandparents, to babysitters next door. She would not come home at night sometimes when he was someplace else.

From the age of two, up to thirteen, he was shuffled back and forth. He was reacquainted with his father approximately around the age of twelve, where his father started introducing him not only to alcohol, but to drugs and also into stealing and burglaries. You will find in the Peoria Police reports, one incident where there is a family that's on vacation that Worthington knows about, he sends Michael and another young boy into the home to steal some items, tells them how to get in, shows them how to get in, when to go and when to come back and where to meet him at. When they bring the item back to him, he tells them you stole stupid stuff, go back, here is what you need to do. This is how he was taught. This is how he learned. He was a kid. This is the social norm that he grew up with and this is what all this evidence will demonstrate to the Court.

We will also show that he was introduced to, as the report shows, dealing and making decisions in his own life by using chemicals. If there wasn't an answer you went to drugs and you had to escape. He didn't get to take vacations, didn't get to go on trips and when he wanted to get away from his life, the way he did it was through taking drugs, to the point that he became so depressive, his suicide attempts began when he was a teenage kid, not when

11

he was twenty-two or twenty-three years old. It has been documented that it began when he was at least fourteen years old. Of course he has suicide ideations, that's in the report of Ms. Kessler in 1985.

This is something that's been malingered, this will be before the Court. All in all, what it shows is and it was brought out through Dr. Givon, who we also stipulated to his report, is that even when you have this diagnosis of antisocial [personality disorder], the medical authorities say that if you come from an antisocial home, you are predisposed to become antisocial. He did not have a chance. He wasn't shown anything different. The reports continuously reference [the] need to get him a support system. Never was a support system given to him[.]

Exhibit D, vol. III, at 633-36.

Defense counsel also presented extensive evidence about Worthington's horrible childhood, through the testimony of his aunt. Exhibit D, vol. IV, at 673-724. Judge Nichols learned the following from her: Worthington's mother was a sixteen-year-old junkie when she got pregnant with Worthington. Exhibit D, vol. IV, at 675. Her husband and Worthington's father, Richard Worthington, was a alcoholic, drug-addict, and drug dealer. Exhibit D, vol. IV, at 676. (Both of Worthington's paternal grandparents were alcoholics. Exhibit D, vol. IV, at 677.) Worthington's father was in and out of jail, because of his drug problems, and "never around." Exhibit D, vol. IV, at 677-78, 684, 695. Worthington and his mother lived a nomadic life, never staying in the same place for long. Exhibit D, vol. IV, at 679. Worthington's mother prostituted herself to get drugs, which she often used in Worthington's presence, and would abandon him when she went out to get high. Exhibit D, vol. IV, at 679-81. Worthington's mother had drug parties at which Worthington was present. Exhibit D, vol. IV, at 694-96. On fifteen to twenty occasions, she tried to kill

herself at the family home – by slashing her wrists, by setting her garage and herself on fire, and by overdosing on pills. Exhibit D, vol. IV, at 681. Worthington saw the emergency personnel come rescue her. Exhibit D, vol. IV, at 682. Worthington's family thought about removing him from his mother's care, but the officials who treated her after her suicide attempts convinced them not to do so, saying that Worthington was her lifeline. Exhibit D, vol. IV, at 686. The only father figure Worthington had was an uncle named Gary, who died when Worthington was seven, devastating Worthington. Exhibit D, vol. IV, at 687-88, 691. When Worthington's father came back into his life (Worthington was then eleven or twelve), one of the first things his father did was to teach him how to burglarize homes, which they would do together. Exhibit D, vol. IV, at 694-96. Throughout Worthington's teens, school psychologists urged his mother to get him family counseling; she ignored their advice. Exhibit D, vol. IV, at 698. Starting in his teens, Worthington began using drugs, Exhibit D, vol. IV, at 692-93, and in 1994, he became homeless. Exhibit D, vol. IV, at 693, 698. His only transportation was a bicycle, and he lived out of his mother's car – until she sold it for drugs. Exhibit D, vol. IV, at 693-94, 698. Distraught, Worthington, at the age of twenty-three, tried kill himself with an overdose of pills; his stomach had to be pumped. Exhibit D, vol. IV, at 714.

Throughout his petition, Worthington cites mitigation evidence that he implies defense counsel were unaware of (e.g., that Worthington was sexually abused, that his father injected him with heroin when he was nine). But Worthington's postconviction counsel

13

never asked his trial counsel whether they were ignorant of this evidence.  See Middleton v. Roper, 455 F.3d 838, 846-47 (8th Cir. 2006).  Such nescience cannot be assumed; it must be proven.  See Strickland, 466 U.S. at 689.  Moreover, some of the "undiscovered" evidence was presented to Judge Nichols – for instance, that Worthington's father taught him how to commit burglaries; that Worthington was traumatized by the loss of his uncle, and that his mother was a prostitute.  Compare Doc. 16, at 44-50 with Exhibit D, vol. IV, at 679-81, 687-88, 691, 694-96.  In any event, that counsel was "aware of some, but not all, of this family history," does not render counsel's investigation into his social and family history inadequate, Burger v. Kemp, 483 U.S. 776, 790 (1987); Fretwell v. Norris, 133 F.3d 621, 627 (8th Cir. 1998), for counsel is not required to investigate his client's past with the thoroughness of a biographer.  Conner v. McBride, 375 F.3d 643, 663 (7th Cir. 2004).

Worthington gives various reasons why he believes his counsel's investigation into his social and family history was inadequate.  They are all unavailing.

Worthington contends that defense counsel Green admitted doing an incomplete social history.  That is not true.  Worthington's postconviction counsel asked Green whether he did a complete social history.  Exhibit M, at 433.  Green asked for a definition of "complete."  Exhibit M, at 433.  Counsel responded:  "Did you talk to as many relatives and friends and associates of Michael to validate any social history that he gave you?  Did you actually go to Peoria, where he lived, to see where –" Exhibit M, at 433.  Green said, "Not like that.  No, I did not."  Exhibit M, at 434.  So the context indicates that Green never admitted doing an

inadequate social history *tout court*, only that he didn't to travel to Peoria to interview witnesses, whose names postconviction counsel did not identify in his question. In any event, whether Green did an adequate investigation into Worthington's social history is a question of law, which was for the postconviction court, not Green, to answer. Insofar as Green believed he did an inadequate investigation, he was mistaken. It also must be kept in mind that "overzealous counsel seeking to gain a new trial for their client may downplay their performance[.]" State v. Whitfield, 939 S.W.2d 361, 370 (Mo. 1997) (en banc), mandate recalled on other grounds by State v. Whitfield, 107 S.W.3d 253 (Mo. 2003) (en banc).

Worthington faults counsel for not hiring a paralegal or mitigation specialist to prepare a social history. But the Supreme Court has never clearly established a *per se* rule that an adequate investigation requires the preparation of a social history report by a paralegal or mitigation specialist. Walker v. True, 401 F.3d 574, 583 n.7 (4th Cir. 2005), vacated on other grounds by Walker v. True, 126 S.Ct. 1028 (2006); Kandies v. Polk, 385 F.3d 457, 469-70 (4th Cir. 2004) (opinion of Gregory, J.), vacated on other grounds by Kandies v. Polk, 125 S.Ct. 2974 (2005); Wilson v. Ozmint, 352 F.3d 847, 864-65 (4th Cir. 2003); see also Carter v. Mitchell, 443 F.3d 517, 527 (6th Cir. 2006) ("[T]here is not and should not be a *per se* rule that trial counsel is ineffective at mitigation unless a particular type of expert is retained."). To the contrary, the U.S. Supreme court has expressly stated that the adoption of a rigid checklist for counsel's conduct "would interfere with the 'constitutionally protected independence of counsel at the heart of Strickland.'" Wiggins v. Smith, 539 U.S. 510, 533

(2003). "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." Strickland, 466 U.S. at 688-89.

Even if defense counsel's investigation into Worthington's social history was subpar, the Missouri Supreme Court reasonably concluded that he wasn't prejudiced. For starters, the testimony of the experts presented in the postconviction-review litigation was unreliable. None of the many mental-health experts who had previously dealt with Worthington ever diagnosed him as being bipolar or having Tourette's. See Worthington, 166 S.W.3d at 574. Smith, Pincus, and Cowan's diagnoses were also based on "very limited experience" with Worthington:

> Dr. Pincus' diagnosis was based on a single meeting more than four years after the murder and rape. Similarly, Dr. Smith examined Mr. Worthington over four years after the crime and the majority of the tests he administered related to substance abuse issues. Dr. Cowan also had just a single meeting with Mr. Worthington almost five years after the murder. Because of their limited familiarity with him, these experts necessarily largely based their conclusions on his own self-reporting of symptoms, history, and condition. . . . [The postconviction] court found that Mr. Worthington was not a reliable or credible witness due to his conflicting testimony throughout the proceedings, and this greatly undermined the reliability of these experts' diagnoses.

Id. at 574.

Worthington also assumes – incorrectly – that if Judge Nichols had learned of the doctors' diagnoses it would necessarily have decreased the likelihood that he would receive the death penalty. "Evidence of mental illness is double-edged: It provides some mitigation

16

for the defendant's crime, but it also proves to most jurors that the defendant will be dangerous in the future." James M. Doyle, *The Lawyers Art: "Representation" in Capital Cases*, 8 YALE J.L. & HUMANITIES 417, 445 (1996); see also Michael L. Perlin, *The Sanist Lives of Jurors in Death Penalty Cases: The Puzzling Role of "Mitigating" Mental Disability Evidence*, 8 NOTRE DAME J.L. ETHICS & PUB. POL'Y 239, 241-42 (1994).[1] Such evidence might have tended to show Worthington to be less culpable, but it might just as well have made him appear "less deterrable," which could have caused Judge Nichols to "incline toward execution as the only way to incapacitate" him. Holman v. Gilmore, 126 F.3d 876, 883 (7th Cir. 1997). There are good reason to believe that their testimony would have *harmed* Worthington. At the penalty phase, defense counsel, in a plea for mercy, repeatedly emphasized that Worthington was taking responsibility for his actions. Presenting evidence that Worthington suffered from a broad variety of mental illnesses, ranging from bipolar disorder, Tourette's syndrome, obsessive compulsive disorder, attention-deficit hyperactivity disorder, and frontal lobe damage would strongly imply that counsel was fobbing off responsibility on Worthington's diseases, diluting counsel's plea for mercy. The doctors'

---

[1]"A review of case law, controlled behavioral research and 'real life' research . . . reveal[s] . . . that jurors generally distrust mental disability evidence, that they see it as a mitigating factor only in a handful of circumscribed situations (most of which are far removed from the typical scenario in a death penalty case), that lawyers representing capital defendants are intensely skeptical of jurors' ability to correctly construe such evidence, and that jurors actually impose certain preconceived schemas in such cases that, paradoxically, result in outcomes where the most mentally disabled persons (those regularly receiving doses of powerful antipsychotic medications) are treated the most harshly, and that jurors tend to over-impose the death penalty on severely mentally disabled defendants."

testimony also could have fueled Dr. Givon's malingering diagnosis. That is because it is improbable that any one person would suffer from so many serious mental illnesses as Worthington's postconviction experts said he suffers from, especially given that no prior psychologist or psychiatrist had so diagnosed Worthington. Judge Nichols likely would have chalked-up Drs. Pincus, Cowan, and Smith's diagnoses to Worthington's "thespian performances: garbage in, garbage out." United States v. Rettenberger, 344 F.3d 702, 705 (7th Cir. 2003).

Even if their testimony had some mitigatory force, it pales in comparison to the strength of the aggravating evidence. Worthington slowly and cruelly strangled the victim after breaking into her apartment and raping her. Ten days before the rape and murder, he had tried to rape a neighbor who lived in the same apartment complex as the victim. Worthington's conduct in the St. Charles County jail was atrocious, indicating that he could not peacefully live among fellow offenders. Among other things, he threatened to kill guards, chased one inmate with a broom and threatened to kill him (because he thought he was going to be a witness against him), made homemade alcohol, and secreted a razor blade inside his cell. It is highly unlikely that Judge Nichols would have attributed all or most of this behavior to mental illness, especially given Dr. Givon's testimony that he has no mental illnesses, but rather is a sociopath and a malinger. Worthington also has an extensive criminal history, beginning when he was a juvenile, which includes multiple burglaries.

Nor was Worthington prejudiced with respect to his decision to plead guilty. That is to say, a reasonable jurist could conclude, as the Missouri Supreme Court did, that there was no reasonable probability that Worthington would have gone to trial but-for counsel's alleged inadequate investigation. See 28 U.S.C. § 2254(d)(1). As noted before, the psychiatric evidence in support of a diminished capacity defense was weak, and, according to defense counsel Rosenblum, generally a hard defense to sell, cf. Weekley v. Jones, 76 F.3d 1459, 1463 (8th Cir. 1996) (noting "considerable empirical evidence that insanity pleas in and of themselves are not received favorably by jurors"), especially in a conservative community such as St. Charles County. Exhibit M, vol. IV, at 549. A diminished capacity defense would require Worthington to prove that, because of a mental illness, he was incapable of deliberating – i.e., cooly reflecting for any length of time, no matter how brief – about killing the victim. State v. Erwin, 848 S.W.2d 476, 480 (Mo. 1993) (en banc); Honeycutt v. Roper, 426 F.3d 957, 971-72 (8th Cir. 2005). Worthington's conduct showed he was quite capable of deliberating about killing the victim. Worthington saw the victim's window was open; he got a razor blade and a pair of gloves (presumably to avoid leaving fingerprints), and returned to her condo; though he saw a bathroom light was on, he chose to enter her condo after cutting the screen off her window. Exhibit C, at 21-24. Worthington used not only his hands, but also a rope or cord, to strangle the victim. Exhibit D, vol. III, at 478-79. And the morning after the murder, he drove the victim's car around (previously he had no mode of transportation, save rides from friends) and gave away some of her property to his friends.

19

Exhibit D, vol. I, at 31-37,45-47, 55. When the police questioned him, he lied about the crime. Exhibit S, at 79. Moreover, the State had ample evidence that Worthington committed the *actus reus*. Worthington had confessed to killing the victim, was caught red-handed with the victim's car and property the day after the crimes, and his DNA was found on the victim. Worthington, 8 S.W.3d at 87. That Worthington had repeatedly told his counsel that he wanted to plead guilty – which counsel told him would show that he was taking responsibility for his actions, decreasing the chances of receiving the death penalty, Exhibit M, vol. V, at 638-43 – further shows that there is no reasonable probability that Worthington would have insisted on going to trial if counsel had done the investigation and presented the psychiatric evidence Worthington faults counsel for not doing. At a minimum, a reasonable jurist could reach such a conclusion. See 28 U.S.C. § 2254(d)(1).

    2.    Dr. Evans

The Missouri Supreme Court reasonably concluded that defense counsel adequately prepared Dr. Evans. As Worthington concedes, defense counsel gave Dr. Evans numerous documents to help him in making his diagnosis: (1) the report of Dr. Givon, the state's expert, who concluded that Worthington was sane and competent and not suffering from a mental illness; (2) Worthington's Methodist Medical Center record; (3) police records; (4) DNA reports; and (5) a cocaine plasma concentration report. Doc. 16, at 38. Moreover, in the absence of a request for further documentation from defense counsel, counsel had no duty – at least not under clearly established U.S. Supreme Court precedent – to give Dr. Evans

the background materials he (later) said he needed, after the sentencing, to make a proper

psychiatric diagnosis. As the Ninth Circuit Court of Appeals has explained:

> To . . . impose a duty on attorneys to acquire sufficient background material
> on which an expert can base reliable psychiatric conclusions, independent of
> any request for information from an expert, would defeat the whole aim of
> having experts participate in the investigation. An integral part of an expert's
> specialized skill at analyzing information is an understanding of what
> information is relevant to reaching a conclusion. Experts are valuable to an
> attorney's investigation, then, not only because they have special abilities to
> process the information gathered by the attorney, but because they also are able
> to guide the attorney's efforts toward collecting relevant evidence. To require
> an attorney, without interdisciplinary guidance, to provide a psychiatric expert
> with all information necessary to reach a mental health diagnosis demands that
> an attorney already be possessed of the skill and knowledge of the expert.

Hendricks v. Calderon, 70 F.3d 1032, 1038-39 (9th Cir. 1995); see also Ake v. Oklahoma,

470 U.S. 68, 80 (1985) ("In this role, psychiatrists gather facts, through professional

examinations, interviews, and elsewhere, that they will share with the judge or jury[.]").

"The problem with [Worthington's] argument is that his criticism is not so much directed at

his counsel, but rather at the examining [expert]." Sidebottom v. Delo, 46 F.3d 744, 753 (8th

Cir. 1995). The argument is also predicated on the assumption that defense counsel did an

inadequate investigation into Worthington's social history – an incorrect assumption.

    3.    *Ake v. Oklahoma*

Worthington's argument that counsel should have sought funding under Ake fails for

three reasons. One, as shown earlier, defense counsel did an adequate investigation into

Worthington's social history. As the Missouri Supreme Court held, "it is not ineffective to

consider cost in deciding what type of investigation to do and how to do it, so long as the

resulting investigation is adequate," as it was here. <u>Worthington</u>, 166 S.W.3d at 575. Two, had defense counsel filed an <u>Ake</u> motion to conduct a more extensive investigation of Worthington's social history, it would have been denied. Worthington does not allege (and has never alleged) that the money in defense counsel Rosenblum's hands was insufficient to do the social history he says defense counsel should have done. "Defense counsel did have sufficient funds to hire two experts on the issue of diminished capacity"[2] – Dr. Miller and Dr. Evans. <u>Worthington</u>, 166 S.W.3d at 575. "A court is not required to appoint a psychiatrist for someone whose defense already has the wherewithal to pay for an appropriate psychiatric examination." <u>Boliek v. Bowersox</u>, 96 F.3d 1070, 1074 (8th Cir. 1996). In fact, Worthington's first attorney had sought funding under <u>Ake</u> and was turned down. Worthington gives no reasons why the court would have changed its mind *after* he had been examined by Drs. Miller and Evans.

4.    <u>Parents</u>

Defense counsel acted reasonably in deciding not to travel to Peoria to interview Worthington's mother, not to have her testify at the penalty hearing, and not to interview Worthington's father – or so a reasonable jurist could conclude.

Defense counsel had sound reasons not to travel to Peoria and personally interview Worthington's mother and not to interview Worthington's father. As noted earlier, defense counsel did talk to her on "at least two occasions" for ten to fifteen minutes. Exhibit M, at

---

[2]This finding is presumed correct. 28 U.S.C. § 2254(e)(1); <u>Mendiola v. Schomig</u>, 224 F.3d 589, 592-93 (7th Cir. 2000).

454-55.  During the phone interviews, "it was hard to keep her on topic.  She was concerned about how she was coming off in the papers and in the media about being a bad mother, and she wanted to defend her position on what a great mother she was."  Exhibit M, at 455.  Defense counsel concluded that he wasn't "getting anywhere with her."  Exhibit M, at 455.  A competent attorney in counsel's shoes could thus conclude that another interview of the mother – even one done in person – would have been a waste.  Exhibit M, at 455; see Rompilla, 125 S.Ct. at 2463.  Defense counsel knew that Worthington's father had the potential to be a beneficial witness, but he was difficult to find, and, more important, "he had not had contact with his son since 1997 and they did not have much of a relationship."  Worthington, 166 S.W.3d at 578.  Defense counsel also had acquired extensive knowledge about Worthington's childhood from the thousands of pages of documents unearthed and from interviewing Worthington's aunt and (to a much lesser extent) his mother.  Hence, counsel had good reasons to believe that interviewing Worthington's father, assuming he could be found, would be unfruitful.  Counsel also could reasonably conclude that parents as awful as Worthington's were unlikely to expatiate on their vile parenting and criminal conduct.  Much better to interview Worthington's aunt, who, unlike his parents, had no drug or alcohol problems, Exhibit D, vol. IV, at 677 (and apparently no criminal past), making her a more reliable source of information – and more likely to show up to trial, if necessary.

The Missouri Supreme Court also reasonably concluded that defense counsel were reasonably competent in deciding not to have Worthington's mother testify at the penalty

phase. See Worthington, 166 S.W.3d at 578. There is a strong presumption that counsel had sound strategic reasons not to call her to the stand. See Strickland, 466 U.S. at 689; United States v. Cohen, 427 F.3d 164, 170 (2nd Cir. 2005); Boyd v. Estelle, 661 F.2d 388, 390 (5th Cir. 1981). First of all, Worthington's aunt was capable of describing in depth Worthington's abysmal childhood. And when Worthington's mother came to court, she continued to insist that she was a good mother, and counsel believed she was high on crack. Worthington, 166 S.W.3d at 578. Because Worthington's mother could help him only by branding herself a horrible parent and admitting to various felonies, because she had insisted on portraying herself as a good mother, and because of her horrible character (as revealed by Worthington's aunt), there was a serious risk that she would deny that Worthington had a bad childhood. That's what happened in Boyde v. Brown, 404 F.3d 1159, 1177-78 (9th Cir. 2005). There, the parents "suggested, in stark contrast to what counsel's own investigation had revealed – that [the defendant] had a normal, non-violent childhood." Id. Having Worthington's mother (or father) testify would also have subverted counsel's strategy, to lay the blame for Worthington's anti-social personality disorder and the rape and murder at his parents' feet. During his closing argument, counsel stated, "His parents don't feel guilty. They cannot be bothered. . . . [They] should be sitting on either side of him. They are equally responsible for Mindy's death." Exhibit F, at 32. What better way to show how heartless and vile they were than to point out their failure even to *attend* the trial at which his life hung in the balance. Such inaction spoke volumes more than their testimony ever could.

Finally, even if defense counsel should have personally interviewed Worthington's mother, interviewed Worthington's father, and had both of them testify at the penalty hearing, the Missouri Supreme Court reasonably held that Worthington wasn't prejudiced. As the Missouri Supreme Court explained:

> [Worthington's aunt] was able to testify to much of the same evidence that Mr. Worthington's parents would have offered. As noted, evidence of his abuse as a child also came in through records obtained from Illinois. Other evidence was also introduced concerning his childhood and social history. Based on the evidence that was offered, the trial judge in fact found that Mr. Worthington was abused and neglected and was raised in a dysfunctional household. She nonetheless imposed the death penalty.

Worthington, 166 S.W.3d at 578. Moreover, like the testimony from Worthington's postconviction experts, the evidence that Worthington faults counsel for not presenting (e.g., that he had been sexually abused) was double-edged. See Fretwell, 133 F.3d at 628 (noting that "graphic evidence of a defendant's violent and troubled family background is 'by no means uniformly helpful'"); Poindexter v. Mitchell, 454 F.3d 564, 588-89 (6th Cir. 2006) (Boggs, J., concurring).[3]

---

[3]"[T]he usual speculation as to mitigating factors goes in two exactly opposite directions. Some would believe that a person's life should be spared if he had a troubled and violent childhood, which made it difficult to grow up to be the kind of citizen who does not murder people in especially culpable ways necessary for a death sentence. On the other hand, it is exactly such evidence that might lead a jury to believe that the convict's life is particularly unworthy, is unlikely ever to improve, and thus his unworthy of mercy. The strength of the opposite line of reasoning is shown by the fact that frequently, when such evidence is available, defense attorneys attempt to show that a person instead possesses considerable redeeming qualities, acquired talents, and turns of mind from a supporting and nurtured youth that makes his life more valuable and particularly worthy to be spared. I hold no brief for either side of this argument . . . I lay this out only to indicate that it is wholly speculative to conclude that the presence of the type of evidence, whose absence ostensibly harms the petitioner, would in fact have spared him had it been presented to a jury."

Worthington objects that mitigating evidence "is persuasive only if supported by specific facts." Doc. 16, at 54 (citing Collier v. Turpin, 177 F.3d 1184, 1204 (11th Cir. 1999)). True, but defense counsel presented a wealth of specific facts allowing Judge Nichols to "fairly balance the seriousness of [Worthington's] transgressions with the conditions of his life." Collier, 177 F.3d at 1204. Among other things, Judge Nichols learned about Worthington's addiction to cocaine and alcohol; his mother's abandonment of him and her failure to get him the therapy he needed; his repeated exposures to her suicide attempts; the traumatic death of his uncle, the only father figure he ever had; his father's educating him on how to commit burglaries; and his period of homelessness. Judge Nichols heard from Dr. Evans that Worthington was intoxicated and incapable of making rational decisions about his behavior when he killed and raped the victim. Exhibit D, vol. IV, at 729-30, 738-76.

5.    U.S. Supreme Court Precedent

The Missouri Supreme Court's decision rejecting claim 1 was both consistent with and involved a reasonable application of Strickland, Williams v. Taylor, Wiggins, and Rompilla. See 28 U.S.C. § 2254(d)(1).

In Strickland, the Court described defense counsel's investigation into the defendant's family background as consisting of only discussions with the defendant "about his background" and telephone conversations with the defendant's wife and mother. 466 U.S. at 672-73. Counsel "did not otherwise seek out character witnesses" and "did not request a

psychiatric examination of his client." Id. at 673. The Court held that this conduct was reasonable. Id. at 698. In contrast, Worthington's defense counsel, both seasoned capital defenders, did *more* than Strickland's counsel. Besides interviewing Worthington, his mother, and his aunt, defense counsel unearthed thousands of pages of reports detailing Worthington's psychological, educational, medical, and substance abuse history. Counsel also had Worthington examined by three mental-health experts – Drs. Givon, Miller, and Evans. If counsel in Strickland was effective, *a fortiori* so were Worthington's counsel.

Williams is inapposite, too. In Williams, trial counsel, unlike counsel here, did not begin to prepare for the penalty phase until a week before trial. 529 U.S. at 395. In addition, counsel in Williams failed to discover records documenting their client's nightmarish childhood "not because of any strategic calculation, but because they incorrectly thought state law barred access to such records." Id. Worthington's counsel did not stop their investigation because of a mistake of law. Nor is the undiscovered information in Williams of the same caliber as that Worthington faults his counsel for not discovering. Williams was borderline mentally retarded and did not advance beyond the sixth grade in school, id. at 396, whereas Worthington went to community college. Mental retardation is especially strong mitigation evidence. See Holman, 126 F.3d at 883-84 (collecting studies). (It now poses an absolute bar to execution. Atkins v. Virginia, 536 U.S. 304 (2002).) Williams' prison records, which counsel did not examine, revealed that he had helped crack a prison drug ring and that prison officials' descriptions of Williams one of the inmates "least likely to act in

a violent, dangerous or provocative way." 529 U.S. at 396. Counsel also failed to return the phone call of a certified public accountant who had frequently visited Williams as a part of a prison ministry and was prepared to testify that Williams seemed to thrive in a more regimented and structured environment. Id. This was potent evidence in favor of life imprisonment and against the death penalty. As noted before, the information faults defense counsel for not discovering was a double-edged sword. Counsel in Williams also gave a "generic, unapologetic closing argument," the weight of which was "devoted to explaining that it was difficult to find a reason why the jury should spare Williams' life." Id. at 369; id. at 415 (O'Connor, J., concurring). A reasonable jurist could, and would, find Williams distinguishable from Worthington's case.

Wiggins does not support Worthington, either. There, counsel told the jury, "You're going to hear that Kevin Wiggins has had a difficult life," but during the proceedings themselves introduced *no* evidence of his life history. 539 U.S. at 515. No such bait-and-switch happened in Worthington's case. Worthington's counsel presented extensive evidence about his poor childhood and upbringing, as recounted above. See Moore v. Parker, 425 F.3d 250, 255 (6th Cir. 2005); Conner, 375 F.3d at 663. Wiggins' counsel only acquired a "rudimentary knowledge" of Wiggins' life history from a "narrow set of sources" – a presentence investigation, which had a one-page personal-history section, and Baltimore City Department of Social Services records. Id. at 523-24. Here, though, Worthington's counsel dug up thousands of pages of documents from multiple sources, and he also interviewed

Worthington, his mother, and aunt about his life history. That Worthington's aunt and mother did not tell counsel about Worthington's prior sexual abuse is not counsel's fault.

Worthington's case is not comparable to Rompilla. There, defense counsel's mitigation case consisted, by and large, of a residual doubt argument and pleas for mercy. 125 S.Ct. at 2460-61. The prosecutor had stated his intention to present evidence about one of Rompilla's prior convictions, but, though the prior conviction file was a readily-available, public file, defense counsel did not bother reading it. Id. at 2462-64. The U.S. Supreme Court concluded, "It flouts prudence to deny that a defense lawyer should try to look at a file he knows the prosecution will cull for aggravating evidence, let alone when the file is sitting in the trial courthouse, open for the asking." Id. at 2467. Worthington analogizes the prior conviction file in Rompilla to the psychological evaluation from the file for his 1989 Illinois burglary conviction.

There are four notable distinctions between Rompilla and Worthington's case. One, Worthington's defense counsel *did* read the psychological evaluation (Worthington doesn't contend otherwise), whereas Rompilla's attorney never read the conviction file. Two, the prior conviction case file in Rompilla represented the *core* of the prosecution's case for death. Summerlin v. Schiro, 427 F.3d 623, 645 (9th Cir. 2005) (Scannlain, J., concurring in part and dissenting in part). That is not true of the 1989 burglary file, which was just one small arrow in the prosecutor's quiver. Three, there is no reasonable probability that the

information from the psychological evaluation would have caused defense counsel to do anything different. The report states:

> Mr. Worthington reported growing up in a dysfunctional chaotic family made up of his chronic alcoholic mother and a heroin addicted father. There is a generational history in this family of addiction and alcoholism. He identified chronic neglect and emotional, physical, and sexual abuse.

Petitioner's Exhibit 3, at 2. Having read this report, a competent attorney would have, or could reasonably have done, what Worthington's attorney did: interview his client and family members (such as Worthington's mother and aunt), and consult police, mental health, and school records that might substantiate his sexual abuse allegations. Four, unlike counsel in <u>Rompilla</u>, Worthington's attorney put on extensive evidence about Worthington's childhood, including, for instance, that his mother was a drug addicted, alcoholic prostitute who abandoned him.

**CLAIM 2**

A.   <u>Summary of Claim</u>

Claim 2 raises a series of claims that defense counsel provided ineffective assistance, in violation of the Sixth and Fourteenth Amendments.

1.   Worthington contends that defense counsel should have objected to Charlotte Peroti's testimony at the penalty phase. Doc. 16, at 47-54. Peroti, who lived two doors down from Worthington, testified that ten days before the rape and murder Worthington had broken into her apartment late at night by removing a screen, used force in an attempt to compel her to have sex with him, and stole some of her jewelry and her car, after being chased out of the

apartment by Peroti's boyfriend. Exhibit D, v. I, at 96, 98, 100, 102, 115. According to Worthington, defense counsel should have objected on the grounds that the State – which two years before the penalty phase had twice endorsed Peroti by the name, "Charlotte Kirn," without providing her street address (though saying she was from Troy, Missouri) – had violated State v. Debler, 856 S.W.2d 641 (Mo. 1993) (en banc) and its discovery requirements. Doc. 16, at 60, 62. At a minimum, Worthington insists, defense counsel should have requested additional time to investigate Peroti's background. Doc. 16, at 60. Such an investigation would have revealed Peroti's prior criminal record (she had pleaded guilty to a misdemeanor for passing a bad check, received a suspended imposition of sentence, and been put on probation), that the prosecutor in Worthington's case had dropped two charges against her, and that her testimony that she was a undercover drug informant seeking to gather evidence of Worthington's drug offenses was a fabrication. Doc. 16, at 59-60. Counsel then could have used this information to impeach Peroti, creating a reasonable probability that the outcome of the penalty phase would have been different. Doc. 16, at 63.

2.      Worthington argues that defense counsel should have objected to the testimony given by Michael McKee, Robert Smith, Jerry McKean, Christine Frey, and Dr. Max Givon at the penalty phase. Doc. 16, at 63-71. He asserts that much of their testimony (he doesn't specify which part) was inadmissible hearsay and that counsel could have raised a valid Debler objection to their testimony. Doc. 16, at 63, 66-67. Worthington also argues that defense counsel did not adequately review and investigate Worthington's St. Charles County

jail records.  Doc. 16, at 68-70.  Had defense counsel done an adequate review and investigation, Worthington maintains that counsel would have learned that most of the fifty-five incidents, about which McKee testified, involved "very trivial incidents" and the "trial court would [not have] had any reasonable factual basis to find a non-statutory aggravating circumstance that petitioner was a violent and aggressive inmate."  Doc. 16, at 69-70.

      3.    Dr. Max Givon testified for the State during the penalty phase.  Exhibit D, at 295-470.  He opined that Worthington did not have a mental disease or defect, had antisocial personality disorder, was cocaine and alcohol dependent, and definitely appreciated the criminality of his conduct when he raped and murdered the victim.  Exhibit D, at 300-06, 313, 335, 450.  He also stated that Worthington malingered during his examination (i.e., intentionally produced false or grossly exaggerated psychological symptoms for an external reward).  Exhibit D, at 317.  While explaining the bases for his diagnoses, in particular anti-social personality disorder, Dr. Givon said:

> He stated that he was suspended from school hundreds of times because of getting in trouble, being uncontrollable, too hyper.  He stated [when] younger he was placed on Ritalin for hyperactivity, but his mother stopped the medication because she didn't believe in it.  He was involved in fights because people were messing with him.  He had admitted setting his own home on fire twice as well as a garbage truck and he also said he was always doing something destructive and made the remarkable statement that we burned our friend, Butch Mackey, over ninety percent of his body.  I was eleven then.  We were throwing gas on each other.  He admitted to stealing and shoplifting when younger, beginning at age six or seven.  He said he was first caught doing that during six or seven.  He admitted that he was accused by his mother and everybody else of being a habitual liar but protested that he told the truth.  He had admitted that he may have lied but explained it as a way of trying to brag so people would like him.

Exhibit D, v. II, at 309-10.

Worthington faults defense counsel for not traveling to Peoria, Illinois, and interviewing Butch Mackey's parents, who would have told him that *Richy* Mackey had been set on fire, and Worthington wasn't involved. Doc. 16, at 71-72. Had defense counsel so investigated the Mackey incident, Worthington maintains that counsel could then have "destroyed" the credibility of Dr. Givon, whose testimony supported the aggravating factor of Worthington's prior criminal history. Doc. 16, at 74.

B.    Procedural Bar

Worthington's contention that defense counsel did not adequately investigate and review his St. Charles County's jail records, see ¶2 of claim 2 supra, is procedurally barred, because it was not fairly presented to the Missouri courts. Before seeking federal habeas relief, a petitioner must fairly present each claim to the appropriate state court. Baldwin v. Reese, 541 U.S. 27, 29 (2004). Fair presentment requires state prisoners to "give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999). Fair presentment also requires the petitioner to raise the "same factual grounds and legal theories in the state courts [that] he is attempting to raise in his federal habeas petition." Wemark v. Iowa, 322 F.3d 1018, 1021 (8th Cir. 2003); accord Forest v. Delo, 52 F.3d 716, 719 (8th Cir. 1995). Neither in his amended Rule 29.15 motion nor in his postconviction appeal to the Missouri Supreme Court did Worthington argue that defense

counsel's investigation and review of Worthington's St. Charles County jail records was inadequate or that an adequate investigation and review would have revealed that most of the fifty incidents about which McKee testified were insignificant – let alone that such (alleged) nonfeasance warranted a finding of ineffectiveness. See Exhibit O, v. II, at 471-73, 474-79; Exhibit R, at 114-22; see also Worthington, 166 S.W.3d at 581-82. By not raising this contention on appeal, Worthington defaulted it. Osborne v. Purkett, 411 F.3d 911, 919 (8th Cir. 2005). Worthington gives no reason to lift the procedural bar. See Murray v. Carrier, 477 U.S. 478, 496-97 (1986).

C.      Analysis of Claim

The Missouri Supreme Court reasonably applied Strickland v. Washington, 466 U.S. 668 (1984) in rejecting claim 2. See 28 U.S.C. § 2254(d)(1).

To prove ineffective assistance of counsel, the defendant must establish that defense counsel's performance was objectively unreasonable and prejudicial – namely, that there was a "reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 684, 695. "Although hindsight may make a decision appear unwise or unsound, when scrutinizing counsel's performance, a court 'must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.'" Underdahl v. Carlson, 381 F.3d 740, 742-43 (8th

Cir. 2004) (quoting <u>Strickland</u>, 466 U.S. at 689). Thus, there is a strong presumption that counsel's conduct fell within the "wide range" of reasonable professional assistance. <u>Strickland</u>, 466 U.S. at 689. In the context of capital sentencing, prejudice means a "reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." <u>Strickland</u>, 466 U.S. at 695.

       1.    <u>Charlotte Peroti</u>

Defense counsel did not provide ineffective assistance by declining to object to Peroti's testimony or to seek a continuance to investigate her background – or so a reasonable jurist could conclude. <u>See</u> 28 U.S.C. § 2254(d)(1).

Defense counsel violated no duty to Worthington by declining to object to Peroti's testimony. There is a strong presumption that counsel had a good strategic reason not to object to her testimony and not to seek a continuance. <u>See</u> <u>Roberts v. Bowersox</u>, 137 F.3d 1062, 1067 (8th Cir. 1998). Worthington notes that defense counsel Green, when asked why he didn't raise a <u>Debler</u> objection to Peroti's testimony, said, "I don't have an answer for you." <u>Compare</u> Doc. 16, at 62 <u>with</u> Exhibit D, v. I, at 484. But counsel's inability to recall why he didn't object cannot be used to establish lack of competent performance. <u>Fretwell</u>, 133 F.3d at 624.

An objection or request for a continuance likely would have failed, in any case. As the Missouri Supreme Court found, "Even if counsel did not know until [Peroti] got on the

35

stand that Charlotte Peroti and Charlotte Kirn were the same person, Mr. Worthington had mentioned Ms. Peroti numerous times in his statement to the police after his arrest and counsel knew all about the events to which she testified[.]" Worthington, 166 S.W.3d at 581. Also, there is no strong affirmative evidence that Peroti ever told the prosecution (or the police) that Worthington had tried to rape her. And Worthington had "endorsed [Peroti] and all of the State's witnesses as his own." Worthington, 166 S.W.3d at 581. So any Debler or discovery violation would likely have been found to be harmless.

Worthington has not produced clear and convincing evidence rebutting the Missouri Supreme Court's factual finding about counsel's knowledge, which is presumed correct. 28 U.S.C. § 2254(e)(1); Mendiola, 224 F.3d at 592-93. Worthington says that he never mentioned the name "Charlotte Peroti" in his statement to the police, that the tape-recorded statement to the police did not mention her allegations, and that defense counsel Green testified at the postconviction hearing that, had he known of Peroti's allegations, his decision to advise Worthington to plead guilty would have been impacted. Doc. 16, at 61. But Worthington and counsel did not have to know Charlotte's last name (there was no testimony that he knew her by a different last name than Kirn) to realize that the "Charlotte Kirn" the prosecution had endorsed was the neighbor from whom (counsel knew that) Worthington had admitted stealing. See Exhibit D, v. I, at 117. Moreover, Worthington had admitted to the police that he had broken into the home of his neighbor "Charlotte" three weeks before and stolen her car and other personal property, see Exhibit S, at 32, so who she was and what she

36

was going to say was probably not a mystery. And the postconviction court did not have to credit counsel's testimony that he was unaware that Charlotte Kirn was Charlotte Peroti.

Worthington cannot prove prejudice, either, because counsel thoroughly impeached Peroti, making any additional impeachment *de minimis*. During his cross-examination of Peroti, defense counsel exposed Peroti's strong personal bias against Worthington. Peroti said that she decided to become an undercover agent against Worthington because Worthington had given Jack Daniels and drugs to her firstborn son, which once caused him to have to be hospitalized for three days. Exhibit D, v. I, at 107. As an undercover agent, Peroti admitted that her goal was to get Worthington arrested for possession of illegal drugs, and that she thought he was a "jerk underneath." Exhibit D, v. I, at 110. Defense counsel also poked holes in Peroti's story. He got her to say that she had "only" worked for a St. Charles County undercover unit; she later said that she worked for a St. Louis County undercover unit. Exhibit D, v. I, at 106, 118. At first, Peroti said that the agent under whom she worked was one "Paul West," but then backtracked and said she only knew his first name was "Casper," which wasn't his "real name." Exhibit D, v. I, at 108-09. Though Worthington had tried to rape her and had stolen her car and jewelry, defense counsel got Peroti to say that the police decided to have Peroti continue operating as a undercover agent and did not arrest him and that Peroti continued to see Worthington, Exhibit D, v. I, at 113, 117 – a story that rings hollow. Defense counsel also got Peroti to admit that the prosecution had discussed her future testimony with the prosecution's office on two occasions. Exhibit

D, v. I, at 117. Because counsel thoroughly impeached Peroti, the Missouri Supreme Court reasonably concluded that Worthington cannot show Strickland prejudice. Worthington, 166 S.W.3d at 581.

      2.    McKee, Smith, McKean, Frey, & Givon

Defense counsel reasonably declined to raise Debler and hearsay objections to the testimony of Michael McKee, Robert Smith, Jerry McKean, Christine Frey, and Dr. Max Givon – or so a reasonable jurist could conclude.

To begin with, there is a strong presumption that counsel's conduct was reasonable trial strategy. See Strickland, 466 U.S. at 689; Cohen, 427 F.3d at 170; see also United States v. Teague, 953 F.2d 1525, 1531 (11th Cir. 1992) (en banc). Further supporting this presumption, defense counsel had sound reasons at the beginning of the penalty phase hearing why he did not raise the objections Worthington faults him for not making:

> I have thought long and hard about the evidence that's to be admitted during this sentencing hearing. There are certain legal objections that I could make to the foundational requirements and chain of custody to some of this evidence that we have stipulated to, there is also constitutional arguments that typically could be made with respect to the aggravating circumstances that have been filed by the State and I have made a conscious decision, which I believe is in the best interest of my client, to waive such objections and foundational requirements because my position is that this is not a jury trial, but is a [c]ourt trial, that the Court would have to review this evidence anyway in order to make those rulings and in addition, that especially for this case, that as much information that we can put before the Court is best for my client and also this information would subsequently end up before the Court through the presentence investigation report that has been offered. So those are my reasons as to why I am entering into the stipulation and why we are not having hearings on motions to preclude certain statutory aggravating circumstances.

Exhibit D, v. I, at 8-9. The Missouri Supreme Court agreed with defense counsel. Worthington, 166 S.W.3d at 581 (holding that "much of the evidence would subsequently be before the court in the pre-sentence investigation [report] and the court could consider it when making a decision on punishment"). This shows both that counsel's decision was reasonable and that Worthington suffered no prejudice.

Worthington is also mistaken that hearsay objections likely would have kept out the lion's share of these witness's testimony. Hearsay is admissible during the penalty phase of a capital case when the judge is the sentencer.[4] See State v. Berry, 168 S.W.3d 527, 539-40 (Mo. Ct. App. 2005) ("It is true that traditionally, in cases of judge sentencing, as opposed to jury sentencing, hearsay is routinely permitted in the form of pre-sentencing investigations and in other ways."); cf. State v. Barnett, 980 S.W.2d 297, 307 (Mo. 1998) (en banc) (holding, in capital case where the jury was the sentencer, that hearsay was improperly admitted during penalty phase). State v. Landers, 596 S.W.2d 487 (Mo. Ct. App. 1980), which Worthington cites, affirmed the trial court's decision not to allow cross-examination about a hearsay statement from a police report, but (1) it did so during the State's case in chief, and (2) the hearsay was ruled inadmissible because the officer who prepared the report could not remember whether or any of the other investigating officers had personal

---

[4]The Confrontation Clause does not apply to penalty-phase hearings, even in capital cases. Williams v. New York, 337 U.S. 241, 251-52 (1949); United States v. Wise, 976 F.2d 393, 397-98 (8th Cir. 1992) (en banc); Szabo v. Walls, 313 F.3d 392, 398 (7th Cir. 2002); United States v. Kikumura, 918 F.2d 1084, 1100 (3rd Cir. 1990); Bassette v. Thompson, 915 F.2d 932, 939 (4th Cir. 1990); see also United States v. Higgs, 353 F.3d 281, 324 (4th Cir. 2003) ("It is far from clear that the Confrontation Clause applies to a capital sentencing proceeding.").

knowledge of the report. Id. at 488. Whether hearsay is inadmissible during the penalty phase of a trial – Landers did not address that issue.

Even if hearsay objection was cognizable during the penalty phase, there were few, if any, viable hearsay objections to raise. Most of the testimony in question did not rely on hearsay. Most of the (purported) hearsay would also have been admissible under the business records exception. See MO. REV. STAT. § 490.680 (2000). Consider, for instance, Christine Frey's testimony that it was reported that Worthington said that "when his adrenaline gets going, he could kill someone." Exhibit D, v. I, at 257. The report would come in under the business records exception, and any double-hearsay problem would be nonexistent because Worthington's statement is an admission of a party opponent. State v. Wallingford, 43 S.W.3d 852, 855 (Mo. Ct. App. 2001). The same is true of Worthington's statement to Dr. Givon that he (Worthington) told him he and his friends had set Butch Mackey on fire. As an expert, moreover, Dr. Givon was entitled to testify about the hearsay bases of his opinion, included the reports he reviewed. Goddard v. State, 144 S.W.3d 848, 853-54 (Mo. Ct. App. 2004); State v. Boyd, 143 S.W.3d 36, 46 (Mo. Ct. App. 2004); Stallings v. Washington University, 794 S.W.2d 270, 272 (Mo. Ct. App. 1990). Moreover, McKee was no mere conduit for the reports of the incident described in the St. Charles County jail records. Of the incidents he described, McKee had personally observed most of them. Exhibit D, v. I, at 138, 144, 175. Likewise, Smith personally observed the damning assault he recounted. Exhibit D, at 199-206. (Worthington chased an inmate with a broom

handle and threatened to kill him. Exhibit D, at 199-206.) And Worthington's testimony at preliminary hearing in the assault case, see Exhibit D, v. I, at 220, because of the prior testimony exception, State v. Purlee, 839 S.W.2d 584, 592-92 (Mo. 1992) (en banc); State ex rel. Chaney v. Franklin, 941 S.W.2d 790, 792 (Mo. Ct. App. 1997), and because it was an admission of a party opponent.

Worthington is also mistaken to assume that the Debler violations[5] would have led Judge Nichols to forbid McKee, Smith, and the rest from testifying. The Debler violations here were probably harmless. Before the penalty phase, defense counsel had reviewed the St. Charles County jail records, Dr. Givon's report and the documents on which he relied, the presentence investigation report from Illinois, and Peoria, Illinois reports. See Exhibit A, at 367-68. These documents gave him reasonable notice about what these witnesses were going to testify about. In all likelihood, then, Judge Nichols would have found a Debler violation, but held the violation to be harmless or granted defense counsel a continuance – but *not* excluded McKee and others' testimony. Notably, Worthington does not cite a single case that holds that a Debler violation automatically or usually requires barring the testimony of the improperly-noticed witness.

3.    Butch Mackey

Ultimately, the validity of the Mackey argument turns on whether or not Worthington ever told Dr. Givon, "[W]e burned our friend, Butch Mackey, over ninety percent of his

---

[5]On direct appeal, the Missouri Supreme Court held that the State had violated Debler. Worthington, 8 S.W.3d at 91.

body.  I was eleven then.  We were throwing gas on each other." Worthington spills a lot of ink explaining how defense counsel (purportedly) could have shown that Worthington was not involved in the burning of Richy Mackey.  The unspoken premise is that if Worthington wasn't involved, then he didn't tell Dr. Givon that he was.  The premise is false.  Given the postconviction court's finding that Worthington was not credible, see Worthington, 166 S.W.3d at 574, and given Dr. Givon's testimony that Worthington told lies to get attention, Judge Nichols likely would have concluded Dr. Givon was telling the truth and Worthington was lying, if the Mackeys had testified – *hurting* Worthington.  So defense counsel cannot be faulted for not calling the Mackeys to testify.

Nor can Worthington establish prejudice – or so a reasonable jurist could conclude.  Worthington's argument miscasts the role Dr. Givon's testimony played.  The State did not call Dr. Givon to prove up Worthington's prior criminal history, as Worthington asserts.  Other witnesses, such as Michael McKee, Robert M. Smith, Jerry McKean, and Christine Frey – did that.  Exhibit D, vols. I-II, at 136-295.  Rather, Dr. Givon was called to give his expert opinion on Worthington's mental health, at the time of trial and when he raped and killed the victim.  Dr. Givon was thus relaying the bases for his opinion, which included what Worthington, whom he had examined, had told him.  He never vouched for the incident's truth.  Worthington, 166 S.W.3d at 577.  Quite the contrary: Dr. Givon called the statement "remarkable" and elsewhere recounted his belief that Worthington was malingering during the examination – both signs that he believed Worthington was lying to him.  Moreover,

Worthington's description of the incident is just one of many reasons Dr. Givon gave for his diagnoses. Surrounding Dr. Givon's comment about the Mackey incident are references to Worthington's reports that he had been involved in fights, treated with Ritalin, set his own home on fire twice as well as a garbage truck, shoplifted starting when he was six or seven, and lied to get attention. Exhibit D, v. II, at 309-10. Worthington "failed to call Dr. Givon at the post-conviction hearing or otherwise present evidence at that hearing that Dr. Givon relied on the burning incident in reaching his diagnosis." Worthington, 166 S.W.3d at 576. Moreover, Dr. Givon's diagnosis was "principally based" on Worthington's "pervasive pattern of disregard for and violation of the rights of others occurring since the age 15 years." Id.

**CLAIM 3**

A.    Summary of Claim

1.    In August 1996, before Worthington pleaded guilty, the prosecutor handling his case charged Charlotte Kirn (i.e., Peroti) with the class D felony (the lowest class of felony under Missouri law) of passing a bad check in the amount of $60.00. Exhibit L, vol. VII, at 886. The charge was reduced to a misdemeanor, and Peroti pleaded guilty in November 1997, received a suspended imposition of sentence, and was put on probation for two years; two other cases brought against her were dismissed. Exhibit L, vol. VII, at 886, 915. The prosecutor did not tell the defense about the foregoing events before or during the penalty phase. During the penalty phase, Peroti testified that ten days before the murder

Worthington had broken into her apartment by removing the screen to a kitchen window, had been "forceful" trying to have sex with her, and then stole her car and fled with some of her jewelry. Exhibit D, vol. I, at 100-02. Peroti also testified that she had worked for the police as an undercover agent trying to dig up evidence inculpating Worthington in drug offenses. Exhibit D, vol. I, at 104-17. The prosecutor did not disclose Peroti's status as an undercover agent before or during the penalty phase, either.

According to Worthington, the foregoing nondisclosures violated Brady v. Maryland, 373 U.S. 83 (1963). Worthington contends that the disposition of the charges against Peroti shows that there was a "deal" between the prosecutor and Peroti – presumably for Peroti's favorable testimony in exchange for leniency from the prosecutor. (Worthington is vague on the terms of the deal.) Had the defense known of the deal, Worthington maintains that it would have used it to "destroy" Peroti's credibility, creating a reasonable probability that he would have escaped the death penalty or that his decision to plead guilty would have been "adversely impacted." Doc. 16, at 70.

2.      Worthington also contends – inconsistently – that Peroti lied about being an undercover agent, because in a presentence investigation report a member of a St. Charles County drug unit reportedly said that Peroti was not working with the unit on a case against Worthington. Doc. 16, at 78. From this, Worthington concludes that the State knowingly presented false testimony, in violation of United States v. Agurs, 427 U.S. 97, 110 (1976). Doc. 16, at 79. In addition, Worthington claims that his death sentence rests on "materially

inaccurate" evidence (i.e., Peroti's testimony), in violation of <u>Johnson v. Mississippi</u>, 486 U.S. 578 (1988).

B.    Procedural Bar

The perjury prong of claim 3 is procedurally barred, because Worthington did not fairly present it to the State courts.  Before seeking federal habeas relief, a petitioner must fairly present each claim to the appropriate state court.  <u>Baldwin</u>, 541 U.S. at 29.  Fair presentment requires state prisoners to "give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."  <u>O'Sullivan</u>, 526 U.S. at 845.  In his amended Rule 29.15 motion, Worthington charges the State with knowingly presenting perjured testimony, namely, Peroti's testimony.  Exhibit O, at 330, 346.  But in neither of his appeals to the Missouri Supreme Court did he raise this argument.  <u>See</u> Exhibit H, at 39-100; Exhibit R, at 44-57. That's why the Missouri Supreme Court did not address Worthington's perjury argument. <u>See</u> Doc. 16, at 77.  Worthington gives no reason why the procedural bar should be lifted. <u>See</u> <u>Murray</u>, 477 U.S. at 496-97.

C.    Merits Analysis

Worthington's <u>Brady</u>, <u>Agurs</u>, and <u>Johnson</u> claims are meritless.

1.    There are three components to a <u>Brady</u> violation:  "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and

prejudice must have ensued." <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999). Prejudice means a reasonable probability that, had the evidence been disclosed, the outcome of the proceeding would have been different. <u>Id</u>. at 280-81.

Worthington's <u>Brady</u> claim fails for three reasons. One, there was no deal between the prosecutor and Peroti – so there was nothing for the prosecutor to disclose. At the postconviction hearing, Worthington didn't present *any* evidence of a *quid pro quo*. Neither Peroti nor the prosecutor testified, let alone admitted that there was an agreement – or even a tacit understanding – that Peroti would be treated with kid gloves if she gave testimony helpful to the State. Moreover,

> [t]he government is free to reward witnesses for their cooperation with favorable treatment in pending criminal cases without disclosing to the defendant its intention to do so, *provided* that it does not promise anything to the witnesses prior to their testimony. . . . [T]he fact that a prosecutor afforded favorable treatment to a government witness, standing alone, does not establish the existence of an underlying promise of leniency in exchange for testimony.

<u>Shabazz v. Artuz</u>, 336 F.3d 154, 165 (2nd Cir. 2003); <u>accord</u> <u>Moore-El v. Luebbers</u>, 446 F.3d 890, 900 (8th Cir. 2006); <u>United States v. Rushing</u>, 388 F.3d 1153, 1158 (8th Cir. 2004); <u>Reese v. Delo</u>, 94 F.3d 1177, 1183 (8th Cir. 1996).

Second, Worthington's complaint that he did not learn that Peroti was an undercover agent until she testified should fall on deaf ears. There is no constitutional right to pretrial discovery. <u>Wardius v. Oregon</u>, 412 U.S. 470, 474 (1973). Though <u>Brady</u> requires disclosure of material impeachment and exculpatory information, that disclosure can occur at trial. <u>Weatherford v. Bursey</u>, 429 U.S. 545, 559 (1977); <u>United States v. Agurs</u>, 427 U.S. 97, 107-

12 (1976).  "<u>Brady</u> . . . is a disclosure rule, not a discovery rule."  <u>United States v. Higgins</u>, 75 F.3d 332, 335 (7th Cir. 1996).

2.      Worthington's perjury argument fares no better than his <u>Brady</u> argument.  "[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the [factfinder]."  <u>Agurs</u>, 427 U.S. at 103; <u>accord</u> <u>Snell v. Lockhart</u>, 14 F.3d 1289, 1298 (8th Cir. 1994).  Worthington has not shown that Peroti gave false testimony.  That a presentence investigation report noted that one member of a St. Charles County drug unit reported that Peroti was not – at least not then – working with the unit on a case against Worthington, Doc. 16, at 78, does not mean she *never* was an undercover agent for the St. Charles unit or for any other unit.  (And there would be no pressing need to bust Worthington for a drug offense after he had been arrested and charged with burglary, rape, and murder, and confessed.)  After all, Peroti ultimately committed to being an undercover agent for *St. Louis County* (when Worthington tried to rape her).  Exhibit D, vol. 1, at 118. That Peroti has a "criminal past," Doc. 16, at 78, doesn't give the lie to her testimony – petty criminals can be the victims of serious crimes.  The only direct evidence that Peroti lied comes from Worthington – a diagnosed sociopath and malingerer with an extensive criminal history and whom the postconviction court found lacking in credibility.  And even if Peroti bent the truth, nothing in the record even hints that the prosecutor knew or should have known that she did.  <u>Murray v. Delo</u>, 34 F.3d 1367, 1375-76 (8th Cir. 1994) ("[I]t often

47

happens that witnesses contradict themselves in statements given from time to time. Such contradictions . . . do not, without more, establish perjury."). As an officer of the court, the prosecutor presumably would have notified the court, and sought to strike Peroti's testimony, if he thought she was lying.

Johnson v. Mississippi does not help Worthington. "The problem in cases such as Johnson . . . arose because an accused was declared eligible for capital punishment on grounds that may have been erroneous, and it became essential to know whether, with the invalid ground sheared off, the accused still would be eligible." Wallace v. Davis, 362 F.3d 914, 917 (7th Cir. 2004). That problem wasn't present here. Even without Peroti's testimony, Worthington was eligible for the death penalty. His gripe about Peroti's testimony is that it increased his chances of getting the death penalty. See Doc. 16, at 75-80. Extending Johnson in the manner Worthington urges would run afoul of Teague v. Lane's prohibition on retroactive application of new rules of constitutional law, Wallace, 362 F.3d at 919, and 28 U.S.C. § 2254(d)(1). In any event, there is nothing unreliable about Peroti's testimony, or the aggravating circumstance to which it related (Worthington's prior criminal conduct).

**CLAIM 4**

A.    Summary of Claim

Worthington makes three arguments in claim 4.

1.      He contends that he was denied due process of law, because the sentencing judge, Judge Nichols, was biased or suffered from an appearance of impropriety, and thus should have *sua sponte* recused herself.  Doc. 16, at 80, 86-87, 88-89.   (Defense counsel never moved to disqualify Judge Nichols.)  As Worthington puts it, there was a "political maelstrom" and "relentless media campaign in favor" of death surrounding his case.  Doc. 16, at 80-81.  The St. Louis Post Dispatch published articles, which, Worthington argues, reflected the political pressure on Judge Nichols to impose the death penalty.  Doc. 16, at 81-85.  In the articles, the victim's mother and writers of letters to the editor advocated death; the prosecutor said, "You shouldn't be putting executions up for election, but the judiciary should share the values of the community and reflect them . . . and the community is overwhelmingly in favor of the death penalty"; and Nancy Schneider, who was running against Judge Nichols for circuit judge, said, "The death penalty and life in prison is [*sic*] an issue all citizens are concerned about . . . The judge can take the place of the jury, so it is important public officials share their values and beliefs."  See Doc. 16, at 81-85.  Further accentuating the pressure, Worthington implies, the prosecutor, who was running for reelection, accepted about $1500 in  contributions from the victim's family.  Doc. 16, at 76.  Worthington also notes that Judge Nichols received twenty-four letters denigrating Worthington and advocating the death penalty – letters that Judge Nichols put under seal without (Worthington claims) ever disclosing their existence to his trial counsel.  Doc. 16, at 85-86.  Another problematic circumstance (to Worthington) was that ten to twelve years

before the penalty phase, Judge Nichols had been a guardian *ad litem* for Charlotte Peroti's son, Anthony Hansen, after getting burned by a hot bath. Doc. 16, at 86-87.

2.     Worthington contends that Judge Nichols' handling of the letters she put under seal violated Gardner v. Florida, 430 U.S. 349 (1977) (plurality). Doc. 16, at 88.

3.     Worthington claims that defense counsel provided ineffective assistance, in violation of the Sixth and Fourteenth Amendments, by not moving to disqualify Judge Nichols, for the reasons listed in paragraph 1 supra. Doc. 16, at 80. Because Judge Nichols was biased, and a biased judge is structural error, Worthington says he need not prove Strickland prejudice. Doc. 16, at 90-91. At a minimum, Worthington contends that defense counsel should have consulted with him about the Hansen matter before waiving any objection to Judge Nichols' presiding. Doc. 16, at 90. Had counsel done so, Worthington says he "would not have agreed to continue his guilty plea in front of Nichols and would have asked to withdraw his plea." Doc. 16, at 90.

B.     *Teague v. Lane*

Worthington's contention that he has a Constitutional right to a judge free of an appearance of impropriety is barred by Teague v. Lane, 489 U.S. 288 (1989), and 28 U.S.C. § 2254(d)(1). Under Teague, retroactive application of a new rule of constitutional law in habeas action is barred (with the exception of two exceptions inapplicable here). Beard v. Banks, 542 U.S. 406, 413 (2004). A rule is new for purposes of Teague if it is not dictated by U.S. Supreme Court precedent. Id. No Supreme Court case has ever held that a

defendant, capital or non-capital, has a Constitutional right to a judge free of an appearance of impropriety. <u>Welch v. Sirmons</u>, 451 F.3d 675, 700-01 (10th Cir. 2006); <u>Johnson v. Carroll</u>, 369 F.3d 253, 262-63 (3rd Cir. 2004); <u>Del Vecchio v. Illinois Dept. of Corr.</u>, 31 F.3d 1363, 1372 (7th Cir. 1994) (en banc); <u>United States v. Couch</u>, 896 F.2d 78, 82 (5th Cir. 1990); <u>Hardy v. United States</u>, 878 F.2d 94, 97 (2nd Cir. 1989); <u>but</u> <u>see</u> <u>Jones v. Luebbers</u>, 359 F.3d 1005, 1012-13 (8th Cir. 2004).

C.      Analysis of Claim

The Missouri Supreme Court reasonably and correctly applied controlling U.S. Supreme Court precedent in rejecting claim 4. <u>See</u> 28 U.S.C. § 2254(d)(1).

1.      Bias and Appearance of Impropriety

Worthington was entitled to a impartial (i.e., unbiased) sentencing judge <u>Taylor v. Hayes</u>, 418 U.S. 488, 501 (1974), and, *arguendo*, a judge free of an appearance of impropriety. The (objective) test for an appearance of impropriety is whether a reasonable person who is fully-informed and thoughtful – "rather than hypersensitive or unduly suspicious" – would perceive a significant risk that Judge Nichols would resolve the case on a basis other than the merits. <u>Liteky v. United States</u>, 510 U.S. 540, 548, 553 n.2 (1994); <u>Liljeberg v. Health Services Acquisition Corp.</u>, 486 U.S. 847, 865 (1988); <u>In the Matter of Mason</u>, 916 F.2d 384, 386 (7th Cir. 1990); <u>see</u> <u>also</u> <u>Aetna Life Ins. Co. v. Lavoie</u>, 475 U.S. 813, 825 (1986). There must be a probability of bias so high as to be constitutionally

intolerable.  <u>Kinder v. Bowersox</u>, 272 F.3d 532, 540 (8th Cir. 2001).  In <u>Jones</u>, the Eight

Circuit cautioned:

> Application of this vague standard [of appearance of impropriety], when
> viewed through the deferential lens of <u>Williams v. Taylor</u> and the AEDPA,
> necessarily leaves state courts considerable latitude to pronounce rulings that
> do not contradict, and are reasonable applications of, <u>Murchison</u> and <u>Tumey</u>.
> This is especially true when the allegations of bias do not relate to pecuniary
> interests [such as when the judge's compensation turns on his disposition of
> cases] or procedural infirmities [ such as when the judge is at the same time the
> complainant, indicter, and prosecutor in a criminal contempt proceeding].

359 F.3d at 1012-13.

The gravamen of Worthington's claim is that Judge Nichol's interest in being

reelected and the public pressure put on her (viz., the <u>St. Louis Post Dispatch</u> articles and

letters) caused her to be predisposed, or highly likely to be predisposed, to impose the death

penalty.  But a reasonable jurist, fully informed of the facts, could reasonably conclude, as

the Missouri Supreme Court did, that she was neither biased nor suffered from an appearance

of impropriety.  Elected judges handling capital cases cannot be disqualified merely because

of "significant pressure from the electorate to be 'tough' on crime[.]" <u>Van Harken v. City of</u>

<u>Chicago</u>, 103 F.3d 1346, 1353 (7th Cir. 1997); <u>compare</u> <u>Moore v. Dempsey</u>, 261 U.S. 86, 91

(1923) (Holmes, J.) (holding that trial dominated by a mob violates dues process of law).

"Were it otherwise, persons could improperly force the recusal of an impartial judge merely

by creating a public controversy about the judge." <u>Worthington</u>, 166 S.W.3d at 580.

Missouri Supreme Court Rule 20.03, Canon 3, required Judge Nichols to "perform

[her] duties . . . impartially and diligently."  Paragraph B(3) of Canon 3 specifically states

that a "judge shall not be swayed by partisan interests, public clamor or fear of criticism."

Presumably, Judge Nichols complied with this precepts. As Justice Stevens has observed:

> [A]ny judge who faces reelection may believe that he retains his office only so long as his decisions are popular. Nevertheless, the elected judge, like the lifetime appointee, does not serve a constituency while holding that office. He has a duty to uphold the law and to follow the dictates of the Constitution. . . . In the absence of reliable evidence one way or the other, a State may reasonably presume that elected judges are motivated by the highest aspirations of their office.

Republican Party of Minnesota v. White, 536 U.S. 765, 799-800 (2002) (Stevens, J., dissenting).

Judge Nichols also took steps to dispel any perception of unfairness toward Worthington. She acknowledged the public pressure to execute Worthington and she repudiated it. In open court, she said, "I am very concerned about a public appearance, that these things are basically just political decisions that are being made. I have no intention of making a political decision. I will follow the law. I will follow the evidence." Exhibit E, at 22. Regarding the prosecutor's statements reported in the St. Louis Post Dispatch, Judge Nichols said that she was "somewhat offended" by them. Exhibit E, at 20. Judge Nichols ordered the prosecutor to instruct his witnesses not to express their sentencing recommendations. Exhibit D, v. I, at 7. She also instructed the parties to "refrain from discussing this publicly in a – certainly in a political partisan way, because I have no intention of doing that myself." Exhibit E, at 22.

In what the postconviction court described as a "conscientious and deliberate effort to remove . . . any appearance of political expediency," Judge Nichols set sentencing for the day *after* the election (which she lost), Exhibit L, vol. VIII, at 1081 – precisely what one letter writer to the <u>St. Louis Post Dispatch</u> said should lead the voters to vote *against* Nichols. Exhibit O, vol. II, at 383. Worthington notes that Judge Nichols became a senior judge after she was defeated, leading him to "conclude that improper political considerations were not removed." Doc. 16, at 86. This is *post hoc, ergo propter hoc* reasoning. It doesn't follow that because Judge Nichols became a senior judge after she lost the election a reasonable person would infer that there was a significant risk that she imposed the death penalty in order to become a senior judge or to maintain her political future, in the event she lost. Such an inference is "highly speculative and contingent." <u>Aetna Life Ins. Co.</u>, 475 U.S. at 826.

That Judge Nichols received and sealed twenty-four letters from the public, many of which advocated executing Worthington, is immaterial. Thirteen of the letters were addressed to the probation officer assigned to prepare the presentence investigation report, not Judge Nichols. Exhibit S, at 50. Only four of the letters were addressed to Judge Nichols, and two of the four were written *after* sentencing. Exhibit S, at 50. Not all the letters favored the death penalty.[6] And there is no evidence that Judge Nichols read *any* of these letters. (She never agreed to doing so, and she was never asked whether she did.)

---

[6]One of these letters, from the American Ethical Union, branded Judge Nichols' sentence "murder by government." Exhibit L, vol. VII, at 933. Community sentiment was far from monolithic.

Moreover, after defense counsel noted that several victim-impact letters advocated the death penalty, Judge Nichols said, "The Court will disregard any portion of those statements that recommend a sentence." Exhibit G, at 2-3. (This undermines Worthington's claim that Judge Nichols never disclosed the existence of the letters until after sentencing. Doc. 16, at 85-86.) At the sentencing hearing, Judge Nichols also said:

> there were things during the penalty phase that I would normally have been very harsh about allowing to happen in front of a jury, but . . . I am aware of what's going on . . . when I am in the courtroom . . . I just set aside those things, that if they are intended to impact on my decision, it isn't going to happen.

Exhibit E, at 21. A reasonable, thoughtful observer could – and would – conclude that the letters had no effect on Judge Nichols' decision.

Finally, to accept Worthington's argument likely would run afoul of the rule of necessity. Worthington's theory – that a judge running for re-election must recuse herself from presiding in a capital case where there is strong public pressure to impose the death penalty – would require the disqualification of every judge in the State. The political temptation to impose the death penalty to strengthen one's political future (this is Worthington's theory, given Judge Nichol's setting of sentencing after her election) would apply to *any* judge assigned to preside over Worthington's case. "If so, it is possible that under the 'rule of necessity,' none of the judges . . . would be disqualified." Aetna Life Ins. Co., 475 U.S. at 825 (citing United States v. Will, 449 U.S. 200, 214 (1980)).

That Judge Nichols had been a guardian *ad litem* for Anthony Hansen did not warrant recusal, either. Worthington has never explained how Judge Nichols' representation of Hansen would lead her to be biased against him or for the State. Nothing in the record indicates that Judge Nichols learned any information antipathetic to Worthington's interests during her representation of Hansen. Worthington, 166 S.W.3d at 579. If anything, her prior representation would tend to make her biased against the State, because the case involved allegations of abuse presumably by Hansen's mother, Peroti, a witness for the State. Exhibit S, at 39. Judge Nichols' representation also took place over ten to twelve years before Worthington's case, greatly attenuating whatever information (if any) she acquired during that representation. In the Missouri Supreme Court (but not here), Worthington argued that Hansen was involved in the murder and rape. But that story was inconsistent with the physical evidence and Worthington's statements to the police. Worthington, 8 S.W.3d at 87; Worthington, 166 S.W.3d at 579; Exhibit S, at 40 n.7. (Worthington said Hansen was involved, but the postconviction court concluded that Worthington he wasn't credible. See Worthington, 166 S.W.3d at 574.) No reasonable person would conclude that Judge Nichols' former representation of Hansen caused her to be biased against Worthington or created a significant risk that she could not fairly preside over his case.

2. *Gardner v. Florida*

Worthington's reliance on Gardner is misplaced. In Gardner, the sentencing court relied "in part" on secret information (i.e., a confidential section in a report) in imposing the

death penalty. 430 U.S. at 351, 360. There is no evidence that Judge Nichols ever read the letters sent to the court, let alone relied on them in imposing the death penalty. Cf. Ford v. Strickland, 696 F.2d 804, 832 (11th Cir. 1983) (Tjoflat, J., concurring in part and dissenting in part) ("I can fathom no constitutional rule, from Gardner or any other authority, that would preclude an appellate court from merely reviewing nonrecord material without relying on such material in the performance of its appellate function."). In fact, as noted before, Judge Nichols told the parties that she was going to ignore the letters' pleas for death. At the penalty phase hearing, she also repeatedly sustained objections to witnesses' recommendations that she impose the death penalty. Exhibit D, vol. III, at 551. Nor were the letters secret, for, as noted before, defense counsel was aware of them.

3.    Ineffective Assistance Regarding Judge Nichols

Defense counsel's decision not to move to disqualify Judge Nichols did not sink to the level of ineffective assistance. For starters, there is a strong presumption that defense counsel had sound strategic reasons not to seek Judge Nichols' recusal. See Strickland, 466 U.S. at 689. Defense counsel had done a thorough background investigation of Judge Nichols, which showed that she was a "a person of integrity," that there was nothing "negative" about her, and that her Catholic background increased the probability that she would not impose the death penalty. Exhibit M, vol. IV, at 510-11, 543, 546. (That defense counsel couldn't recall why he didn't move to disqualify Judge Nichols, Exhibit M, at 493, is immaterial. Fretwell, 133 F.3d at 624.) Defense counsel also had one very sound reason

not to move to disqualify Judge Nichols: a motion to disqualify would almost certainly have been denied. See analysis supra.

Worthington says that if defense counsel had consulted with him about the Hansen matter, he would have withdrawn his guilty plea. This assumes that whether to move to disqualify Judge Nichols on account of her prior representation of Hansen is an "important decision" about which defense counsel had a duty to consult with Worthington. Strickland, 466 U.S. at 688. It is not. Whether to move to disqualify Judge Nichols was a tactical question. It required legal training to appreciate and weigh – and is not one the four fundamental decisions the defendant must make, see Jones v. Barnes, 463 U.S. 745, 751 (1983) – and so was defense counsel's, not Worthington's, to make. United States v. Washington, 198 F.3d 721, 723-24 (8th Cir. 1999); United States v. Plitman, 194 F.3d 59, 63 (2d Cir. 1999); see generally Wayne R. LaFave, Jerold H. Israel & Nancy J. King, CRIMINAL PROCEDURE § 11.6(A), at 598-603 (2d ed. 1999).[7] Nor does Worthington say that if counsel had consulted him he would have given him *new* information that would have aided counsel's ultimate decision. That Judge Nichols' prior representation of Hansen was a weak reed on which to base a disqualification motion is another reason counsel had no duty

---

[7]Worthington cites Geders v. United States, 425 U.S. 80 (1976), as supporting his position that defense counsel should have consulted him about the Hansen situation. Doc. 16, at 90. In Geders, the U.S. Supreme Court held that "an order preventing petitioner from consulting his counsel 'about anything' during a 17-hour overnight recess between his direct-and cross-examination impinged upon his right to the assistance of counsel guaranteed by the Sixth Amendment." 425 U.S. at 91. That the State cannot impose such a barrier between an attorney and his client says nothing, however, about the scope of the attorney's duty to consult with the client. Nor is there any language in Geders addressing the topic.

to consult with Worthington about the matter. "It is not the normal practice of lawyers to advise their clients of every defense or argument or tactic that while theoretically possible is hopeless as a practical matter." Evans v. Meyers, 742 F.2d 371, 374 (7th Cir. 1984).

In any event, Worthington's prejudice theory is defective, for three reasons. One, Worthington could not have withdrawn his guilty plea. "The accused is not entitled to withdraw a guilty plea as a matter of right; such relief is reserved for extraordinary circumstances, such as a showing of fraud, mistake, misapprehension, fear, persuasion, or the holding out of false hopes." State v. Taylor, 929 S.W.2d 209, 215 (Mo. 1996) (en banc). Second, Worthington's prejudice theory turns on whether he was telling the truth when he said he would have withdrawn his guilty plea had he known about Judge Nichols' prior representation of Hansen. Doc. 16, at 90; Exhibit N, at 219-20. The postconviction court concluded that Worthington was not credible. See Worthington, 166 S.W.3d at 574. Three, given the strong aggravating evidence, there is no reasonable probability that a different (replacement) judge wouldn't have imposed the death penalty – and Worthington hasn't deigned to explain why there would be. See Young v. Bowersox, 161 F.3d 1159, 1160-61 (8th Cir. 1998); Purvis v. Crosby, 451 F.3d 734, 740 (11th Cir. 2006) ("[P]rejudice may not be presumed but must be shown in order to establish ineffective assistance of counsel based on failure to raise a claim of structural error at trial."); but see Miller v. Dormire, 310 F.3d 600, 602-03 (8th Cir. 2002) (neither mentioning nor purporting to overrule Young).[8]

---

[8]The Miller court could not overrule Young even if it had wanted to. See United States v. Wright, 22 F.3d 787, 788 (8th Cir. 1994) ("[A] panel of this Court is bound by a prior Eighth Circuit

**CLAIM 5**

A.     <u>Summary of Claim</u>

At defense counsel's request, the trial court ordered an examination of Worthington under Mo. Rev. Stat. § 552.020 (1994).[9]  Exhibit A, vol. I, at 41-42, 50-51.  The examination was to ascertain, among other things, whether Worthington had a mental disease or defect, whether he lacked the capacity to understand the proceedings against him or to assist in his defense, and whether at the time of the murder and rape he knew or appreciated the nature, quality, or wrongfulness of his conduct or could not conform his conduct to the requirements of law.  Exhibit A, at 51.  Dr. Max Givon did the examination.  Doc. 16, at 92.  Worthington contends that it is "undisputed" that Dr. Givon did not *Mirandize* Worthington before examining him.  Doc. 16, at 92.

At the penalty phase, the State called Dr. Givon.  Exhibit D, vol. II, at 295.  Defense counsel Rosenblum objected to the report on the grounds of relevancy, but withdrew his relevance objection after defense counsel Green said he had previously stipulated to Dr.

---

decision unless that case is overruled by the Court sitting *en banc*.").

[9]The statute mandates, among other things, that "[a] report of the examination made under this section shall include:  (1) Detailed findings; (2) An opinion as to whether the accused has a mental disease or defect; (3) An opinion based upon a reasonable degree of medical or psychological certainty as to whether the accused, as a result of a mental disease or defect, lacks capacity to understand the proceedings against him or to assist in his own defense; (4) A recommendation as to whether the accused should be held in custody in a suitable hospital facility for treatment pending determination, by the court, of mental fitness to proceed; and (5) A recommendation as to whether the accused, if found by the court to be mentally fit to proceed, should be detained in such hospital facility pending further proceedings."  MO. REV. STAT. § 552.020.3 (1994).

Givon's report. Exhibit D, vol. II, at 295. Defense counsel never raised a Fifth or Sixth Amendment objection to Dr. Givon's testimony.

Worthington argues that Dr. Givon's testimony violated his Fifth Amendment right to free of self-incrimination and his Sixth Amendment right to counsel, because (1) Dr. Givon did not *Mirandize* Worthington before examining him and (2) Dr. Givon's examination was supposed to be limited to determining Worthington's competence and sanity. Doc. 16, at 96. The Missouri Supreme Court's rejection of these claims, Worthington contends, is "contrary to and involves an unreasonable application of" Estelle v. Smith, 451 U.S. 454 (1981). Doc. 16, at 96. Worthington also contends that, by stipulating to Dr. Givon's report and withdrawing an objection to his testimony on the grounds of relevancy, defense counsel provided ineffective assistance in violation of the Sixth and Fourteenth Amendments. Doc. 16, at 96.

B.    Procedural Bar

The ineffective-assistance prong of claim 5 is procedurally barred. Failure to follow applicable state procedural rules in exhausting a claim can result in the procedural default of claim, precluding federal habeas review. Coleman v. Thompson, 501 U.S. 722, 731-32 (1991); Sweet v. Delo, 125 F.3d 1144, 1151 (8th Cir. 1997). Missouri law required Worthington to raise all ineffective-assistance claims in his Rule 29.15 motion; any omitted claim was waived. Missouri Supreme Court Rule 29.15(a) & (d); Moore-El v. Luebbers, 446 F.3d 890, 896 (8th Cir. 2006); see also Winfield v. Roper, 460 F.3d 1026, 1037-38 (8th Cir.

61

2006). Worthington did not raise the present ineffective-assistance claim in his amended Rule 29.15 motion, see Exhibit O, so it is procedurally defaulted. It is also procedurally defaulted because Worthington did not raise the claim in his postconviction appeal to the Missouri Supreme Court. See Exhibit R, at 21-166; Osborne v. Purkett, 411 F.3d 911, 919 (8th Cir. 2005).

The remaining prongs of claim 5 are procedurally barred, too. Under Missouri law, to preserve an argument on appeal that evidence was wrongly admitted, the opponent must make a timely, specific objection to the evidence, and the theory underlying the argument must be identical to the theory underlying the objection. State v. Driver, 912 S.W.2d 52, 54 (Mo. 1995) (en banc); State v. Boydston, 198 S.W.3d 671, 674 (Mo. Ct. App. 2006). Though defense counsel Rosenblum objected to Dr. Givon's testimony, he did so on the grounds of relevancy, not the Fifth or Sixth Amendment, and he withdrew his objection. Defense counsel green also had stipulated to Dr. Givon's report. Defense counsel implicitly waived any objection to Dr. Givon's testimony. See State v. Mead, 105 S.W.3d 552, 555-56 (Mo. Ct. App. 2003) (discussing waiver of plain-error review). Consequently, the Missouri Supreme Court did plain-error review, thereby recognizing and imposing the procedural default. See Evans v. Luebbers, 371 F.3d 438, 443 (8th Cir. 2004) ("We agree with the District Court that this claim was procedurally defaulted, notwithstanding the fact the Missouri Court of Appeals reviewed the claim for plain error after it concluded the issue had not been raised at trial."); Roll v. Bowersox, 177 F.3d 697, 700 (8th Cir. 1999) ("When a

state court reviews a petitioner's claim under a plain-error standard, in federal habeas proceedings we either review the claim for plain error or view the claim as procedurally barred and decline to consider it at all absent a showing of cause and prejudice."); Neal v. Gramley, 99 F.3d 841, 843-44 (7th Cir. 1996); but see Rousan v. Roper, 436 F.3d 951, 962 n.4 (8th Cir. 2006) (not mentioning Evans or Roll).

No reason is given to lift the procedural bar. See Murray, 477 U.S. at 496-97. This court should not review the merits of claim 5. At most, review should be for plain error that caused a manifest injustice. See Roll, 177 F.3d at 700.

C.    Analysis of Merits

The Missouri Supreme Court reasonably – and correctly – applied Estelle v. Smith, 451 U.S. 454 (1981), in rejecting claim 5. See 28 U.S.C. § 2254(d).

In Estelle, the Court held that "[a] criminal defendant who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding." Id. at 468. The Court clarified the scope of Estelle in Buchanan v. Kentucky, 483 U.S. 402 (1987), declaring that

> [i]f a defendant requests such an evaluation or presents psychiatric evidence, then, at the very least, the prosecution may rebut this presentation with evidence form the reports of the examination that the defendant requested. The defendant would have no Fifth Amendment privilege against the introduction of this psychiatric testimony by the prosecution.

Id. at 422-23.

The Missouri Supreme Court reasonably applied <u>Estelle</u>. As the Missouri Supreme Court noted, it was *Worthington* (through counsel) who initiated the psychiatric evaluation. <u>Worthington</u>, 8 S.W.3d at 91; 28 U.S.C. § 2254(e).[10] Worthington also presented psychological evidence from Dr. Evans that Worthington was intoxicated and incapable of making rational decisions about his behavior when he killed and raped the victim. Exhibit D, vol. IV, at 729-30, 738-76; <u>see</u> <u>Coble v. Dretke</u>, 444 F.3d 345, 354-55 (5th Cir. 2006); <u>McWee v. Weldon</u>, 283 F.3d 179, 189-90 (4th Cir. 2002). That Worthington consented to the evaluation is a "distinction without a difference" to Worthington, Doc. 16, at 95, it is a distinction U.S. Supreme Court considers important, <u>Penry v. Johnson</u>, 532 U.S. 782, 796 (2001) (noting that the holding in <u>Estelle</u> was "limited to the 'distinct circumstances' presented there") – and for good reason. The element of coerciveness essential to the presence of custodial interrogation, <u>Thompson v. Keohane</u>, 516 U.S. 99, 112-13 (1995), is missing when the person being questioned has consented to the questioning. <u>See</u> <u>also</u> <u>Garner v. United States</u>, 424 U.S. 648, 655 (1976) ("Unless the Government *seeks* testimony that will subject its giver to criminal liability, the constitutional right to remain silent absent immunity does not arise."). Another important distinction is that the expert testimony in <u>Estelle</u> was used to establish the defendant's future dangerousness, which was a necessary condition (i.e., eligibility factor) to imposing the death penalty. Here, in contrast, even if Dr.

---

[10]<u>See</u> <u>also</u> <u>United States v. 7108 West Grand Ave.</u>, 15 F.3d 632, 634 ("The clients are principals, the attorney is an agent, and under the law of agency the principal is bound by the chosen agent's deeds.").

Givon had never testified, Worthington would have been eligible for the death penalty – and he does not argue otherwise. See Mahaffey v. Schomig, 294 F.3d 907, 919-20 (7th Cir. 2002). The Fifth Amendment did not require Dr. Givon to *Mirandize* Worthington before examining him. See Williams v. Stewart, 441 F.3d 1030, 1051 (9th Cir. 2006); White v. Mitchell, 431 F.3d 517, 536-37 (6th Cir. 2005).[11]

Does it matter that Dr. Givon's examination was allegedly thought to be limited to Worthington's sanity or competence? Doc. 16, at 95-96; Exhibit R, at 79. It doesn't. When Worthington requested the examination, the Missouri Supreme Court had already held that the State could use the statements he made to the examiner and the information acquired during the examination at the penalty phase. State v. Copeland, 928 S.W.2d 828, 839 (Mo. 1996) (en banc) ("The statute in question, § 552.020.12, only prohibits admission of the examiner's testimony on the issue of guilt."). So defense counsel knew, or should have known, that Dr. Givon's testimony was not limited to Worthington's sanity or competence. See Fleenor v. Anderson, 171 F.3d 1096, 1101 (7th Cir. 1999); Savino v. Murray, 82 F.3d 593, 603-05 (4th Cir. 1996) ("The statute . . . provided adequate warning of the scope of the

---

[11]Even if Worthington was entitled to be *Mirandized* by Dr. Givon, Worthington presented no evidence, at the penalty phase or the postconviction hearing, that the warnings were not given. Worthington says its "undisputed" that he wasn't *Mirandized*. Doc. 16, at 92. But the State never made a judicial admission that Worthington had *not* been *Mirandized*. Had Worthington objected to Dr. Givon's testimony on Fifth Amendment grounds, the State may very well have had the burden to prove that the *Miranda* warnings had been given (assuming custodial interrogation). But no such objection was made. For all that's known, Dr. Givon – or someone else – *Mirandized* Worthington before the examination.

Commonwealth's evaluation and the possible uses of the mental health information gathered.").

Worthington assumes that the <u>Miranda</u> exclusionary rule would bar Dr. Givon's testimony. But that rule does not apply to sentencing proceedings. <u>United States v. Nichols</u>, 438 F.3d 437, 443 (4th Cir. 2006); <u>see</u> <u>United States v. Tauil-Hernandez</u>, 88 F.3d 576, 581 (8th Cir. 1996) ("Extending the exclusionary rule to sentencing would have a detrimental effect on the traditional judicial prerogative of sentencing an offender based upon all the relevant and reliable information that is available."). True, the <u>Estelle</u> Court assumed the <u>Miranda</u> exclusionary rule applied in capital sentencing proceedings (the parties did not join issue on the matter); however, an assumption is not a holding. <u>Pennhurst State School & Hospital v. Halderman</u>, 465 U.S. 89, 119 (1984); <u>Zenith Radio Corp. v. United States</u>, 437 U.S. 443, 462 (1978); <u>Hagans v. Lavine</u>, 415 U.S. 528, 533 n.5 (1974). And under 28 U.S.C. § 2254(d)(1) only the Supreme Court's "clearly established" precedent (i.e., its holdings) matter. <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 660-61 (2004).

The Sixth Amendment component of claim 5 is also baseless. Worthington's counsel "requested the psychiatric evaluation by [Dr. Givon]. It can be assumed – and there are no allegations to the contrary – that defense counsel consulted with [Worthington] about the nature of his examination." <u>Buchanan</u>, 483 U.S. at 424; <u>Murtishaw v. Woodford</u>, 255 F.3d 926, 952 (9th Cir. 2001). (Nor did the Sixth Amendment require Worthington's counsel to

be present during Dr. Givon's examination.  Estelle, 451 U.S. at 471 n.14; Re v. Snyder, 293 F.3d 678, 682 (3rd Cir. 2002).)

**CLAIM 6**

A.    Summary of Claim

In a pretrial motion for discovery, Worthington requested, among other things, the names and "last known addresses of persons whom the prosecution intend[ed] to call as witnesses at any hearing or at the trial, together with their written or recorded statements, and existing memoranda reporting or summarizing part or all of their oral statements."  Exhibit A, at 37-38.  Two years before the penalty phase, the prosecution endorsed "Charlotte Kirn" (i.e., Charlotte Peroti) as a witness, without listing her street address or the nature of the testimony she would give.  Doc. 16, at 96-97.  Likewise, the prosecution did not disclose (at least not directly) the nature of the testimony to be given by Michael McKee, Robert Smith, Jerry McKean, and Christine Frey.  Peroti, McKee, and the rest testified against Worthington at the penalty phase.

Worthington charges that the foregoing nondisclosures violated Missouri Supreme Court Rule 25.03 and State v. Debler, 856 S.W.2d 641 (Mo. 1993) (en banc), and thus (the argument goes) the Sixth, Eighth, and Fourteenth Amendment rights to a fair trial and to confront his accusers.  Doc. 16, at 87-89.  Worthington also contends that the Missouri Supreme Court's holding that the Debler and Rule 25.035 violations did not prejudice him "is contrary to Lankford [v. Idaho, 500 U.S. 110 (1991)] and Gardner v. Florida[, 430 U.S.

349 (1977)] and is not supported by the state court record." Doc. 16, at 100. He maintains that the disclosure of Kirn's street address and real name (Peroti) would have allowed the defense team to discredit her by revealing on cross-examination that she had been placed on probation in a bad-check case brought by the prosecutor in Worthington's case and that she had fabricated her testimony about being an undercover drug informant. Doc. 16, at 99-100.

B.     Procedural Bar

This claim is procedurally barred. When a habeas petitioner fails to follow state procedural rules in exhausting a claim, the claim is generally procedurally barred. Coleman, 501 U.S. at 731-32; Sweet, 125 F.3d at 1151. Worthington's claim is based on violations of Rule 25.03 and Debler. To preserve his Debler and Rule 25.035 arguments for appeal, Worthington had to lodge a specific objection, based on lack of notice, to Peroti, McKee, Smith, McKean, and Frey's testifying. Thomas v. Wade, 361 S.W.2d 671 (Mo. 1962) (en banc). He did not do so. Worthington, 8 S.W.3d at 90 n.4. Hence, the Missouri Supreme Court did plain-error review, thereby recognizing and imposing the procedural default. See Evans, 371 F.3d at 443 ("We agree with the District Court that this claim was procedurally defaulted, notwithstanding the fact the Missouri Court of Appeals reviewed the claim for plain error after it concluded the issue had not been raised at trial."); Roll, 177 F.3d at 700 ("When a state court reviews a petitioner's claim under a plain-error standard, in federal habeas proceedings we either review the claim for plain error or view the claim as procedurally barred and decline to consider it at all absent a showing of cause and

prejudice."); Neal, 99 F.3d at 843-44; but see Rousan, 436 F.3d at 962 n.4 (not mentioning Evans or Roll). Worthington gives no reason to lift the procedural bar. See Murray, 477 U.S. at 496-97. This court should not review the merits of claim 6. At most, review should be for plain error resulting in a manifest injustice. See Roll, 177 F.3d at 700.

An additional reason to forego reviewing Worthington's claim is that the Confrontation Clause prong of it wasn't fairly presented to the state courts. Before seeking federal habeas relief, a petitioner must fairly present each claim to the appropriate state court. Baldwin, 541 U.S. at 29 (2004). "A claim has been fairly presented when a petitioner has properly raised the same factual grounds and legal theories in the state courts [that] he is attempting to raise in his federal habeas petition." Wemark, 322 F.3d at 1021; accord Forest, 52 F.3d at 719. On direct appeal to the Missouri Supreme Court, Worthington did not argue that the Debler and Rule 25.03 violations deprived him of the right to confront his accusers. Cf. Exhibit H, at 59 ("Due process and the Eight Amendment require that the state give the defense notice of the information that it intends to use in penalty phase.").

C.    Cognizability

Claim 6 is not cognizable. Worthington seeks habeas relief for a violation of state law. A violation of state law is not a grounds for habeas relief. Estelle v. McGuire, 526 U.S. 62, 67-68 (1991); Schleeper v. Groose, 36 F.3d 735, 737 (8th Cir. 1994); 28 U.S.C. § 2254(a). "Further, there is no due process violation simply because a trial court admits evidence of a defendant's uncharged bad acts," Harris v. Bowersox, 184 F.3d 744, 752 (8th

Cir. 1999), and the lion's share of the testimony McKee, Peroti, and rest concerned Worthington's prior bad acts. See Doc. 16, at 96-98 (describing witnesses' testimony).

D.    *Teague v. Lane*

Teague v. Lane, 489 U.S. 288 (1989), and 28 U.S.C. § 2254(d)(1) bars Worthington's claim. Under Teague, retroactive application of a new rule of constitutional law in habeas action is barred (with the exception of two exceptions inapplicable here). Beard, 542 U.S. at 413. A rule is new for purposes of Teague if it is not dictated by U.S. Supreme Court precedent. Id. Worthington is seeking to invoke a new rule of constitutional law. Worthington cites no, and there is no, U.S. Supreme Court case that holds that the State must announce the names, street addresses, and the substance of the witnesses it intends (or might) call at a penalty hearing in a capital case. It has never even hinted that such a requirement might exist.

E.    Analysis of Merits

Worthington says the Missouri Supreme Court's prejudice analysis is contrary to Lankford v. Idaho and Gardner v. Florida. This is a nonissue. The real question is whether the Missouri Supreme Court's decision is contrary to the rights under the U.S. Constitution clearly established in those cases. The answer is no.

The Lankford Court held that the Due Process Clause mandates that the State give the defendant adequate notice that he could receive the death penalty. 500 U.S. at 127. There, the notice was inadequate, in part, because the prosecutor had "formally advised" the trial

judge and the defendant that the death penalty was off the table, and the "silent" judge never hinted that he might nonetheless impose the death penalty. Id. at 123-27. The plurality in Gardner held that a defendant must have a meaningful opportunity to deny or explain away the State's evidence used in support of death. 430 U.S. at 351, 360; Lankford, 500 U.S. at 125.

To be contrary to these decision, the Missouri Supreme Court's opinion must have arrived at a conclusion different than that reached by Lankford or Gardner on a question of law or confronted facts materially indistinguishable but reached an opposite result. Williams, 529 U.S. at 405; Engesser v. Dooley, 457 F.3d 731, 735 (8th Cir. 2006). Neither condition obtains. The Missouri Supreme Court did not qualify, let alone reject, the Lankford or Gardner rules. The facts in Lankford and Gardner are also materially *distinguishable*. The trial court and prosecutor did not lull Worthington into believing that the State wouldn't seek the death penalty. Nearly two years before the penalty phase, the prosecutor issued his formal notice of intent to seek the death penalty. Exhibit A, vol. I, at 61-62. Nor did Judge Nichols, in deciding to impose the death penalty, rely on secret information, as the judge in Gardner did. Peroti, McKee, Smith, and the rest all testified in open court and were open to cross-examination.

**CLAIM 7**

A.     Summary of Claim

Worthington contends that the Missouri Supreme Court unreasonably and incorrectly applied Payne v. Tennessee, 501 U.S. 808 (1991), and Gardner v. Florida, 430 U.S. 349 (1977), in denying his argument that the State's victim-impact evidence was so unduly prejudicial as to deprive him of due process.  Doc. 16, at 100, 103, 106.  As described by Worthington, the victim-impact evidence included repeated and explicit calls for his death, including the following statement by the victim's mother:

> Simply put, even the most humane concerned and adamant animal rights person would not need a thunderbolt to know a rabid or a vicious dog should be human[e]ly slain for the good of the whole, and further to cease his own suffering.  Good and bad, right and wrong is not that complicated.  A gross crime deserves a gross penalty.

Exhibit G, at 21. According to Worthington, the State's witnesses also invidiously compared Worthington's life to the victim's and, in violation of Lockett v. Ohio, 438 U.S. 586 (1978), urged the court to disregard valid mitigating evidence.  Doc. 16, at 105-06.  Concludes Worthington:

> It could not be more manifest that Worthington's death sentence was based upon caprice and emotion, rather than on reason. . . . The quantity and scope of the evidence clearly exceeded the limits noted in Payne.  The court heard an avalanche of evidence from no less than eleven live witnesses regarding [the victim's] life and worth. . . . the volume and contents of this evidence injected passion, prejudice and arbitrariness into the sentencing process.

Doc. 16, at 105.

Worthington also contends that his trial counsel provided ineffective assistance of counsel, in violation of the Sixth and Fourteenth Amendments, by not objecting to the victim-impact evidence.

B.    Procedural Bar

Worthington's <u>Payne</u> claim is procedurally barred. When a habeas petitioner fails to follow state procedural rules in exhausting a claim, the claim is generally procedurally barred. <u>Coleman</u>, 501 U.S. at 731-32; <u>Sweet</u>, 125 F.3d at 1151. Missouri law required Worthington to object to the victim-impact evidence to preserve his argument for appeal, <u>Johnson v. State</u>, 103 S.W.3d 182, 189 (Mo. Ct. App. 2003), but Worthington did not do so. <u>Worthington</u>, 8 S.W.3d at 90. Hence, the Missouri Supreme Court did plain-error review, thereby recognizing and imposing the procedural default. <u>See Evans</u>, 371 F.3d at 443 ("We agree with the District Court that this claim was procedurally defaulted, notwithstanding the fact the Missouri Court of Appeals reviewed the claim for plain error after it concluded the issue had not been raised at trial."); <u>Roll</u>, 177 F.3d at 700 ("When a state court reviews a petitioner's claim under a plain-error standard, in federal habeas proceedings we either review the claim for plain error or view the claim as procedurally barred and decline to consider it at all absent a showing of cause and prejudice."); <u>Neal</u>, 99 F.3d at 843-44; <u>but see Rousan</u>, 436 F.3d at  962 n.4 (8th Cir. 2006) (not mentioning <u>Evans</u> or <u>Roll</u>). Worthington gives no reason to lift the procedural bar. <u>See Murray</u>, 477 U.S. at 496-97.

This court should not review the merits of the <u>Payne</u> claim. At most, review should be for plain error that caused a manifest injustice. <u>See</u> <u>Roll</u>, 177 F.3d at 700.

The <u>Gardner</u> prong of Worthington's claim of trial court error is also procedurally barred, because it was not fairly presented to the Missouri Supreme Court. Before seeking federal habeas relief, a petitioner must have first fairly presented each claim to the appropriate state court. <u>Baldwin</u>, 541 U.S. at 29. "A claim has been fairly presented when a petitioner has properly raised the same factual grounds and legal theories in the state courts [that] he is attempting to raise in his federal habeas petition." <u>Wemark</u>, 322 F.3d at 1021; <u>Forest</u>, 52 F.3d at 719. In his direct appeal, Worthington never mentioned <u>Gardner</u> or the <u>Gardner</u> rule (i.e., that sentencing courts cannot rely on secret information) in attacking the victim-impact evidence. Exhibit H, at 59-72. Hence, the <u>Gardner</u> prong of Worthington's claim of trial-court error is procedurally barred.

C.    <u>Analysis of Merits</u>

In <u>Payne v. Tennessee</u>, the U.S. Supreme Court held that victim-impact evidence can be presented during the penalty phase in a capital case but that "[i]n the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." 501 U.S. at 825. In <u>Gardner</u>, the U.S. Supreme Court invalidated a death sentence that was based in part on secret information (i.e., information from a report that had a confidential section not revealed to defense counsel). 430 U.S. at 351, 360; <u>Lankford</u>, 500 U.S. at 125.

The Missouri Supreme Court reasonably applied <u>Gardner</u>, <u>Payne</u>, and <u>Strickland</u> in rejecting claim 7.[12]

Though the State presented more than a "brief glimpse" of the victim's life – something <u>Payne</u> does not forbid, <u>see</u> <u>State v. Knese</u>, 985 S.W.2d 759, 771-72 (Mo. 1999) (en banc) – the victim-impact evidence was not excessively and unfairly prejudicial. The State just showed the "unique loss to society and in particular to [the victim's] family," <u>Payne</u>, 501 U.S. at 825, that Worthington's heinous crimes caused. Those losses were extensive – and Worthington is responsible for them. Other courts have rejected due-process challenges to similar presentations of victim-impact testimony. For instance, in <u>United States v. Barnette</u>, 211 F.3d 803 (4th Cir. 2000), seven witnesses "presented stories of the victim's childhoods, family experiences, and the trauma of their deaths, and poems reflecting the deep sadness and regret over their losses," and their testimony formed a substantial portion of the prosecution's case at sentencing. <u>Id</u>. at 818; <u>United States v. Folks</u>, 454 F.3d 410, 436 (4th Cir. 2006).

It is not true, as Worthington contends, that most of the witnesses urged Judge Nichols to impose death. Doc. 16, at 101. Some asked the judge to do "justice," and the victim's mother *implied* that Worthington should die. Exhibit D, vol. III, at 545, 618. On the few occasions when a witness made an express recommendation that the judge impose the death

---

[12]Because defense counsel did not object to the victim-impact evidence, it is doubtful whether the trial court could have violated the Due Process Clause by not *sua sponte* declaring a mistrial or entering a curative instruction. <u>See</u> <u>Carter v. Armontrout</u>, 929 F.2d 1294, 1297 n.2 (8th Cir. 1991).

penalty, Judge Nichols would strike it or sustain an objection to it. Exhibit D, vol. III, at 551. In fact, Judge Nichols stated, in line with defense counsel's motion *in limine*, that she would not "take into consideration" any sentencing recommendations from the witnesses. Exhibit D, vol. III, at 551-52. (Judge Nichols had previously order the prosecutor to instruct his witnesses not to recommend a sentence. Exhibit D, vol. I, at 7.) Moreover, the few witnesses who advocated death did not tell Judge Nichols anything she didn't already know. The whole point of victim-impact evidence is to bolster the case for death, by revealing the extent of the harm wrought by the murderer. It's highly unlikely the State would call a witness who *didn't* want Worthington to die.

Even if some of the victim-impact evidence crossed the line, the Missouri Supreme Court reasonably and correctly concluded that it had no effect. "In bench trials, judges routinely hear inadmissible evidence that they are presumed to ignore when making decisions." Harris v. Ribera, 454 U.S. 339, 346 (1981) (per curiam); accord Sinclair v. United States, 279 U.S. 749, 767 (1929); United States v. Foley, 871 F.2d 235, 240 (1st Cir. 1989) (collecting cases). Hence, the Missouri Supreme Court held that "[a]ny prejudicial effect was greatly limited by the fact that the case was tried to the court, rather than a jury." Worthington, 166 S.W.3d at 582. Much of the evidence was also "similar in nature." Worthington, 166 S.W.3d at 582. Moreover, in her report to the Missouri Supreme Court explaining the sentence, Judge Nichols did not cite the victim-impact evidence as playing a role in sentencing, though she had an opportunity to do so in the section asking for "general

comments" explaining why the sentence was appropriate. Exhibit V, at 3891-3900. In its independent review of the proportionality of the sentence, the Missouri Supreme Court "found it was not the result of passion, prejudice or other arbitrary factors." Worthington, 8 S.W.3d at 89-91; Worthington, 166 S.W.3d at 582. Consistent with that finding, which is presumed correct, see 28 U.S.C. § 2254(e)(1), Judge Nichols stated that "there were things during the penalty phase that I would normally have been very harsh about allowing to happen in front of a jury, but you know, I am aware of what's going on, aware of all that's going on, and when I am in the courtroom and I just set aside those things, that if they are intended to impact on my decision, it isn't going to happen[.]" Exhibit E, at 21. Given the foregoing, the Missouri Supreme Court reasonable concluded that there was no reasonable probability that the sentencing would have been different if a lesser amount of victim impact evidence had been admitted. Worthington, 166 S.W.3d at 582; cf. Anderson v. Goeke, 44 F.3d 675, 679 (8th Cir. 1995) (adopting more-likely-than-not standard for due process claims regarding admission of evidence in violation of state law).

Gardner, the other Supreme Court case Worthington relies on, is inapplicable. As noted before, in Gardner, the sentencing court relied on secret information in deciding to impose the death penalty. 430 U.S. at 351, 360. Here, in contrast, the victim-impact evidence Worthington criticizes was publicly aired in court, and Worthington had an opportunity to rebut the evidence.

The second prong of claim 7 is Worthington's claim that competent counsel would have objected to the victim-impact evidence. The Missouri Supreme Court reasonably and correctly applied <u>Strickland</u> in rejecting this claim. First of all, defense counsel violated no duty to Worthington. There is a strong presumption that counsel declined to object to some of the victim-impact evidence (Worthington does not say he should have objected to all or most of it) because of sound strategic reasons. <u>See Strickland</u>, 466 U.S. at 689. One good reason is that, as noted before, the judge is presumed to disregard any bathetic or over-the-top victim-impact evidence and not to be swayed by caprice or passion. Moreover, because the scope and amount of victim-impact evidence was not excessive, raising any objection likely would have been futile – and made defense counsel appear heartless. Worthington cannot show prejudice, either. <u>Worthington</u>, 166 S.W.3d at 582. He would have this court conclude that Judge Nichols was infected with caprice and passion, but <u>Strickland</u> teaches that "[a]n assessment of the likelihood of a result more favorable to the defendant must exclude the possibility of arbitrariness, whimsy, caprice, 'nullification,' and the like. A defendant has no entitlement to the luck of a lawless decisionmaker, even if a lawless decision cannot be reviewed." 466 U.S. at 695. And Worthington cites no, and there is no, evidence that Judge Nichols was inflamed by the victim-impact evidence.

## IV. CONCLUSION

For the foregoing reasons, this court should deny the petition for a writ of habeas corpus.

Respectfully submitted,

JEREMIAH W. (JAY) NIXON
Attorney General

/s/ Ronald S. Ribaudo
RONALD S. RIBAUDO
Assistant Attorney General
Missouri Bar No. 53833

P.O. Box 899
Jefferson City, MO 65102
(573) 751-0464 – phone
(573) 751-3825 – facsimile
ron.ribaudo@ago.mo.gov
Attorneys for Respondents

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was filed and sent to the following counsel for petitioner via the ECF system on this 23rd day of October 2006:

Kent E. Gipson, #34524
305 E. 63rd Street
Kansas City, MO 64113

Gino F. Battisti, #2586
Foley & Mansfield, P.L.L.P.
1001 Highlands Plaza Drive West
Suite 400
St. Louis, MO 63110

/s/ Ronald S. Ribaudo
Ronald S. Ribaudo
Assistant Attorney General