# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

---

**MICHAEL WORTHINGTON,**

**Petitioner,**

**v.**

**DONALD ROPER,**

**Respondent.**

**Case No.   4:05-CV-1102 (CAS)**

---

**PETITIONER'S TRAVERSE**

---

**KENT E. GIPSON #34524**
**Attorney At Law**
**305 E. 63rd Street**
**Kansas City, MO  64113**
**816/363-2795 • fax 816/363-2799**

**GINO F. BATTISTI, #2586**
**Foley & Mansfield, P.L.L.P.**
**1001 Highlands Plaza Drive West**
**Suite 400**
**St. Louis, Missouri 63110**
**(314) 645-7788 • fax (314) 645-9945**

TABLE OF CONTENTS

Page

I.  INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

III.  ISSUES REGARDING INDIVIDUAL CLAIMS FOR RELIEF . . . . . . . . . 8

CLAIM 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

CLAIM 2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

CLAIM 3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

CLAIM 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

CLAIM 5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

CLAIM 6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

CLAIM 7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

EXHIBIT 9 - PART 1 THRU PART 4
       PRE-TRIAL PSYCHIATRIC EVALUATION BY DR. MILLER

EXHIBIT 10 -  PART 1 THRU PART 12
       PRE-TRIAL MENTAL EVALUATION BY DR. GIVON

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| MICHAEL WORTHINGTON, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | Case No.   4:05-CV-1102 (CAS) |
| v. | ) | |
| | ) | |
| DONALD ROPER | ) | |
| | ) | |
| | ) | |
| Respondent. | ) | |

## PETITIONER'S TRAVERSE

COMES NOW petitioner, by and through counsel, and hereby replies as follows to respondent's response to order to show cause why a writ of habeas corpus should not be granted.

## I.

## INTRODUCTION

Following a lackluster and incomplete investigation by his ill-informed and underpaid lawyers, petitioner Michael Shane Worthington pleaded guilty to first degree murder, without the benefit of a plea bargain, and was sentenced to death by a judge who knew only sketchy details of petitioner's life history. Despite the fact that

1

petitioner grew up in Peoria, Illinois, only a short drive from the venue of this case in St. Charles County, trial counsel Joseph Green did not bother to travel to Peoria to interview petitioner's friends and family and investigate petitioner's social, medical, and legal history. Counsel's substandard performance, coupled with the compelling evidence of mental illness, brain damage, and sexual abuse uncovered during post-conviction proceedings, removes any doubt that petitioner did not receive the effective assistance of counsel that the Sixth Amendment guarantees in capital punishment cases.

In defending this tainted conviction and sentence, counsel for respondent advances a number of factual and legal arguments against the grant of habeas relief, hoping that at least one of them will stick. In respondent's lengthy defense of counsel's substandard performance, however, there is a significant and remarkable omission. Respondent says nary a word about the ABA guidelines governing the performance of counsel in capital cases, which the Supreme Court has adopted in assessing the competence of counsel in capital cases. *Wiggins v. Smith*, 539 U.S. 510, 524 (2003); *Rompilla v. Beard*, 545 U.S. 374, 387 (1995). This omission, viewed in the context of counsel's abysmal performance, speaks volumes.

Respondent interposes numerous procedural and substantive arguments against petitioner's claims. A great deal of the State's response consists of word by word

2

regurgitations of the Missouri Courts' opinions and word by word by citations to the record, followed by assertions that the state courts' rulings are "reasonable." Many of respondent's other arguments rest upon contrived and misleading assertions crafted to mask the clear deficiencies in counsel's investigation and the powerful impact that the mitigating evidence uncovered during post-conviction proceedings would have had in influencing the outcome of the penalty phase.

In a few instances, respondent also advances procedural bar arguments to various sub-parts of certain claims. Because of the nature of respondent's arguments, this traverse will reply to respondent's arguments on a claim by claim basis. In addressing claims involving threshold procedural issues, petitioner will reply to the procedural bar issues before discussing merits of the underlying claim. In many instances, petitioner's argument will focus on whether the Missouri decision was contrary to, or involved an unreasonable application of existing Supreme Court precedent or, alternatively, was based upon an unreasonable determination of the facts necessary to entitle him to relief under 28 U.S.C §2254(d). Petitioner is confident that this court, after a full and fair assessment of all of the relevant facts and applicable law, will conclude that habeas relief is warranted.

3

# II.

## **STANDARD OF REVIEW**

Although the specific application of §2254(d) will be discussed regarding each of petitioner's constitutional claims, petitioner believes it would be beneficial to the court to set out general parameters and an analysis that the court should employ in determining whether habeas relief is warranted.

Under 28 U.S.C. §2254(d)(1), federal court may grant an application for a writ of habeas corpus for a claim adjudicated in state court if that adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States." The Supreme Court has held that the clauses "contrary to" and "unreasonable application of" have independent meaning. *Penry v. Johnson*, 532 U.S. 782 (2001); *Williams v. Taylor*, 529 U.S. 362 (2000). The "contrary to" clause applies, *inter alia,* when a state "applied a rule that contradicts the governing law set forth in the Supreme Court's cases," the "unreasonable application of" clause applies when the state applies the correct legal standard but applies it unreasonably. *Id*. at 404.

Where the Missouri Courts did not apply the proper legal test or pertinent legal rules established by the Supreme Court, petitioner is entitled to relief under the "contrary to" clause if this court independently determines that a non-harmless

4

constitutional violation occurred.  *See e.g.  Williams v. Anderson*, 460 F.3d 789, 801-05 (6th Cir. 2006).   In other words, if this court finds that the "contrary to" clause applies to a claim for relief, this court is free to review the claim *de novo* and grant relief if the court finds a constitutional violation.  *Id.*

In *Williams*, Justice O'Connor noted two possible ways that a state court decision might violate the "unreasonable application" clause of §2254(d)(1):

> First, a state court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule in this Court's cases, but unreasonably applies it to the facts of a particular state prisoner's case.  Second, a state court decision also involves an unreasonable application of this Court's precedent if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.  529 U.S. at 407.

In the aftermath of the decision in *Williams*, lower federal courts have grappled with the proper definition of and scope of the unreasonable application clause.  Because the Supreme Court did not give specific guidance as to what the term "objectively unreasonable" means, lower federal courts have had difficulty applying this standard.  *See e.g.  Maynard v.  Boone*, 468 F.3d 665, 670-71 (10th Cir. 2006).  (Describing difficulty in defining and applying the unreasonable application clause).

Although the Eighth Circuit has granted relief under the unreasonable application clause, it has not given any precise meaning to the term "objectively unreasonable."

5

*Carter v. Bowersox*, 265 F.3d 705 (8th Cir. 2001). The Tenth Circuit in *Maynard* described the appropriate definition of "objectively unreasonable" as being more onerous than the "clearly erroneous" standard, but more lenient than the "unreasonable to any jurist" standard[1]. 468 F.3d at 670-71.

The best and most precise interpretation of the "objectively unreasonable" standard comes from the Second Circuit.   In making the objectively unreasonable determination, reviewing courts should focus on "whether the state court decision reveals an increment of wrongness beyond error." *Francis S. v. Stone*, 221 F.3d 100, 110 (2nd Cir. 2000); *Henry v. Poole*, 409 F.3d 48, 68 (2nd Cir. 2005); *Monroe v. Kuhlmann*, 433 F.3d 236, 246 (2nd Cir. 2006).

For a habeas petitioner to prevail under this standard, a prisoner must meet the following test:

> Some increment of incorrectness beyond error is required.  We caution, however, that the increment need not be great; otherwise, habeas relief would be limited to state court decisions 'so far off the mark as to suggest judicial incompetence.'  We do not believe AEDPA restricted federal habeas corpus to that extent.  221 F.3d at 111.

---

[1] This distinction is important because respondent appears to argue that §2254(d) precludes relief if any reasonable jurist could or would distinguish the facts of this case from *Williams*, *Wiggins*, and *Rompilla*. (Resp. 27-30).

This interpretation of 2254(d)(1) has also been adopted by the First Circuit. *Santiago v. Spencer,* 346 F.3d 206, 211 (1st Cir. 2003).

It is also clear under the law of this circuit that it is necessary for reviewing courts to review caselaw from lower federal courts because such an inquiry is relevant to whether the state court unreasonably applied existing Supreme Court precedent. *See e.g. Atley v. Ault*, 191 F.3d 865, 871 (8th Cir. 1999). In petitioner's view, the "unreasonable application" standard, to be given meaning, must be interpreted in such a manner that allows meaningful review of state court decisions. To hold to the contrary would render this proceeding a futile and empty formality.

In deciding this case, this court, particularly with regard to the first claim for relief, must also address whether the Missouri decision "was based on an unreasonable determination of the facts . . ." under §2254(d)(2). If the court determines that the Missouri decision rests upon a significant factual flaw, this court is free to review the claim *de novo* and grant relief if a non-harmless constitutional violation has occurred. *See e.g. Simmons v. Luebbers*, 299 F.3d 929, 937-38 (8th Cir. 2002); *Ward v. Sternes*, 334 F.3d 696, 703-704 (7th Cir. 2003). As the Seventh Circuit noted in *Ward*: "A state court decision that rests upon a determination of fact that lies against the clear weight of the evidence is, by definition, a decision 'so inadequately supported by the record' as to be arbitrary and therefore objectively unreasonable." *Id.* at 704.

7

## III.

## ISSUES REGARDING INDIVIDUAL CLAIMS FOR RELIEF

## CLAIM 1

Petitioner's Claim 1 advances an ineffective assistance of counsel claim regarding counsel's failure to adequately investigate and present evidence regarding petitioner's background and social and medical history, which petitioner contends impacted his decision to plead guilty and affected the result at the penalty phase of trial. (Pet. 14-46). Respondent devotes approximately one third of his response to addressing this claim. (Resp. 4-30). Throughout his response, counsel for respondent wrongly assumes that the standard of review provisions of 28 U.S.C. §2254(d) apply to every aspect of this claim. (*Id*).

Although the standard of review provisions of §2254(d) obviously do apply to the aspect of the claim involving counsel's performance during the guilt phase/guilty plea, §2254(d) does not apply to the penalty phase claim because the Missouri Supreme Court did not address petitioner's mental health issues or counsel's failure to investigate sexual abuse in deciding whether counsel was ineffective at the penalty phase of the trial.   In addressing the issue of petitioner's mental illness and brain damage that was presented in state post-conviction proceedings, the Missouri Supreme Court opinion only addresses this evidence in adjudicating petitioner's claim

8

that counsel was ineffective in not utilizing this evidence to pursue a diminished capacity defense that impacted the voluntariness of the guilty plea. *Worthington v. State*, 166 S.W.3d 566, 573-75 (Mo. banc. 2005). In addressing the impact of the mental health evidence upon the guilt phase, the Supreme Court states in a footnote that it will address this evidence in the penalty phase context later in its opinion. *Id*. at 574, n.2. However, in its later adjudication of penalty phase ineffectiveness issues , the Missouri Supreme Court does not address the impact of the mental health evidence in any aspect whatsoever. *Id*. at 576-582.

There is also a second significant omission from the Missouri Supreme Court's adjudication. There was absolutely no discussion of the evidence uncovered by post-conviction counsel that indicated petitioner was sexually abused as a child, evidence that should have been discovered had counsel bothered to review the records from petitioner's 1989 burglary conviction that the state utilized as aggravating evidence. (*Id.*; *see also* Exh.'s 3, 7, 8). It is well settled that where a prisoner raises a federal constitutional claim and the state court ignores it, there is no state court adjudication on that issue. As a result, the federal courts are free to review the claim *de novo* because §2254(d)(1) does not apply. *See e.g. Skillicorn v. Luebbers*, 475 F.3d 965, 972 (8th Cir. 2007); *Taylor v. Bowersox*, 329 F.3d 963, 967-68 (8th Cir. 2003)**.**

9

Alternatively, these two significant omissions and flaws in the Missouri Supreme Court's decision also require de novo review of the penalty phase claim under §2254(d)(1) and (2) because it was unreasonable for the state courts to completely disregard the most compelling aspects of petitioner's mitigating evidence in addressing this claim. *See e.g. Taylor v. Maddox* 366 F.3d 992, 1006-08 (9th Cir. 2004); *Williams v. Taylor*, 529 U.S. 362, 416 (2002) (Relief appropriate under unreasonable application clause of §2254(d)(1) where state decision "reveals an obvious failure to consider the totality of the omitted mitigation evidence."). Petitioner will address these standard of review issues in greater detail in addressing the merits of the penalty phase ineffectiveness claim below.

On the issue of guilt phase ineffectiveness, the Missouri Supreme Court noted that trial counsel retained Dr. Kevin Miller and Dr. Lee Evans to evaluate petitioner prior to trial. Thus, the court held that counsel's performance was not deficient because they hired "two experts on the issue of diminished capacity." *Worthington v. State*, 166 S.W.3d at 575. According to the Missouri Supreme Court, because these experts adequately explored the issue, trial counsel made a reasoned tactical decision to forgo a diminished capacity defense in favor of a guilty plea to the first degree murder charge without a plea bargain. *Id.*

10

This determination, as the record shows, rests on an "unreasonable determination" of material fact. As a result, this court is free to review this issue de novo and grant relief under §2254(d)(2). *See Simmons v. Luebbers*, 299 F.3d 929, 937-38 (8th Cir. 2002). Neither Dr. Miller nor Dr. Evans evaluated petitioner for the purpose of determining whether petitioner "cooly reflected" or deliberated on the homicide. *See* §565.002 R.S.Mo. (2000). To present a viable diminished capacity defense in Missouri, expert testimony that the defendant suffered from a mental disease negating this element of the offense of murder in the first degree must be presented. *Nicklasson v. State*, 105 S.W.3d 482, 485 (Mo. banc. 2003).

The Missouri Supreme Court failed to recognize that Dr. Evans is not a mental health expert. He has a Ph.D in pharmacology. Dr. Evans never addressed the issue of diminished capacity, as defined by Missouri law, in his pre-trial evaluation of petitioner. Dr. Evans also indicated in his post-conviction report that he is not qualified to offer any expert opinion on any psychological issue. (Exh. 1).

Dr. Miller's report also reveals that he did not conduct a diminished capacity evaluation of petitioner. As his pretrial psychiatric report indicates, he was asked by counsel to evaluate petitioner for competency, mental status at the time of the offense, and any mitigating evidence. (*See* Exh. 9). Dr. Miller's ultimate conclusion was that petitioner was competent to stand trial and that at the time of the offense petitioner

11

apparently blacked out and suffered from amnesia due to excessive drug and alcohol use.  Dr. Miller never addresses whether petitioner's mental illness negated the element of deliberation required to support a possible diminished capacity defense, undoubtedly because he was not asked to do so by trial counsel. (*Id*.)

More importantly, Dr. Miller's report was not completed until September 13, 1998, two weeks after petitioner pleaded guilty.  (*See* Exh.  9).  Mr. Rosenblum also testified that he did not receive Dr. Miller's report until two weeks after the guilty plea. (1st Supp. PCR L.F., Vol. V. p. 694).  Thus, it is clear that the Missouri Supreme Court's determination that trial counsel had petitioner thoroughly evaluated for a possible diminished capacity defense and made an informed tactical decision to forego this defense based upon Dr. Miller's evaluation before the guilty plea, rests upon an unreasonable determination of fact under §2254(d)(2)[2]. *See e.g. Miller-El v. Cockrell*, 537 U.S. 322, 346 (2003)(Failure to consider key aspects of the record is a defect in the fact finding process under §2254(d)(2).)

The Missouri Supreme Court's decision also rubberstamps the 29.15 motion court's findings that petitioner's post-conviction mental health experts were not

---

[2] In light of this chronology, it was objectively unreasonable for the Missouri Supreme Court to credit Mr. Rosenblum's testimony that he abandoned diminished capacity because he "feared Dr. Miller's report would corroborate" Dr. Givon. 166 S.W.3d at 575.

credible because they based their opinions on a single meeting with petitioner four years after the crime. 166 S.W.3d at 574. This passage from the Missouri Supreme Court implicitly suggests that the evaluation of Dr. Givon was more credible because it was more extensive and was conducted closer to the time of the offense. An examination of the circumstances surrounding all of the mental evaluations conducted in this case reveals that the Missouri Supreme Court's determination in this regard is also based on an unreasonable determination of material fact under §2254(d)(2).

First, similar to the evaluations of the post-conviction experts, Dr. Givon's report was also based upon a single six hour evaluation of petitioner. (See Exh. 10) It is also clear that Dr. Givon offered his opinion after reviewing only a very limited amount of information regarding petitioner's background and social history. (*Id.*) All of petitioner's post-conviction experts conducted equal or more extensive interviews of petitioner[3], conducted more extensive psychological tests, and reviewed more extensive background information. (Exh. 1, table; Exh. 4, p. 32-33; Exh. 8, p. 2-3). As a result, it was objectively unreasonable for the Missouri Supreme Court to denigrate the credibility of the post-conviction experts by pointing out purported flaws in their examinations that were, to put it charitably, equally applicable to Dr. Givon's

_____

[3] Dr. Smith evaluated petitioner for 10 hours over a two day period. (Exh. 8, p. 2)

13

pretrial examination. *See e.g. Taylor v. Maddox*, 366 F.3d 992, 1001, 1006-08 (9th Cir. 2004)(relief available under §2254(d)(2) where state court "misapprehends," "mistakes," "ignores," or fails to reconcile a material factual issue.); *See also Antwine v. Delo*, 54 F.3d 1357, 1365-66 (8th Cir. 1995)(rejecting state court finding that post-conviction mental expert was not credible where evaluation was of same duration as the pre-trial examination and more extensive testing was done by the second expert.)

Apart from the fact that petitioner's better qualified post-conviction experts conducted more thorough and extensive evaluations, there is also objective evidence that Dr. Givon's diagnosis of malingering was wrong.  As noted in the petition, Dr. Givon opined that petitioner was faking mental illness.  Extensive neuropsychological tests administered by Dr. Pincus and Cowan during the post-conviction process revealed that Mr.  Worthington was brain damaged, bi-polar, and suffered from a variety of mental conditions that were not uncovered in the cursory examinations conducted by Dr. Givon and retained defense expert Dr. Miller. (*See* Exhs. 2, 4). Dr. Givon's malingering diagnosis is patently wrong because it is impossible for the subject of a mental evaluation to fake neurological impairments and brain damage.[4] Dr.

---

[4] Dr. Givon's malingering and Anti-Social Personality ("ASPD") diagnosis could have been effectively rebutted by Dr. Smith. Dr. Givon only administered one test to petitioner, the MMPI-2, and did not administer any recognized tests for malingering. (See Exh. 10). Dr. Smith administered a test, known as the TSI, that

Givon's findings are also called into question because he failed to uncover that petitioner had bi-polar disorder, "a life-time condition that usually arises in early adulthood." *Antwine*, 54 F.3d at 1365.

On the issue of guilt phase prejudice, respondent implicitly suggests that the Missouri Supreme Court decision rests upon a finding that there was no reasonable probability that Worthington would not have pleaded guilty but for counsel's ineffectiveness. (Resp. at 19). There is, however, nothing in the text of the Missouri Supreme Court's decision addressing the issue of prejudice in the context of the guilty plea. Instead, it appears the Missouri Supreme Court's entire analysis of this claim is based upon its view that it was a reasonable tactical decision for trial counsel to advise petitioner to plead guilty. 166 S.W.3d at 573-75. When the state court decision does not address *Strickland* prejudice, federal courts may review this issue *de novo*. *See e.g. Dickerson v. Bagley*, 453 F.3d 690, 697 (6th Cir. 2006).

Petitioner testified during post-conviction proceedings that if the evidence of his diminished capacity had been known to him, he would have elected to go to trial rather than plead guilty without the benefit of a plea bargain. (2d Supp. PCR L.F. 222).

---

determined that petitioner's responses were "straightforward and candid." (Exh. 8, p. 15). Based upon the more extensive post-conviction evaluations and tests, Dr. Smith's report also effectively refutes Dr. Givon's ASPD diagnosis. (*Id.* 32-38).

No evidence was presented by the State to dispute petitioner's testimony. As a result, this testimony from petitioner was sufficient to establish *Strickland* prejudice under *Hill v. Lockhart*, 474 U.S. 52 (1985). The Missouri Supreme Court's explicit finding of a reasonable tactical decision was objectively unreasonable under 28 U.S.C. §2254(d)(1) and (2). Petitioner's convictions must be reversed.

In assessing counsel's ineffectiveness at the penalty phase, trial counsel's deficient performance in failing to conduct the reasonable and thorough investigation that the ABA guidelines require in a capital case is readily apparent. As the Missouri Supreme Court noted, co-counsel Joseph Green was hired by lead counsel Scott Rosenblum and was paid $10,000 out of Mr. Rosenblum's $50,000 fee as a "sub-contractor" to represent petitioner at the penalty phase of his trial. 166 S.W.3d at 575. Unfortunately, an objective evaluation of Mr. Green's performance indicates that petitioner got his money's worth.

In his post-conviction deposition, Mr. Green, to his credit, candidly admitted that his investigation for mitigating evidence was inadequate. Mr. Green did not conduct a thorough social history investigation. (1st Supp. PCR L.F. Vol. IV, pp. 433-34). Because of a lack of funds, he did not hire a paralegal or an investigator/mitigation specialist to attempt to uncover evidence to present at the penalty phase from petitioner's background. (*Id*. 434-36). In fact, Mr. Green indicated

16

that this was the only death penalty case he has ever handled where a mitigation specialist wasn't retained or utilized to help the defense team in preparing for the penalty phase. (*Id.*).

Mr. Green also admitted that he never bothered to travel a relatively short distance down the road from his St. Louis offices to petitioner's hometown of Peoria, Illinois, to interview witnesses and investigate for mitigating evidence. The following testimony from Mr. Green in response to the question as to why he did not travel to Peoria is instructive. In response to this question, Mr. Green stated:

> For a boatload of reasons. Because of the sequence of events that were happening with his case. . . Another reason is because quite frankly, you know, time and expense was not a luxury I had, keeping up my own private practice and what I was getting paid on – paid for on this case. And I didn't have control over the finances or how things were done, so – with respect to logistics of hiring experts and knowing what money was available and what money wasn't available. (*Id.*)

Mr. Green also admitted that he did not ask co-counsel Scott Rosenblum, who controlled the money, for funds to go to Peoria. (*Id*. 459). Mr. Green also indicated he asked Mr. Rosenblum for funds for a mitigation specialist. No money was permitted to be utilized for any expert or investigative assistance for the penalty phase, except for funds that were expended for the testimony of Dr. Lee Evans. (*Id.*)

Based upon Mr. Green's testimony, the Missouri Supreme Court's finding that the lack of funds did not contribute to Mr. Green's inadequate investigation is

indefensible and unreasonable under §2254(d)(1) and (2). *Wiggins*, 539 U.S. at 528. It appears, based upon a fair review of the record, that Mr. Green's entire penalty phase investigation consisted of a couple of phone calls with petitioner's mother, as well as phone contacts with his aunt, Carol Tegard, the only penalty phase witness who provided any background information regarding petitioner at the sentencing phase.[5]

Respondent's feeble attempts to defend Mr. Green's performance are uncompelling. (Resp. 8-16). As noted earlier, respondent conveniently steers clear of even mentioning the ABA guidelines, which reviewing courts must apply in assessing counsel's performance during the penalty phase of a capital case. *Wiggins* 539 U.S. at 524. Regardless of the standard of review that this court employs, it is not a close question that counsel's penalty phase investigation was objectively deficient under *Strickland*, *Wiggins*, and *Rompilla*.

---

[5] Respondent places great emphasis upon the 29.15 motion court's statement that trial counsel unearthed records of petitioner's history. (Resp. 10). These records were undoubtedly provided to Dr. Givon prior to his January 1997 evaluation by petitioner's previous attorney, Joel Eisenstein. (See Exh. 10). Eisenstein withdrew when his law license was suspended in March 1997. (L.F. 69). Rosenblum and Green entered their appearances on September 5, 1997. (*Id*. 138). The record is unclear whether and to what extent Mr. Green reviewed the records Eisenstein gave to Givon. It is clear, however, that these records were not obtained by Green through his own investigation.

As noted earlier, in assessing counsel's effectiveness during the penalty phase, the Missouri Supreme Court did not explicitly consider the post-conviction testimony of Dr. Evans, Dr. Pincus, Dr. Cowan and Dr. Smith. In addition, the court never mentions the evidence uncovered by state post-conviction counsel that petitioner was sexually abused as a child. In fact, the Missouri Supreme Court's entire analysis of the issue of penalty phase ineffectiveness only addressed the issue surrounding the burning of Butch Mackey (*see* Claim 2) and whether counsel should have called petitioner's parents as penalty phase witnesses. 166 S.W.3d at 576-78.

The Missouri Supreme Court's failure to address the mental health evidence and the evidence of sexual abuse is not only a serious oversight, but is also clearly "contrary to" and an unreasonable application of the command of *Strickland v. Washington*, 466 U.S. 668 (1984). In assessing prejudice, *Strickland* requires reviewing courts to assess the impact of all of the excluded evidence resulting from a deficient investigation in determining whether a new trial is warranted. *Id.* at 694; *Williams*, 529 U.S. at 416. Habeas relief is warranted under §2254(d)(1) and (2) because the adjudication of this claim is "contrary to" and an unreasonable application of *Strickland* and *Williams* and involves an unreasonable determination of fact. (See pp. 8-10, infra.).

19

In addressing trial counsel's failure to call the parents of petitioner as penalty phase witnesses, the Missouri Supreme Court held that trial counsel's performance was not deficient based upon an implicit motion court finding that trial counsel had a tactical basis for not calling petitioner's mother because her testimony might harm the defense. In this regard, the Missouri Supreme Court stated:

> The court below could well have found that the decision was made not to call her because her testimony would not have supported Mr. Worthington's assertions that she would have aided in his defense at trial. *Worthington v. State*, 166 S.W. 3d at 578.

Because the motion court did not make an explicit ruling on this issue, the Missouri Supreme Court's decision finding a tactical reason based upon a non-existent factual finding rests upon an unreasonable determination of the fact under §2254(d)(2). Under similar circumstances, the First Circuit granted habeas relief under §2254(d)(2), rejecting the state's argument that in the absence of an express state court finding, it could implicitly conclude that the trial court made adverse credibility findings on a claim for relief. *Norton v. Spencer*, 351 F.3d 1, 6 (1st Cir. 2003).

In addressing *Strickland* prejudice, respondent advances an array of unconvincing arguments. First, respondent cites the passage from the motion court's decision finding that the post-conviction mental health expert testimony was not credible because of their limited contacts with petitioner. (Resp. 16). Petitioner

20

adequately addressed the factual flaws of this position in addressing the issue of guilt phase ineffectiveness. (See pp. 12-13, *infra*). As noted earlier, these experts' contacts with petitioner and review of the documents were more extensive than those conducted by the state's expert, Dr. Givon. As a result, the state decision finding that this testimony lacked credibility is objectively unreasonable under §2254(d)(1) and involves an unreasonable determination of fact under §2254(d)(2).

In addition, the Eighth Circuit rejected an almost identical argument raised by the state of Missouri in *Antwine v. Delo*, 54 F.3d 1357 (8th Cir. 1995). In *Antwine*, the 29.15 motion court made an adverse credibility determination regarding Antwine's post-conviction mental evaluation that diagnosed bi-polar disorder based upon a five year lapse of time and the thoroughness of the expert's evaluation. *Id*. at 1365-66. As noted earlier, the court in *Antwine* rejected this argument based upon factors, also presented here, that the post-conviction evaluation was of the same duration and involved more extensive psychological tests than the pre-trial evaluation. *Id*.

In addition, the court in *Antwine* also noted that the 29.15 motion court's adverse credibility findings did not constrain the court from granting relief under *Strickland*. In this regard, Judge Arnold stated:

> The issue is whether the failure to discover and present evidence of Antwine's mental condition undermines our confidence in the outcome of either the guilt or sentencing phase of the trial. We are concerned,

21

then, with whether the jury - not the motion court- would have found the evidence of Antwine's mental condition credible... [T]he motion court found that Dr. O'Connor's diagnosis was not credible because it was based on an exam that occurred five years after the offense. Had counsel been effective, though, the examination would have been made shortly after the offense occurred. The question we must ask is whether a jury would have credited Dr. O'Connor's diagnosis if it had been presented to them at the trial, and whether the failure to present the evidence undermines our confidence in the proceedings. We believe that the jury might well have believed Dr. O'Connor's testimony if he had diagnosed Antwine's condition shortly after the offense.

*Id.*

Second, respondent advances a ridiculous argument that a capital defendant's mental illness is not necessarily mitigating because it could also scare jurors into thinking that the defendant would be a future danger.  (Resp. 16-17).  The only authority cited for this absurd proposition is two law review articles more than a decade old.  (*Id.*)  This argument also ignores the fact that future dangerousness is not a statutory aggravating circumstance in Missouri, as it is in some other states. §565.032.2 RSMo. (2000).  In addition, Missouri's death penalty scheme includes two statutory mitigating factors that encompass mental illness: (1) that the defendant was "under the influence of extreme mental or emotional disturbance;" and (2) "the capacity of the defendant to appreciate the criminality of his conduct or conform his conduct to the requirements of the law was substantially impaired." §565.032.3(2)(7) RSMo. (2000). At sentencing, Judge Nichols did not find or weigh any statutory

mitigating factors involving mental illness because no evidence was presented to support them. (Sent. Tr. p. 29). In fact, no statutory mitigating factors were found or weighed by the sentencing judge. *Id*.; *See also State v. Worthington*, 8 S.W.3d 83, 89 (Mo. banc. 1999).

Undoubtedly, the most ridiculous argument advanced by respondent in this vein is the assertion that presenting concrete evidence of mental illness would diminish trial counsel's naked plea for mercy and would have added credence to Dr. Givon's malingering diagnosis. (Resp. 17-18). This argument flies in the face of the ABA guidelines and numerous published decisions where counsel has been found ineffective in failing to present evidence of a similar nature. *See e.g. Ainsworth v. Woodford*, 268 F.3d 874-75 (9th Cir. 2001); *Outten v. Kearney*, 464 F.3d 401, 420 (3rd Cir. 2000). In fact, the Fifth Circuit rejected the same argument, in overturning a Texas death sentence where trial counsel failed to uncover evidence of mental illness and childhood abuse. *Lewis v. Dretke*, 355 F.3d 364, 368 (5th Cir. 2003); *See also Dickerson v. Bagley*, 453 F.3d 690, 697-702 (6th Cir. 2006)(finding that excluded mental health evidence presented a much stronger case for life than a "naked plea for mercy.") The Eighth Circuit also rejected a similar argument in *Antwine v. Delo*, 54 F.3d 1357, 1367-68 (8th Cir. 1995).

23

Respondent's argument that presenting concrete mental health evidence regarding petitioner's illnesses and brain damage would enhance rather than diminish Dr. Givon's malingering diagnosis is insulting to anyone's intelligence. The sentencing court was presented with no evidence whatsoever to contradict Dr. Givon's diagnosis. Had the testimony of the several respected and eminently qualified mental health experts who subsequently examined petitioner been presented to rebut Dr. Givon, the sentencer would have had reason to doubt the credibility of his diagnosis. This is particularly true regarding the testimony of Dr. Pincus and Dr. Cowan, who performed neuropsychological tests indicating petitioner is brain damaged. *See Haliym v. Mitchell*, __ F.3d __, 2007 WL 2011268 (6th Cir. July 13, 2007) at *28-29 (finding trial counsel ineffective in relying on diagnosis of court-appointed expert after post-conviction evaluation revealed brain damage). This evidence would have provided fodder for a classic defense counsel cross-examination of Dr. Givon, during which he would be asked: "How did petitioner fake his brain damage?" To use respondent's words describing petitioner, even the greatest "thespian" could not accomplish this feat. (Resp. 18).

Respondent also argues that petitioner cannot establish prejudice from counsel's deficient penalty phase performance because of the overwhelming nature of the aggravating evidence presented. In particular, respondent notes the heinous nature of

24

the homicide, petitioner's prior criminal record, and his bad behavior while incarcerated in the St. Charles County Jail. (Resp. 18). Although this case did involve a violent and senseless crime, petitioner's crime is no worse than the facts confronted by the Supreme Court in addressing similar claims of ineffectiveness in the cases involving Terry Williams, Kevin Wiggins and Ronald Rompilla.[6]  Given the parallels between the crimes in *Williams*,  *Wiggins*, and *Rompilla*, as well as the nature of the mitigating evidence that was not presented due to trial counsel's ineffectiveness, there is no principled basis to distinguish those cases from the claim presented here.

Petitioner also takes issue with respondent's view that petitioner's prior criminal record and his misbehavior while incarcerated provided compelling aggravating evidence supporting a death sentence.  Prior to this homicide, petitioner's criminal record involved petty crimes such as burglary and stealing.  If trial counsel had effectively investigated and rebutted the Butch Mackey burning incident, it would be safe to say that a compelling argument could be made that petitioner's prior record

---

[6]Rompilla repeatedly stabbed a tavern owner and set his body on fire.  545 U.S. at 377.  Wiggins drowned a 77 year old woman in the bathtub of her ransacked apartment.  539 U.S. at 514.  Williams bludgeoned an elderly man to death with a pickaxe, because he would not lend Williams a couple of dollars. 529 U.S. at 395.

25

was not particularly aggravating because he had no history of violence prior to this crime.

Similarly, as petitioner points out later under Claim 2, the extent and nature of petitioner's misconduct while jailed was exaggerated by the state to support its plea for a death sentence.  As the petition also points out, many of the instances of jail misconduct could have been rebutted and mitigated by evidence of Tourette's Syndrome and the fact that petitioner was receiving the wrong medication for his bi-polar disorder.  (*See* Pet. 29-30).  Likewise, many of the bad acts attributed to him as a youth in Peoria were actually committed by his mother.  (*See* Pet. 36-38).  To establish *Strickland* prejudice, it is not necessary for petitioner to conclusively establish he would have received a life sentence. *See Harries v. Bell*, 417 F.3d 631, 640 (6th Cir. 2005). However, given the powerful nature of the mitigating evidence that was never presented to the sentencing judge, there is more than a reasonable probability of a different result. *Wiggins*, 539 U.S. at 537.

Respondent also argues that *Strickland* prejudice is not established because the omitted mitigating evidence is somehow cumulative to the brief testimony offered by petitioner's aunt Carol Tegard describing petitioner's turbulent childhood.  As the petition indicates, Mr. Green briefly examined Ms. Tegard in the penalty phase and established that Mr. Worthington's parents were heavy drug and alcohol users, his

26

mother was a prostitute, his father was a criminal and other sketchy details of his disadvantaged youth.  (Tr. 675-696). The sentencing judge heard no information that Mr. Worthington was sexually abused or suffered from several mental illnesses or brain damage. (*Id.*) As Ms. Tegard's testimony reveals, the court also heard very little substance or anecdotes regarding any particular instances of abuse or neglect that Mr. Worthington endured during his childhood.

It is difficult to imagine how any reasonable person or reviewing court can categorize the evidence uncovered during state post-conviction proceedings as cumulative to the brief and sketchy trial testimony of Ms. Tegard.  Moreover, respondent's argument that this evidence is somehow cumulative, apart from being factually indefensible, is contrary to the command of *Wiggins*, requiring counsel in death penalty cases to seek discovery of all "reasonably available mitigating evidence." 539 U.S. at 524.

Several other circuits have emphatically rejected similar arguments advanced by the state in similar situations.  The Third, Fifth, Ninth and Eleventh Circuits have held that trial counsel has a duty to discover specific facts and events from  defendants' personal and social history, rather than allowing counsel to rely on a "hollow shell" of mitigation, based upon generic testimony that the defendant is "honest," a "hard worker," "takes care of his family," or "was abused."  *See Collier v. Turpin*, 177 F.3d

27

1184, 1201-02 (11th Cir. 1999); *Ainsworth v. Woodford*, 268 F.3d 868, 874-75 (9th Cir. 2001); *Lewis v. Dretke*, 355 F.3d 364, 368-69 (5th Cir. 2003); *Outten v. Kearney*, 464 F.3d 401, 420-23 (3rd Cir. 2006).

In *Lewis* and *Outten*, the Fifth and Third Circuits explicitly rejected arguments almost identical to those raised by respondent here. In both of those cases, the sentencing jury heard brief "skeletal" testimony regarding the defendants' disadvantaged and abusive childhoods. In both cases, evidence came out during state post-conviction proceedings outlining specific instances of abuse and neglect and evidence of mental illness. As in this case, post-conviction investigation in *Outten* uncovered that the defendant suffered from neurological damage and was sexually abused. 464 F.3d at 420. Under these circumstances, the court in *Outten* emphatically rejected arguments that the uncovered mitigation evidence was cumulative to the sketchy evidence that was presented and granted habeas relief under the unreasonable application clause of §2254(d)(1). *Id.* at 422-23; The court in *Lewis* also granted relief under the pre-AEDPA standard of review. 355 F.3d at 368-69. The same result is warranted here.

Respondent's final line of defense to the grant of habeas relief on this claim is the contention that counsel's ineffectiveness in this case is categorically different and distinguishable from *Strickland*, *Williams, Wiggins*, and *Rompilla*. (Resp. 26-30).

28

Although *Strickland* is perhaps the most frequently cited case in habeas actions, it is almost unheard of for either party to delve into the facts of that case or the result that was reached. Instead, *Strickland* is the seminal case establishing the familiar test for reviewing courts to apply in analyzing ineffectiveness claims. 466 U.S. at 687. The outcome in *Strickland* has no bearing on this case because the decision there was issued before the 1989 ABA guidelines for capital cases were issued. Undoubtedly, the result would have been different if the same facts came before the Supreme Court today, as demonstrated by the results in *Williams*, *Wiggins*, and *Rompilla*.

Respondent's attempt to distinguish *Williams v. Taylor* is also unpersuasive. Respondent notes that in *Williams*, trial counsel did not begin his penalty phase preparation until a week before trial. (Resp. 27). The record here establishes Mr. Green's preparation for the penalty phase suffered from similar deficiencies. Apart from Green's previously noted shortcomings, the record also indicates that trial counsel, despite a three year lapse between the time of the crime and the trial, did not diligently attempt to obtain mitigating evidence until the eve of trial. This point is best illustrated by the last minute retention of psychiatrist Kevin Miller to conduct an evaluation of Worthington for competence and for mitigating evidence. Dr. Miller's report indicates that he was retained to evaluate petitioner just a few weeks before petitioner pleaded guilty. (*See* Exh. 9). Although Dr. Miller was supposed to give

29

counsel an opinion regarding competency and possible mental defenses, he did not issue his report until September 13, 1998, two weeks <u>after</u> petitioner pled guilty. (*Id.*) The penalty phase in the case commenced before Judge Nichols the following day.

Joseph Green, who was responsible for the penalty phase, testified in his post-conviction deposition that he was not even aware of Dr. Miller's report until after the plea and sentencing phase had ended.  (1st Supp. PCR L.F., Vol. IV p. 466).  Trial counsel's negligence is significant because Dr. Miller's report, like the psychiatric report from petitioner's 1989 burglary conviction, documents that petitioner was sexually abused as a child (See Exh. 9, p. 2) and, as Mr. Green indicated, Miller's report also would have given Green leads to pursue other mitigating evidence regarding petitioner's mental problems.  (1st Supp. PCR L.F. Vol. IV p. 466-69).

The mitigating evidence in this case is at least as strong as the excluded mitigation evidence in *Williams,* which the Supreme Court held was sufficiently prejudicial to reverse Williams' death sentence. 529 U.S. at 415-16. Williams was physically abused by his father. Petitioner was physically and sexually abused by relatives of two different babysitters.  Williams was borderline mentally retarded. Petitioner also suffered from some very serious mental illnesses that also lessened his culpability.

Petitioner's case is also remarkably similar to *Wiggins*, because both cases involved counsel's failure to uncover and present compelling evidence that both men were sexually abused as children. 539 U.S. at 517.  Respondent argues that *Wiggins* is distinguishable because trial counsel here dug up many pages of records from many sources and interviewed a few members of petitioner's family.  (Resp. 28-29). Obtaining records, however, is no defense to incompetent performance if the information is ignored, not investigated further, and not utilized.  *See Frazier v. Huffman*, 343 F.3d 780, 794-95 (6th Cir. 2003).

There is also no material distinction between the facts supporting the grant of habeas relief in *Rompilla* and this case. As in *Rompilla*, a psychiatric report from petitioner's 1989 burglary conviction (Exh. 3) provided documented evidence that petitioner was sexually abused as a child. 545 U.S. at 382-383. Respondent attempts to distinguish *Rompilla* by arguing that petitioner has never contended that Mr. Green did not read this 1989 report because he had obtained it prior to trial. Whether Mr. Green read the report or not is irrelevant. There was documented evidence of sexual abuse that counsel had access to and did not investigate or utilize.[7] Respondent's

---

[7] As noted earlier, Dr. Legan's 1989 report was unearthed and provided to Dr. Givon several months before Green entered his appearance. (See p. 18, n.5, *infra*.). If Green read this report, he was incompetent in not pursuing a sexual abuse investigation. *See e.g. Frierson v. Woodford*, 463 F.3d 982, 980 (9th Cir.

31

contention that *Rompilla* is distinguishable because the 1989 burglary was not significant aggravating evidence also ignores the fact that petitioner's criminal record and other bad acts were essential aspects of the State's argument for death. Because the evidence of petitioner's childhood sexual abuse should have been discovered by a reasonably competent attorney who fulfilled his obligation to investigate as required by the ABA guidelines, there is no material distinction between the facts of this case and those confronted by the Supreme Court in *Wiggins* and *Rompilla*. Petitioner is entitled to the same result those men received.

Further convincing evidence that the Missouri Supreme Court unreasonably applied Supreme Court precedent in denying relief on this claim is the spate of recent decisions from the circuits granting penalty phase relief in similar situations. As noted earlier in this traverse, decisions from the circuits in similar situations are particularly instructive to reviewing courts in determining whether a state court decision is unreasonable under §2254(d). *Atley v. Ault*, 191 F.3d 865, 871 (8th Cir. 1999).

In the aftermath of *Wiggins*, there have been numerous decisions from other circuits granting death row inmates penalty phase relief on ineffectiveness claims that involve very similar facts to those presented here. *See e.g. Lambright v. Schriro*, __

---

2006). If he didn't read the report, he was ineffective under *Rompilla*.

F.3d __, 2007 WL 1880985 (9th Cir. July 2, 2007); *Haliym v. Mitchell*, __ F.3d __,

2007 WL 2011268 (6th Cir. July 13, 2007); *Dickerson v. Bagley*, 453 F.3d 690 (6th

Cir. 2006); *Williams v. Anderson*, 460 F.3d 789 (6th Cir. 2006); *Frazier v. Huffman*,

343 F.3d 780 (6th Cir. 2003); *Boyde v. Brown*, 404 F.3d 1159 (9th Cir. 2005); *Lewis*

*v. Dretke*, 355 F.3d 364 (5th Cir. 2003); *Outten v. Kearney*, 464 F.3d 401 (3rd Cir.

2006).  As noted earlier, the recent decisions in *Outten* and *Lewis* contain remarkably

similar facts to those presented here.

In *Outten*, the Third Circuit found trial counsel's investigation deficient and held

the Delaware Supreme Court's decision was contrary to and involved an unreasonable

application of *Wiggins*, despite the fact that some mitigating evidence regarding

Outten's abusive childhood was introduced before the jury. *Id.* at 421. The omitted

mitigating evidence in *Outten* was also similar to petitioner's evidence because the jury

heard nothing regarding Outten's childhood sexual abuse while in foster care and his

neurological damage. *Id.*

Less than a month ago, the Sixth Circuit granted an Ohio prisoner penalty phase

relief on a *Wiggins* claim involving similar issues regarding deficient performance and

prejudice. *Haliym v. Mitchell*, *supra*. In that case, as here, counsel did present some

mitigating evidence from an expert and a relative, regarding mental illness and the

defendant's disadvantaged upbringing. 2007 WL 2011268 at *21-22. However, a post-

33

conviction investigation revealed that Haliym had brain damage and was seriously abused as a child. When confronted with this factual scenario, the Sixth Circuit had little difficulty in finding that trial counsel's investigation was unreasonable and that the defendant was prejudiced under *Wiggins. Id.* at \*25-32.

The facts surrounding petitioner's ineffectiveness claim are also virtually indistinguishable from *Antwine v. Delo*, 54 F.3d 1357 (8th Cir. 1995), a pre-AEDPA case. In that case, a post-conviction evaluation indicated that Antwine suffered from bi-polar disorder, which would have mitigated the severity of the crime because there was a good probability that he committed the murder in the "throes of a manic episode." *Id*. at 1365-68. As in *Antwine*, petitioner's bi-polar disorder, other mental defects, brain damage, and his history of childhood sexual abuse would have been powerful mitigating evidence that would have altered the balance of aggravating and mitigating evidence, creating a reasonable probability of a different result. *Id*. at 1368. Had counsel performed effectively in petitioner's case, the court would have found two additional statutory mitigating factors supporting a life sentence. (See pp. 22, *infra*.)

Regardless of the standard of review that this court employs in reviewing this claim, the relevant facts and applicable law establish that counsel's investigation was substandard and that petitioner was prejudiced at both the guilt and penalty phases of

34

trial. This court's duty is clear. It must grant petitioner a writ of habeas corpus vacating his unconstitutional convictions and sentence of death.

## CLAIM 2

This claim raises multiple issues regarding counsel's failure to object to and properly investigate much of the State's aggravating evidence involving prior bad acts. The prior bad acts encompassed in this claim include the testimony of Charlotte Peroti, who testified that petitioner attempted to rape her a week before the murder; evidence presented from Dr. Givon that Worthington intentionally set Butch Mackey on fire as a youth; police and probation reports outlining petitioner's prior criminal activity; and evidence of petitioner's misconduct during his pre-trial incarceration in the St. Charles County jail. (Pet. 47-67).

As a threshold matter, respondent argues that the component of this claim involving the St. Charles jail is procedurally barred because that issue was not fairly presented during state post-conviction proceedings. (Resp. 33-34). This argument distorts the state court record and the legal limitations of the procedural default rule.

Principles of exhaustion and procedural default require petitioner to have "fairly presented" his claims in state court. *Picard v. Connor*, 404 U.S. 270, 275 (1971). A state court brief need only present the "substance" of the claim; it need not cite "book and verse" of the federal Constitution or the entire set of legal arguments later asserted

35

in federal court. *Id.* at 278. A federal habeas claim need only be "closely related" to one advanced in state court, and the case law requires only an "arguable factual commonality" between the two. *Kenley v. Armontrout*, 937 F.2d 1298, 1302-1303 (8th Cir. 1991). A petitioner may amplify a state court claim with additional facts and legal arguments so long as the "substance" of the claim is presented. *Odem v. Hopkins*, 192 F.3d 772, 776 (8th Cir. 1999).

Applying these principles to this claim, it is clear that petitioner fairly raised an ineffectiveness claim regarding trial counsel's failure to object to and investigate evidence regarding jail misconduct. In his argument in his post-conviction appellate brief, petitioner contended that Joe Green was ineffective for stipulating to the jail records "because he thought there was no legal basis for objecting and had not investigated the contents' veracity." (Resp. Exhibit R at 115). It is, therefore, clear that although the claim could have been more thoroughly raised, petitioner argued in state court that his trial counsel was ineffective in not objecting to and in not investigating the records regarding jail misconduct. To establish *Strickland* prejudice from the failure to investigate, it follows that evidence that these incidents were relatively minor and were blown out of proportion by the prosecution is relevant to this prejudice inquiry. Although this claim could have and should have been more artfully raised, it clearly fairly presented the substance of a claim involving both the failure to

36

object and failure to properly investigate jail misconduct. *See Clemmons v. Delo*, 124 F.3d 944, 952 (8th Cir. 1997).

In addressing the admissibility under hearsay rules of some of the bad acts evidence, respondent contends that the confrontation clause does not apply to penalty phase hearings in capital cases. (Resp. 39, n.4). The authority respondent cites for this view, however, predates the landmark decision in *Crawford v. Washington*, 541 U.S. 36 (2004), which radically altered confrontation clause jurisprudence. In the aftermath of *Crawford*, the majority of courts who have addressed this issue have held that the confrontation clause does apply to the penalty phase of capital cases. *See e.g. United States v. Mills*, 446 F.Supp.2d 1115 (C.D. Cal. 2006); *United States v. Jordan*, 357 F.Supp.2d 889 (E.D.V.A. 2005). In a recent federal death penalty appeal, the Eighth Circuit declined to address this issue. *United States v. Johnson*, __ F.3d __, 2007 WL 2163002, (8th Cir. July 30, 2007) at *17n. 23.

In addressing the merits of the aspect of the claim involving Charlotte Peroti, respondent first suggests that Mr. Green had a tactical reason for not objecting to her testimony. Addressing this issue in his post-conviction testimony, Mr. Green offered no tactical reason for not objecting to her testimony based upon a discovery violation because her name and address were not disclosed to him prior to trial. (1st Supp. L.F., Vol. IV, p 482-485). *See Harris v. Reed*, 894 F.2d 871, 878 (7th Cir. 1990).

37

("Just as a reviewing court should not second guess the strategic decisions of counsel with the benefit of hindsight, it should also not construct strategic defenses which counsel does not offer."). This strategy finding was, therefore, unreasonable under §2254(d)(1) and (2). *See Norton v. Spencer*, 351 F.3d 1, 6 (1st Cir. 2003).

Respondent also argues that Mr. Green's 29.15 testimony to the contrary is not sufficient to establish that the Missouri Supreme Court's finding that trial counsel knew of Ms. Peroti before trial was based upon an unreasonable determination of fact under §2254 (d)(2). (Resp. 36-37). There is nothing in the record to contradict Mr. Green's sworn testimony regarding the lack of notice given to him regarding the substance of Peroti's penalty phase testimony. The only contrary evidence cited by respondent is petitioner's statement to police, in which he states that he burglarized his neighbor Charlotte, last name unknown, three weeks earlier. However, there is nothing in petitioner's statement to put the defense on notice regarding the most damaging aspect of Peroti's penalty phase testimony, that Mr. Worthington attempted to rape her. Thus, this finding of fact was unreasonable under §2254(d)(2). See *Taylor v. Maddox*, 366 F.3d 992, 1006-1008 (9th Cir. 2004).

Respondent also argues that petitioner was not prejudiced because Peroti was effectively cross-examined.  This contention is refuted by the record. (The entire cross-examination of Peroti is set forth in the petition at pp 49-50.). The substance of

38

this cross-examination clearly reveals that counsel was completely unprepared to vigorously attack Peroti's credibility. As the petition notes, available evidence could have been introduced to utterly destroy Peroti's credibility with evidence of her prior criminal record and her fabrication of her role as a police drug informant. Even assuming for the sake of argument that Peroti was effectively cross-examined in other areas, this does not change the fact that Peroti misled both the defense and the trier of fact by concealing her criminal record and testifying falsely that she worked as a police informant. The fact that she may have been effectively cross-examined in other areas did not "turn what was otherwise a tainted trial into a fair one." *Napue v. Illinois*, 360 U.S. 264, 269-70 (1959); *see also United States v. Foster*, 874 F.2d 491, 494 (8th Cir. 1988).

In addressing the jail misconduct issue, respondent, perhaps because he is willing to place all of his "eggs in the basket" of his meritless procedural default argument, does not address the central issue that most of petitioner's conduct violations were minor and non-violent. The same is true with the police and parole records from Peoria, Illinois. Even those records that could not have been excluded on hearsay/confrontation clause grounds could have been effectively neutralized if petitioner's counsel had investigated these incidents. (See Pet. 29, 35-36, 59-61).

It is readily ascertainable from the record that Mr. Green was literally overwhelmed due to the lack of funds and his lack of preparation and, as a result, was unable to vigorously defend petitioner at the penalty phase. As a result, petitioner's death sentence was based in large part on materially false and inaccurate testimony regarding his prior acts of misconduct. Had counsel performed competently, there is a reasonable likelihood the outcome would have been different. *Strickland*, 466 U.S. at 694.

Undoubtedly, the most damaging testimony falling in the other bad acts category was Dr. Givon's testimony that petitioner had set his friend, Butch Mackey, on fire when they were youths. Respondent fails to address petitioner's primary argument that this situation is materially indistinguishable from *Rompilla*, and if counsel had looked into the issue, he could have presented testimony establishing that petitioner did not set Butch Mackey on fire. (See Pet. 63-66).

Respondent also ignores the argument that this evidence, that has now been revealed to be materially false, independently violates the Eighth Amendment under *Johnson v. Mississippi*, 486 U.S. 578, 590 (1988). Respondent's petition also ignores the inescapable fact that the vivid image of a child setting his friend on fire is more damaging than any other testimony offered by Dr. Givon supporting an antisocial personality diagnosis, such as the relatively minor incidents involving petitioner's fights

in school, setting fires in dumpsters, and shoplifting. Had this false evidence been effectively rebutted, there is a reasonable likelihood that the outcome of the penalty phase would have been different.

## CLAIM 3

In addressing the *Brady*/perjured testimony claim involving Charlotte Peroti, respondent raises a threshold procedural bar argument, arguing that the aspect of the claim alleging perjured testimony is defaulted because there is no mention of perjured testimony in appellant's briefs. (Resp. 45). Respondent does note, however, that a perjured testimony claim was included in the 29.15 motion. *Id*. For many of the reasons advanced in addressing the procedural bar argument in Claim 2, respondent's argument is meritless. However, a few more words are in order.

Respondent's argument ignores the inescapable fact that there is considerable overlap between *Brady* and perjured testimony claims, particularly when the nature of the claim involves the prosecution's failure to disclose deals with a witness or correct inaccurate testimony given by a cooperating witness. In such situations, there are distinct and interrelated due process violations involving the failure to disclose impeaching information as well as the failure of the State to correct the witness' false testimony that they either knew or should have known was false. *See e.g. Napue v. Illinois*, 360 U.S. 264, 269 (1959). The same situation is presented here. The

41

prosecution failed to disclose Miss Peroti's criminal record and the disposition of her bad check charges and also failed to correct her false testimony that she worked as an undercover informant. There is no procedural bar to this claim.

In addressing the merits of the claim, respondent argues that there is no *Brady* violation because there is no evidence of a deal between Peroti and the government in exchange for her testimony. Respondent contends that, at best, petitioner merely alleged a state discovery violation. (Resp. 45-47). Respondent's argument ignores the fact that the prosecutor was required, not only by due process, but also by State discovery rules to disclose Miss Peroti's criminal convictions so that the defense could challenge and the court assess her credibility. See Mo. S.Ct. Rule 25.03(7). The timing of her plea bargain in relation to the homicide here would have raised a reasonable inference in the mind of the sentencer that there was a deal struck between the State and Peroti for her penalty phase testimony. This evidence would have constituted material impeachment evidence under *Brady. See e.g. Strickler v. Greene*, 527 U.S. 263 (1999).

In addressing the argument that Peroti's testimony was false and inaccurate, respondent contends that the information from the pre-sentence investigation does not conclusively demonstrate that Peroti was never a drug informant. (Resp. 47-48). Petitioner intends to conclusively resolve this question by seeking discovery on this

42

issue after the legal and factual issues have been thoroughly aired after this traverse is filed. Records and possible testimony from the applicable law enforcement agencies from St. Charles and St. Louis County should conclusively resolve this question during the upcoming discovery process.

Finally, respondent argues that petitioner's claim that the use of Peroti's false testimony violated the Eighth Amendment under *Johnson v. Mississippi* is *Teague* barred. (Resp. 48). It is well settled that a conviction or sentence, including a sentence of death that is obtained either through the knowing or unknowing use of materially inaccurate or false testimony by the prosecution, violates a criminal defendant's right to due process and infringes upon his Eighth Amendment rights in a death penalty case. The Supreme Court first recognized this due process right in a noncapital sentencing proceeding in 1948. *See Townsend v. Burke*, 334 U.S. 736 (1948). Respondent's arguments that there is no *Johnson* violation unless the inaccurate evidence involves evidence making the defendant eligible for the death penalty is also meritless. In fact, in a Missouri case, the Missouri Supreme Court found a *Johnson* type violation based upon the use of inaccurate prior convictions of a capital defendant, despite the fact that such convictions do not make the defendant death eligible under Missouri's capital punishment scheme. *See State v. Griffin*, 848 S.W.2d 464 (Mo. banc. 1993).

As pointed out in the petition, Peroti's false testimony was material to the outcome of the penalty phase because of the emphasis the prosecutor placed upon this incident in arguing for death and the similarity between the false allegations of Peroti and the circumstances of the offense.  Habeas relief is warranted.

## CLAIM 4

In addressing this judicial bias claim, respondent advances a retroactivity bar under *Teague v. Lane*, 489 U.S. 288 (1989) to the aspect of petitioner's claim alleging that due process requires that a judge be disqualified if there is a strong appearance of impropriety.  (Resp. 50-51).  Respondent's argument ignores the long line of Supreme Court precedent, holding that due process requires that a judge be disqualified if there is strong circumstantial evidence of bias.

For instance, the seminal case on the due process right to an impartial tribunal was the 1927 case of *Tumey v. Ohio*, 273 U.S. 510, 532 (1927). In *Tumey*, as here, there was no direct evidence that the judge was actually biased against Tumey. However, the circumstances of that case, where the municipal judge was paid based upon a percentage of traffic fines he assessed, created such a strong appearance of bias that a due process violation occurred.  *Id.*

Similarly, in *Bracy v. Gramley*, 520 U.S. 899 (1997), the circumstances did not conclusively demonstrate that the judge was biased.  However, the judge's history of

44

taking bribes in other cases created such an appearance of impropriety that, after discovery was ordered, penalty phase relief was granted to William Bracy. *Bracy v. Schomig*, 286 F.3d 406 (7th Cir. en banc 2002). If there was a *Teague* bar to a claim of this nature, the Seventh Circuit would have been powerless to grant relief to Mr. Bracy.

In addressing the merits of this claim, respondent attempts to downplay the politically charged atmosphere surrounding this case arising from the fact that the trial took place when both the trial judge and the prosecutor were engaged in heated reelection campaigns. From the beginning to end of this case, starting with the decision of Judge Cundiff to recuse himself after a secret meeting with the victim's parents, until the final sentencing decision, there is a strong inference that the ultimate outcome was tainted by political pressures. It ignores reality and recent history to downplay the significance that the "politics of death" plays in electoral politics involving judges. The electoral purge of several judges from the California Supreme Court because of their stances in death row appeals, including Chief Justice Rose Bird, is perhaps the best illustration of this point. See Robert Lindsey, *The Elections: The Story in Some Key States*, *Deukmejian and Cranston win as 3 Judges are Ousted*, N.Y. Times, Nov. 6, 1986, at A30. The political considerations here, no less than the monetary considerations in *Tumey* and *Bracy*, establishes a strong

45

circumstantial case[8] that petitioner was denied the fair tribunal that due process requires.

The other significant component of this claim involves the fact that the sentencing judge received several sealed letters from the victim's friends and the public, urging her to sentence petitioner to death, before the sentencing proceeding took place. Although the record indicates defense counsel was aware that there was some sort of letter writing campaign, which is not surprising considering the extraordinary efforts that the victim's family and friends took to obtain the recusal of Judge Cundiff, there is no dispute that the contents of these letters were not disclosed to counsel in advance of sentencing. These facts establish a clearcut violation of due process under *Gardner v. Florida*, 430 U.S. 349 (1977). Although respondent contends that there is no direct evidence that Judge Nichols read all of these letters, it is incredible to believe that, in light of the victim's family's prior activism, that these letters were not crafted to exert political pressure on the judge to impose death or face the consequences at the ballot box. Respondent has offered no credible argument to counteract the applicability of the holding in *Gardner*. Because defense counsel

---

[8] Evidence supporting judicial bias claims on appeal is always circumstantial because no judge, who has not to recused him or herself from the case, is going to admit actual bias.

should have been given an opportunity to address and rebut these letters before the sentence was imposed, due process requires a new sentencing hearing.

## CLAIM 5

In addressing petitioner's *Estelle v. Smith* claim, respondent argues that the issue is procedurally barred because trial counsel did not object to Dr. Givon's testimony and stipulated to the admission of his report. Respondent contends that, since the Missouri Supreme Court only reviewed this claim under the plain error rule, there is a valid procedural bar. (Resp. 62-63). This argument is meritless.

For a valid procedural bar to exist, the last state court to address the issue must actually rest its decision on this procedural default. *See e.g. Harris v. Reed*, 489 U.S. 255, 257-59 (1989); *Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991). The Missouri Supreme Court fully addressed the merits of the issue on direct appeal and said nary a word about any purported default rising from trial counsel's failure to object. *State v. Worthington*, 8 S.W.3d 83, 91-92 (Mo. banc. 1999). In fact, contrary to respondent's argument, the Missouri Supreme Court did not even subject this claim to plain error review. *Id.* Instead, they fully addressed the merits and determined that no constitutional violation occurred. *Id.*

Although it is theoretically possible that the Missouri Supreme Court *could* have procedurally barred this claim due to trial counsel's failure to object, the court elected

47

not to do so and fully addressed the merits of the underlying constitutional issue. As the late Judge Richard Arnold noted, "State procedural bars are not immortal . . . ; they may expire because of later action by state courts." *Antwine v. Delo*, 54 F.3d 1357, 1361 (8th Cir. 1995). This is precisely what occurred here. There is no procedural bar.

In addressing the merits, respondent's primary argument is that this case is distinguishable from *Estelle* because the court-ordered competency/sanity examination was requested by the defense. However, respondent has not offered any satisfactory explanation to petitioner's argument that this situation is not materially different from *Estelle,* because a supposedly neutral state expert[9] far exceeded the scope of his court-ordered examination and became a state agent offering testimony at the penalty phase on the issue of future dangerousness/anti-social personality. Because the Missouri Supreme Court "unreasonably refuse[d] to extend [*Estelle*] to a new context where it should apply," habeas relief is warranted under the unreasonable application clause of §2254(d)(1). *Williams v. Taylor*, 529 U.S. 362, 407 (2000).

_____

[9] To underscore the point that this case is not materially different than *Estelle*, it is inescapable that Dr. Givon would have conducted the pre-trial evaluation had it been requested by the state or the trial court, instead of petitioner. *See* §552.020 R.S. Mo. (2000).

48

Respondent also argues that petitioner somehow opened the door to this testimony by presenting the testimony of Dr. Evans. The problem with this argument is that Dr. Evans is not a mental health expert. He is a PhD. in pharmacology and offered testimony only on the distinct issue regarding the effects of the drugs and alcohol petitioner ingested before the crime. During post-conviction proceedings, Dr. Evans indicated that he is not qualified to give any psychological diagnosis. (*See* Exh. 1). As a result, this argument is a red herring to divert the court's attention from the obvious merit of this constitutional violation.

## CLAIM 6

Respondent advances several threshold procedural arguments against granting relief on petitioner's Sixth and Fourteenth Amendment challenge to the nondisclosure of other bad acts evidence. Like the argument he advanced against Claim 5, respondent argues that this claim is procedurally barred because there was no contemporaneous objection and the Missouri Supreme Court only reviewed the claim under its plain error rule. (Resp. 68-69). As in the case of Claim 5, there is no procedural bar resulting from counsel's failure to object because the Missouri Supreme Court did not rely on a failure to object bar in addressing the claim. *See e.g. Caldwell v. Mississippi*, 472 U.S. 320, 327 (1985). Because the Missouri Supreme Court reviewed the merits of the constitutional claim under the plain error rule despite

49

trial counsel's failure to object at trial, federal courts are free to consider the merits of this issue. *See e.g*. *Baker v. Leapley*, 965 F.2d 657, 659 (8th Cir. 1992); *Williamson v. Jones*, 936 F.2d 1000, 1004 (8th Cir. 1991); *Williams v. Armontrout*, 877 F.2d 1376, 1378 (8th Cir. 1989).

Respondent also argues that the claim is not cognizable because it merely alleges a violation of state law. Respondent also advances a related argument that relief on this claim is barred by *Teague v. Lane*, 489 U.S. 288 (1989). (Resp. 69-70). Respondent's non-cognizability claim is meritless. The constitutional basis of the claim is not a due process challenge to the admissibility of the prior bad acts *per se*. Instead, this claim advances a due process argument based on *Gardner v. Florida* and *Lankford v. Idaho*, 500 U.S. 110 (1991), which hold that due process requires fair notice and an opportunity to rebut evidence that the sentencer relies upon to impose a death sentence. The record establishes that petitioner was not given fair notice of the nature of the aggravating evidence the state utilized against him and was, therefore, unprepared to effectively rebut it. In a death penalty case, this "trial by ambush" scenario violates fundamental due process guarantees.

## CLAIM 7

Once again, in addressing this claim involving victim impact evidence, respondent asserts a meritless procedural bar defense based upon the fact that counsel

did not object and the Missouri Supreme Court only reviewed the issue for plain error. (Resp. 73-74). As the foregoing discussion regarding the prior two claims illustrates, this argument is meritless.

In addressing the merits of the claim, the scope of the evidence presented here went well beyond the constitutional limits imposed on such evidence by the United State Supreme Court in *Payne v. Tennessee*, 501 U.S. 808 (1991). Several of these witnesses clearly indicated they wanted the judge to sentence petitioner to death. Coupled with the other political pressures that the victim's family brought to bear during these proceedings, this testimony was prejudicial. Habeas relief is warranted.

## **CONCLUSION**

The balance of the issues in this case was adequately addressed in the petition.

Wherefore, for all the foregoing reasons, as well as those reasons advanced in his habeas corpus petition, petitioner respectfully requests that this court grant petitioner reasonable discovery and, after a full and fair hearing, grant a writ of habeas corpus discharging Mr. Worthington from his unconstitutional convictions and sentence of death and, grant such other and further relief that seem just, equitable and proper under the circumstances.

Respectfully submitted,

/s/Kent E. Gipson
Kent E. Gipson, #34524
Public Interest Litigation Clinic
305 East 63rd Street
Kansas City, Missouri 64113
(816) 363-2795 • (816) 363-2799 (fax)


/s/Gino F. Battisti
Gino F. Battisti, #2586
Foley & Mansfield, P.L.L.P.
1001 Highlands Plaza Drive West, Ste 400
St. Louis, Missouri 63110
(314) 645-7788 • (314) 645-9945 (fax)
*Attorneys for Petitioner*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was filed and sent to following counsel of record for Respondent, via the ECF system on this 6th day of August 2007.

Ronald S. Ribaudo
Assistant Attorney General
P.O. Box 899
Jefferson City, Missouri 65102

/s/Kent E. Gipson