**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MICHAEL S. WORTHINGTON, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 4:05-CV-1102 CAS |
| | ) | |
| DON ROPER, | ) | |
| | ) | |
| Respondent. | ) | |

**MEMORANDUM AND ORDER**

This matter is before the Court on petitioner Michael Shane Worthington's petition for writ of habeas corpus made pursuant to 28 U.S.C. § 2254. Petitioner is a state prisoner currently incarcerated in the Potosi Correctional Center under a sentence of death. Petitioner, who is represented by appointed counsel in these proceedings, challenges the constitutionality of his sentence. The matter is fully briefed and now ripe for review.

## I. Procedural History

### Factual Background

On October 1, 1995, Worthington was arrested in connection with the death of Melinda Griffin.[1] Ms. Griffin, whose body was discovered by a neighbor, had been raped and strangled, and her condominium had been burglarized. Worthington was found in possession of her car and several of her personal items. When questioned by the police, Worthington could not remember the details of the killing because he had been drinking alcohol and taking drugs for several days. Worthington's DNA was found on the victim's body.

---

[1]A detailed statement of facts is set forth in the opinion of the Missouri Supreme Court addressing petitioner's direct appeal. State v. Worthington, 8 S.W.3d 83, 86-87 (Mo. 1999) (en banc), cert. denied, 529 U.S. 1116 (2000).

*Trial Court Proceedings*

Worthington was initially represented by retained counsel, Joel Eisenstein. Mr. Eisenstein later withdrew, and petitioner was represented by Joseph Green, N. Scott Rosenblum and Bradford Kessler, who were also retained. On August 28, 1998, without a written plea agreement, Worthington pleaded guilty to murder in the first degree, burglary in the first degree and forcible rape. The trial judge, the Honorable Grace M. Nichols of the Eleventh Judicial Circuit, St. Charles County, accepted the guilty plea.[2] Worthington waived a jury for sentencing, and Judge Nichols preceded over a penalty hearing that began on September 14, 1998 and concluded three days later.

At the penalty hearing, the prosecution called twenty-four witnesses on its behalf, including five Missouri law enforcement officers, petitioner's co-worker, a neighbor, two correctional officers from the St. Charles County Department of Corrections, a law enforcement officer from Peoria, Illinois, an Illinois probation officer, a state forensic psychologist, the medical examiner, a genetic analyst, and eleven friends and family members, who read prepared victim impact statements.

The Missouri law enforcement officers testified as to the crime scene, petitioner's arrest, his interrogation, and the victim's effects that were found in petitioner's possession, including her jewelry and credit cards. The medical examiner provided compelling testimony regarding the extreme brutality of the rape, as well as the force and the time it would have taken petitioner to strangle the victim. The detective from Peoria, petitioner's home town, testified about Worthington's juvenile record and extensive criminal history. The probation officer testified regarding petitioner's juvenile record, his extensive criminal history, and some of his family background and educational history.

---

[2]The Honorable Ellsworth Cundiff, who had been originally assigned to the case, had previously recused himself.

Charlotte Peroti, the neighbor, testified that ten days before the murder, she confronted Worthington inside her condominium late at night and he attempted to sexually assault her and stole her car. Petitioner's co-worker testified that she had spent time with petitioner earlier in the evening on the night of the murder and she described those events.

The prosecution also called officers from St. Charles County Department of Corrections, the jail where petitioner had been detained prior to trial. The officers testified that while in jail Worthington had been involved in many incidents involving contraband, fighting and other misconduct.

The prosecution also offered the testimony of Dr. Max Givon, a state forensic psychologist, who had interviewed Worthington in 1996 for a competency examination. Dr. Givon testified that Worthington did not have a mental disease or defect, but that he had antisocial personality disorder, was malingering, cocaine-dependent, and abused alcohol. He also opined that petitioner appreciated the criminality of his offense conduct at the time of the crime.

The prosecution also presented victim impact statements from a number of friends and family members, and introduced numerous photographs, awards and mementoes of and from the victim. Defense counsel did not object to the introduction of the victim impact evidence, aside from asking that the witnesses not offer their recommendations for a sentence. The court sustained this objection.

Defense counsel called only two mitigation witnesses to the stand: Carol Tegard, petitioner's maternal aunt, and Roswald "Lee" Evans, a psychiatric pharmacist.[3] Ms. Tegard, the petitioner's

---

[3]Defense counsel also called as witnesses the custodian of records for St. Charles County Department of Corrections and three of petitioner's fellow inmates. Defense counsel used these four witness in an attempt to undermine the credibility of the state's witness, Michael McKee, a shift supervisor at the St. Charles County Department of Corrections, and to establish his bias against petitioner. These four witnesses were not offered for mitigation purposes.

maternal aunt, testified about Worthington's abuse and neglect as a child. Ms. Tegard testified that petitioner's mother, who was sixteen when she was pregnant with petitioner, was a prostitute, and that she had sex and abused drugs and alcohol in front of petitioner when he was a child. She also stated that petitioner's mother attempted suicide numerous times in petitioner's presence. Ms. Tegard testified that petitioner's father was also a drug abuser, in addition to a dealer and an absentee father, who was often in jail and had virtually no contact with petitioner until he was an adolescent when he introduced petitioner to drugs and crime. According to Ms. Tegard, petitioner was heavily involved in drugs starting as a teenager and his immediate family was not supportive and, in fact, they enabled and supported, if not initiated, his drug addiction and discouraged his treatment.

Dr. Lee Evans, a psychiatric pharmacist, was the defense's only expert witness. He testified that Worthington was extremely intoxicated and high on crack cocaine and alcohol at the time of the offense. He opined Worthington used prescription drugs and alcohol to control the after-effects of crack cocaine abuse. He also stated that crack cocaine users often experience black-outs, and that Worthington's drug abuse made him unable to control his impulses and impaired his judgment. Dr. Evans testified that he could not offer an opinion as to whether petitioner suffered from mental disease or defect because it would be outside his area of expertise. Furthermore, defense counsel did not ask Dr. Evans to prepare a report and, therefore, none was entered into the record.

Closing arguments for the penalty phase were heard on October 15, 1998. On November 4, 1998, the day after she lost her re-election bid, Judge Nichols held the sentencing hearing. At the sentencing hearing, petitioner made a statement, as did the victim's mother. At the conclusion of the hearing, Judge Nichols stated that she found the state had established beyond a reasonable doubt two statutory aggravating circumstances: (1) that petitioner committed the murder for the purpose of

receiving money or any other thing of monetary value from the victim, and (2) that the murder was committed while petitioner was engaged in the perpetration of forcible rape and burglary. The trial judge considered the non-statutory mitigating circumstances, and found that petitioner was raised in a dysfunctional family, was abused and neglected as a child, and was a long-term drug abuser. The trial judge concluded, however, that beyond a reasonable doubt, the aggravating circumstances outweighed the non-statutory mitigating circumstances. She sentenced Worthington, as a prior and persistent offender, to death for the murder, and to terms of thirty years and life imprisonment for the burglary and rape respectively.

### Petitioner's Direct Appeal

Petitioner appealed the sentence and different counsel represented petitioner on direct appeal. Under Missouri law, the Missouri Supreme Court has exclusive appellate jurisdiction to review a death sentence and "any errors enumerated by way of appeal." State v. Worthington, 8 S.W.3d 83, 86 (Mo. 1999) (en banc) (citing Mo. Const. art. V, sec. 3; Mo. Rev. Stat. §565.035.2 (1994)). In his direct appeal, petitioner argued, among other things, that he was unfairly prejudiced by the admission of the victim impact evidence. He also argued the trial court erred in admitting evidence of other bad acts without prior notice to the defense, and statements he made during the competency examination to prove statutory aggravating circumstances should have been excluded. The Missouri Supreme Court rejected petitioner's arguments, many on plain error review, and affirmed his sentence. The Missouri Supreme Court also conducted a proportionality review of the death sentence as required by state law. Mo Rev. Stat. § 565.035.3. The court found that the death sentence was not imposed under the influence of "passion, prejudice or any other arbitrary factor" and was not "excessive and disproportionate to other similar cases." Worthington, 8 S.W.3d at 94 (citing state

cases in which death sentences were affirmed where victims were murdered in course of robbery and rape).

### *Petitioner's Motion for State Post-conviction Relief*

Following the denial of his direct appeal, Worthington filed a pro se motion for state post-conviction relief. The trial court appointed the office of the public defender to represent petitioner, and motion counsel filed an amended motion. An evidentiary hearing was held in late January through early February 2003. In May 2003, the motion judge, the Honorable Nancy L. Schneider, denied the motion for post-conviction relief.[4] Worthington appealed the denial to the Missouri Supreme Court.

In his post-conviction appeal, petitioner argued that trial counsel was ineffective and did not adequately investigate his social and medical history. Worthington argued he would not have pleaded guilty but instead would have proceeded to trial using a diminished capacity defense had his counsel conducted an adequate investigation. He also argued that defense counsel's failure to adequately investigate his background impacted the penalty phase, and had his counsel done a more thorough investigation and presented the evidence at the penalty hearing – through fact witnesses and experts – he would not have been sentenced to death. Worthington further argued that trial counsel was ineffective because he did not consult him before waiving a potential conflict of interest of the trial judge. Worthington also argued that the trial judge should have recused herself sua sponte after she realized there was a potential conflict, and that she was  biased in favor of the death penalty because she received calls from members of the public, through the press and in letters, to impose the death

---

[4]As noted earlier, Judge Nichols, who was the trial judge and preceded over the penalty phase, was not re-elected. She was replaced by Judge Schneider.

penalty, and because her opponent in a judicial election stated that a judge's view on the death penalty was a relevant election issue. Worthington also argued that trial counsel should have objected to the state's failure to provide adequate notice of Ms. Peroti's testimony about other bad acts, and should have sought a continuance to investigate the basis of her allegations that Worthington had broken into her apartment, had attempted to assault her and stolen her property. Worthington also argued that trial counsel should have objected to other evidence of non-statutory aggravating factors, such as his misconduct in school and in jail, uncharged crimes, and burglaries committed with his father. Petitioner further argued that trial counsel should have objected to the victim impact evidence because it was so excessive as to be unduly inflammatory.

The Missouri Supreme Court affirmed the denial of post-conviction relief. Worthington v. State, 166 S.W.3d 566 (Mo. 2005) (en banc). The court reviewed most, but not all, of the claims petitioner raised in his post-conviction appeal. Furthermore, it decided many of the claims on plain error review because they were not properly raised in the trial court proceedings. In its opinion, the Missouri Supreme Court noted that the standard for post-conviction relief was "particularly difficult" to meet where, as here, the case was tried to a judge. Id. at 573. "[B]ecause 'judges are presumed to not consider improper evidence at sentencing, [the state supreme court] presumes that inadmissible evidence' relevant to sentencing 'is neither prejudicial nor fundamentally unfair in court-tried matters.'" Id. (citing State v. Carter, 955 S.W.2d 548, 560 (Mo. 1997)).

**_Petitioner's Federal Habeas Petition_**

On July 15, 2005, petitioner filed the instant petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. In his habeas petition, petitioner raises seven (7) claims for relief:

Claim One: Petitioner claims that he was denied effective assistance of counsel, in violation of the Sixth, Eighth and Fourteenth Amendments, because his trial attorneys failed to adequately investigate his social and medical history.

Claim Two: Petitioner claims that he was denied effective assistance of counsel, in violation of the Sixth, Eighth and Fourteenth Amendments, because his trial attorneys failed to adequately investigate and object to and rebut "bad acts" evidence the prosecution offered during the penalty hearing.

Claim Three: Petitioner claims that his death sentence was imposed in violation of the Eighth and Fourteenth Amendments because it was based upon perjured testimony and because the state failed to disclose material evidence in its possession that would have impeached that witness's credibility.

Claim Four: Petitioner claims that he was denied a fair and impartial penalty phase trial in violation of the Sixth, Eighth and Fourteenth Amendments because trial judge had a conflict of interest or at least the appearance thereof.

Claim Five: Petitioner claims that he was denied effective assistance of counsel in violation of the Fifth, Sixth and Fourteenth Amendments because the prosecution's use of Dr. Max Givon's testimony at the penalty phase violated his right to an attorney and to be protected from self-incrimination.

Claim Six: Petitioner claims that he was denied a fair trial at the penalty phase in violation of the Sixth, Eighth and Fourteenth Amendments because the state failed to give adequate notice to the defense of the identities of its witnesses.

Claim Seven: Petitioner claims that he was denied a fair trial at the penalty phase in violation of the Sixth, Eighth and Fourteenth Amendments because the victim impact evidence was excessive and inflammatory.

## II. Legal Standard

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides federal courts with specific standards for review of state court adjudications on habeas corpus review. 28 U.S.C. § 2254(d)(1), (2). The Supreme Court determined the proper interpretation of 28 U.S.C. § 2254(d)(1), and established a framework for review of state court legal conclusions. See Williams v. Taylor, 529 U.S. 362, 405, 411, 413 (2000). The Court held that § 2254(d)(1) delineates two independent categories of cases in which a state prisoner may obtain federal relief with respect to a claim adjudicated on the merits in state court. See id. at 404. The statute provides that a federal habeas court may grant a writ of habeas corpus if the state court decision is either "(1) contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." § 2254(d)(1) (emphasis added).

The Supreme Court stated that a state court's decision may be "contrary to" clearly established Supreme Court precedent in either of two respects: (1) "if the state court applies a rule that contradicts the governing law set forth in [the Court's] cases," or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Court's] precedent." Williams, 529 U.S. at 406, 412. According to the Eighth Circuit, "the state court need not cite or even be aware of the governing Supreme Court cases, 'so long as neither the reasoning nor the result of the state-court decision

contradicts them.'" <u>Brown v. Luebbers</u>, 371 F.3d 458, 461 (8th Cir. 2004) (<u>citing</u> <u>Early v. Packer</u>, 537 U.S. 3, 8 (2002)). "In the 'contrary to' analysis of the state court's decision, [the federal court's] focus is on the result and any reasoning that the court may have given; the absence of reasoning is not a barrier to a denial of relief." <u>Id.</u>

A state court's decision may be "an unreasonable application" of clearly established Supreme Court precedent in either of two respects: (1) if the state court identifies the correct governing legal rule from the Court's cases "but unreasonably applies it to the facts of the particular state prisoner's case," or (2) "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." <u>Williams</u>, 529 U.S. at 406. The Supreme Court stated that the "unreasonable application" inquiry is an objective one, <u>id.</u> at 409-10, and instructed that "an <u>unreasonable</u> application of federal law is different from an <u>incorrect</u> application of federal law." <u>Id.</u> at 410 (emphasis in original). Thus, "a federal habeas court may not grant relief simply because it concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." <u>Id.</u>; <u>see also</u> <u>Wiggins v. Smith</u>, 539 U.S. 510, 520-21 (2003).

If the state court correctly identifies the governing legal rules, only the unreasonable application clause is relevant. <u>Marcrum v. Luebbers</u>, 509 F.3d 489, 54 (8th Cir. 2007). "A state determination may be set aside under this standard if, under clearly established federal law, the state court was unreasonable in refusing to extend the governing legal principle to a context in which the principle should have controlled." <u>Ramdass v. Angelone</u>, 530 U.S. 156, 166 (2000). "The factual findings of the state court also may be challenged in a § 2254 petition, but they are subject to an even

more deferential review." <u>Kinder v. Bowersox</u>, 272 F.3d 532, 538 (8th Cir. 2001). Factual findings by the state court "shall be presumed to be correct, a presumption that will be rebutted only by "clear and convincing evidence." 28 U. S. C. § 2254(e)(1).

### III. Discussion

**A.    Claim One – Ineffective Assistance of Counsel for Failure to Adequately Investigate Petitioner's Social and Medical History**

Petitioner has bundled a number of claims in his first claim for relief. He argues that his trial counsel was constitutionally ineffective for failing to adequately investigate and present his social and medical history to experts and the court. According to petitioner, had his counsel done an adequate investigation, he would have unearthed compelling mitigation evidence regarding his social background, including evidence of physical, emotional, and sexual abuse, as well as evidence of mental illness. This evidence, he argues, should have been presented as mitigation evidence during the penalty hearing through live witnesses such as his parents, other family members and his former babysitter. According to petitioner, had this evidence been presented, he would not have been sentenced to death. Petitioner also argues the inadequate investigation greatly impacted the effectiveness of the defense experts. He argues had his attorney done an adequate investigation and provided his social history and prior medical records to expert witnesses, they would have been able to accurately diagnose his mental illnesses and he would have had a viable diminished capacity guilt-phase defense, and he would not have pleaded guilty. Furthermore, he argues, the outcome of the penalty phase would have been different had defense experts been able to testify regarding his mental illnesses.

**1.    The investigation**

11

In this case, petitioner's trial counsel conducted a very limited investigation of petitioner's childhood and social background. Mr. Joseph Green, the attorney who assumed the responsibility of obtaining mitigation evidence, only had two ten-to-fifteen minute conversations with petitioner's mother, as well as some telephone contact with Carol Tegard, petitioner's aunt – the only non-medical witness who testified on petitioner's behalf and presented mitigating evidence during the penalty phase. Mr. Green did not travel to petitioner's hometown, Peoria, Illinois, and he did not seek out or contact other character witnesses. As for records, it appears Mr. Green did not look for records beyond those that Mr. Eisenstein, petitioner's previous counsel, provided the state mental health expert at the beginning of petitioner's representation.[5] While these records did include some medical records and social history, they did not contain petitioner's school records or records from the Illinois Department of Corrections, despite the fact defense counsel knew petitioner had been incarcerated in Illinois prisons prior to his arrest in Missouri. Furthermore, of the records defense counsel did have, not all were provided to the mental health experts defense counsel hired. See discussion infra. Petitioner's trial counsel admitted in his deposition testimony that his failure to contact additional witnesses or search for documents was not a matter of trial strategy or because he felt it would have been pointless, but rather the decision was made based on a lack of time and funds.

Petitioner's post-conviction counsel, on the other hand, did conduct an extensive investigation. They uncovered a number of witnesses who were available and could have provided valuable information and/or testified on petitioner's behalf, including: Richard Worthington, petitioner's father; Janet Carol Worthington Blumenshine, petitioner's paternal aunt; Vincent David Worthington, petitioner's paternal uncle; Jimmy Worthington, petitioner's paternal uncle; Tracy Lynn

_____

[5]It is unclear from the record when, where, and how Mr. Eisenstein obtained these records.

Seling, petitioner's first cousin; Ryan Harms, petitioner's half brother; Eric Harms, petitioner's half brother; Patty Ann Harms, petitioner's stepmother; Bessie Smith, petitioner's childhood babysitter; Michael D. Williams, petitioner's childhood babysitter; and Paula Marie Mitchell, petitioner's father's girlfriend. According to affidavits and deposition testimony provided during the post-conviction proceedings, petitioner's family members and the two babysitters could have provided the trial court and/or experts information regarding petitioner's turbulent family history, which included mental illness and prevalent substance abuse, as well as the extreme abuse and neglect he suffered as a child. A number of the witnesses also stated in their deposition testimony and affidavits that some of the crimes for which petitioner was arrested and adjudicated as a juvenile were actually committed by his mother or father.

Petitioner's post-conviction counsel also searched for additional records and readily obtained over 464 pages from the Illinois Department of Corrections, most of which are psychiatric and medical records. In addition, post-conviction counsel obtained psychiatric and medical records of petitioner's mother, father, uncle, grandmother, and grandfather, as well as petitioner's mother's police records. These records show that members of petitioner's immediate and extended family suffer from severe mental illness, as well as chronic drug and alcohol abuse and addiction. Because they were not obtained by trial counsel, none of these records were provided to the two defense experts.

### 2. Ineffective assistance of counsel legal standard

The Sixth Amendment guarantees a criminal defendant the right to effective assistance of trial counsel. <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). To succeed on a claim of ineffective assistance of trial counsel, a habeas petitioner must establish both "that counsel's representation fell

below an objective standard of reasonableness," and that but for counsel's deficiency there is "a reasonable probability that . . . the result of the proceeding would have been different." Id. at 694. When addressing the adequacy of counsel's performance, a federal district court must be "highly deferential," and make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Odem v. Hopkins, 382 F.3d 846, 850 (8th Cir. 2004) (quoting Strickland, 466 U.S. at 689). There is a strong presumption that counsel's performance fell "within the wide range of reasonable professional assistance." Id. "Lawyers are not perfect, and the Constitution does not guarantee a perfect trial." Jones v. Delo, 258 F.3d 893, 902 (8th Cir. 2001). "Reasonable trial strategy does not constitute ineffective assistance of counsel simply because it is not successful." James v. Iowa, 100 F.3d 586, 590 (8th Cir. 1996). However, "counsel must exercise reasonable diligence to produce exculpatory evidence, and strategy resulting from lack of diligence in preparation and investigation is not protected by the presumption in favor of counsel." Kenley v. Armontrout, 937 F.2d 1298, 1304 (8th Cir. 1991) (vacating death sentence where defense counsel conducted an incomplete investigation for purposes of the penalty phase).

Deficient performance by counsel, even if professionally unreasonable, does not necessarily require that a judgment be set aside. "[A] defendant must affirmatively show prejudice. It is not sufficient for a defendant to show that the error had some 'conceivable effect' on the result of the proceeding. . . . The defendant must show that because of counsel's error, there is a reasonable probability that the result of the proceeding would have been different. 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Odem, 382 F.3d at 850 (quoting

Strickland, 466 U.S. at 694 ). See also King v. Kemna, 266 F.3d 816, 823 (8th Cir.2001); Jones, 258 F.3d at 901.

### 3.     Counsel's failure to adequately investigate petitioner's social background as deficient performance

Although the issue was before it, the Missouri Supreme Court did not squarely address whether Worthington's trial counsel's superficial investigation into petitioner's background was constitutionally deficient.[6]  Because the Missouri Supreme Court did not address the performance prong on the merits, the deferential standard review of the AEDPA does not apply, and the Court will review this aspect of petitioner's claim de novo.  28 U.S.C. § 2254(d); Kenley v. Bowersox, 275 F.3d 709, 711 (8th Cir. 2002).

The Supreme Court has addressed defense counsel's duty to investigate a capital defendant's social and medical background in a number of decisions.  In Strickland v. Washington, the Supreme Court case that provides the standard for all ineffective assistance of counsel claims, the Court held the Constitution requires that counsel make a reasonable investigation into the defendant's background or that counsel must make a reasonable decision, based on his or her professional judgment and the information available, not to conduct a particular investigation.  466 U.S. at 691. Counsel's "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."  Id. at 690-91.  Under the facts of the case, the Court in Strickland found counsel's performance was not

---

[6]The Missouri Supreme Court addressed whether petitioner's trial counsel was ineffective for failing to find appropriate experts to testify regarding a diminished capacity defense for the guilt phase; whether his trial counsel was ineffective for failing to investigate and rebut the Butch Mackey burning incident, and whether his trial counsel was ineffective for failing to have petitioner's parents testify during the penalty hearing.  Worthington v. State, 166 S.W.3d 566, 574 (Mo. 2005) (en banc).  The Court will address these three issues infra.

deficient because "[t]rial counsel could reasonably surmise from his conversations with respondent that character and psychological evidence would be of little help." Id. at 699. The Court held defense counsel's investigation was not unreasonable and did not amount to ineffective assistance of counsel because it was his strategy to rely as much as possible on the defendant's acceptance of responsibility of his crimes. Id.

In Williams v. Taylor, on the other hand, where defense counsel failed to obtain the defendant's juvenile and prison records and failed to return the phone call of a witness who offered to testify, the Supreme Court applied the Strickland standard and concluded counsel's inadequate investigation was ineffective assistance of counsel. The Court found counsel's failure to uncover and present voluminous mitigating evidence at sentencing could not be justified as a tactical decision to focus on the defendant's voluntary confessions, because counsel had not "fulfill[ed] their obligation to conduct a thorough investigation of the defendant's background." 529 U.S. at 396. In reaching this conclusion and reversing the defendant's sentence, the Court cited to the American Bar Association Standards for Criminal Justice ("ABA Guidelines").

The Supreme Court also employed the ABA Guidelines for capital defense work in Wiggins v. Smith, and found the defense counsel's investigation, which consisted of a psychological evaluation and tracking down a pre-sentence report and records from the department of social services, was unreasonable in light of what was discovered in the records they had obtained. 539 U.S. at 510. In reversing the sentence, the Court concluded "counsel chose to abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible." Id. at 527-28.

Finally, in <u>Rompilla v. Beard</u>, the Supreme Court also reversed a death sentence where defense counsel failed to examine a court file from a prior conviction that counsel knew the prosecution intended to use. The file contained information regarding the defendant's troubled upbringing and mental illness about which defense counsel was previously unaware. 545 U.S. 374, 389 (2005). Defense counsel also failed to examine the defendant's school records, "despite counsel's knowledge that [defendant] left school after the ninth grade"; failed to obtain records of the defendant's juvenile and adult incarcerations "although they were aware of their client's criminal record"; and "did not look for evidence of a history of dependence on alcohol that might have extenuating significance," even though they knew the defendant had been drinking heavily at the time of his offense and "one of the mental health experts reported that [the defendant]'s troubles with alcohol merited further investigation." <u>Id.</u> at 382. In reaching its conclusion that defense counsel had performed a constitutionally inadequate investigation, the Supreme Court also referenced the ABA Guidelines as guides to what is reasonable in a death penalty case. <u>Id.</u> at 387.

In regard to capital cases, the ABA Guidelines provide that:

> Counsel should conduct independent investigations relating to the guilt/innocence phase and to the penalty phase of a capital trial. Both investigations should begin immediately upon counsel's entry into the case and should be pursued expeditiously. . . .

> The investigation for preparation of the sentencing phase should be conducted regardless of any initial assertion by the client that mitigation is not to be offered. This investigation should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.

> Sources of investigative information may include the following:
> . . .

C.  Collect information relevant to the sentencing phase of trial including, but not limited to: medical history, (mental and physical illness or injury of alcohol and drug use, birth trauma and developmental delays); educational history (achievement, performance and behavior); special educational needs including cognitive limitations and learning disabilities); military history (type and length of service, conduct, special training); employment and training history (including skills and performance, and barriers to employability); family and social history (including physical, sexual or emotional abuse); prior adult and Juvenile record; prior correctional experience (including conduct or supervision in the institution/education or training/clinical services); and religious and cultural influences.

D.  Seek necessary releases for securing confidential records relating to any of the relevant histories.

E.  Obtain names of collateral persons or sources to verify, corroborate, explain and expand upon information obtained in (C) above.

Guideline 11.4.1 Investigation.[7]

Here, petitioner's counsel did what the Court would categorize as an inadequate investigation.

Counsel made only a handful of short telephone calls to two of petitioner's family members – his

mother and his aunt – despite having the names of other family members and neighbors. He made

no attempt to contact other witnesses. As far as records and other documentation, although defense

counsel had one record from a school counselor, defense counsel made no attempts to obtain other

school records. And even though he was aware that petitioner had been incarcerated in Illinois and

that the prosecution intended to use the prior convictions against petitioner, he made no attempt to

obtain records from the Illinois Department of Corrections. Defense counsel's investigation into

---

[7]In his memorandum, petitioner cites to the 2003 ABA Guidelines. Petitioner was arrested in 1995 and the penalty phase took place in 1998. As the inquiry is whether petitioner's counsel's performance was reasonable at the time, the Court will refer to the 1989 ABA Guidelines, which were superceded in 2003.

petitioner's mental health was even less diligent. Defense counsel made no attempt to obtain additional mental health records despite knowledge that petitioner had a history of mental illness. He also did not provide the two mental health experts he did hire with all the relevant information he had. See discussion infra. The Court notes that this is not a case where counsel did not investigate further because he thought it would be fruitless. Rather, petitioner's counsel did not look for additional records or interview additional witnesses for no other reason than he believed he was not being adequately paid and he did not have the time due the demands of his private practice.[8]

In sum, defense counsel's investigation did not meet the ABA Guidelines – the investigation was not undertaken "to discover all reasonably available mitigating evidence." Guideline 11.4.1 Investigation. More importantly, giving counsel the benefit of the doubt, the investigation did not meet what is required by the Supreme Court of the United States. The minimal investigation defense counsel did undertake uncovered avenues he should have pursued, and like the attorneys in Wiggins, counsel here "chose to abandon [his] investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible." 539 U.S. at 527-28. The background investigation petitioner's counsel conducted clearly fell short of constitutionally effective performance. Id. See also Williams, 529 U.S. at 396; Rompilla, 545 U.S. at 389, Antwine v. Delo, 54 F.3d 1357, 1368 (8th Cir. 1995) (vacating death sentence where counsel conducted an inadequate investigation and failed to present mitigating evidence during penalty phase); Hill v. Lockhart, 28 F.3d

---

[8]In his petition, petitioner also argues his counsel was ineffective for failing to request, pursuant to Ake v. Oklahoma, 470 U.S. 68 (1985), funds from the trial court for an investigation. Petitioner's counsel, Mr. Rosenblum, however, was paid $50,000.00 for the representation. Ms. Rosenblum, in turn, hired Mr. Green as co-counsel. Petitioner has not alleged $50,000.00 was an insufficient amount, and this Court agrees with the Missouri Supreme Court that there is nothing to suggest that had his counsel filed an Ake motion, it would have been granted. Worthington, 166 S.W.3d at 575.

832, 847 (8th Cir. 1994) (vacating death sentence where trial counsel ignored obvious clues of mental illness during his investigation); <u>Kenley v. Armontrout</u>, 937 F.2d at 1308 (vacating death sentence where defense counsel conducted an incomplete investigation for purposes of the penalty phase); <u>Chambers v. Armontrout</u>, 907 F.2d 825, 829 (8th Cir. 1990) (vacating sentence where defense counsel failed to interview or call witness to testify) counsel); <u>Thomas v. Lockhart</u>, 738 F.2d 304, 308 (8th Cir. 1984) (vacating death sentence where defense counsel's investigation of case fell short of what a reasonably competent attorney would have done).

**4.    Did petitioner suffer prejudice as a result of the inadequate investigation?**

Whether the deficient investigation prejudiced petitioner is a more complex inquiry. Petitioner argues that had more evidence of his background been presented directly to the trial court, presumably through more mitigation witnesses, there is a reasonable likelihood that petitioner would have received a life sentence. Petitioner also argues that had his counsel done a proper investigation, the information gathered could have been presented to experts, who in turn could have completed more thorough evaluations and provided accurate diagnoses of his mental illnesses. According to petitioner, accurate diagnoses by experts of his mental illnesses would have provided him with a diminished capacity defense and he would not have pleaded guilty to the charges of first degree murder. In addition, he argues, the expert opinions regarding his mental illness could have been used during the penalty phase to provide additional compelling mitigation evidence. The Court will address these distinct prejudice arguments separately.

**a.    *General mitigation evidence***

The Missouri Supreme Court did not address whether petitioner was prejudiced by his defense counsel's failure to present more evidence at the penalty hearing of the abuse he suffered as a child and youth, which counsel would have uncovered had he done a proper investigation. The Court, therefore, will review this aspect of petitioner's claim de novo. 28 U.S.C. § 2254(d); Kenley v. Bowersox, 275 F.3d at 711.

At the penalty hearing, the trial judge, who served as the finder of fact and sentencer, heard testimony of petitioner's appalling childhood and youth. Ms. Tegard, the petitioner's maternal aunt, testified about Worthington's abuse and neglect as a child. She testified that petitioner's mother was sixteen when she became pregnant and that she abused drugs while pregnant with petitioner. When petitioner was a child, he and his mother were constantly moving. At one point, petitioner was living with his mother out of her car, until she sold it for drugs. Ms. Tegard testified that petitioner's mother was a prostitute, and that she had sex and abused drugs and alcohol in front of petitioner when he was a child. She would also frequently leave petitioner alone or with strangers when he was a child. She also stated that petitioner's mother attempted suicide numerous times in petitioner's presence.

Ms. Tegard testified that petitioner's father was also a drug abuser, in addition to a drug dealer and absentee father, who was often in jail and had virtually no contact with petitioner until he was an adolescent. Ms. Tegard stated that petitioner's father figure was her brother-in-law. Petitioner worshiped his uncle, who was stable and involved in petitioner's life. Tragically, petitioner's uncle died when petitioner was seven. According to Ms. Tegard, petitioner's father re-entered petitioner's life when he was a young adolescent, but his influence was harmful. Petitioner's father taught him how to burglarize and he used petitioner to steal to support his drug habit, as well

as involving him in drugs. Ms. Tegard testified that petitioner often got into trouble for his father's crimes.

Ms. Tegard testified that petitioner was heavily involved in drugs, that he was at times homeless and without a car. According to Ms. Tegard, petitioner's immediate family was not supportive and, in fact, they enabled and supported, if not initiated, his drug addiction. She testified that petitioner's parents, grandparents and step-mother were all alcoholics or drug users. She also testified that in his youth petitioner underwent psychiatric treatment, saw psychologists, and went through a drug rehabilitation program, but that he received no support from his family, and the treatment was not completed. She testified that petitioner had been suicidal in the past. In addition to attempting to jump from a bridge, he tried to overdose on pills.

Ms. Tegard was the only live witness who presented testimony regarding petitioner's childhood and background. There were, however, numerous documents that were entered into the record describing the severe neglect and abuse petitioner suffered as a child. For example, in a psychological evaluation report dated August 3, 1989, which was admitted into the record, petitioner was described as having grown up "in a dysfunctional chaotic family made up of his chronic alcoholic mother and a heroin addicted father." Resp. Ex. V at 2193. Petitioner was said to have identified chronic neglect and emotional, physical, and sexual abuse over the years." Id. Records from the Methodist Medical Center of Illinois state petitioner "grew up in a severely dysfunctionally [sic] family which continues to be severely dysfunctional." Id. at 2273. Records from White Oaks Companies of Illinois also described petitioner's chaotic childhood. A case coordinator from a White Oaks facility described drug abuse by both of petitioner's parents, as well as physical abuse and neglect by his family and babysitter. Id. at 2360-62.

In addition to the records that were admitted during the penalty hearing, the pre-sentence report prepared by the Missouri Board of Probation and Parole ("Missouri PSR") also contained details of petitioner's abusive childhood. The report described petitioner's mother as an alcoholic and drug addicted prostitute who was suicidal and abusive toward petitioner. Resp. Ex. X at 14. The report states petitioner was abused physically, emotionally and sexually by babysitters. Petitioner is said to have described "instances when he was tied up, held under water in the bath tub, sprayed with mace, and burned with cigarettes." Id. Petitioner is also said to have stated that both his mother and his father were heavy drug users who stole to support their habits and that he had taken the blame for some of the crimes they committed. Id. at 15. It is also in the report that petitioner related that his father injected him with heroin when he was nine years old, and at age ten, he took PCP that his father provided him. Id. Petitioner is also reported to have said that it was his father who taught him how to steal and burglarize. In summary, the probation officer concluded "[petitioner] was raised in an extremely dysfunctional home with no boundaries. His parents are both drug addicted and his father taught [petitioner] how to burglarize homes at a very young age to help him support his drug habit. [Petitioner] was abused emotionally, physically, and sexually when younger." Id. at 24.

Based on the testimony of petitioner's aunt and the records before her, the trial judge found, as a mitigating factor, that petitioner "was raised in a dysfunctional family, and was neglected and abused as a child," in addition to the fact that he was "a long-term drug abuser." Resp. Ex. G at 29. She concluded, however, that the aggravating circumstances outweighed the mitigating circumstances and sentenced petitioner to death. Id.

The Court does not find that additional evidence regarding petitioner's childhood and youth would have made a difference in the sentence he received. The Court has reviewed the trial court

record and the affidavits and testimony provided in the post-conviction proceedings, and it finds had petitioner's counsel conducted a more complete background investigation, and had he called other family members and possibly former babysitters to testify, they would provided much of the same testimony and evidence regarding the abuse and neglect petitioner suffered that was already before the trial judge. And while the testimony may have corroborated evidence that was already admitted, and might have been more compelling coming from live witnesses, the Court does not find that the additional evidence, which would have been essentially cumulative, would have changed the outcome of the proceeding. There is nothing in the record to suggest that the trial judge discounted Ms. Tegard's testimony and the records regarding petitioner's nightmarish childhood. In fact, she specifically found as a mitigating factor the fact petitioner was abused and neglected as a child. She concluded, however, that aggravating circumstances – including the fact that petitioner invaded the victim's home and brutally raped her; that he strangled the victim for several minutes in order to kill her and stole several of her belongings and car; that he had a significant prior criminal record and committed the crime while he was on parole; and that he was violent in his pretrial confinement – outweighed the mitigating factors in the case. As for petitioner's contention that testimony would have established that in his youth he took the blame for crimes he did not commit, this too was before the trial judge from Ms. Tegard's testimony and the Missouri PSR. Furthermore, petitioner had a significant criminal record even setting aside his juvenile record, and petitioner's criminal history was only one of many aggravating factors the trial judge took into account. In light of the circumstances of the case and the aggravating factors that were proven during the penalty phase, the Court does not find a reasonable probability exists that petitioner would have received a life sentence had more

witnesses testified regarding his dysfunctional childhood and crimes he supposedly did not commit. Strickland, 466 U.S. at 694

The Missouri Supreme Court did specifically address whether it was ineffective assistance of counsel for petitioner's attorney not to have called petitioner's mother and father to the stand to testify at the penalty hearing. In addressing the claim, the Missouri Supreme Court noted that "'counsel's decision not to call a witness is presumptively a matter of trial strategy and will not support a claim of ineffective assistance of counsel unless the defendant clearly establishes otherwise.'" Worthington v. State, 166 S.W. 3d at 577 (quoting Hutchinson v. State, 150 S.W. 3d 292, 304 (Mo. 2004)). In analyzing the claim as to petitioner's mother, the court noted that although petitioner's mother was present at the hearing, his counsel chose not to call her because he believed her testimony might undermine petitioner's defense because during interviews with defense counsel, petitioner's mother tried to portray herself as a good mother and not abusive. Id. The court also noted that trial counsel believed petitioner's mother might have been high on crack cocaine at the time of the hearing. Id. The Missouri Supreme Court found it reasonable trial strategy not to call petitioner's mother to the stand to testify. Id. This Court finds the state court's findings to be supported by the record and its legal conclusions are not contrary to established Supreme Court law. It was reasonable trial strategy not to have called petitioner's mother to testify. See Strickland, 466 U.S. at 689.

Regarding petitioner's father, the Missouri Supreme Court found that counsel was not ineffective assistance for failing to call him to testify. In analyzing the claim, the court determined that petitioner's father was difficult to locate, petitioner had not had contact with his father since 1997, and they did not have much of a relationship. Worthington v. State, 166 S.W. 3d at 577.

While this Court does not agree with the Missouri Supreme Court's factual findings, its conclusion that petitioner was not prejudiced by trial counsel's failure to call him to the stand is not contrary to established law. Contrary to the Missouri Supreme Court's findings, Richard Worthington was not difficult to locate before and at the time of the hearing – he was incarcerated. Petitioner was aware of his father's whereabouts and his trial counsel made no attempt to locate him. The penalty hearing took place in September 1998, therefore, the fact that petitioner had little contact with his father since the previous year is not surprising, especially considering both were incarcerated. The fact that the two did not have much of a relationship actually supported petitioner's case, because it is petitioner's contention that Richard Worthington should have been called to testify about being a neglectful father, which is supported by the record.

Nevertheless, petitioner has not stated a claim under Strickland based on defense counsel's failure to call his father to testify. As discussed above, evidence of petitioner's awful childhood, including the dysfunctional relationship he had with his father, was admitted into evidence at the hearing, and the trial court found petitioner had been abused as a child. There was evidence already in the record that petitioner took the blame for crimes his father committed. It was not unreasonable for the Missouri Supreme Court to have concluded that Richard Worthington's testimony would have been cumulative, and petitioner was not prejudiced by his counsel's decision not to call him as a witness at the penalty hearing.

> **b.** ***The impact of the inadequate investigation on expert testimony***

The other aspect of petitioner's prejudice argument relates to his experts. Petitioner argues that he was prejudiced by his counsel's deficient investigation because had a proper investigation been

done, more facts and medical history could have been given to his experts, who in turn would have been able to provide more accurate diagnoses of his severe mental illnesses. According to petitioner, accurate diagnoses would have provided him a diminished capacity defense during the guilt phase and he would not have pleaded guilty. In addition, he argues, the experts could have provided compelling mitigating evidence during the penalty phase regarding his mental illnesses and, had they done so, he would have received a life sentence.

Petitioner's trial counsel hired two experts on petitioner's behalf: Roswald "Lee" Evans, a psychiatric pharmacist, and Kevin B. Miller, a forensic psychiatrist[9] – only one, Dr. Evans, testified at the penalty hearing, and he did not even prepare or provide a report. In preparation for his testimony, defense counsel provided Dr. Evans with the following information: records from the Methodist Medical Center from July 1994; Dr. Givon's report; law enforcement records regarding petitioner's arrests; and St. Charles County Sheriff Medical Department Records from 1996. He was not provided, the following, all of which defense counsel had in his possession: petitioner's school records; Illinois Youth Center records; Valerie Kessler's report, a psychological evaluation from August 1989; a juvenile placement report from 1987; the Illinois Pre-Sentence Investigation Report ("Illinois PSR"); treatment records from White Oak Knolls from August 1994; St. Charles County Detention records; transcripts of the videotaped police interviews from October 1995; and interview notes from Dr. Ryall, a psychiatrist who had treated petitioner in July 1995. In addition, Dr. Evans did not have the medical records from petitioner's family, including mental health records from his parents, uncle, and grandfather, affidavits from his family members and babysitters, school records,

<hr>

[9]From the record, it would appear the experts were hired independently of one another and that incredibly, Mr. Green, who hired Dr. Evans, was unaware his co-counsel, Mr. Rosenblum, had hired Dr. Miller until after the sentencing hearing.

and Illinois Department of Correction records, all of which were uncovered by petitioner's post-conviction counsel and could have been obtained prior to the time of the hearing. Dr. Evans interviewed petitioner, but he did not speak with any of his relatives.

At the hearing, Dr. Evans testified that petitioner was a "classic addict" and at the time of the rape and murder, he was under the influence of alcohol and cocaine, which made him incapable of making a decision about his behavior. Dr. Evans was unaware at the time of the hearing that petitioner had been evaluated by Dr. Miller, a forensic psychiatrist, and he testified at the penalty hearing that he could not opine whether petitioner suffered from a mental disease or defect, and that he normally worked in conjunction with a psychiatrist or psychologist.

Dr. Miller, a forensic psychiatrist, was also hired by defense counsel to evaluate petitioner. Defense counsel provided Dr. Miller with: reports from the Major Case Squad; the victim's autopsy report and laboratory evaluation, including DNA findings; Dr. Givon's report; partial records from the Methodist Medical Center from July 1994, and at least one incident report from the St. Charles Department of Corrections.[10] As with Dr. Evans, he was not given, although they were within defense counsel's control: petitioner's school records; Illinois Youth Center records; Valerie Kessler's report, a psychological evaluation from August 1989; a juvenile placement report from 1987;Illinois PSR; treatment records from White Oak Knolls from August 1994; transcripts of the videotaped police interviews from October 1995; and interview notes from Dr. Ryall, a psychiatrist who had treated petitioner in July 1995. He also was not given St. Charles County Sheriff Medical Department Records from 1996, or the records that were uncovered by petitioner's post-conviction

---

[10]Although Dr. Miller does not list the St. Charles County Department of Corrections records as records he reviewed for his report, he does reference an incident report regarding petitioner's attack on another inmate with a broom. Resp. Ex. V at 2608, 2611.

counsel. Like Dr. Evans, Dr. Miller interviewed petitioner, but he did not interview any family members.

In his report, Dr. Miller concluded there was evidence petitioner was suffering from attention-deficit/hyperactivity disorder, cocaine dependence, alcohol abuse, post-traumatic stress disorder, major depressive disorder, which was in remission, and had a history of cocaine-induced psychosis with onset during intoxication. Resp. Ex. V at 2613. He also indicated that he needed to rule-out Bipolar disorder, dissociative disorder, malingering, and complex partial seizures. Id. Based on petitioner's self-reporting that he had been drinking heavily on the night of the crime, had been using crack cocaine regularly during that time of his life, and had no conscious knowledge of killing or raping the victim, Dr. Miller found that there was no direct evidence petitioner was psychotic around the time of the crime, but he may have experienced a period of cocaine-induced paranoid psychosis, which could have been associated with amnesia. Id. at 2614. He concluded the crime would not have occurred absent the influence of cocaine and that petitioner was predisposed to drug addiction. Id. at 2613-16. Dr. Miller did not testify at the penalty hearing and his report, which is dated September 13, 1998, one day before the start of the penalty hearing, was not admitted into evidence.

While Dr. Miller did not testify at the penalty hearing, Dr. Evans, the pharmacist, did testify. His testimony was limited, however, because he specifically stated that he could not opine as to whether petitioner suffered from a mental disease or defect. He stated that he normally works with a psychiatrist or psychologist who lays the foundation of a patient's mental impairment, and he will provide testimony regarding what effect drugs might have on that condition. During the sentencing hearing, the trial judge did not state that she found petitioner to be suffering from mental illness.

Post-conviction counsel provided to Dr. Evans, as well as three additional experts, Jonathan

H. Pincus, M.D., a professor of Neurology, Dr. Dennis G. Cowan, a psychologist, and Dr. Robert Smith a clinical psychologist, all of the records that were uncovered prior to the penalty hearing, as well as the records that were located by post-conviction counsel, which included mental health records from some family members, and affidavits from family members and two babysitters. The post-conviction experts all examined petitioner. In addition, Dr. Smith and Dr. Cowan conducted extensive interviews and some testing with petitioner's family members.

All three new experts concluded petitioner suffered serious mental illness. Dr. Pincus concluded in a report prepared for post-conviction counsel that petitioner has "a neurologic condition, Tourette's syndrome, with obsessive-compulsive disorder, tics, vocalizations, and Bipolar affective disorder and he has a number of neurological abnormalities on examination which indicate that the brain circuits that subserve frontal-basal ganglia-thalamus are not functioning properly. He has an attention deficient disorder and has had one since the earliest school years . . ." Resp. Ex. V at 4748. Dr. Pincus noted that at the time of the murder, petitioner had been prescribed Prozac for depression. "Treatment with Prozac precipitated an episode of mania, and I believe that he was very much under its influence when he participated in the robbery of the victim's apartment." Id. at 4751.

Dr. Cowan agreed with Dr. Pincus's diagnosis of Tourette's syndrome. He noted that when not properly medicated, persons with Tourette's are more likely to have significant problems with "emotional lability, impulsivity, and aggression directed towards others." Resp. Ex. V at 4628-29. Dr. Cowan believed petitioner was not properly medicated at the time of the murder and during his pretrial incarceration. Dr. Cowan also found the presence of brain-related dysfunction. "The suspected etiologies for the noted dysfunction are from the multiple sustained head injuries, substance abuse and congenital abnormalities and that of cerebral brain dysfunction." Id. at 4635. He also

noted petitioner was at the time suffering from attention deficient hyperactivity disorder ("ADHD"), Bipolar affective disorder, as well as cocaine abuse/dependency and alcohol abuse/dependency. Dr. Cowan also stressed the importance of genetics. He wrote "[petitioner] is the biological product of his parents' genetic make-up and predispositions. The neuropsychological evaluations conducted on [petitioner]'s family failed to produce a normal evaluation or one free of cerebral dysfunction. These genetics, the abnormalities and the predispositions were all passed onto [petitioner]." Id. at 4637-38. Dr. Cowan did not opine as to petitioner's state of mind at the time of the crime.

Dr. Smith also provided post-conviction counsel with a report. Dr. Smith diagnosed petitioner with Bipolar disorder with psychotic features, Tourette's disorder, post-traumatic stress disorder, ADHD, alcohol dependence, and cocaine dependence. Resp. Ex. V at 4527. In his report, he emphasized the importance of petitioner's family mental health history:

> This extensive family history of psychiatric illness reported by [petitioner] was confirmed by interviews with the family members listed, as well as the medical records reviewed. This history is significant in gaining an understanding of [petitioner]'s psychiatric disorders. The research regarding the causes of psychiatric illness has demonstrated that many disorders are genetically influenced. In particular, the mood disorders (e.g., Depression and Anxiety) and the more severe disorders involving hallucinations and delusions (e.g., Bipolar Disorder and Schizophrenia) are the result of an inherited predisposition. [Petitioner]'s family has definite history of depression, Bipolar Disorder, Substance Dependence Cerebral Brain Dysfunction and psychotic behaviors. This positive family history directly contributed to his development of the psychiatric disorders that have affected his behavior throughout his life. Id. at 4502

Dr. Smith noted that petitioner first met with a mental health counselor in sixth or seventh grade, but that his family, and more particularly his mother, did not follow through with his medication, treatment or counseling. Id. at 4510, 4530. Throughout his youth and early twenties,

with the exception of July and August 1994, when he attempted suicide and he was briefly committed, petitioner only received mental health care and medications, albeit often the wrong medications, when he was under the supervision of the criminal justice system.  Id. 4504-05.  Dr. Smith noted that petitioner often requested psychiatric treatment at the St. Charles Department of Corrections, and medical staff at the facility recognized they needed to rule-out Bipolar disorder.  Id. at 4517, 4532.  While incarcerated in the facility, he was prescribed psychiatric medication, but he often did not receive it, and "[d]uring those time that his medication was discontinued, his behavior became aggressive and unmanageable.  In other words, [petitioner]'s impulsivity, acting-out, oppositional behavior and aggressiveness was the direct result of his not receiving the appropriate medications while placed at the St. Charles County Jail."  Id. 4506.  Dr. Smith noted that petitioner's Tourette's syndrome added to petitioner's difficulties in confinement because he responded to stressful situations with grunting and cursing uncontrollably and the guards viewed these vocalizations as a sign of defiance. Id. at 4515.  Dr. Smith also opined extensively about the negative impact the extreme abuse petitioner suffered as a child had on him.  In summary, Dr. Smith concluded that the culmination of petitioner's psychiatric conditions, as well as his use of alcohol and cocaine, contributed to petitioner's involvement in the offense, and that his ability to appreciate the wrongfulness of his actions or to conform his behavior to the law was substantially impaired, and due to his mental disease or defects, petitioner evidenced a diminished mental capacity and was unable to deliberate at the time of the offense.  Id. at 4533-36

Dr. Evans also provided a report to post-conviction counsel.  He stated in a report dated July 1, 2000, that he was "overwhelmed by the amount of information that was available and pertinent to this cause that was not provided by defense counsel."  Resp. Ex. V at 4647.  He stated that he was

provided minimal records and had very limited contact with petitioner's trial counsel prior to the hearing. Trial counsel did not ask that he prepare a report. "At the hearing I was not qualified appropriately by defense counsel, which prevented me from rendering appropriate expert opinions based on my clinical expertise. I am a psychiatric pharmacy specialist and within the legal system I am reliant on a psychiatrist or psychologist to provide diagnostic foundation for my opinion, it is important to have corroborating experts. In this case there were not other experts called, a situation I was not aware of prior to the [hearing] in September 1998." Id. at 4647. He added that the opinion he gave at the penalty hearing was strengthened by the additional records. See discussion infra.

All four post-conviction experts disagreed with the conclusions of Dr. Givon, the state forensic psychologist who testified at the penalty hearing. Dr. Givon opined that petitioner was not suffering from a mental disease or defect, but that petitioner's behavior was consistent with a conduct disorder and as an adult constituted an antisocial personality disorder. Dr. Smith in his report provided an extensive criticism of Dr. Givon's report, pointing out the inconsistencies in Dr. Givon's report with the medical records and petitioner's history.

<em>i.      Effect on petitioner's guilty plea</em>

Worthington argued that he would not have pleaded guilty but instead would have proceeded to trial using a diminished capacity defense had his counsel conducted an adequate investigation. The Missouri Supreme Court did address this aspect of petitioner's claim in his post-conviction appeal and denied the claim. In addressing the claim, the Missouri Supreme Court noted that the fact that post-conviction counsel found experts who were willing to testify at the motion hearing did not mean that trial counsel had been ineffective in failing to find similar experts before deciding that a diminished capacity defense would not be effective and recommending that Worthington plead guilty.

Worthington v. State, 166 S.W.3d at 574. The court also gave deference to the motion court's findings that the three post-conviction experts were not credible. It discounted the experts' conclusions because they were largely based on Worthington's own statements, which were not reliable or credible, and they were based in part on interviews with petitioner that occurred years after the murder. Id.

In its analysis, the Missouri Supreme Court remarked that petitioner's trial counsel were "seasoned capital-litigation attorneys, with extensive experience in criminal and death penalty litigation." Id. The court noted that in a post-conviction deposition one of the defense attorneys testified that he had initially considered and investigated a diminished capacity defense but Dr. Miller's report did not support the defense. The court also noted that the defense attorney testified he believed "that in general, diminished capacity defenses do not go over well and are difficult to defend"; "that it would be an 'uphill battle' to present the defense with all the evidence of [petitioner]'s drug and alcohol abuse"; and "that the portion of Dr. Miller's report that supported the defense was outweighed by the negative effect it might have." Id. at 575. In sum, the Missouri Supreme Court found that trial counsel made a "strategic choice to advise . . . Worthington to plead guilty and concentrate on his penalty phase defense." Id. at 575. The state supreme court concluded that "it was not unreasonable for defense counsel to conclude that the risk of a death sentence was greater if . . . Worthington went to trial than if he [pleaded] guilty and the penalty phase was tried to the judge." Id.

The Court finds the Missouri Supreme Court's decision involved an unreasonable application of clearly established Supreme Court law and, furthermore, its findings of fact are not supported by the record. That said, petitioner is not entitled to relief on this basis because he suffered no prejudice.

34

Petitioner's trial counsel made the decision to recommend that petitioner forgo a diminished capacity defense based on incomplete information. It is not clear from the record when defense counsel, Mr. Rosenblum,[11] received information from Dr. Miller regarding his opinion of petitioner's mental state, however, Dr. Miller's written report is dated September 13, 1998, only a day prior to the penalty hearing and long after petitioner had already pleaded guilty. Even assuming defense counsel had the information contained in Dr. Miller's report before petitioner's guilty plea, as discussed in the preceding section, Dr. Miller's opinion was based on incomplete information. Dr. Miller did not have many of petitioner's own mental health records – he often only referenced Dr. Givon's summary of records. Significantly, while petitioner was receiving treatment during his pretrial detention at the St. Charles Department of Corrections, Dr. Miller had none of the medical records from this facility when he wrote his report. Dr. Miller also did not have information regarding petitioner's family history of mental illness, which is significant because the post-conviction experts all found petitioner's family had an extensive history of mental illness, including Bipolar disorder, and that genetics is an important contributing factor to mental illness.

Dr. Miller's lack of access to many relevant records contributed to his incomplete diagnosis. Dr. Miller indicated in his report that he needed more information to rule-out Bipolar disorder, dissociative disorder, malingering, and complex partial seizures. On the other hand, the post-conviction experts, who were provided the additional records and documentation, did conclude petitioner was suffering from Bipolar disorder, as well as Tourette's syndrome and cerebral brain dysfunction. The diagnoses from the post-conviction experts show that had petitioner's trial counsel

---

[11]Mr. Green, Mr. Rosenblum's co-counsel, testified at his post-conviction deposition that he was not aware Mr. Rosenblum had hired Dr. Miller until after sentencing.

given defense experts more information about petitioner and his background, which was readily available and some even within their control, it is reasonably certain that these experts would have concluded petitioner suffered from severe mental illness, and more particularly Bipolar disorder.[12]

The motion court and the Missouri Supreme Court discounted the post-conviction experts out of hand because their conclusions were supposedly largely based on interviews with petitioner, who is not credible, and which occurred years after the murder. The Court disagrees with the characterization and finds it is not supported by the records.[13] The post-conviction experts' opinions were based on interviews with and testing of the petitioner, as well as the review of thousands of pages of medical records and background documents. The post-conviction experts reviewed affidavits from petitioner's family members and babysitters, and some even conducted testing on petitioner's family members. All post-conviction experts noted that petitioner's description of his childhood, substance abuse, and treatment (or lack thereof), was corroborated by petitioner's family members and the medical records. The experts' conclusions were not based merely on petitioner's own self-reporting. Furthermore, the Missouri courts credited Dr. Givon's opinions, which were based on fewer records. The Missouri courts also discredited the post conviction experts because

---

[12]This is further supported by the fact that the Missouri Department of Corrections has also diagnosed and treated petitioner with and for Bipolar disorder following his sentencing. Res. Ex. V at 4506. Bipolar disorder is "a lifetime condition that usually arises in early adulthood." Antwine v. Delo, 54 F.3d 1357, 1365 (8th Cir. 1994). If petitioner had the condition following his sentencing, it seems likely he would have had the condition at the time of the offense, and counsel would have discovered it had a full investigation of petitioner's mental condition been done. Id.

[13]The court also faulted the experts for diagnosing petitioner with Tourette's syndrome, ADHD, obsessive compulsive disorder, Bipolar disorder, frontal lobe cerebral brain dysfunction, and post traumatic stress disorder, "which were not otherwise support by prior medical opinions . . ." Id. at 574. This Court finds to the contrary. Petitioner was diagnosed with ADHD as early as twelve years old. He was diagnosed as having post traumatic stress disorder as a teenager, and medical staff at the Missouri Department of Corrections diagnosed petitioner with Bipolar disorder.

their examinations of petitioner occurred years after the offense, but "had [trial] counsel been effective, though, the examination would have been made shortly after the offense occurred." Antwine v. Delo, 54 F.3d 1357, 1366 (8th Cir. 1995). The Missouri courts improperly discredited the post-conviction experts.

That said, would the information defense counsel could have obtained from properly prepared experts have changed petitioner's decision to plea guilty? The Court finds it would not. Under Missouri law, a defendant is not responsible for his conduct if, as a result of a "mental disease or defect," such person was "incapable of knowing and appreciating the nature, quality or wrongfulness of his conduct." Mo. Rev. Stat. § 552.030.1. The statute defines "mental disease or defect" as follows:

> The terms "mental disease or defect" include congenital and traumatic mental conditions as well as disease. They do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct, whether or not such abnormality may be included under mental illness, mental disease or defect in some classifications of mental abnormality or disorder. The terms "mental disease or defect" do not include alcoholism without psychosis or drug abuse without psychosis or an abnormality manifested only by criminal sexual psychopathy. . . .

Mo. Rev. Stat. § 552.010.

A "diminished capacity" defense permits a defendant to introduce evidence of a mental disease or defect to prove the absence of a particular mental element of the crime, such as "deliberation," which is an element of first-degree murder. Under a diminished capacity defense, the defendant accepts criminal responsibility for his conduct, but is convicted of a lesser crime because the mental defect prevented the defendant from forming the mental element of the higher degree crime. Wilkins

v. Bowersox, 933 F. Supp. 1496, 1517 n.18 (W.D. Mo. 1996) (citing State v. Anderson, 515 S.W.2d 534, 537 (Mo. 1974)).

As the Missouri Supreme Court noted, petitioner's counsel believed, in general, that proving and defending a diminished capacity defense is very difficult. The fact that all post-conviction experts found petitioner was suffering from a mental disease or defect does not establish the defense. A finding of mental disease or defect would permit the jury to conclude that appellant was unable to form the necessary specific or general intent and to thereby acquit him of the offense charged; but "[t]he jury must still determine, considering all the evidence, whether the mental disease or defect prevented the defendant from forming the requisite mental state at the time of the offense." Wainwright v. State, 143 S.W.3d 681, 685 n.1 (Mo. Ct. App. 2004) (quoting Nicklasson v. State, 105 S.W.3d 482, 484-85 (Mo. 2003) (en banc)).

The post-conviction expert reports were not conclusive regarding whether petitioner was unable to form the necessary specific or general intent at the time of the crime. Unlike the threshold question – whether petitioner had a mental disease or defect – there is nothing to suggest Dr. Miller would have concluded petitioner was unable to form the necessary intent had petitioner's counsel provided the doctor with the additional medical records and background information. In addition, it appears to be undisputed that petitioner was high at the time of the crime. Although the extent of petitioner's intoxication is disputed, voluntary intoxication does not support a defense of diminished capacity. State v. Gary, 913 S.W.2d 822, (Mo. Ct. App. 1995) (overruled on other grounds). Further, counsel's deficient performance in preparing Drs. Miller and Evans does not change the fact that Dr. Givon did find petitioner had the requisite intent, and counsel were aware of Dr. Givon's conclusions at the time of the plea. Even if trial counsel had done an adequate investigation and

properly prepared the expert witnesses, the diminished capacity defense was not a slam dunk. This Court finds the Missouri Supreme Court's ultimate conclusion – that it was not unreasonable for trial counsel to conclude that petitioner's risk of receiving a death sentence was greater if he went to trial than if he pleaded guilty – to be reasonable. The Court finds that even if defense counsel had performed adequately, petitioner would have continued to take the strategy of accepting responsibility for the murder in the hopes of obtaining leniency from the sentencing judge. Petitioner has not shown that the results of the guilt phase would have been different had there been an adequate investigation and the defense experts were properly prepared. Strickland, 466 U.S. at 695.

### ii. Effect at penalty phase

It is a different matter as to whether a more complete investigation and adequately prepared experts would have changed the outcome of the penalty phase. While stating in a footnote that it would address the issue infra, the Missouri Supreme Court never addressed whether petitioner might not have received a death sentence had his counsel introduced properly prepared expert witnesses at the hearing. Id. at 574 n.2. Because Missouri's Supreme Court failed to address this issue, this Court will review this aspect of the claim de novo. 28 U.S.C. §2254(d); Kenley, 275 F.3d at 711.

In the context of a death sentence, the question of prejudice is whether "but for counsel's deficient performance, there is a reasonable probability [the finder of fact] would have concluded the balance of the aggravating and mitigating circumstances did not warrant death." Kenley v. Armontrout, 937 F.2d at 1303-04 (citing to Strickland, 466 U.S. at 695). "A reasonable probability is one sufficient to undermine our confidence in the outcome of the proceeding." Id. The Court believes there is a reasonable probability Worthington would not have received a death sentence if properly prepared defense experts had testified at the penalty hearing regarding Worthington's mental

illnesses and the impact drugs had on their symptoms. Not only would the experts' testimony have provided additional mitigating evidence, but it would have rebutted and explained some of the prosecution's aggravating evidence.

Under Missouri law, the following are statutory mitigating circumstances in a capital murder case:

> (2) The murder in the first degree was committed while the defendant was under the influence of extreme mental or emotional disturbance;
>
> . . .
>
> (6) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired;

Mo. Rev. Stat. § 552.010. Mental illness is also a non-statutory mitigating factor in death penalty proceedings. See, e.g., Eddings v. Oklahoma, 455 U.S. 104, 114-15 (1982) (evidence of mental conditions, disorders and disturbances are the kinds of facts which may be considered by a jury as mitigating evidence).

Even though evidence of petitioner's mental illness likely would have fallen short of a diminished capacity defense during the guilt phase, it would have been compelling mitigating evidence during the penalty phase. See e.g., Antwine, 54 F.3d at 1368 (rejecting diminished capacity argument regarding guilt phases, but finding reasonable probability defendant would not have been sentenced to death if counsel had effectively presented evidence of mental impairment during penalty phase); Hill, 28 F.3d at 846 (same).

Only Dr. Evans, the psychiatric pharmacist, testified as an expert for the defense, and he testified that it was beyond his area of expertise to opine whether petitioner suffered from a mental

disease or defect. He specifically stated that he normally works in conjunction with a psychiatrist or psychologist, who provides a diagnostic foundation, but none was provided in this case. At the hearing, Dr. Evans attempted to testify that cocaine and antidepressants exacerbate the symptoms of Bipolar disorder. Although the trial judge appeared interested in this testimony, it was ultimately stricken because defense counsel had not laid a foundation that petitioner indeed suffered from the condition.

After reviewing the additional records and the reports from the post-conviction experts, Dr. Evans stated in his post-conviction report that he was "overwhelmed" by the amount of relevant information that was available and not provided to him before he testified at the penalty hearing. In his report, Dr. Evans revised his findings and added that based on new information it was his opinion that petitioner was predisposed to substance abuse, and based on the environment in which petitioner lived during his formative years, it was likely that his substance abuse was not voluntary. He also opined that it was likely petitioner was using alcohol and illegal drugs to escape his abuse and self medicate his ADHD and Bipolar disorders. He also stated in the report, as he attempted to testify at the hearing, that cocaine would exacerbate the symptoms of petitioner's Bipolar disorder, such that he would experience acute episodes of mania and depression resulting in paranoid symptoms, agitation, irritability, impulsivity, racing thoughts, difficulty concentrating, and poor judgment. He also stated in his post-conviction report that antidepressants such as Prozac, which petitioner was prescribed during the summer preceding the murder, has an adverse impact on Bipolar disorder and exacerbates the manic symptoms of the disorder. He also noted petitioner was prescribed antidepressants during his pretrial detention by the medical staff of the St. Charles County Department of Corrections, which may have contributed to his behavioral problems at the jail.

Dr. Miller did not testify or prepare a report for post-conviction regarding how his opinion might have changed had he been provided the additional information. That said, as discussed supra, the Court is reasonably certain Dr. Miller also would have concluded that petitioner was suffering from mental illnesses – at the very least, Bipolar disorder. It also seems reasonably likely that had he made such a diagnosis, effective counsel would have used his testimony and a report at trial not only as mitigation evidence in of itself, but to provide the foundation for Dr. Evans's opinion.

There were indications in the record before the trial judge that petitioner suffered from some sort of mental impairment. The record contained medical reports, but they were thoroughly disorganized and the import of which would not have been apparent to a lay person. See Marcrum, 509 F.3d at 507. Without the opinions of experts, it was unlikely the trial judge, as finder of fact, would have sifted through the medical evidence and even discerned the possibility that petitioner was suffering from a mental illness that was not properly medicated, and the ramifications thereof. Id. 507-08.

It is apparent from the record that Judge Nichols did not find as a mitigating factor, statutory or otherwise, that petitioner was suffering from mental illness or disturbance. However, she did find petitioner's violent behavior during pre-trial detention to be a non-statutory aggravating factor. This Court finds that had the trial judge heard testimony that petitioner had Bipolar disorder and was not properly medicated while incarcerated or otherwise, it is likely that she would have found petitioner suffered from mental illness as a mitigating factor, and the strength of the aggravating factor would have been diminished if not extinguished. Furthermore, because petitioner's counsel presented such a small amount of mitigating evidence in general and no qualified defense expert testified regarding petitioner's mental state, it is likely that had petitioner's counsel properly prepared the defense

witnesses, the trial judge would not have found the aggravating factors outweighed the mitigating factors beyond a reasonable doubt.

Based on a review of the totality of the evidence that was presented at the penalty hearing, the Court finds that had the trial judge heard testimony from properly prepared defense experts, there is a reasonable probability that petitioner would have received a different sentence. Rompilla, 545 U.S. at 389; Wiggins, 539 U.S. at 536; Williams, 529 U.S. at 399, Antwine, 54 F.3d at1368; Hill, 29 F.3d at 847; Kenley v. Armontrout, 937 F.2d at 1309; Thomas, 738 F.2d at 309. And the likelihood of a different result had properly prepared experts testified is "'sufficient to undermine confidence in the outcome' actually reached at sentencing." Rompilla, 545 U.S. at 389. Petitioner is entitled to habeas relief on these grounds and his death sentence should be vacated. The Court will order that petitioner be sentenced to life in prison without the possibility of parole, or that he be given a new penalty hearing.

### B. Claim Two -- Ineffective Assistance of Counsel for Failure to Adequately Investigate and Rebut State's Evidence at Penalty Phase

For his Second Claim for relief, petitioner asserts that his constitutional right to the effective assistance of trial counsel was violated by defense counsel's failure to properly investigate and object to much of the other bad acts evidence introduced by the state as aggravating evidence during the penalty phase. He cites Charlotte Peroti's testimony about an attempted rape, a childhood burning incident that he related to Dr. Givon during the competency examination, his prior juvenile and criminal record in other jurisdictions, and his jail misconduct during his detention prior to trial. He also argues that if trial counsel had more thoroughly investigated the aggravating evidence, trial counsel could have impeached or undermined Dr. Givon's diagnoses of malingering and anti-social

personality disorder and rebutted the evidence of other bad acts. Worthington argues that, but for counsel's failure, much of this aggravating evidence would have been discredited, and there is a reasonable probability that he would not have been sentenced to death.

The Court begins its analysis with the Missouri Supreme Court's opinion. The Missouri Supreme Court correctly set forth the controlling Strickland standard. Its conclusion that trial counsel did not render ineffective assistance is not a finding of fact binding on this Court to the extent stated by § 2254(d). "However, the findings made by the state court in deciding the claim are subject to the deference required by that statute." Nave v. Delo, 62 F.3d 1024, 1037 (8th Cir. 1995) (citing Strickland, 466 U.S. at 687); see also Sloan v. Delo, 54 F.3d 1371, 1382 (8th Cir. 1995) (ineffective assistance claims are mixed questions of law and fact; legal conclusions are reviewed de novo and state court findings of fact are presumed to be correct under 28 U.S.C. § 2254(d)).

> **1. Trial counsel failed to object to the non-disclosure of Ms. Peroti and failed to investigate.**

Worthington argues trial counsel was ineffective by failing to object to the non-disclosure of penalty phase witness Charlotte Peroti and failing to conduct an investigation of this witness. At the penalty phase of the trial, state witness Charlotte Peroti testified that she and Worthington were neighbors. She testified that ten days prior to the rape and murder of Ms. Griffin, Worthington broke into her apartment through her kitchen window, attempted to force himself on her sexually, stole her jewelry, and stole her car. Prior to the hearing, Ms. Peroti was identified by the prosecution only as "Charlotte Kirn" of Troy, Missouri.

The Missouri Supreme Court addressed this claim as follows:

> Mr. Worthington has not shown that there is a reasonable probability
> that the result of the penalty trial would have been different had

44

counsel objected to the lack of notice of Ms. Peroti's testimony and sought a continuance.

As this Court noted on direct appeal, Ms. Peroti had been listed as a witness for two years under the name of Charlotte Kirn. Defendant endorsed her and all of the State's witnesses as his own. Even if counsel did not know until she got on the stand that Charlotte Peroti and Charlotte Kirn were the same person, Mr. Worthington had mentioned Ms. Peroti numerous times in his statement to police after his arrest and counsel knew all about the events to which she testified and cross-examined her effectively about them. While counsel was not aware of Ms. Peroti's bad check conviction, he did establish her bias against Mr. Worthington, her attempt to get him arrested for drug trafficking, her belief that he was corrupting her son, and her dislike of him. There is no reasonable probability that the minor additional impeachment value of showing that she had a prior bad check conviction and that she may have exaggerated her role as a police informant affected the outcome of the case.

Worthington v. State, 166 S.W.3d at 581.

Because Worthington's claim that counsel rendered ineffective assistance by not objecting to the lack of notice of Ms. Peroti's testimony was adjudicated on the merits in the Missouri Supreme Court, the AEDPA directs that Worthington's writ of habeas corpus shall not be granted unless the Missouri Supreme Court's resolution was contrary to clearly established federal law, involved an unreasonable application of that clearly established federal law, or resulted in a decision based on an unreasonable determination of facts in light of the evidence presented. 28 U.S.C. § 2254(d). In ruling on an application for writ of habeas corpus, "a determination of a factual issue made by a state court shall be presumed to be correct" unless the petitioner can rebut the finding of fact "by clear and convincing evidence." § 2254(e)(1). A state court's determination of facts is unreasonable only if "it is shown that the state court's presumptively correct factual findings do not enjoy support in the

record." <u>Palmer v. Clarke</u>, 408 F.3d 423, 429 (8th Cir. 2005) (quoting <u>Jones v. Luebbers</u>, 359 F.3d 1005, 1011 (8th Cir. 2004)).

### a.  *Unreasonable interpretation of facts*

Petitioner argues that the Missouri Supreme Court's decision involves an unreasonable interpretation of the relevant facts and the applicable law.  Most notably, petitioner asserts that the state court's factual findings that Worthington mentioned Peroti numerous times to the police and that counsel knew in advance about all the events to which she testified are erroneous.  Petitioner argues that the state court record explicitly contradicts any factual findings that petitioner's counsel knew in advance the substance of Peroti's testimony.

Reviewing Mr. Worthington's statement to the police, he mentions his neighbor "Charlotte" several times.  Resp. Ex. V 3597-98, 3608-09, 3610, 3634-35, 3665, 3687.  These statements to police were made on October 2, 1995 at 2:45 a.m. and on October 3, 1995 at 3:50 a.m.  At the time, Worthington states that he had been awake for three to four days using crack cocaine.  The statements are disjointed, and the transcription reflects several instances in which the statements of either Worthington or the detectives are inaudible.  Based on the references to Charlotte in Worthington's statement to the police, a reasonable attorney could discern that at some point possibly three weeks before the interview that: Worthington had been out drinking with his neighbor Charlotte and he had stolen her car; Charlotte found him the next morning in the car, and the car had an empty gas tank; Worthington did not know how he got her car keys, but may have gotten them out of Charlotte's purse in her bedroom; and at some point in the past, he had stolen jewelry from Charlotte's apartment, which he entered through an unlocked door.  Worthington's statements to police regarding a "Charlotte" establish nothing more.

At the penalty phase, however, Ms. Peroti testified that during the night of September 20, 1995, ten days before the rape and murder of Ms. Griffin, she awoke because her bedroom light had been turned on. She heard a noise downstairs, and went to investigate. She discovered Worthington inside her apartment. Ms. Peroti testified that he attempted to have sex with her:

> A.      Then he wanted to have sex with me and I told him no and I pushed him away and he kept saying, oh, come on, come on and he was – I don't know, he quit because Darren was coming down the stairs. . . . He was being very forceful with me. He took his thing out, had it in my face. I was shoving him . . . . Darren grabbed the hockey stick and ran down the steps and then he took off out the door.

> Q.      Now, you said that he was being forceful with you, what was he doing?

> A.      He had me down on the corner of the couch, his dick in my face.

> Q.      All right. How did you get to the couch from where you were standing?

> A.      He pushed me down.

> Q.      And how far from where you were standing was it to the couch?

> A.      Probably about – well, like from the window, from about where that stand is. I kept moving back, then I was going around this way to get away from him and telling him to go, get out, you know, telling him to get out because I knew something was wrong and he had told me Anthony let him in somewhere in between that time and Anthony didn't let him in.

> Q.      All right. You are saying he put his penis in your face?

> A.      Yes, he did.

> Q.      Okay. Did he say anything to you?

A.    I don't remember his exact words, he just kept wanting to do it.

Q.    This may sound silly, were you consenting to this at all?

A.    No.  I kept telling him, no, get off, get off me, get away from me.

Resp. Ex. D at 96-103.

After Ms. Peroti's boyfriend came down the stairs, Ms. Peroti testified that Worthington went out the door and she "brushed it off."  Ms. Peroti stated that she then called an undercover narcotic agent, "Casper," with the St. Louis County Police Department.  She testified that prior to the incident she had been working for Casper as an unpaid, undercover narcotics agent for two months on a drug operation, the only target of which was Michael Worthington.  She testified that she did not report the incident as a sexual assault.  Ms. Peroti did not testify as to the substance of her conversation with Casper on the night of September 20, 1995, other than to confirm that she did not report the incident as a sexual assault.  Ms. Peroti testified that she did not contact the Lake St. Louis Police Department that evening.

Ms. Peroti testified that the next morning she discovered Worthington had entered her home by removing her kitchen window screen and entering through the kitchen window.  She also noticed her car keys and jewelry were missing.  At this point, Ms. Peroti went to Worthington's apartment to get her car keys back.  When Worthington refused to return the keys, Ms. Peroti testified that she contacted the Lake St. Louis Police Department.  After an officer from the Lake St. Louis Police Department came out to her apartment, Ms. Peroti again called her contact Casper.  Casper stated that he was more interested in pursuing eventual drug charges against Worthington than pursuing any charges related to this incident.  Ms. Peroti testified that she was instructed by Casper to continue to

pursue the undercover drug operation against Worthington.  After this conversation, Ms. Peroti said she contacted the Lake St. Louis Police Department and told them that she did not wish to pursue charges against Worthington.

Defense counsel's cross-examination of Ms. Peroti also revealed that on at least four occasions, Ms. Peroti had driven Worthington to a residence in St. Louis City to buy crack cocaine, and took him at least once to buy drugs near Cuivre River State Park.  She stated that as part of her "cover," she held herself out as Worthington's friend, but in actuality she thought of him as a "jerk." Counsel also established that after the alleged sexual incident, Ms. Peroti wished to remain in contact with Worthington, and attempted to visit him at his apartment on several occasions.

The Missouri Supreme Court's determination that counsel "knew all about the events to which [Ms. Peroti] testified" is not supported by the record.  From the police interview, counsel knew that at some point Worthington had stolen Ms. Peroti's car and her jewelry.  Counsel could not have known based on petitioner's statements to police that Ms. Peroti would testify that petitioner broke into her house through a kitchen window and attempted to sexually assault her ten days prior to the rape and murder of Ms. Griffin.  At deposition, Mr. Green was questioned regarding the events to which Ms. Peroti testified, and he testified as follows:

> Q.     Okay.  Within that pre-sentence investigation report, they talk about the police report where Charlotte Peroti said Michael raped her. Do you see anywhere in that report where Michael – at the time of the incident that Michael – that she indicated that Michael raped her?
>
> Well, I guess her testimony was actually that he attempted to rape her.
>
> . . . .

49

A.    There's no reference of that in the pre-sentence investigation report.

Q.    Now, if you had known that Charlotte Peroti was not a police informant and at the time when she made her report that she didn't say that Michael attempted to rape her, how would that have changed your cross-examination of her?

A.    Well, obviously, I would have attacked her credibility on that issue.  And if I had known it prior to her giving that testimony and felt that it was false testimony, I would have moved to strike.

Resp. Ex. M at 488-89.

Based on the questioning of Mr. Green at deposition, it is clear that he did not "kn[ow] all about the events to which [Ms. Peroti] testified."  At the time of Worthington's sentencing, Mr. Green did not know that Ms. Peroti's police report regarding this incident contained no mention of an attempted sexual assault.  He did not have a copy of her police report, nor was the Missouri PSR prepared.  Resp. Ex. M at 477, 482-83.  Worthington's statements to police mentioned his neighbor Charlotte, but made no reference to any attempted sexual assault or burglary through a kitchen window.  In fact, the statements made no mention of any events occurring ten days prior to the rape and murder of Ms. Griffin.  At most, counsel could discern from Worthington's statements to police that he had at some point stolen Ms. Peroti's car and jewelry.

Moreover, based on counsel's cross examination of Ms. Peroti, it is unclear whether he knew a police report existed.[14]  Twice during cross examination, counsel asked Ms. Peroti whether the police came to her apartment that evening and she stated that they did not, that "nothing ever really happened."  Resp. Ex. D at 104, 113.  Based on the testimony of counsel, the police report of the

_____

[14]The record before this Court did not contain a copy of the police report.

incident did not mention any alleged rape.  Therefore, even assuming counsel had a copy of the police report, the report would not have revealed the substance of Ms. Peroti's testimony.

Based on Worthington's statements to the police, counsel's cross examination of Ms. Peroti, counsel's statements at deposition, and the Missouri PSR, counsel did not know all about the events to which Ms. Peroti testified at sentencing.  Nothing in the state court record, save Ms. Peroti's testimony itself, would have revealed to counsel that Ms. Peroti would testify at sentencing that ten days prior to the burglary, rape, and murder of Ms. Griffin, Worthington had entered Ms. Peroti's apartment through the kitchen window, attempted to sexually assault her and stole her jewelry and car.

Under the AEDPA, Worthington may obtain habeas relief only by showing the state court's conclusion to be "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  The Court must presume the Missouri court's factual findings to be sound unless Worthington rebuts the presumption of correctness by clear and convincing evidence. § 2254(e)(1).  "The standard is demanding but not insatiable; . . . deference does not by definition preclude relief."  Miller-El v. Dretke, 545 U.S. 231, 240 (2005) (internal quotations omitted).  The state court's conclusion that counsel was aware of the events to which Ms. Peroti testified at sentencing is not supported by the record, and was wrong to a clear and convincing degree.

### b.    *Prejudice arising out of counsel's error*

The Court's finding that the Missouri Supreme Court's determination of the facts was unreasonable is not alone enough to entitle Worthington to habeas relief on his claim.  Worthington still must establish that he was prejudiced by his counsel's error.  See Wiggins, 539 U.S. at 552.

51

Specifically, Worthington must demonstrate that if his attorney had known the substance of Ms. Peroti's testimony, there is a reasonable probability that the result of the proceeding would have been different.[15]  See id.; Strickland, 466 U.S. at 688.

The Court recognizes that Ms. Peroti's testimony stands alone as the only evidence the sentencing judge heard of any alleged prior sexual misconduct committed by Worthington.  Had counsel objected to Ms. Peroti's testimony and the prosecution's failure to disclose the substance of the testimony, the sentencing Judge might have continued the sentencing hearing or might have stricken the testimony.  Had counsel known of Ms. Peroti's testimony, he could have impeached her with the police report of the incident, should he have obtained it.

None of this, however, convinces the Court that there is a reasonable probability the result of the sentencing proceeding would have been different.  The Missouri Supreme Court's assessment that counsel cross-examined Ms. Peroti effectively, establishing her bias against petitioner and her dislike of him, was a reasonable adjudication of the merits.  Without any apparent prior knowledge of the alleged sexual assault, counsel effectively established that Ms. Peroti never reported the sexual assault to the police.  Counsel also established that Ms. Peroti held herself out as a friend of Worthington, and attempted to maintain contact with Worthington after these events, even visiting his apartment the next morning.  Even if counsel had been aware of the allegations concerning the sexual assault, and even if he had investigated and discovered the police report regarding the incident,

_____

[15]The Missouri Supreme Court did not address whether counsel's failure to object to Ms. Peroti's testimony fell below an objective standard of reasonableness.  The Court focused instead on the second prong of Strickland, and found that petitioner had not shown a reasonable probability that the results of the penalty trial would have been different had counsel objected to the lack of notice of Ms. Peroti's testimony and sought a continuance.  For purposes of this federal habeas motion, therefore, the Court will assume that counsel's failure to object to Ms. Peroti was unreasonable under the first prong of the Strickland analysis, and will likewise focus on the analysis of prejudice.

his cross-examination would have been no more effective. He had already established Ms. Peroti did not report the incident as a sexual assault. Impeaching her testimony with the police report, which did not mention a sexual assault, would have been cumulative. In addition, the sentencing judge had before her at the time of sentencing the Missouri PSR. The Missouri PSR details much of the information contained in the police report of the alleged incident on September 20, 1995. Based on the Missouri PSR, the police report contradicts much of Ms. Peroti's sworn testimony at the penalty hearing. Although counsel did not introduce the police report of the incident (and was likely not aware of its existence), the trial judge had a detailed description of the police report, including lengthy quotations from the report, and was aware that the police report of the incident did not mention an attempted rape.

Petitioner also argues that the Missouri Supreme Court's decision is flawed because counsel testified that he learned for the first time that Ms. Peroti was an alleged police informant when she took the stand. Worthington argues that Ms. Peroti fabricated her role as a drug informant and, had counsel investigated, he would have been able to destroy her credibility with this information or had the testimony stricken.

Although not mentioned specifically, Worthington's argument appears to rely on the investigation conducted by post-conviction counsel, which established that Ms. Peroti was never an informant for the St. Charles County Police Department. See Ex. L at 470 ("[T]he testimony presented was false in whole or in part, based on an investigation conducted by officers of the St. Charles Police Department, which concluded that Charlotte had never been an informant or in any was associated with the St. Charles MEG unit.") At the sentencing hearing, however, Ms. Peroti testified unambiguously that she was not working with the St. Charles County Police Department in

the summer of 1995.  She was working with the St. Louis County Police Department in the summer of 1995, trying to have Worthington arrested on drug charges.  She was questioned specifically on this point.  See Ex. D at 118.  Assuming counsel had discovered Ms. Peroti had fabricated her role as an informant with the St. Charles County Police Department, this would not necessarily have impeached her testimony regarding her role with the St. Louis County Police Department in the summer of 1995.

Moreover, the cross-examination of Ms. Peroti regarding her alleged duties as a police informant established her clear bias against Worthington.  Counsel elicited testimony that Ms. Peroti pursued an unpaid, undercover position as a narcotics agent with the St. Louis County Police Department in an effort to have Worthington arrested on drug charges and to "make sure he got out of [her] area."  As the Missouri Supreme Court found, counsel established her bias against Mr. Worthington, and "[t]here is no reasonable probability that the minor additional impeachment value of showing that . . . she may have exaggerated her role as a police informant affected the outcome of the case."  Worthington v. State, 166 S.W.3d at 581.

While it was unreasonable for the Missouri Supreme Court to have determined that "counsel knew all about the events to which [Ms. Peroti] testified," the Court does not find that the state court's decision was based on this mistaken factual determination.  The Court finds that regardless of counsel's lack of prior knowledge of Ms. Peroti's testimony, counsel's cross-examination of Ms. Peroti, taken as a whole, effectively impeached her testimony, and established Ms. Peroti as a witness with questionable credibility, clearly biased against Worthington.  There is no reasonable probability that had the sentencing judge stricken her testimony or allowed counsel additional time to investigate the alleged prior bad acts, the outcome of the case would have been affected.  The Court does not

find the Missouri Supreme Court's resolution of this issue contrary to clearly established federal law or involving an unreasonable application of that law.

### 2. Jail misconduct and prior bad acts

Petitioner contends that trial counsel rendered ineffective assistance by failing to object to evidence establishing the non-statutory aggravating factor of "violent behavior in pre-trial confinement." According to petitioner, counsel stipulated to records submitted by the St. Charles County Department of Corrections without investigating their accuracy, stipulated to the admission of numerous police reports and police records from the Peoria, Illinois Police Department, and stipulated to the Illinois PSR, prepared by an Illinois probation officer stemming from petitioner's 1995 guilty plea for burglary and theft in Peoria.

> The Missouri Supreme Court addressed this claim as follows:
>
> It was not unreasonable for counsel to conclude that it was better not to object and instead to use the positive aspects of the information to support the claim that Mr. Worthington should not receive death. Counsel cannot be ineffective for making reasonable choices of trial strategy, even if in hindsight another strategy might have been more favorable.
>
> Further, given the large amount of evidence of prior crimes that was admissible and the evidence of prior arrests and other bad acts that had to be put before the judge to make some of Mr. Worthington's arguments, there is no reasonable probability that any error in admitting some additional prior bad act evidence was so prejudicial that the result of the proceeding would have been different if that evidence had not been admitted.

Worthington, 166 S.W.3d at 582.

Mr. Green stated at deposition that he stipulated to the St. Charles County Department of Corrections records for the following reason:

55

[b]ecause at the time I was thinking of whether there were any legal objections that could be made to keep those records out, and I could not formulate for myself any legal objection that would have kept those records out, so instead of delaying the trial and making an argument that wasn't legally going to win with the judge, I chose to not fight a fight that I thought I – that I wasn't going to win. . . . [Y]ou win some favor with the court by making objections that are truly meritorious, you know, and also to keep things moving.

Resp. Ex. M at 469-70.

Petitioner argues that the Missouri Supreme Court's decision, that "[i]t was not unreasonable for counsel to conclude that it was better not to object and instead to use the positive aspects of the information to support the claim that Mr. Worthington should not receive death," involved an unreasonable determination of fact. Petitioner argues the Missouri Supreme Court did not identify which aspects of this evidence were positive or favorable to Worthington, and these records "categorically portray[] Worthington as a dangerous sociopath who was beyond redemption and rehabilitation."

The Missouri Supreme Court's finding, that counsel's failure to object was not unreasonable because counsel could use the "positive aspects" of these records to support his claim for a noncapital sentence, is unreasonable to the extent it applies to the St. Charles County Department of Corrections records. Because the state court's decision combines its discussion of petitioner's school records, jail records, prior uncharged misconduct with friends, burglaries undertaken with his father, and other similar evidence under one heading, it is unclear to this Court whether the state court's finding applies solely to the St. Charles County Department of Corrections records. To the extent it does, this Court agrees with petitioner that the Missouri Supreme Court's decision is an unreasonable determination of fact. The Court has reviewed the St. Charles County Department of Corrections records

extensively, and cannot find any "positive aspects" of these records that would support petitioner's claim that he should not receive a capital sentence. The records are voluminous, and portray petitioner as a prisoner with an inability to control his anger and temper his actions with reasoned judgment, and a person with problems submitting to authority. Additionally, counsel for petitioner did not state that he decided not to object based on a consideration of the "positive aspects" of these records. Rather, he stated that he could not think of a valid legal objection.

Although this aspect of the Missouri Supreme Court's decision involves an unreasonable determination of fact, the state court's decision was not "based on" this determination. See 28 U.S.C. § 2254(d). The state court found that even assuming counsel's failure to object was unreasonable, petitioner was not prejudiced. "[T]here is no reasonable probability that any error in admitting some additional prior bad act evidence was so prejudicial that the result of the proceeding would have been different if that evidence had not been admitted." Worthington v. State, 166 S.W.3d at 582. This determination is not contrary to clearly established federal law, nor is it unreasonably applied. Had counsel objected to the introduction of the St. Charles County Department of Correction records, this objection likely would have been overruled.[16]

Even assuming a hearsay objection would have been sustained, many of the damaging records would have come in under the business records exception. To the extent the records contained double hearsay, many of these hearsay-within-hearsay statements were attributed to Worthington, and

---

[16]At the time of the sentencing proceedings, the United States Supreme Court and the Eighth Circuit were clear that the Confrontation Clause does not apply to penalty phase hearings, even in capital cases. See Williams v. New York, 337 U.S. 241, 251-51 (1949); United States v. Wise, 976 F.2d 393, 397-98 (8th Cir. 1992) (en banc). The Eighth Circuit declined to revisit this issue after the decision in Crawford v. Washington, 541 U.S. 36 (2004). See United States v. Johnson, 495 F.3d 951, 976 & n.23 (8th Cir. 2007).

would have fallen under the exception to hearsay for statements made by a party opponent. See, e.g., Resp. Ex. V at 3271 ("Inmate [Worthington] spat at me and stated, 'I am going to stab you with my pen.' Inmate Worthington also stated that he was going to kill the first officer that gives him the chance."). Moreover, Sergeant Michael McKee, shift supervisor with the St. Charles County Department of Corrections, testified at the post-conviction proceedings as to Worthington's violent conduct in jail. He testified to incidents within his personal knowledge, including Worthington assaulting and attempting to assault corrections officers, threatening to kill corrections officers, fighting with inmates, and hiding razor blades in his cell. Resp. Ex. D, 136-52. This direct evidence was admissible to show Worthington's propensity for violence while detained in the St. Charles County Department of Corrections.

Finally, the state introduced into evidence the transcript of the preliminary hearing on Worthington's assault charge. Resp. Ex. V at 4174. During this incident, Worthington chased another inmate from his cell into the recreation room (the "day room") at the jail where he assaulted him with a broom handle. When the inmate attempted to return to his cell, Worthington jammed the cell door with the broomstick. The victim of the assault and a corrections officer testified as to this incident. This evidence likely would not have been excluded by a hearsay objection because it is testimony by a witness at a hearing in another proceeding, and petitioner had the opportunity to develop the testimony by cross examination. See State v. Aaron, 218 S.W.3d 501, 512 (Mo. Ct. App. 2007). The details of this assault are also reported in the Missouri PSR dated September 29, 1998, which was before the sentencing judge. Resp. Ex. V at 3555. An objection to this information, even if sustained, would not have prevented the judge from being aware of this information.

The Missouri Supreme Court's determination that petitioner was not prejudiced by counsel's failure to object to evidence of the St. Charles County Department of Corrections records is not contrary to clearly established federal law, nor is it unreasonably applied. As stated above, the United States Supreme Court has clearly delineated the standard for ineffective assistance of counsel claims. In order to prevail on such a claim, petitioner must first demonstrate that his attorney failed to exercise the degree of skill and diligence that a reasonably competent attorney would exercise under similar circumstances. Strickland, 466 U.S. at 687. Petitioner must then demonstrate that he suffered prejudice as a result of his attorney's actions. Id.

A thorough review of the record supports the conclusion that petitioner cannot establish he was prejudiced by his counsel's failure to object to the introduction of the St. Charles County Department of Corrections records. State law governs the admissibility of evidence in a state criminal proceeding. Clark v. Groose, 16 F.3d 960, 963 (8th Cir. 1994). The majority of the St. Charles County Department of Corrections records were admissible under applicable Missouri law for the aforementioned reasons. Even had an objection been made and sustained, there was enough non-objectionable evidence of petitioner's prior bad acts in jail adduced through the testimony of the witnesses that the admission of additional alleged hearsay evidence did not cause petitioner any prejudice. Petitioner therefore cannot establish that he suffered ineffective assistance of counsel.

### 3.     Jerry McKean and Illinois law enforcement records

Petitioner also argues that counsel was ineffective for stipulating to the admission of numerous police reports and records admitted during the testimony of Detective Jerry McKean from the Peoria, Illinois Police Department. McKean testified at the sentencing hearing about specific instances of alleged crimes committed by Worthington.

Counsel discussed his reason for stipulating to much of this evidence prior to the sentencing hearing, stating that he was aware of the legal objections as to foundational requirements and chain of custody and the constitutional objections with respect to aggravating circumstances, and made a conscious decision to waive these objections. Counsel stated that because it was a court trial, the judge would have to review the evidence in making a ruling on any objection, and furthermore, this information would be before the court through the Missouri PSR report. Resp. Ex. D at 8-9.

The Missouri Supreme Court found that counsel's decision not to object to the police reports and records of Detective Jerry McKean was not unreasonable because given the large amount of evidence of prior crimes that was admissible and the evidence of prior arrests that had to be put before the judge to make some of Worthington's arguments, "there is no reasonable probability that any error in admitting some additional prior bad act evidence was so prejudicial that the result of the proceeding would have been different." Worthington v. State, 166 S.W.3d at 582.

The Court finds this adjudication of the claim did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law. Detective McKean testified that he personally arrested Worthington on at least one occasion for burglary, and was directly involved in investigating another three burglaries. Resp. Ex. D at 224. He testified in detail about these incidents and his involvement in the investigations. This testimony based on his personal knowledge and his familiarity with Worthington was not objectionable. He also testified that Worthington was listed in thirty-seven police reports of the Peoria Police Department. Detective McKean testified briefly as to several of these incidents. Defense counsel cross-examined Detective McKean, using the police records and reports to elicit testimony regarding Worthington's dysfunctional family, his drug problem, his bouts of homelessness, and the criminal history of his

parents. Although investigation by post-conviction counsel revealed that Worthington's mother admitted to committing three of the burglaries against Worthington's maternal grandparents and the theft of his grandmother's car, given the large number of arrests and other bad acts already before the sentencing judge, the Court agrees with the state court that there is no reasonable probability any error in admitting this evidence was so prejudicial that Worthington would have obtained a different result at sentencing. The Court finds that the Missouri Supreme Court's opinion finding no prejudice to Worthington based on counsel's failure to object to the admission of the police reports and records is reasonable and does not contradict clearly established federal law.

### 4. Christine Frey and probation records

Petitioner argues counsel was ineffective for not objecting to the testimony of Christine Frey, an Illinois probation officer, who testified concerning the Illinois PSR she prepared in connection with petitioner's guilty plea for burglary and theft in 1995. Ms. Frey's PSR was admitted into evidence without any objection from defense counsel. Petitioner argues that Ms. Frey's testimony, and the report she prepared, included hearsay evidence about petitioner being a "major security risk" while in juvenile custody, and a statement from a report by psychologist Valerie Kessler that petitioner said "when his adrenaline gets going, he could kill someone" by stabbing them in the chest.

The Missouri Supreme Court addressed this claim as follows:

> Ineffective assistance of counsel is rarely found in cases of a failure to object. It will only be deemed ineffective when the defendant has suffered a substantial deprivation of his right to a fair trial. "In addition, counsel is not ineffective for failing to make non-meritorious objections."
> . . . .
> Further, given the large amount of evidence of prior crimes that was admissible and the evidence of prior arrests and other bad acts that had to be put before the judge to make some of Mr. Worthington's

arguments, there is no reasonable probability that any error in admitting some additional prior bad act evidence was so prejudicial that the result of the proceeding would have been different if that evidence had not been admitted.

Worthington v. State, 166 S.W.3d at 582 (citations omitted).

The Court finds this decision was not contrary to and did not involve an unreasonable application of clearly established federal law. Ms. Frey testified about petitioner's criminal record from his juvenile arrests starting in 1987 through a retail theft in 1994. She relied on her PSR dated October 16, 1995 prepared in connection with Worthington's sentencing for burglary in Peoria County, Illinois. Resp. Ex. V at 2239-51. All of this information regarding Worthington's prior criminal record was included in the Missouri PSR prepared by Sandy K. Tinkham on September 29, 1998 in connection with the instant case, which was before Judge Nichols at sentencing. The Missouri PSR includes detailed information from the police reports of these prior arrests. The Missouri PSR also includes the statement from Valerie Kessler's report that petitioner revealed thoughts of killing others by sticking a knife in their chest. "He specifically mentioned his stepfather, teachers, and other children." Resp. Ex. V. at 3562. The petitioner himself moved for the admission of Dr. Kessler's report as an exhibit. Resp. Ex. A at 376. Also included was the fact that petitioner was considered a "major security risk due to his involvement in several escape plots" while in juvenile custody. Resp. Ex. V at 3549. Petitioner cannot show that any hearsay evidence allowed through Ms. Frey's testimony at his sentencing hearing was prejudicial because this evidence was contained in great detail in the Missouri PSR prepared for Judge Nichols. The Missouri Supreme Court's assessment that there was "no reasonable probability that any error in admitting some additional prior bad act evidence was so prejudicial that the result of the proceeding would have been different if that

evidence had not been admitted" is not contrary to federal law and does not unreasonably apply federal law.

### 5. Failure to rebut evidence that Worthington set Butch Mackey on fire

Petitioner argues that counsel failed to investigate an incident in which petitioner allegedly set a friend, Butch Mackey, on fire. Petitioner argues this incident was relied upon by Dr. Max Givon in his written report, which diagnosed petitioner with cocaine dependence, alcohol abuse, and anti-social personality disorder. Petitioner states that had counsel investigated this incident, he would have discovered that it was not Butch Mackey, but his brother Richey Mackey, who was burned, and petitioner had nothing to do with this incident. Petitioner argues this would have destroyed Dr. Givon's credibility.

The Missouri Supreme Court addressed this claim as follows:

> Mr. Worthington also argues that his counsel's alleged failure to adequately investigate his social history made their penalty phase defense ineffective. He alleges that a more thorough investigation would have provided counsel with facts with which they could have countered inaccuracies in the testimony offered by the State's expert, Dr. Max Givon, in support of the latter's diagnosis of anti-social personality disorder. In particular, he alleges that Dr. Givon testified that he exhibited severe conduct disorder before he was age 15 based on the belief that he had intentionally burned his friend, Butch Mackey, over 90 percent of his body. At his post-conviction hearing, Mr. Worthington presented the testimony of Butch's father and stepmother, Mr. and Mrs. Mackey, who testified that it was Butch's brother, Richey, who was burned, not by defendant but by two other boys. They said that they would have so testified at trial, but no one had contacted them.

> Even assuming the Mackeys' testimony was accurate—they made it clear that their knowledge of the incident was based on hearsay and counsel was unable to bring Butch or Richey to testify because they had their own problems with the law—the failure to investigate a collateral issue did not constitute ineffective assistance.

Correcting the record as to who caused the burns was relevant only to the extent that the incident affected Dr. Givon's diagnosis of anti-social personality disorder and, in turn, to the extent that diagnosis affected the trial court's decision to impose the death penalty. Because extrinsic evidence cannot normally be used to impeach a non-party witness on a collateral issue, counsels' failure to undertake further investigation that might have revealed such extrinsic evidence was not prejudicial.

Even assuming that extrinsic evidence impeaching Dr. Givon's diagnosis would have been admissible had the burning incident been central to that diagnosis, there was no showing that this was the case. Defendant failed to call Dr. Givon at the post-conviction hearing or otherwise present evidence at that hearing that Dr. Givon relied on the burning incident in reaching his diagnosis. Dr. Givon's testimony at the trial indicates that the incident was not important to that diagnosis.

Dr. Givon testified that he principally based his diagnosis of anti-social personality disorder on Mr. Worthington's "pervasive pattern of disregard for and violation of the rights of others *occurring since age 15 years*" (emphasis added). He said this pattern included unlawfulness, deceit, impulsivity, irritability and aggression as indicated by fights and assaults, reckless disregard for safety, failure to sustain consistent work behavior, and lack of remorse.

Dr. Givon said that anti-social personality disorder also manifests itself as conduct disorder before age 15 and that Mr. Worthington showed such conduct disorder. But, he did not state that the burning incident was necessary to this conclusion. To the contrary, he stated that conduct disorder manifests itself as "aggression, fighting, crimes against property, stealing, behavior in school, fire setting, vandalism, things of that nature." He then listed dozens of examples of conduct disorder that Mr. Worthington told him about. They began at age six or seven and continued into his teen years, of which the incident in which Mr. Worthington's friend was burned was only one, albeit remarkable part:

. . . .

As is evident, Dr. Givon was simply repeating what Mr. Worthington had told him, not vouching for its accuracy. Moreover, he did not state he particularly relied on the burning incident, nor that he believed that it showed intent to injure his friend. He simply

reported that Mr. Worthington had told him that "we" burned our friend when "we" were throwing gas on each other. This description is more consistent with a reckless game than intentionally injuring another. Nothing suggests that, had the facts as to that incident been further explored, Dr. Givon's diagnosis would have changed. The failure to further investigate the burning incident was not ineffective.

Worthington v. State, 166 S.W.3d at 576-77. Petitioner argues that the Missouri Supreme Court's decision does not address his argument that this alleged crime was used to support Judge Nichols' decision to impose death based upon the non-statutory aggravating factor of Worthington's prior criminal history. "The Missouri Supreme Court's opinion totally ignored the impact of this evidence and focused solely on whether this evidence would have affected Dr. Givon's diagnosis." Pet. Mem. at 65. Although the Missouri Supreme Court did not specifically address this argument, the post-conviction trial court addressed the argument and found it unpersuasive:

> The movant alleges that he was denied effective assistance of counsel for the failure of his trial counsel to present the testimony that refuted an account of an alleged incident that took place in Bartonville, Illinois involving Richey Mackey, Elex "Butchie" Mackey, and the movant. The incident in question involved "Butchie" Mackey being burnt while playing with the other boys, including the movant. This evidence was not presented as aggravating evidence but was information that was contained in Dr. Givon's report.

> The Court finds that this is a collateral matter. The information about this event was presented as part of the information that went into Dr. Givon's report and thus a collateral matter. The transcripts of the trial show that Dr. Givon was rigorously cross-examined by trial counsel about his methodology of compiling the report and the conclusions that he made in the report. Since this case was tried to a judge and not a jury, the court finds this to be harmless error. It is well settled in Missouri that a judge will not be misled by irrelevant or incompetent evidence.

Resp. Ex. L at 1071.

A thorough review of the record supports the conclusion that petitioner cannot establish his counsel's performance fell below acceptable standards. Nothing in the record supports petitioner's argument that this alleged crime was used as a non-statutory aggravating factor to support petitioner's death sentence. Petitioner cites only to Judge Nichols' Report of the Trial Judge for support that she considered the alleged burning of Richey Mackey as a non-statutory aggravating circumstance. This report lists only "Defendant's Criminal History" as a non-statutory aggravating circumstance indicated by the evidence. Resp. Ex. V at 3893. No criminal adjudication resulted from the burning incident. At most, it could be classified as a prior bad act. That said, the prosecution did not present the burning of Richey Mackey as a prior bad act, but rather it was referred to in Dr. Givon's report. In his testimony at the sentencing, Dr. Givon mentioned this incident only when he was reading verbatim from his report. Resp. Ex. D, 310. The state did not refer to this incident in its opening or closing remarks, and based on the record, reference to the incident was limited to Dr. Givon's report.

Petitioner argued in state court (an argument largely abandoned here) that had counsel investigated the claim, he could have countered the inaccuracies in Dr. Givon's testimony that led to the diagnosis of anti-social personality disorder. The Missouri Supreme Court addressed this argument at length, finding that based on the entirety of Dr. Givon's testimony at trial, the incident was not important to his diagnosis. Worthington v. State, 166 S.W.3d at 576-77. Petitioner does not contest this finding, and based on Dr. Givon's testimony the Court concludes the state court's finding is accurate and reasonable. Dr. Givon's testimony is replete with references to factors he considered in diagnosing petitioner with anti-social personality disorder, and nothing in his testimony

suggests the burning incident was central to that diagnosis.  Resp., Ex. D at 308-10, 312-13, 334-35, 384-85, 406-12.

The state court found counsel's failure to investigate the burning incident was not ineffective. Petitioner has not established that the state court's decision with respect to this issue resulted in a decision that was contrary to or involved an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States.  Linehan v. Milczark, 315 F.3d 920, 924 (8th Cir. 2003).  Moreover, the Court finds that the state court's decision did not result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  Id.

### C.    Claim Three – **Brady** Violation With Respect to Charlotte Peroti

In Claim Three petitioner argues the state violated Brady v. Maryland, 373 U.S. 83 (1963), because it did not disclose that Charlotte Peroti had a bad check conviction and that she received a "deal" on the charge in exchange for her testimony at the penalty hearing.  He also argues the state violated Brady in that it failed to disclose that Ms. Peroti was not an undercover agent.  He claims these facts would have "destroyed" Ms. Peroti's credibility, and that his counsel was denied the opportunity to impeach the witness on these grounds.  Furthermore, he asserts that had Ms. Peroti's testimony been discredited, there is a reasonable probability he would not have been sentenced to death.

Petitioner raised the alleged Brady violations in his post-conviction appeal to the Missouri Supreme Court, but the court did not address petitioner's arguments on the merits or find them to be procedurally barred.  Respondent argues the claim is procedurally barred because the claim was not raised in petitioner's direct appeal, which, according to respondent, is why it was not addressed

by the Missouri Supreme Court in petitioner's post-conviction appeal. In its post-conviction opinion, the Missouri Supreme Court does not state why the claim was not addressed, and it is unclear whether its failure was inadvertent or purposeful.

"[A] district court is precluded from considering any issue that a state court has already resolved on an independent and adequate state law ground." Reagan v. Norris, 279 F.3d 651, 656 (8th Cir. 2002). A state prisoner procedurally defaults a claim when he violates a state procedural rule that independently and adequately bars direct review of the claim by the United States Supreme Court, unless the prisoner can show cause and prejudice for the default, or actual innocence. Coleman v. Thompson, 501 U.S. 722, 750 (1991). "For the federal court to enforce a state procedural bar, either the state court must have declined to reach the issue for procedural reasons or it is clear that the state court would hold the claim procedurally barred. The default must have been actually imposed; it is not enough that the state court could or should have imposed a default." Clemons v. Luebbers, 381 F.3d 744, 750 (8th Cir. 2004) (citing to Caldwell v. Mississippi, 472 U.S. 320, 327 (1985)). While it appears the claim could have been procedurally barred, it is not clear from the record whether the Missouri Supreme Court declined to review the claim on this basis. While the Court declines to impose a procedural bar in this habeas proceeding, based on a review of the substance of the claim, it is without merit, even under de novo review.

There are three components to a Brady violation. "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281-82 (1999). Neither piece of supposedly suppressed evidence meets this test.

In regard to the bad check conviction, Charlotte Peroti was charged with the felony of passing a bad check over $150.00 in August 1996 by Steve Kobal of the Office of the St. Charles County Prosecuting Attorney.[17]  Resp. Ex. L at 886.  Fifteen months later, on November 20, 1997, Douglas Bellon, an assistant prosecuting attorney for St. Charles County, accepted a misdemeanor guilty plea from Ms. Peroti in exchange for a two-year suspended sentence, restitution of $1221.48, and the dismissal of two other cases.  Id. at 915.  The record does not specify the charges in the two other cases.  Petitioner points to no other evidence that Ms. Peroti received a "deal" in exchange for her testimony at the penalty hearing, and the Court does not find petitioner has met his burden of establishing there was a deal for Ms. Peroti's testimony.  Ms. Peroti's guilty plea was entered almost a year before she testified at the penalty hearing.  In addition, she agreed to pay $1221.48 in restitution, well more than the $60.00 bad check for which she was charged.  The Court finds it more likely that an agreement was reached to resolve all three of Ms. Peroti's cases, and her guilty plea was unrelated to testimony in petitioner's case.

Although the state should have disclosed the fact Ms. Peroti had a misdemeanor criminal conviction of passing a bad check, no prejudice flowed from the non-disclosure.  As discussed above, petitioner's counsel effectively cross-examined Ms. Peroti and called into doubt her credibility without the evidence of the misdemeanor.  While evidence of the bad check misdemeanor conviction may have shown Ms. Peroti had been untruthful in the past, the slight impeachment value of this conviction on cross examination would only have been cumulative, as petitioner's counsel did effectively attack her credibility.  See United States v. Quintanilla, 25 F.3d 694, 699 (8th Cir. 1994)

---

[17]Ms. Peroti was charged with passing a check over $150.00, but the complaint only referenced one bad check for $60.00.  Resp. Ex. L at 886.

("undisclosed evidence was cumulative and would not have significantly enhanced the defendants' cross examination of [the witness]").  There is no evidence the trial judge relied on Ms. Peroti's testimony in reaching the sentence, and the Court does not find it probable that petitioner would have received a life sentence had his attorney cross examined Ms. Peroti about the bad check plea.  The Court does not find that evidence of the misdemeanor bad check conviction "could reasonably be taken to put the whole case in such a different light as to undermine confidence in [petitioner's sentence]."  <u>Kyles v. Whitley</u>, 514 U.S. 419, 435 (1995).  There was no <u>Brady</u> violation in regard to the misdemeanor bad check conviction.

In regard to petitioner's claim that the state failed to disclose Ms. Peroti was not an undercover police agent, petitioner also has not established a <u>Brady</u> violation.  At the hearing, Ms. Peroti testified that she was "working with" the St. Louis County "MEG unit" in the summer of 1995 to get petitioner arrested on a drug violation.  Resp. Ex. D at 104.  She also testified that in sometime the summer of 1990, she worked with the St. Charles police department.  <u>Id.</u> at 105-06.  Petitioner maintains Ms. Peroti was never an undercover drug agent.  In support of his claim, petitioner cites to the Missouri PSR, which states: "[w]hen a member of the St. Charles MEG unit was asked if [Peroti] was working with them, or if they were working a case on [Peroti] or [petitioner], he replied they were not."  Resp. Ex. X at 3554.  The statement in the Missouri PSR does not that establish Ms. Peroti was not working with the St. Louis County MEG unit in 1995, or that she had not worked with the St. Charles County Police sometime in 1990.  In sum, it does not contradict her testimony.  As petitioner has not established Peroti's testimony contained falsehoods in regard to her working undercover for the police, the state was under no duty to disclose she was not an agent.  Setting aside the issue of the veracity of her testimony regarding her undercover activities, petitioner has provided

no authority for the notion that the state was required to disclose whether Ms. Peroti was, or was not, working with the St. Louis County and/or St. Charles police departments. The Court does not view Ms. Peroti's status as an undercover "agent" for the police department to be exculpatory evidence. The claims petitioner raises in Claim Four are without merit.

### D. Claim Four– Bias or the Appearance of Bias on the Part of the Trial Judge

In Claim Four petitioner has once again bundled a number of claims into one claim. The underlying basis of the claims is that petitioner was denied due process of law because the judge who presided over the penalty hearing and imposed petitioner's sentence, Judge Nichols, was biased or suffered from an appearance of impropriety. More specifically, petitioner argues his trial counsel should have moved to disqualify Judge Nichols because at the time of the penalty phase, she was in the midst of a hotly contested re-election campaign, and there was political pressure that she sentence petitioner to death. He also argues that Judge Nichols was biased or there was an appearance of impropriety because she had once represented Charlotte Peroti's son, Anthony Hansen, as a guardian ad litem, and consequently his counsel should have moved to disqualify Judge Nichols or she should have recused herself sua sponte. Lastly, petitioner argues there was a "secret letter writing campaign" by the public and the victim's family members urging her to impose the death penalty, and Judge Nichols violated the principles in Gardner v. Florida, 430 U.S. 349 (1977), by placing these letters under seal.

#### 1. Political pressure

The Missouri Supreme Court addressed in petitioner's post-conviction appeal whether petitioner's counsel was ineffective for not moving to disqualify Judge Nichols on the basis that she faced political pressure. The court found that petitioner had presented no cases showing that a judge

must recuse on the basis of public pressure during a political campaign, and it held, "[i]n the absence of evidence showing that the publicity and calls for the death penalty affected Judge Nichols' impartiality, the mere existence of publicity did not require her recusal." Worthington v. State, 166 S.W.3d at 580. The court further noted Judge Nichols had taken reasonable measures to limit the appearance of political pressure in that she delayed sentencing until the day after the election. Id.

Petitioner's depiction of the atmosphere surrounding Judge Nichols's re-election campaign does suggest it was hotly contested and the death penalty was a central issue of the campaign. Nonetheless, petitioner points to nothing that suggests impropriety on the part of Judge Nichols, or even an appearance thereof. He quotes statements by the prosecutor, the victim's family members, and even Judge Nichols's opponent that were published in local media that overtly or implicitly supported the death penalty– in the petitioner's case and generally. None of the statements are attributed to Judge Nichols. Petitioner makes a point that the victim's family members made campaign contributions to the prosecutor, who was also running for re-election.[18] There are no allegations that any such contributions were made to Judge Nichols.

Petitioner was entitled to an impartial sentencing judge. Taylor v. Hayes, 418 U.S., 488, 501 (1974). In regard to whether this right was violated as a result of the public and political pressures stemming from Judge Nichols's re-election bid, this Court agrees with the Missouri Supreme Court that there is no evidence of bias or even the appearance of impropriety. Judge Nichols took reasonable measures to limit the appearance of political influence by holding the sentencing the day

---

[18]Petitioner's trial counsel moved that the prosecutor be disqualified on account of the charged political atmosphere and statements attributed to him by the press. The motion was denied. This issue was not reviewed by the Missouri Supreme Court, and petitioner did not ask the Court to review it in these proceedings.

after the election. Furthermore, Judge Nichols repudiated in open court the political pressures regarding petitioner's case: "I am very concerned about a public appearance, that these things are basically just political decisions that are being made. I have no intention making a political decision I will follow the law. I will follow the evidence." Resp. Ex. E at 22. She also instructed witnesses not to express their sentencing recommendations and stated that she would disregard any portion of victim impact statements that recommend a sentence. Resp. Ex. G at 2-3. As there was no evidence of bias or even an appearance thereof, the Missouri Supreme Court was correct to conclude petitioner did not received ineffective assistance of counsel when his counsel failed to move to disqualify Judge Nichols based on the political pressures she faced.

### 2. Anthony Hansen

During her testimony at the penalty hearing the state's witness, Charlotte Peroti, testified that her son's name was Anthony Hansen. Following Ms. Peroti's testimony, Judge Nichols informed counsel that during the witness's testimony, it had become clear to her that ten or twelve years prior to the penalty hearing she had represented Ms. Peroti's son in an unrelated proceeding as a guardian ad litem in juvenile court. She further stated that the case had related to an incident in which Anthony Hansen, who was six years old at the time, had been burned by hot water in a bathtub. Petitioner's trial counsel, Joseph Green, stated he did not have any objection to Judge Nichols continuing with the sentencing proceedings on the basis of that representation. It is not clear from the trial transcript whether this discourse took place in open court or during a side bar conference.

Petitioner argued to the Missouri Supreme Court that his counsel was ineffective for not moving to disqualify Judge Nichols on this basis. He also argued that it was ineffective assistance for

his counsel not to have consulted him on the issue, and, had he been counseled, he would have asked that counsel move to have her disqualified and/or move to withdraw his guilty plea.

The Missouri Supreme Court found petitioner's argument was without merit. Citing to state case law, the court held petitioner's trial counsel was not required to consult with his client before waiving the conflict. It noted "[t]he accused has the right to make certain fundamental decisions, such as whether to plead guilty, waive a jury, testify or appeal; other decisions are for the attorney alone, even without consultation with the client. Waiving the disqualifications of a judge is not one of these fundamental decisions that must be personally made by the accused." Worthington v. State, 166 S.W.3d at 579. Furthermore, the Missouri Supreme Court found the decision not to seek disqualification was reasonable. The court cited to post-conviction testimony from petitioner's counsel that the decision was made as a matter of strategy. It was noted that counsel had done a thorough background investigation on Judge Nichols and counsel had "determined that she was fair and a person of integrity, and that he had not found any negative information about her." Id. The record further indicates that defense counsel felt it was to their advantage that she was Catholic.

The Missouri Supreme Court further found petitioner had not shown that Judge Nichols was indeed impartial or that there was an appearance of impartiality as a result of her prior representation of Anthony Hansen. It noted that "[t]here is a presumption that a judge acts with honesty and integrity and will not preside over a trial in which he or she cannot be impartial." Id. at 579. It found there was no evidence Judge Nichols, who represented Anthony Hansen over ten years prior to petitioner's hearing, acquired any extrajudicial information about the petitioner's case from that representation. There was also no indication that the representation caused her to look more favorably upon Ms. Peroti.

Although the Missouri Supreme Court did not cite Supreme Court precedent, it correctly identified the principle that "the accused has the ultimate authority to make certain fundamental decisions regarding a case . . . ." <u>Jones v. Barnes</u>, 463 U.S. 745, 751 (1983) (citing <u>Wainwright v. Sykes</u>, 433 U.S. 72, 93 n.1 (1977)). While the Supreme Court has found decisions whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal qualify to be fundamental decisions belonging to the defendant, it has never held that the decision to disqualify a judge is a personal decision to be made by the defendant. In this regard, the Missouri Supreme Court's decision counsel need not have consulted with petitioner before waiving the potential conflict was not contrary to or an unreasonable application of clearly established Supreme Court law. The same can be said regarding its analysis of the ineffective assistance of counsel claim. The Missouri Supreme Court's conclusion that trial counsel's decision not to move to disqualify the judge was a matter of sound trial strategy was not contrary to established Supreme Court precedent and was a reasonable determination of the facts. <u>Strickland</u>, 466 U.S. at 687.

### 3.     Letters from the public and family members

Petitioner claims Judge Nichols received several letters from the victim's friends and the public urging the judge to sentence petitioner to death. Judge Nichols placed these records under seal. From the record, it would appear defense counsel was aware of the letters. Petitioner claims, however, that his counsel did not know the content of the letters. According to petitioner, the non-disclosure of the letters was a clear violation of <u>Gardner</u>, 430 U.S. at 349.

Petitioner raised this argument in his post-conviction appeal to the Missouri Supreme Court. Resp. Ex. R at 80. The court, however, did not address the issue in its opinion. Because the state

court did not adjudicate petitioner's claims on the merits, section 2254(d) does not apply and the Court will review the claim de novo. 28 U.S.C. §2254(d); Kenley v. Bowersox, 275 F.3d at 711.

In Gardner, the trial judge ordered a pre-sentence investigation after the jury retired to deliberate sentencing in a capital case. 430 U.S. at 353. Although the jury found that mitigating circumstances outweighed aggravating circumstances and returned an advisory sentence of life imprisonment, the trial judge sentenced the defendant to death based on material in a pre-sentence report that was not disclosed to the parties. Id. at 362. A plurality of the Supreme Court found that the trial judge violated the defendant's right to due process of law in considering the confidential report. Id.

Here, Judge Nichols placed approximately twenty-four letters from the victim's friends and family and the public under seal. The majority of the letters were addressed to the probation officer assigned to the case, although at least four were addressed to the judge. Some were dated prior to sentencing, but it would seem many were delivered after the sentence was handed down. Most urged that petitioner receive the death penalty, while others asked for "justice." At least one advocated life. Some of the letters contained poems or descriptions of the victim. A few described the impact the victim's death had on the family. Newspaper articles and clippings were also included in some of the letters.

The letters were placed under seal, but it would appear from the record that petitioner's counsel was aware of their existence, and at least some of their content. On the day of sentencing, the following colloquy took place between petitioner's counsel and Judge Nichols:

> DEFENSE COUNSEL: There was (sic) some victim impact letters that were sent to the Court, and they made references to a preference for the type of punishment. We

would ask the Court to disregard those letters in compliance with our motion in limine.

THE COURT: The Court will disregard any portions of those statements that recommend a sentence.

DEFENSE COUNSEL: Thank you, Judge.

Resp. Ex. G at 2-3. Importantly, petitioner's counsel did not move that the letters be disclosed or that they be disregarded entirely.

Petitioner argues the mere fact that Judge Nichols placed the letters from the public and the victim's friends and family under seal is a "clear-cut" violation of due process under <u>Gardner</u>. The Court finds petitioner has failed to establish <u>Gardner</u> is applicable to the case at hand. First, the letters were not entirely secret in that petitioner's counsel was aware of their existence and knew that some recommended that petitioner receive a death sentence. This is significant because petitioner's counsel was then able to move that the judge not consider any such recommendation in reaching a sentence – a motion that she <u>granted</u>. Second, there is no evidence Judge Nichols read the letters in question. Petitioner argues that it would incredible that she did not because the letters were designed to exert political pressure on the judge. That may well be, but the purpose of the letters does not establish that the judge read them. Third, there is no indication that the judge considered the letters in arriving at her sentence. Neither the letters nor the contents thereof were referenced as a basis for her decision, and in fact the judge stated she would not consider any sentence recommendations contained in the letters in deciding petitioner's sentence. In <u>Gardner</u>, on the other hand, the trial judge explicitly stated that he had relied on information not disclosed to the defendant in sentencing the defendant to death. <u>Id.</u> at 351. Petitioner's argument that placing the letters under seal violated

Supreme Court precedent set in <u>Gardner</u> is without merit.  The claims in Claim Four are without merit.

> **E.**     **Claim Five –  Dr. Max Givon's Testimony as a Violation of Petitioner's Right to Be Protected from Self Incrimination.**

For his fifth claim for relief, petitioner argues he was denied his rights to counsel and to be protected against self-incrimination by the prosecutor's use of Dr. Max Givon's testimony and the introduction of his report.  Respondent argues this claim is procedurally barred because petitioner's counsel did not object to the admission of the evidence on constitutional grounds.  The Missouri Supreme Court, however, reviewed the claim on the merits using plain error review.  Currently, there is a split within the Eighth Circuit with respect to plain error review and procedural bar.  One line of cases stands for the proposition that "a properly limited plain error review by a state court does not cure a procedural default."  <u>Toney v. Gammon</u>, 79 F.3d 693, 699 (8th Cir. 1996); <u>see</u> <u>also</u> <u>Evans v. Luebbers</u>, 371 F.3d 438, 443 (8th Cir.2004) (finding a habeas claim was procedurally defaulted "notwithstanding the fact that the Missouri Court of Appeals reviewed the claim for plain error").  Another line of cases holds that when a state court conducts a plain error review, a federal habeas court may also review for plain error.  <u>See</u> <u>e.g.</u>, <u>Thomas v. Bowersox</u>, 208 F.3d 699, 701 (8th Cir. 2000);  <u>Hornbuckle v. Groose</u>, 106 F.3d 253, 257 (8th Cir. 1997); <u>Sweet v. Delo</u>, 125 F.3d 1144, 1152 (8th Cir. 1997).  Under this standard, a federal court "will grant habeas relief only if 'manifest injustice resulted' from the alleged errors."  <u>Mack v. Caspari</u>, 92 F.3d 637, 641 (8th Cir. 1996).  Because of this split in circuit authority, the Court may choose which line of cases to follow.  <u>See</u> <u>Sweet</u>, 125 F.3d at 1152.  The Court will review the claim for plain error.

Prior to trial, defense counsel moved that the trial court order a psychiatric examination pursuant to § 552.020, Mo. Rev. Stat.  The trial court granted defendant's motion and ordered that

the Missouri Department of Mental Health provide a psychiatrist or psychologist to examine petitioner and write a report that contains: "(1) [a]n opinion as to whether the accused, as a result of a mental disease or defect, lacks capacity to understand the proceedings against [him] or to assist in [his] own defense; (2) [a]n opinion as to whether the accused is criminally responsible as provided in § 552.030, Mo. Rev. Stat.; [and] (3) [a determination] whether the accused did or did not have a state of mind which is an element of the offense . . . ." Resp. Ex. V at 2578.

Dr. Givon, a licenced psychologist and certified forensic examiner for the State of Missouri Department of Mental Health, conducted two examinations of petitioner, in addition to reviewing numerous documents. Dr. Givon also prepared a report in which he concluded, among other things, that defendant was not suffering under a mental disease or defect; he understood the proceedings against him and was capable of assisting in his own defense; and he knew and appreciated the nature, quality and wrongfulness of his conduct at the time of his offense. Id. at 2597-98, 2604. Dr. Givon's diagnostic impression was that petitioner was cocaine dependant and abused alcohol. He also opined petitioner was malingering and suffering from "a severe antisocial personality disorder and appears to display signs of primary psychopathy." Id. at 2597.

In the report, Dr. Givon noted that "[p]rior to each interview he was advised about the nature and purpose of the evaluation and limitations of confidentiality. [Petitioner] wondered if the information he provided would be used against him. He was informed that whatever he said to the examiner as well as any impressions and opinions the examiner will have will be shared with the court, his attorney and the prosecuting attorney. He was also informed that any admission of guilt on his part could not be introduced as evidence against him during a trial." Id. at 2592. It is not clear from the record whether Dr. Givon informed Worthington that he had the right to have counsel present,

that he had the right to remain silent, and that the state could use any statements he made against him during the penalty phase.

During the penalty phase, Dr. Givon testified for the state that Worthington did not suffer from a mental disease or defect, that he abused alcohol and cocaine, that he had anti-social personality disorder, and that he was malingering. Just prior to Dr. Givon taking the stand, petitioner's counsel objected on the ground of relevance. He withdrew the objection after learning that co-counsel had already stipulated to the admission of the report.

On direct appeal, petitioner argued that the admission of his statements, through Dr. Givon's report and testimony, violated his right to remain silent and his right to counsel. Citing Estelle v. Smith, 451 U.S. 454 (1981), the Missouri Supreme Court found under a manifest injustice standard that petitioner's rights had not been violated. State v. Worthington, 8 S.W.3d at 91. Petitioner now argues that the state court unreasonably applied Estelle v. Smith and that there is a reasonable probability he would not have been sentenced to death if Dr. Givon's testimony and report had been excluded.

The circumstances in Estelle are not analogous to the facts at hand. In Estelle, the trial court ordered sua sponte that the accused be evaluated by a state psychiatrist to determine if he was able to stand trial. It was not even clear if defense counsel knew the exam had been ordered. The defendant did not receive a Miranda warning prior to or at the examination, and his lawyer was not present. Following the defendant's murder conviction, the state psychologist testified at the penalty hearing. He was the only state witness at the hearing and he testified, relying on the defendant's own statements, regarding the defendant's future dangerousness. Based on this testimony, the jury recommended a death sentence.

The Supreme Court vacated the sentence. It held "[a]n accused who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding." Estelle, 451 U.S. at 468. In reaching this conclusion, the Court emphasized that the examination had been custodial and non-voluntary. "[W]hen faced while in custody with a court-ordered psychiatric inquiry, respondent's statements to [the doctor] were not 'given freely and voluntarily without any compelling influences' and, as such, could be used as the state did at the penalty phase only if respondent had been apprised of his rights and had knowingly decided to waive them." Id. at 469 (citing to Miranda v. Arizona, 384 U.S. 436, 478 (1966)). The Supreme Court also found the defendant's Sixth Amendment right to counsel had been violated.

Here, on direct appeal, the Missouri Supreme Court correctly noted the differences between the circumstances of petitioner's case and those in Estelle. State v. Worthington, 8 S.W.3d at 91-92. Petitioner underwent a state psychiatric examination on his own request, and he put his mental condition in controversy. The Missouri Supreme Court held, using plain error review, that because petitioner had initiated the examination, "he was not compelled to testify against himself, nor was his right to counsel violated." Id. at 92.

While not mentioned in the Missouri Supreme Court opinion, this Court agrees with respondent that Buchanan v. Kentucky, 483 U.S. 402 (1987), is a more analogous case. In that decision, the United States Supreme Court wrote, "if a defendant requests [a mental] evaluation or presents psychiatric evidence, then, at the very least, the prosecution may rebut this presentation with evidence from the reports of the examination that the defendant requested. The defendant would have no Fifth Amendment privilege against the introduction of this psychiatric testimony by the

prosecution." Id. at 422-23. The Supreme Court also found there was no Sixth Amendment violation of the right to counsel where the defendant's attorney had requested the examination.

Because petitioner requested the mental health examination and attempted to place his mental health at issue,[19] the state did not violate petitioner's Fifth or Sixth Amendment rights by introducing Dr. Givon's testimony and report during the penalty hearing. This Court does not find that the Missouri Supreme Court decision in this regard was contrary to, or involved an unreasonable application of, clearly established federal law, or resulted in a decision that was based on an unreasonable determination of the facts.

Petitioner also argues in Claim Five that he received ineffective assistance when trial counsel stipulated to the admission of Dr. Givon's written report. Petitioner did not raise and the Missouri courts did not address petitioner's argument that his counsel was ineffective for failing to object to Dr. Givon's testimony and report on Fifth and Sixth Amendment grounds. Respondent argues the claim is procedurally barred, and petitioner, in his traverse, offers no rationale explaining why the procedural bar should be lifted as to this issue. Accordingly, the Court agrees with respondent that the issue is not reviewable in his habeas proceeding. Coleman v. Thompson, 501 U.S. 722, 750 (1991). But even if the Court were to review the claim, it is without merit because, as addressed above, there were no Fifth or Sixth Amendment violations, and petitioner's counsel's objections would have been overruled. The claims in Claim Five are without merit.

_____

[19]In his traverse, petitioner attempts to fit his case into Estelle's holding by arguing that he did not introduce psychiatric evidence at the penalty hearing. He argues Dr. Evans, his only defense expert, was not a mental health expert but a pharmacologist. Setting aside whether Dr. Evans' qualified area of expertise is psychiatric, it is undisputed petitioner's counsel introduced psychiatric evidence, albeit ineffectively, during the penalty hearing. Petitioner's Exhibits. I, J, and K, which were admitted into the record, were all psychiatric or psychological reports. See Resp. Ex. A at 376.

### F.　Claim Six – Failure to Disclose Witnesses at the Penalty Hearing

In Claim Six, petitioner asserts that his right to a fair trial and to confront his accusers was violated by the prosecution's failure to give adequate notice of the witnesses it intended to use at the penalty hearing and the substance of their testimony. Petitioner complains he was not given adequate notice regarding Charlotte Peroti, correctional officers Michael McKee and Robert Smith, Officer Jerry McKean and Probation Officer Christine Frey.[20]

In regard to Charlotte Peroti, defense counsel filed a patterned motion under Missouri Supreme Court Rule 25.03 requesting disclosure of the state's witnesses. In response, the prosecution endorsed, among other witnesses, "Charlotte Kirn" of Troy, Missouri, but did not provide her specific address or disclose the substance of her testimony. As noted earlier, Charlotte Kirn was Charlotte Peroti. Petitioner argues this was an inadequate disclosure, and her testimony at the penalty phase about the burglary and attempted rape was "a complete surprise." Petitioner's trial counsel, however, did not object to Ms. Peroti's testimony on the basis of non-disclosure. He also did not ask for a continuance or that her testimony be stricken. Citing Lankford v. Idaho, 500 U.S. 110 (1991), and State v. Debler, 856 S.W.2d 641, 656-58 (Mo. 1993) (en banc), petitioner argues in his habeas petition that the non-disclosure was a due process violation and that he was prejudiced as a result of the inadequate disclosure, because his counsel was not able to effectively cross-examine the witness about the fact that she had passed bad checks and that she fabricated testimony about being an undercover informant.

---

[20]Again, respondent argues this claim is procedurally barred because it was not properly raised at trial. The Missouri Supreme Court reviewed the claim for plain error review, and the Court will do so as well. Thomas, 208 F.3d at 701; Hornbuckle, 106 F.3d at 257; Mack, 92 F.3d at 641.

Petitioner makes similar claims with respect to the corrections officers who testified at the penalty phase about his misconduct in jail before trial and Peoria law enforcement officers who testified about his juvenile and criminal record in other jurisdictions. From the record, it does not appear these witnesses were disclosed prior to the hearing, but petitioner's counsel did not object on the basis of non-disclosure. Petitioner argues because of the lack of notice, his counsel was unable to effectively rebut the evidence of his prior bad acts or to cross-examine the witnesses properly.

The Missouri Supreme Court reviewed petitioner's claim regarding the non-disclosure for plain error because petitioner's trial counsel did not object to the admission of the evidence based on lack of notice. The court noted under Missouri state law, "evidence of non-conviction misconduct is inadmissible where the state does not provide the defendant with notice that it intends to introduce the evidence." State v. Worthington, 8 S.W. 3d at 90. It found the state's failure to provide petitioner notice of the admission of his prior bad acts to be error, but not plain error, because prejudice "constituting manifest injustice" did not exist under the circumstances of the case. Id. According the Missouri Supreme Court, defense counsel stipulated to the evidence, with the exception of Ms. Peroti's testimony. As for Ms. Peroti, the court noted the state had endorsed her two years prior, albeit under a different name, and defense counsel cross-examined Ms. Peroti about her failure to report the burglary and assault to the police. Citing to Debler, 856 S.W.2d at 656-58, the Missouri Supreme Court also noted that the potential harm resulting from evidence of undisclosed past bad acts, which is not as reliable as evidence of past criminal convictions, was not as great in this case because the case was tried to a judge. 8 S.W. 3d at 90. The court noted that the Debler holding addressed the concern that "[t]o the average juror . . . unconvicted criminal activity is practically indistinguishable from criminal activity resulting in convictions, and a different species from other

character evidence." Id. at 90 n.5. Confusion regarding the reliability of the evidence was not such a concern in this case because a judge was the finder of fact.

The Missouri Supreme Court based its decision regarding the issue of non-disclosure on Missouri state law, which is non-reviewable in federal habeas proceedings. 28 U.S.C. § 2254(a). Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Schleeper v. Groose, 36 F.3d 735, 737 (8th Cir. 1994). "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. at 67-68. Furthermore, petitioner has not show that the Missouri Supreme Court's decision applying its own state law was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." § 2254(a).

In his brief, petitioner argues the Missouri Supreme Court's decision was contrary to Lankford, 500 U.S. at 110, and Gardner, 430 U.S. at 349. Petitioner did not raise these arguments in his direct appeal and they are procedurally barred. But even if the Court were to address petitioner's argument on the merits, the Court does not agree that these two cases are analogous to the facts at hand. Lankford involved the unusual situation where a defendant was sentenced to death without notice that the judge was even considering a death sentence. 500 U.S. 112. In the case, the prosecutor had filed notice that he was not seeking the death penalty, and at the sentencing hearing there was no discussion of the death penalty and, in fact, the parties argued the merits of concurrent verus consecutive sentences. Id. at 120. The judge, who remained silent during the hearing, then sentenced the defendant to death. Under these unusual circumstances, the Supreme Court found the defendant had been deprived due process of law because he had not been given proper notice that the

judge was contemplating a death sentence. The case is not analogous to petitioner's case where he was given more than ample notice that the state was seeking, and the judge was considering, a death sentence.

As for Gardner v. Florida, as discussed in Claim Four, the circumstances of this case involved a defendant who was sentenced to death based on evidence that had never been disclosed to the defendant or his counsel. 430 U.S. at 356. Again, these are not the circumstances of this case. Petitioner has not established that the state was required, under federal law, to disclose the names, addresses and substances of the testimony of all the witnesses it called at the penalty hearing. Furthermore, even if the Court were to assume there was such an obligation that the state did not meet, as discussed in Claim Two, petitioner has not established he was prejudiced by the non-disclosure of this information. Petitioner's counsel had records from St. Charles County Correctional Center and the law enforcement records from Peoria. He knew the substance of the witnesses' testimony. As for Ms. Peroti, the Missouri Supreme Court was correct that she was disclosed, although under a different name, and petitioner's counsel did effectively impeach her testimony on cross-examination. See discussion supra. Petitioner's arguments in Claim Six are without merit.

## G.    Claim Seven – Victim Impact Evidence

Petitioner argues in Claim Seven that the prosecution used excessive and inflammatory victim impact evidence that rendered the penalty phase fundamentally unfair. He also argues his trial counsel was ineffective in failing to object to or limit the victim impact evidence.[21]    During the penalty phase, eleven family members and friends of the victim testified. They read prepared statements and

_____

[21]The Missouri Supreme Court reviewed the claims raised in Claim Seven for plain error. This Court will also review under the plain error standard. Thomas, 208 F.3d at 701; Hornbuckle, 106 F.3d at 257; Mack, 92 F.3d at 641.

introduced mementoes of the victim. Petitioner's trial counsel did not object to the introduction of such evidence. On direct appeal, petitioner, citing Payne v. Tennessee, 501 U.S. 808 (1991), argued that the victim impact evidence was excessive and inflammatory and so infected the penalty phase as to make it fundamentally unfair. The Missouri Supreme Court found no plain error. Petitioner then argued in his post-conviction motion that his trial counsel was constitutionally ineffective for failing to object to the excessive victim impact evidence. The Missouri Supreme Court likewise rejected this argument. Petitioner now argues that the state supreme court's analysis is contrary to and involves an unreasonable application of federal law, as established by the Supreme Court, and that there is a reasonable probability that, but for the excessive victim impact statements and trial counsel's failure to object to this evidence, he would not have been sentenced to death. On direct appeal, the Missouri Supreme Court conducted a plain error review of petitioner's claim. State v. Worthington, 8 S.W.3d at 89. Citing to Payne, it found no manifest injustice occurred when the trial judge allowed witnesses to read prepared statements into the record that a message be sent to the community and that "justice" be served through the sentence imposed. Id. at 89-90. The court also noted that the trial judge had sustained two objections where the witnesses had showed a preference for death. Id. at 89 n.2. It also noted, citing to state law, that victim impact evidence is designed to show each victim's uniqueness as an individual and the harm inflicted, and the prosecution is allowed to present more than just a brief glimpse of the victim's life. Id. at 90.

On post-conviction, the Missouri Supreme Court noted that it had already held that the victim impact evidence was admissible and that it was neither excessive nor unduly inflammatory, and it reaffirmed this conclusion. Worthington v. State, 166 S.W.3d at 582. Even assuming that an excessive amount of victim impact evidence was presented, the court held there was not a reasonable

probability that the result of the sentencing would have been different had counsel objected and a lesser amount of victim impact evidence been admitted.  Id.  It noted much of the evidence was similar in nature, and that any prejudicial effect was greatly limited because the case was tried to the court and not a jury, and judges "'are presumed not to consider improper evidence when sentencing a defendant.'"  Id. (citing State v. Roll, 942 S.W.2d 370, 378 (Mo. 1997) (en banc)).

The Court finds the Missouri Supreme Court's analysis was not contrary to and did not involve an unreasonable application of Supreme Court law.  Victim impact evidence is not per se inadmissible under the Eighth Amendment.  It can be relevant to determine the specific harm caused by a particular crime and enables the finder of fact to "assess  meaningfully the defendant's moral culpability and blameworthiness."  Payne, 501 U.S. at 825.  "We thus hold that if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no per se bar. A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed. There is no reason to treat such evidence differently than other relevant evidence is treated."  Id.

Victim impact evidence should be excluded only when it "is so unduly prejudicial that it renders the trial fundamentally unfair."  Id. (citation omitted).  This was not the case here.  Id.; see also United States v. Barnette, 211 F.3d 803 (4th Cir. 2000) (finding no violation where seven witnesses, who formed a substantial portion of the state's case, "presented stories of the victims' childhoods, family experiences, and the trauma of their deaths, and poems reflecting the deep sadness and regret over their losses.").

Furthermore, as noted by the Missouri Supreme Court, even if the evidence was excessive, much of it was duplicative in that it mainly consisted of family and friends describing the talents and virtues of the victim. The testimony did not explicitly urge the judge to impose a sentence of death, and when witnesses crossed that line and did urge a death sentence, the judge struck the testimony from the record. The Missouri Supreme Court was also correct that any harm was further ameliorated by the fact that the case was tried to the judge, not a jury. "In bench trials, judges routinely hear inadmissible evidence that they are presumed to ignore when making decisions." Harris v. Rivera, 454 U.S. 339, 346 (1981) (per curiam).

As for petitioner's argument that his counsel was deficient in failing to object to the victim impact evidence, the Missouri Supreme Court correctly applied, while not specifically citing to, the standard articulated in Strickland. The court noted that the evidence was admissible and. therefore, an objection would not have been sustained. Worthington v. State, 166 S.W.3d at 582. The court also found that the outcome of the proceeding would have not have been different had a lesser amount of victim impact evidence been presented. Id. According to the Missouri Supreme Court, as stated above, the sentence was determined by a judge, who is presumed to ignore improper evidence, not a jury. Id. Furthermore, the court found there was no evidence in the record that the judge's decision was the result of passion, prejudice or other arbitrary factors. Id. This Court does not find that the Missouri Supreme Court decision in this regard was contrary to, or involved an unreasonable application of, clearly established federal law, or resulted in a decision that was based on an unreasonable determination of the facts. Petitioner's claims in Claim Seven will be denied.

## IV. Conclusion

For the reasons stated above, the Court finds that petitioner Michael Shane Worthington is entitled to a writ of habeas corpus vacating his sentence of death on the ground presented in portions of Claim One: that his trial counsel was constitutionally ineffective and failed to adequately investigate his social and medical background and properly prepare defense experts to testify at the penalty hearing regarding his mental condition. The Court finds that all other claims for habeas relief are either procedurally barred or fail on the merits.

Accordingly,

**IT IS HEREBY ORDERED** that Michael S. Worthington's Petition for Writ of Habeas Corpus pursuant to Title 28 U.S.C. § 2254 is **GRANTED** as to the sentence of death only, based on portions of Claim One as discussed above, and **DENIED** in all other respects. [Doc. 1 and 16] Petitioner's death penalty is vacated, and he must either be sentenced to life in prison without the possibility of parole or must be given a new penalty hearing.

An appropriate writ of habeas corpus will accompany this Memorandum and Order.


_____
**CHARLES A. SHAW**
**UNITED STATES DISTRICT JUDGE**


Dated this 27th day of March, 2009.